UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------

UNITED STATES OF AMERICA

v.                                                                          25 Cr. 318 (JPO)

CHRISTINE HUNSICKER

-----------------------------------------------------

**DEFENDANT CHRISTINE HUNSICKER'S
SENTENCING MEMORANDUM**

Michael N. Levy
Elizabeth L. Martin
ELLERMAN ENZINNA LEVY PLLC
1050 30th Street, NW
Washington, DC 20007
Tel: (202) 753-5553
mlevy@eellaw.com
emartin@eellaw.com

Anna M. Skotko
SKOTKO LAW PLLC
29 Broadway, Floor 31
New York, NY 10006
Tel: (646) 396-5251
anna@skotkolaw.com

*Counsel for Christine Hunsicker*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

PROCEDURAL HISTORY ...................................................................................... 3

BACKGROUND ...................................................................................................... 4

    A. Ms. Hunsicker's Childhood and Adolescence ............................................ 4

    B. Ms. Hunsicker's College Years .................................................................. 6

    C. Ms. Hunsicker's Early Employment and Co-Founding of CaaStle ............ 7

    D. Ms. Hunsicker's Traumatic Brain Injury ................................................... 11

    E. CaaStle's Struggles and Ms. Hunsicker's Misrepresentation of
       Its Finances ................................................................................................ 14

    F. Ms. Hunsicker's Acceptance of Responsibility .......................................... 17

        1. Disclosure to CaaStle's Board of Directors ........................................... 18

        2. Discussions with the Government, Voluntary Surrender, and
           Guilty Plea ............................................................................................. 20

        3. Participation in Gambler's Anonymous and Continued
           Mental Health Treatment ....................................................................... 21

        4. Post-Indictment Employment and Service ............................................ 23

    G. The Presentence Report and Advisory Guidelines ...................................... 25

ARGUMENT ........................................................................................................... 26

    A. Applicable Law .......................................................................................... 26

    B. Discussion ................................................................................................. 27

        1. The nature and circumstances of the offense and the history and
           characteristics of the defendant ............................................................ 28

           (a) Pre-existing Psychological Vulnerabilities ...................................... 30

(b) Cumulative Traumatic Brain Injuries ........................................... 31

(c) Genetic Predispositions to Reward-Seeking Behavior ................... 31

(d) Situational and Professional Pressures .......................................... 32

2.  The need for the sentence imposed to (A) reflect the seriousness
    of the offense, to promote respect for the law, and to provide just
    punishment for the offense; (B) afford adequate deterrence to
    criminal conduct; (C) protect the public from further crimes of the
    defendant; and (D) provide the defendant with needed education or
    vocational training, medical care, or other correctional treatment in
    the most effective manner ........................................................................ 33

3.  The kinds of sentences available ............................................................ 36

4.  The advisory Guidelines range ................................................................ 37

5.  Pertinent policy statements by the Sentencing Commission ................. 39

6.  The need to avoid unwarranted sentencing disparities ......................... 40

7.  The need to provide restitution to the victims of the offense ............... 42

CONCLUSION........................................................................................................ 45

# TABLE OF AUTHORITIES

**Cases:**

*Gall v. United States*, 552 U.S. 49 (2007) ................................................................... 26

*Kimbrough v. United States*, 552 U.S. 108 (2007) ..................................................... 26, 27, 37

*United States v. Adelson*, 441 F. Supp. 2d 509 (S.D.N.Y. 2006) .............................. 37

*United States v. Algahaim*, 842 F.3d 796 (2d Cir. 2016) ............................................ 37, 39

*United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013) ................................................. 38

*United States v. Emmenegger*, 329 F. Supp. 2d 427 (S.D.N.Y. 2004) .................... 37

*United States v. Johnson*, 16 Cr. 457 (NGG), 2018 WL 1997975
(E.D.N.Y. Apr. 27, 2018) ................................................................................... 37, 38

*United States v. Milton*, 21 Cr. 478 (ER) (S.D.N.Y. 2024) ...................................... *passim*

*United States v. Parris*, 573 F. Supp. 2d 745 (E.D.N.Y. 2008) ............................... 37

**Statutes, Rules, and Other Sources:**

18 U.S.C. § 3553(a) ........................................................................................................ *passim*

28 U.S.C. § 994(p) .......................................................................................................... 40

Anita Raghavan, *CaaStle CEO Confessed to Fraud. The Board Let Her Stay
in Charge*, The New York Times (Jun. 7, 2026) ........................................... 9, 34

Ben Foldy and Christopher Kup, *Pardoned for Fraud, a CEO Mounts His
Comeback: 'We Can Trust You Now,'* The Wall Street Journal
(March 17, 2026) ................................................................................................. 41

Centers for Disease Control and Prevention, *About Mild TBI and Concussion*
(Sept. 15, 2025) .................................................................................................. 11

Jennifer Williams, *Urban Outfitters' Rental Business Beats Its Sales Target*,
Wall Street Journal (Feb. 25, 2026) ................................................................. 15

Jill R. Shah, *CaaStle CEO Hunsicker Resigns Over Fraud Claim as Firm
Teeters*, Bloomberg (Apr. 1, 2025) ................................................................. 34

Jonathan Stempel, *Founder of Clothing Tech Startup CaaStle Pleads Guilty in $300 Million Fraud Case*, Reuters (Mar. 4, 2026) ..................................... 34

Kenneth Vogel, *The S.E.C. Drops Efforts to Recoup Funds From Trump Clemency Recipients*, New York Times (Sept. 19, 2025) ........................... 41

Larry Neumeister, *Fashion Startup Founder Charged With $300M Fraud Freed on $1M Bail*, Associated Press (Jul. 18, 2025) ................................ 34

Mayo Clinic, *Persistent Post-concussive Symptoms (Post-Concussion Syndrome)* (Oct. 30, 2024) ................................................................. 14

National Institute of Health, *Alcohol and Substance Use Disorders Diagnostic Criteria Changes and Innovations in ICD-11: An Overview*, National Library of Medicine (Dec. 15, 2022) ............................................. 22

Tatiana Walk-Morris, *Nuuly is Dominating the Apparel Rental Market*, Retail Dive (Jun. 16, 2025) ....................................................... 15

U.S. Sec. & Exch. Comm'n, *Accredited Investors* (last reviewed or updated Apr. 24, 2026) ........................................................ 9

U.S. Sentencing Comm'n, *Adopted Amendments* (effective Nov. 1, 2026) (Apr. 30, 2026) ........................................................... 38, 39

U.S. Sentencing Comm'n, *Proposed Amendments to the Sentencing Guidelines* (Dec. 12, 2025) ................................................. 39

U.S. Sentencing Comm'n, *Rules of Practice and Procedure* (as amended, Aug. 18, 2016) ........................................................ 40

U.S.S.G. § 2B1.1 ................................................................ *passim*

## PRELIMINARY STATEMENT

This is not a typical fraud case.

In a typical fraud case, a defendant takes the victims' money and uses it for their own benefit. In this case, Christine Hunsicker did deceive investors, and she has taken responsibility for that, but she did not use the money for herself. Rather, she used investors' money to try to make the company in which they were investing, CaaStle, successful. In fact, she believed so strongly in CaaStle and wanted so much for it to succeed and benefit investors that she went broke putting nearly $20 million more of her own money *into* CaaStle than she took out. Ms. Hunsicker did not act out of greed or avarice.

This is also not a typical fraud case because Ms. Hunsicker's fraudulent conduct was precipitated by a traumatic brain injury she suffered in December 2017, when a 30-pound mirror fell on her head, leaving her with severe, years-long physical, mental, and emotional repercussions. In intense pain and with significant cognitive deficits, Ms. Hunsicker lost the executive functions that allowed her to control her decision-making and to regulate the emotional aftermath of a psychologically devastating childhood, including a destructively demanding father and near-daily sexual abuse ███████████████████ In this context, Dr. Sarah Schaffer, a board-certified clinical neuropsychologist, concluded that Ms. Hunsicker's traumatic brain injury was a necessary contributing factor to her criminal conduct.

In addition, in a typical fraud case, a defendant will continue to lie and deceive, denying their own misconduct well after the government has begun to investigate. In this case, after the fog finally lifted from her head injury, Ms. Hunsicker recognized the gravity of her actions, decided to stop, and self-reported to the CaaStle Board of Directors. More than three months before she first became aware of any investigation, she proactively approached the CaaStle

1

Board and fully disclosed that she had been providing false financial information to investors. From that point forward, the Board decided how best to proceed and satisfy its fiduciary duties to CaaStle's investors, and Ms. Hunsicker complied with the Board's directives. When she learned the government was investigating allegations of fraud at CaaStle, she never once evaded or denied responsibility. Within hours of the FBI's execution of a search warrant at her home, her counsel informed the United States Attorney's Office that Ms. Hunsicker did not dispute the fundamental facts of this case and wanted to accept responsibility. She acknowledged and sought to atone for her misconduct well before she was indicted.

Following her self-disclosure to the Board, Ms. Hunsicker has been working assiduously not only to try to repay the investors she defrauded, but also to address in a brutally honest way the personal characteristics that led her astray. As multiple colleagues, friends, family members, and harmed investors have attested in their letters to the Court, this has been a genuine effort at self-improvement, sparked not by an effort to impress the Court but by honest and painful self-reflection and hard work. Perhaps most significantly, Ms. Hunsicker recognized that she had an unhealthy addiction to risk and sought help through Gamblers Anonymous ("GA") in early 2025, *before* she learned about the government's investigation.[1] Through her ongoing commitment to GA and mental health counseling, Ms. Hunsicker now deeply understands her own vulnerabilities, knows how to manage them, and demands of herself full accountability for her actions, including this offense. Her self-awareness and desire to help others avoid similar mistakes have led her to write a book and develop several programs to foster accountability and other positive character traits. Ms. Hunsicker is not a typical fraud defendant.

---

[1] As described throughout this submission, Ms. Hunsicker's risk-seeking behavior here was not betting on sports or playing poker; it was putting investors' money into CaaStle, believing she could make it successful, no matter the odds. She did not use the money for any other purpose.

2

Nevertheless, the Probation Office has recommended the quintessentially typical sentence in this case: literally the median sentence for defendants sentenced under Section 2B1.1 of the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") with the same Guidelines range. Sentencing a very atypical defendant who committed a very atypical offense to a typical sentence is not consistent with the purposes of sentencing set forth in 18 U.S.C. § 3553(a). It would be particularly inappropriate when other defendants—such as Trevor Milton, the founder of Nikola Corporation—have recently received far lower sentences for securities fraud in this district. Mr. Milton was convicted following trial and continued to deny responsibility for his conduct through and even after sentencing. He had a higher loss amount and Guidelines range than Ms. Hunsicker and a higher sentencing recommendation from the Probation Office. Mr. Milton was sentenced to 48 months in prison. Considering all the mitigating factors in this case that were not present for Mr. Milton, Ms. Hunsicker's sentence should be substantially lower than that.

Pursuant to the plea agreement negotiated with the government, Ms. Hunsicker agreed that "in light of the factors set forth in 18 U.S.C. §3553(a), a sentence of less than two years' imprisonment would not be sufficient to comply with the purposes of sentencing." Consistent with that agreement, a sentence of two years' imprisonment necessarily *is* sufficient in these circumstances and any lengthier sentence, accordingly, would be greater than necessary to comply with the purposes of sentencing.

## PROCEDURAL HISTORY

Ms. Hunsicker was charged in a six-count Indictment on July 17, 2025. She voluntarily surrendered the following day and was released on pretrial supervision. On March 4, 2026, Ms. Hunsicker pled guilty before this Court to one count of securities fraud pursuant to a plea

agreement with the government. Bail was continued, and she has been fully compliant with the conditions of her release. Sentencing is scheduled for August 20, 2026.

## BACKGROUND

### A. Ms. Hunsicker's Childhood and Adolescence

Ms. Hunsicker was raised in Northampton, Pennsylvania, as the youngest of three children. Her parents were married before completing high school due to an unplanned pregnancy, and her mother had all three children by the age of 22. Her father worked as a welder in a steel plant and later at a dog food factory. He also took on a second job as a soccer coach at Ms. Hunsicker's high school. Her mother worked as a tax preparer. (PSR ¶¶ 47, 50; A.4).[2]

███████████████████████████████████████████████████████████

███████████████████ (PSR ¶¶ 50, 53; A.4).

Her father was an accomplished athlete but "missed his opportunity to see if he could pursue that career in college" due to the unplanned teenage pregnancy and instead "had to go right into working an hourly job in manufacturing to support his now wife and … children." (A.146). He "always wondered what could have been." (*Id.*). Of his three children, Ms. Hunsicker was the most talented athlete, and her father pushed her relentlessly. Ms. Hunsicker's brother believes that, through her, their father "was seeking to capture the opportunity he may have lost in his own sports childhood and she certainly was subjected to much more pressure than my brother or I was." (A.147).

---

[2] "Presentence Report" or "PSR" refers to the Presentence Investigation Report prepared by the United States Probation Office (the "Probation Office") in advance of Ms. Hunsicker's sentencing. "A." refers to the Appendix filed with this memorandum. Unless otherwise indicated, internal citations and quotation marks have been omitted.

4

While her father recognized Ms. Hunsicker's athleticism at an early age, he did so in a demoralizing way—including by calling her "Bubba" and "half-man, half-woman" in front of her teammates and other families at sports events. (PSR ¶ 54; A.4). He became obsessive about her success in sports. Her brother Rick recalls, "Our father placed extraordinary pressure on her to excel as an athlete, creating an environment where success was expected and failure was rarely tolerated." (A.144). Their father pushed Ms. Hunsicker in a cruel and unsafe manner. For example, when Ms. Hunsicker was injured during a game as a young teen, he forced her to run laps on a sprained ankle for an hour and a half to teach her not to get hurt. In tears but fighting through the pain, Ms. Hunsicker ran for half an hour longer than her father demanded. (PSR ¶ 52; A.5).

In high school, Ms. Hunsicker became a star student athlete. She played many sports well, including soccer, basketball, and field hockey. (PSR ¶ 52). "She was one of the best athletes to come through Northampton High School up to that time." (A.147). But her drive and success on the field had its consequences—Ms. Hunsicker had no time to develop friendships and felt very alone.

Her isolation rendered her vulnerable to abuse. Starting in the tenth grade, she was sexually assaulted almost daily

Ms.

5

Hunsicker went directly to her soccer practice, where her father was the coach. She didn't tell her father; she trained. (PSR ¶ 55; A.5-6).

███████████████████████████████████████████████████

███████████████████████████████████████████████████ With no support system of trusted friends or adults, Ms. Hunsicker was the "perfect target"—"she coped through dissociation, severe anorexia, and the internalization of a belief that her experience was not unusual or worthy of attention." (A.6). Ms. Hunsicker did not share that she was sexually abused ██████████ with anyone, including her parents, until after she graduated high school and left home. (PSR ¶ 56; A.6).

When she was 16 years old, Ms. Hunsicker discovered she was pregnant. Having no trusted adult to help her, Ms. Hunsicker attempted to end the pregnancy herself using a bent wire hanger. When this was not effective, she drove to another state to obtain an abortion without her parents' knowledge. The following day, she played in a soccer game, coached by her father, and bled profusely. She hid the abortion from her father and only told her older brother when he noticed the bleeding and confronted her. (A.6, 144).

### B. Ms. Hunsicker's College Years

Ms. Hunsicker was recruited to play Division I field hockey at Princeton University. Not knowing how to process the feelings of shame and helplessness from the abuse she had survived, Ms. Hunsicker became severely anorexic and bulimic.[3] (PSR ¶ 57; A.6, 11). "She was trying, in the most literal physical sense, to make herself disappear." (A.96). She arrived at Princeton her

---

[3] After years of binging and purging, Ms. Hunsicker still suffers from severe stomach issues to this day.

6

freshman year at least 50 pounds below her healthy weight. She also began drinking heavily and cutting herself. (PSR ¶ 57; A.8, 96).

It was then that Ms. Hunsicker first confided to her teammates about the sexual abuse she had endured in silence, and a supportive group of friends encouraged and assisted her in getting the help she desperately needed.[4] (PSR ¶ 57; A.8). After being overwhelmed with the impulse to end her life, Ms. Hunsicker's teammates persuaded her to check into a hospital. She also began psychiatric therapy and medication. When Ms. Hunsicker shared her treatment with her parents, her father said she was a "failure." (A.6).

During a trip home from college, and at the suggestion of her therapist, Ms. Hunsicker told her parents that she had been sexually abused routinely ▮▮▮▮▮▮▮▮▮▮▮▮ Her father responded with characteristic anger and said only, "What do you want me to do about it now?" ▮▮▮▮▮▮▮ (PSR ¶ 56; A.6). Ms. Hunsicker and her father never spoke about the sexual abuse again.

### C. Ms. Hunsicker's Early Employment and Co-Founding of CaaStle

Ms. Hunsicker earned her B.A. in English from Princeton in 1999 and went on to study toy design at the Pratt Institute. (PSR ¶ 77). Her father passed away unexpectedly from a heart attack in 2004 at the age of 50. (PSR ¶ 47). Ms. Hunsicker stepped up to care for her mother, both practically and financially. (A.138).

From 2004 through 2007, Ms. Hunsicker served as the president and Chief Operating Officer ("COO") of Right Media, an online advertising company that operated a marketplace that enabled advertisers, publishers, and ad networks to trade digital media. In 2007, Right Media

---

[4] As one friend recalls, "Sophomore year I expressed concern about how she was doing, and she agreed to come with me to the University Health Center to pursue therapy. She demonstrated willingness to get support during a time when attending therapy was far less common than it is now." (A.149).

was sold to Yahoo! for $850 million, of which Ms. Hunsicker earned $30 million. She remained employed with Yahoo! for another two years. (PSR ¶ 81).

While at Right Media, Ms. Hunsicker was briefly married to a male co-worker. Ms. Hunsicker now believes that she rushed into the marriage after her father died, and the marriage ended as she came to realize that she is homosexual. (PSR ¶ 60). She also met Jaswinder Pal ("JP") Singh, a professor of computer science at Princeton and a technology advisor to Right Media. Mr. Singh showed interest in Ms. Hunsicker's ideas and abilities. The two went on to work together in subsequent ventures, and over time Ms. Hunsicker came to view Mr. Singh as a father figure. (A.14).

In 2010, Ms. Hunsicker was briefly employed as the president and COO of Drop.io, where Mr. Singh was employed as a technology consultant. Ms. Hunsicker left Drop.io when the company was sold to Facebook. (PSR ¶ 80). Following her departure, Ms. Hunsicker's alcoholism took over. She was drinking more than a bottle of liquor each day. In 2011, she sought help and has not consumed alcohol since. (PSR ¶ 72). That same year, Ms. Hunsicker began regular mental health treatment, which she has pursued consistently for the past fifteen years to treat her Substance Use Disorder, Bipolar Disorder, Complex Post-Traumatic Stress Disorder, and Borderline Personality Disorder. (PSR ¶ 68; A.7-8, 762-65). She currently is prescribed Prozac and lithium carbonate to manage her symptoms related to these diagnoses.[5] (A.9).

Also in 2011, Ms. Hunsicker and Mr. Singh co-founded Gwynnie Bee, a privately-held, online clothing rental service catering to women underserved by traditional fashion sizing. The company struggled due to lack of customer referrals and was rebranded as "CaaStle" in 2018,

---

[5] Ms. Hunsicker also has been treated for a remote history of Eating Disorders. All of her diagnoses were confirmed by her psychiatrist via email on April 22, 2026. (A.762-65).

with the first four letters standing for "clothing as a service." (PSR ¶¶ 5-6). CaaStle expanded its scope, moving from direct-to-consumer sales to selling its technology platform to other fashion retailers. From 2011 through 2025, Ms. Hunsicker served as the company's Chief Executive Officer ("CEO"). From 2011 until 2017, Mr. Singh was its Chief Technology Officer. For most of its existence, CaaStle's Board of Directors consisted of three individuals: John Hennessy, who is also Chair of Alphabet's board; Scott Callon, a Tokyo-based asset manager; and Ms. Hunsicker.[6]

Ms. Hunsicker and Mr. Singh raised money for CaaStle exclusively from accredited investors with the financial resources and sophistication to invest in speculative private companies.[7] CaaStle raised no money from retail investors or public markets. Recognized fashion brands like Ann Taylor, Express, and Vince signed on, prompting positive reviews in the trade press. At its peak in 2018, CaaStle was valued at $1.25 billion.[8]

Ms. Hunsicker put everything she had into CaaStle's success—financially, physically, and mentally. From 2012 to 2024, she declined to take $3,160,000 of salary—nearly half the amount due to her from the company—allowing those funds to be used for payroll and business expenses. (PSR ¶¶ 19) ███████████

---

[6] Alphabet is the parent company of Google and one of the most valuable publicly-traded companies in the world. Mr. Hennessy previously served as President of Stanford University. Mr. Callon is an international corporate governance expert and Chair of Ichigo, a multi-billion-dollar Japanese real estate asset management company. He was the only foreigner to serve on Japan's Council of Experts Concerning the Corporate Governance Code.

[7] An accredited investor is an individual or entity that meets specific financial or professional criteria set by the Securities and Exchange Commission, allowing them to invest in private securities not available to the general public. *See* U.S. Sec. & Exch. Comm'n, *Accredited Investors* (last reviewed or updated Apr. 24, 2026), *available at* https://www.sec.gov/resources-small-businesses/capital-raising-building-blocks/accredited-investors (accessed on June 26, 2026). Individuals qualify as accredited investors if they have a net worth in excess of $1 million, excluding their primary residence. *See id.* Many of CaaStle's investors were family offices, trusts, and investment companies with hundreds of millions of dollars, or more, in assets.

[8] Anita Raghavan, *CaaStle CEO Confessed to Fraud. The Board Let Her Stay in Charge*, The New York Times (Jun. 7, 2026), *available at* https://www.nytimes.com/2026/06/07/business/caastle-fraud-christine-hunsicker.html (accessed on Jul. 5, 2026).

███████████████████████████████████████████████████████

For several years, Ms. Hunsicker put a portion of the salary she did take toward a fund to assist CaaStle employees who were experiencing unexpected financial hardship. (PSR ¶ 79). From 2014 to 2017, Ms. Hunsicker deposited approximately $104,000 in the fund, from which CaaStle employees withdrew money to cover emergency expenses such as furniture replacement after a house fire, airfare and accommodations to visit a dying parent, counseling after an assault, and mental health treatment for an employee's child. (*Id.*). Ms. Hunsicker never used money from the emergency fund herself.[9] (*Id.*).

Ms. Hunsicker helped CaaStle employees in non-financial ways as well ████

████████████████████████████████████████████

████████████ When a young CaaStle employee was sexually assaulted by her roommate, she turned to her colleagues for help. "Christine's response was immediate and unequivocal. She … let our employee know she should take whatever time she needed and that her healing was the priority." (A.112). Ms. Hunsicker helped the employee locate a therapist and then she "personally paid for eight weeks of therapy …. She never hesitated, never asked what it would cost, and never sought recognition for doing it." (*Id.*).

Colleagues from this time describe Ms. Hunsicker as a boss who "truly led by example" and "felt personally responsible for not letting people down." (A.113, 116). One said, "She was always the smartest and hardest-working person in the building." (A.113).

---

[9] In approximately 2018, CaaStle began covering the costs of employees' emergencies, and Ms. Hunsicker's salary no longer was used for that purpose. (*Id.*).

10

### D. Ms. Hunsicker's Traumatic Brain Injury

Ms. Hunsicker married Phaidra Knight, a former professional rugby player and MMA fighter, in September 2017. (PSR ¶ 61). Ms. Knight describes Ms. Hunsicker during the early months of their relationship as "energetic, engaged, adventurous, and deeply driven. We traveled together, worked out frequently together, spent time exploring new places, and shared a close emotional and physical connection." (A.136).

Then, on December 10, 2017, a 30-pound mirror fell on Ms. Hunsicker's head, resulting in significant cognitive impairments, frequent migraine headaches, fatigue, dizziness, and mood issues. (A.11). This was not her first concussion. She suffered multiple head injuries playing field hockey in high school and college and from accidents as a young adult.[10] (A.16). Ms. Knight was shocked by the change she experienced in her spouse:

> What followed was unlike anything I had ever experienced. As a lifelong professional athlete, I have been exposed to people who have encountered head injuries for many years. I have never witnessed the degree of change that I observed in Christine.
>
> The person I knew became withdrawn and isolated. She spent much of her time on the couch suffering headaches, fatigue, and a lack of any zest for life. Activities we once enjoyed disappeared. Travel stopped. Intimacy diminished. Communication became increasingly difficult. I often felt as though I was living with a completely different person than the one I married. Her memory was terrible. She repeated herself frequently. It was incredibly sad and frustrating.

(A.136).

Like most difficult events in her life, Ms. Hunsicker initially tried to endure her pain and cognitive difficulties alone. When she finally sought treatment, she reported severe symptoms, including "difficulty staying awake, inability to focus, feeling 'foggy and lethargic,' headaches,

---

[10] The Centers for Disease Control and Prevention recognizes that "[a] person with a history of multiple or repeated mild TBIs or concussions may experience a longer recovery or more severe symptoms." Centers for Disease Control and Prevention, *About Mild TBI and Concussion* (Sept. 15, 2025), *available at* https://www.cdc.gov/traumatic-brain-injury/about/index.html (accessed on July 5, 2026).

11

dizziness, balance problems, sensitivity to noise, difficulty concentrating and remembering, and fatigue." (A.11). To assist with her recovery, Ms. Hunsicker and her wife moved out of the city to a quieter area in New Jersey, close to her mother's residence. (PSR ¶ 49).

In the years following the concussion, Ms. Hunsicker sought treatment for her traumatic brain injury "by no fewer than 8 different providers or treatment modalities." (A.17). "The breadth and intensity of her treatment-seeking clearly demonstrated the severity of her symptoms and was especially notable in light of her usual modus operandi of just pushing through adversity without asking for help, though it did reflect her characteristic determination to solve problems through relentless effort." (A.12).

Ms. Hunsicker's treatments included regular vestibular physical therapy at NYU Rusk Rehabilitation center starting in February 2018. (A.430-57). The following month, she sought treatment at the NYU Langone Eye Center. (A.414-29). During this time, Ms. Hunsicker let some colleagues know about the issues she was having. After a frightening incident when she mistook the gas pedal for the brake pedal, Ms. Hunsicker didn't feel safe driving a car, so her assistant transported her to and from the office and medical appointments. (A.107). Ms. Hunsicker took frequent naps in her glass-walled office to manage her migraines and exhaustion. (A.108).

By late April 2018, Ms. Hunsicker alerted CaaStle's Board about her concussion and ongoing symptoms. (A.91). A month later, when her symptoms were exacerbated by an airplane flight, she informed the Board that she could no longer fly for any reason. (A.569). "The board did not intervene, limit her duties, or implement any governance mechanism to address her impairment." (A.97). Ms. Hunsicker understood that, as she had been conditioned to do since her childhood, she simply needed to push through.

In May 2018, Ms. Hunsicker suffered another concussion and visited the NYU emergency room after a cell phone fell and landed squarely on the injured part of her head. Medical records reflect:

> At baseline patient reports chronic dull headache, brain fog, lethargy, hypo or hypersomnia, depression and balance problems since concussion in December 2017…. Today she has new sharp shooting pain on left side of head, blurred vision, dizziness and increased word finding difficulties.

(A.12, 361).

In June 2018, Ms. Hunsicker consulted specialists in the neurology department at Weil Cornell. (A.748-51). By August, with symptoms persisting more than eight months after the mirror fell on her head, Ms. Hunsicker had an initial consultation with Physicians Pain Treatment Associates, which prescribed magnesium and Botox injections. (A.587-95).

In January 2019, recognizing that the Physicians Pain Treatment Associates' efforts were not alleviating her symptoms, Ms. Hunsicker turned to the Brain Resource Center and began neurofeedback sessions. (A.596-621). Comprehensive neuropsychological and electrophysiological testing conducted at the Brain Resource Center on January 26, 2019, revealed continuing "objective evidence of significant cognitive and neurophysiological dysfunction."[11] (A.12). Ms. Hunsicker had at least 37 neurofeedback visits between January 2019 and February 2020, after which the pandemic interfered with her ability to receive in-person care. (A.732-33).

In February 2019, still suffering from severe pain and the cognitive and emotional effects of her head injury, Ms. Hunsicker began Hyperbaric Oxygen Therapy ("HBOT") treatment in addition to the neurofeedback sessions. (A.500-86). From late February through June 2019, Ms.

---

[11] Notably, these symptoms and Ms. Hunsicker's desperate efforts to alleviate them preceded, and then continued beyond, the onset of the fraud, which began in February 2019.

Hunsicker received at least 44 HBOT treatments.[12] (A.500-86). Ms. Hunsicker's psychiatrist also significantly modified her medication regimen "with lamotrigine tapered 'in context of PCS' and lithium subsequently introduced and escalated to triple the initial dose between 2021 and 2022."[13] (A.17)

Despite these numerous and sustained treatments, Ms. Hunsicker continued to suffer. Her wife describes a person "in constant pain, deeply depressed, [who] at times expressed hopelessness that alarmed me greatly." (A.136). Her friends saw the same behavior:

> There were numerous times she was incapable of communicating, just wanting to pass out. She admitted she was having issues with her short term memory and that it was making it difficult to put her thoughts together....
>
> She kept trying to show up as best she could. But by the end of each week her body had made the decision for her. She would go home and sleep in the dark.

(A.96) ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Other colleagues also recognized her distress: "She was visibly suffering. There were times when she would forget things we had discussed or seem to be pushing through pain in a way that was obvious to those close enough to see it." (A.117).

### E. CaaStle's Struggles and Ms. Hunsicker's Misrepresentation of Its Finances

While Ms. Hunsicker was impaired, in pain, and battling the severe effects of her traumatic brain injury, CaaStle began to flounder. Sales stalled, and Ms. Hunsicker struggled to

---

[12] Ms. Hunsicker discontinued the HBOT treatments only after suffering an episode of intense claustrophobia in the oxygen chamber. (A.583).

[13] "PCS" refers to Post-Concussive Symptoms. Mayo Clinic, *Persistent Post-concussive Symptoms (Post-Concussion Syndrome)* (Oct. 30, 2024), *available at* https://www.mayoclinic.org/diseases-conditions/post-concussion-syndrome/symptoms-causes/syc-20353352 (accessed on Jun. 24, 2026) ("Persistent post-concussive symptoms in most people appear within the first 7 to 10 days after an injury and typically last longer than three months. But sometimes they can last for a year or more.").

meet the company's expenses. Accounts and partnerships that Ms. Hunsicker thought she could count on to increase revenue failed to materialize. For example, in 2018, after months of meetings with URBN (the parent company of Anthropologie, Free People, and Urban Outfitters) "all communication from everyone we'd spent months working with and talking to suddenly ceased." (A.114). Shortly thereafter, when URBN launched its own subscription-based clothing rental service, Ms. Hunsicker and her colleagues realized "that [URBN] had in fact seen the value in what we were offering. In fact, they found it so valuable that they decided to start their own service."[14] (A.114).

In the midst of setbacks like the URBN debacle, Ms. Hunsicker found herself "pouring" her own savings into CaaStle. (PSR ¶ 70). But even that wasn't enough. As the money she invested into the company was depleted to cover payroll for CaaStle's employees and other operating expenses, she came under intense pressure from investors, including ███████████ ████████████████████████████████████████████████████████████ Although his investment carried with it a right to general, annual financial information, ████ ███████ began to demand detailed, quarterly financial data from Ms. Hunsicker. His requests were volatile, insistent, and relentless. Ms. Hunsicker, still very much in the throes of her traumatic brain injury, was overwhelmed.

Shortly before an in-person meeting with ████████ in the first quarter of 2019 that Ms. Hunsicker anticipated would become confrontational, she resorted to the "deeply entrenched set of behavioral patterns … forged as survival mechanisms in childhood …." (A.7). Ms. Hunsicker

---

[14] Nuuly, the service that URBN started, is now the dominant apparel subscription service in the country and highly profitable, demonstrating the significant value of CaaStle's business plan. *See* Tatiana Walk-Morris, *Nuuly is Dominating the Apparel Rental Market*, Retail Dive (Jun. 16, 2025), *available at* https://www.retaildive.com/news/nuuly-is-dominating-the-apparel-rental-market/750749/ (accessed on Jul. 10, 2026); Jennifer Williams, *Urban Outfitters' Rental Business Beats Its Sales Target*, Wall Street Journal (Feb. 25, 2026), *available at* https://www.wsj.com/cfo-journal/urban-outfitters-rental-business-beats-its-sales-target-420fdb29?mod=Searchresults&pos=2&page=1 (accessed on Jul. 10, 2026).

created a false income statement and balance sheet that she believed would satisfy ███████

until she felt well enough to deal with him and his expectations. At the meeting, as she feared,

█████████ became hostile, repeatedly yelled, and "wiped the floor" with her, threatening to ruin

her career unless she started providing the information he expected. (A.101). Shortly after the

meeting concluded, Ms. Hunsicker confided to another investor, ████████████████

███████ that ██████████ had been so abusive that he made her "feel like a piece of shit on the

bottom of his shoe." (*Id.*).

At the same time, Ms. Hunsicker's relationship with her CaaStle co-founder, Mr. Singh,

was in distress. Even as he was aware of her significant brain injury and its effects on her

cognitive abilities and mental wellbeing, Mr. Singh exerted enormous pressure on Ms.

Hunsicker, insisting that her efforts were not enough. (A.116-17). Mr. Singh was publicly

"dismissive, hypercritical, authoritarian, and openly disrespectful" toward Ms. Hunsicker.

(A.116). The conflict with Mr. Singh "created additional pressure to conceal problems and

maintain the appearance of control," despite her mental and physical frailty. (A.14). Colleagues

recognized how much she was struggling:

> She fought as hard as she could through the pain and discomfort to make sure that
> she could be well enough to be responsible for her company, all of the people she
> employed, all those who invested, and for everyone else who was watching. The
> weight of the world seemed to live on her shoulders over those two years leading
> into COVID.

(A.115). But Ms. Hunsicker recognized no port in the storm. She felt she had to keep moving

forward and to "perform[] through crises and appeas[e] authority figures [like ████████████

█████ at any cost." (A.14).

16

In this context, Ms. Hunsicker shared the false financial documents she created with ███ ███ and other investors,[15] and over time she created additional false documents that mirrored—and eventually amplified—the initial false performance data. Once she created the false financial documents, and their attendant expectations, she felt compelled to continue sharing them until she regained her cognitive and executive functioning capabilities and could make things right.

In December 2019, with full knowledge of CaaStle's true financial state, Ms. Hunsicker took out a personal loan for $20 million, which she invested in the company. (PSR ¶ 70). In fact, even on a net basis, backing out any funds she received in any form for any reason, Ms. Hunsicker put nearly $20 million more of her own money into CaaStle than she took out of it, including more than $15 million *after* she began providing false information to investors. (PSR ¶¶ 70, 79). Ms. Hunsicker sincerely believed in the viability and potential profitability of CaaStle's technology, and she wasn't alone. A former employee wrote:

> Christine's vision for the future of retail and the role our company could play in the ever-expanding shared economy was shared by employees, investors, and even the media, because it was real. It had the ability to be profitable and the potential to serve hundreds of millions of subscribers ….

(A.114; ███████████████████████████)

### F. Ms. Hunsicker's Acceptance of Responsibility

Between 2019 and late 2023, Ms. Hunsicker "was operating in a state of severe cognitive impairment." (A.14). In fact, she recalls almost nothing from 2020, 2021, or 2022. (A.13). Ms.

---

[15] Understanding that investors might share financial information and note any discrepancies, Ms. Hunsicker prepared the financial statements in anticipation of her meeting with ███████ and, to maintain consistency, shared those statements in scheduled meetings with a few investors in advance of her meeting with ███████

Hunsicker's normal cognitive functioning finally started to return at the end of 2023, when "the fog began to lift." (A.14). Recognizing the gravity of the situation she had gotten herself into, Ms. Hunsicker was scared. At first, she doubled down on her old modus operandi, trying simply to keep moving, to appease investors while she worked to resolve the situation with sheer will and effort. But with her mental clarity restored, Ms. Hunsicker determined that she needed to come clean.

### 1. Disclosure to CaaStle's Board of Directors

On December 8, 2024, Ms. Hunsicker voluntarily and proactively disclosed to CaaStle's Board and to Mr. Singh that she had made fraudulent misrepresentations to numerous investors over the past five years. (PSR ¶ 11 n.1 █████████████████████████

█████████████████████████████████

The government's attempt to devalue Ms. Hunsicker's self-disclosure is not supported by the facts. (*See* PSR ¶ 11 n.1). The government has consistently emphasized that shortly before Ms. Hunsicker's full and open admission to the CaaStle Board one investor (identified as "Investor-4" in the Indictment) emailed Messrs. Hennessy and Callon about a draft audit report shown to Investor-4 by Ms. Hunsicker the prior month. (*See id.*). In that email, however, Investor-4 neither identifies nor suggests any fraud. (A.183-85). Investor-4 simply asks the Board to investigate CaaStle's financials and the validity of that audit document, expressing no view whatsoever about what might have happened. (*Id.*). Furthermore, Investor-4 expressly asks the Board not to inform Ms. Hunsicker about Investor-4's outreach, and Messrs. Hennessy and Callon agree. (*Id.*). Ms. Hunsicker did not know the content of Investor-4's communications with the Board prior to her disclosure. (PSR ¶ 11 & n.1). Her admission to the Board came *before* it raised Investor-4's concerns with Ms. Hunsicker, initiated any investigation, or uncovered any fraud. ████████

When she revealed her conduct to the CaaStle Board, Ms. Hunsicker did so with full transparency. Without prompting, she admitted to showing investors multiple fraudulent financial statements going back to early 2019, not just the draft audit report she had shown Investor-4 a few weeks earlier. (PSR ¶ 11 & n.1). She accepted full responsibility for her misconduct, blaming only herself.

By fully confessing to the Board, Ms. Hunsicker was placing the interests of CaaStle's investors ahead of her personal interests.[16] She gave the Board detailed information regarding her misconduct and agreed to proceed in whatever way the Board determined was appropriate. If the Board had chosen to turn her in to the authorities, she had provided the information needed to do so. Whether to do so, however, was a decision for the Board to make, keeping paramount what the Board believed to be in the investors' best interests.

For that path to succeed, the Board felt that it needed to avoid a panic that could threaten the company's reputation and operations. Accordingly, the Board—not Ms. Hunsicker—decided not to apprise CaaStle employees or investors, or anyone else, of Ms. Hunsicker's misconduct. Rather, the Board—not Ms. Hunsicker—decided that Ms. Hunsicker should retain the title of

---

[16] Shortly after admitting her misconduct, Ms. Hunsicker resigned from the Board, and Mr. Singh, who had left the Board in 2017, rejoined.

19

CEO but refrain from taking any actions on CaaStle's behalf, including fund-raising for CaaStle. From that moment on, CaaStle did not raise any more money from investors.

She took no actions to bind CaaStle, continued to support P180 and its efforts to raise money and purchase fashion brands, and followed the Board's decision not to disclose to others the misconduct she had openly disclosed to the Board.

It was not until mid-March 2025, after learning about the criminal investigation from Ms. Hunsicker, that CaaStle's Board disclosed Ms. Hunsicker's fraudulent conduct to employees and investors and sought her resignation as CEO.

## 2.  Discussions with the Government, Voluntary Surrender, and Guilty Plea

Ms. Hunsicker first learned of the government's investigation when the FBI executed a search warrant at her house on March 17, 2025. She told the Board about the search the same day. From that moment to the present, Ms. Hunsicker's interactions with the government have been extraordinarily cooperative and compliant. Two days after FBI agents seized her laptop and smartphone, prosecutors requested that Ms. Hunsicker provide the passwords securing both

devices. Ms. Hunsicker promptly agreed, voluntarily allowing the government full and unfettered access to all her electronic data—both related and unrelated to the matter at hand.

Counsel for Ms. Hunsicker engaged with the prosecution in good faith on her behalf, starting the morning of the search when counsel informed the government that Ms. Hunsicker did not dispute the fundamental facts in the matter and wanted to accept responsibility for her conduct. A few weeks after the execution of the search warrant, counsel provided the government with a three-hour-long, detailed proffer describing Ms. Hunsicker's misconduct dating back to early 2019. Counsel also repeatedly offered—before, during, and after that meeting—for Ms. Hunsicker to sit down with the prosecution in person to answer any questions about what she did and why. The government declined the offer every time. Without explanation, the government also refused repeated requests to engage in plea discussions prior to indictment.

On July 18, 2025, the day after her Indictment, Ms. Hunsicker voluntarily surrendered and was released on pretrial supervision. On March 4, 2026, Ms. Hunsicker formally accepted responsibility and pled guilty before this Court to one count of securities fraud. Ms. Hunsicker has been fully compliant with the conditions of her release.

### 3. Participation in Gambler's Anonymous and Continued Mental Health Treatment

At the recommendation of her psychiatrist, Ms. Hunsicker began attending Gambler's Anonymous ("GA") meetings in early 2025, *before* she first became aware of the government's investigation. She proudly celebrates March 6 as her gambling sobriety anniversary. (A.99). Ms. Hunsicker has become deeply involved in GA, as a member and volunteer, attending six to seven

meetings each week, leading meetings, volunteering on the GA hotline, and serving as a sponsor to a newer member. (A.128-29). Ms. Hunsicker has attended more than 400 GA meetings and maintained gambling abstinence for more than a year.

To be clear, Ms. Hunsicker did not frequent casinos or engage in sports betting, which made it more difficult for her to recognize that she had a gambling disorder. But through GA she has come to realize that she got an unhealthy "rush" out of engaging in risky behavior. (A.10). Notably, gambling disorder is described alongside substance use disorders in both the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5), and the International Classification of Diseases, Eleventh Revision (ICD-11).[17] The GA website describes the characteristics of a compulsive gambler as including "insecurity," an "inability to accept reality," and a subconscious desire to punish oneself—characteristics that Ms. Hunsicker has worked hard to overcome.[18]

Her participation in GA has been a "life-changing experience." (PSR ¶ 70). A sixteen-year veteran of the GA program describes Ms. Hunsicker as "someone who's doing the hard, uncomfortably plain work of accountability in front of other people, week after week." (A.131). A newer participant whom Ms. Hunsicker sponsors in the program describes her as someone who shows up consistently and honestly to meetings and is working to make the GA program a more inclusive space. (A.133-135). Another GA member, with almost 28 years of sobriety from gambling, says that he has referred to Ms. Hunsicker

> as 'my hero' during meetings—words I do not use lightly. I say this because I have witnessed someone who, despite facing overwhelming personal and legal challenges, has continued to show up, participate honestly, and work toward rebuilding her life with dignity and purpose.

---

[17] *See* National Institute of Health, *Alcohol and Substance Use Disorders Diagnostic Criteria Changes and Innovations in ICD-11: An Overview*, National Library of Medicine (Dec. 15, 2022), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC9881115/ (accessed on Jul. 6, 2026).
[18] *Available at* https://gamblersanonymous.org/questions-answers/ (accessed on Jul. 6, 2026).

(A.125-26).

In addition, Ms. Hunsicker has been diligent about seeking consistent mental health treatment for more than fifteen years. She attends weekly psychotherapy sessions. (PSR ¶ 68). In therapy, Ms. Hunsicker has addressed the intense pressure from her father related to sports and performance, the chronic psychological and sexual abuse ████████ and her gambling addiction. (A.762-65). Ms. Hunsicker now has an extensive group of family, friends, co-workers, and fellow GA members supporting her, all of whom are eager to help her move forward. (A.92-105; 107-78).

### 4. Post-Indictment Employment and Service

Since May 2025, Ms. Hunsicker has been employed part-time as an operations director at a tennis club, earning approximately $9,000 per month. (PSR ¶ 78). On her very first day, before she was indicted or pled guilty, Ms. Hunsicker introduced herself to the club's accountant and told her "in detail what she had done not in general terms, not with excuses but specifically and honestly." (A.118). She expressly disclosed that she had committed securities fraud, and she proactively stated that she should not be placed in a position of trust with respect to the club's finances. (Id.). "Christine was clear that she did not want access to the books or the bank accounts, that she wanted to help and with appropriate boundaries in place: she would not be involved with the club's finances or fundraising, and she would not be eligible for sales-based incentives." (Id.). Working within the guardrails she established for herself, Ms. Hunsicker has turned the tennis club from suffering losses for many years to now being profitable. (A.97; A.118). As a coworker remarked:

> I've watched Christine patiently teach club staff members who are in various roles at the club, identify their natural strengths and help them thrive in their roles. Her positive, constructive approach to dealing with the workforce and her insights on

23

> operations have helped … make the business of the club and the restaurant run more smoothly and profitably for the first time.

(A.120-21). Since pleading guilty in March 2026, Ms. Hunsicker has been setting aside 10% of her earnings to use toward restitution in this case.

In addition to her part-time work, Ms. Hunsicker has been developing various programs around accountability and resilience—the sorts of programs she wishes existed when she was a child. She developed a badge program for children in the tennis club's summer camp designed to help campers learn about positive character traits, such as bravery, resilience, accountability, and curiosity. (PSR ¶ 82; A.15, 23-63). She also is in the process of completing a book geared toward readers ages 8-12 years old, titled *The In Between*, about character development and making good choices. (PSR ¶ 82; A.15, 186-282). Ms. Hunsicker hopes the book will be a resource for tweens to help them identify, avoid, and seek help for problematic, high-risk behavior. (*Id.*).

Through her own experience, Ms. Hunsicker also became interested in how the criminal justice system prepares inmates for life after incarceration. Applying tools and teachings from GA, she developed an 8-step peer program called "Accountable" for individuals with criminal convictions to help them avoid isolation, accept responsibility, and make amends. (PSR ¶ 82; A.15; A.64-83). Ms. Hunsicker created this program with significant encouragement from her Pretrial Services Officer, who suggested that Ms. Hunsicker share the program with the Commissioner at Rikers Island for distribution to inmates in that facility.

To facilitate attendance by individuals new to GA, and particularly women, who Ms. Hunsicker had noticed were less likely to attend in-person meetings, Ms. Hunsicker initiated and implemented an online GA "beginners room" in April 2026. (A.126, 128, 134). The beginners room now serves between 15 and 20 members each week. (PSR ¶ 70). A fellow GA member observed that Ms. Hunsicker

24

> has stepped forward in a meaningful way to support other women in recovery—
> something that is both rare and greatly needed….
>
> Having someone who is willing to mentor, support, and encourage others can
> make a tremendous difference. Christine has become that person for many women
> in the program.

(A.126).

Following her one-year anniversary of recovery in GA in March 2026, Ms. Hunsicker

now serves as a sponsor to a newer member, who wrote:

> There were many moments where I remember thinking that she would have been
> fully justified emotionally in disappearing into her own problems and focusing
> only on surviving her own situation. Instead, she continued spending emotional
> energy helping other people stabilize.

(A.134).

In addition, throughout her own difficulties, Ms. Hunsicker has maintained the role of

primary breadwinner for her family and familial caretaker for her elderly mother, taking her to

doctors' appointments and managing her health care needs. (PSR ¶¶ 49, 61; A.138).

### G. The Presentence Report and Advisory Guidelines

The Probation Office calculated the same Guidelines range as agreed to by the parties in

the plea agreement—namely, a total offense level of 34 and a Criminal History Category of I,

yielding an advisory Guidelines range of 151 to 188 months' imprisonment. However, the

Probation Office concluded that "a guideline term of imprisonment may . . . be greater than

necessary to satisfy the relevant sentencing objectives." (PSR p. 29). In consideration of Ms.

Hunsicker's "compliance with pretrial supervision, strong employment record, family

responsibilities, strong support network, engagement in gambling and mental health therapy,"

and low risk of recidivism, the Probation Office recommended a downward variance to 120

months' imprisonment. (*Id.*). In making this recommendation, the Probation Office did not

25

conduct a searching inquiry. It simply chose the median length of imprisonment for the 57 defendants who were sentenced to a term of confinement and whose primary Guideline also was Section 2B1.1 with a total offense level of 34 and a Criminal History Category of I. (PSR p. 24).

For the reasons articulated below, we respectfully submit that the Probation Office's recommendation fails to capture the unusual circumstances of the offense—from which Ms. Hunsicker did not profit and indeed invested (and lost) far more of her own money than she ever received—and Ms. Hunsicker's unique history and characteristics, including vulnerabilities from the horrific sexual and psychological abuse she endured as a child, her traumatic brain injury in 2017, and her remarkable accountability and recovery.

## ARGUMENT

### A. Applicable Law

While the Court is obligated to calculate and consider the Sentencing Guidelines, the Guidelines are merely advisory and mark only a "starting point" for determining an appropriate sentence. *Kimbrough v. United States*, 552 U.S. 85, 108 (2007), citing *Gall v. United States*, 552 U.S. 38, 49 (2007). Rather, sentencing is governed by 18 U.S.C. § 3553(a), which provides, in pertinent part, "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" that section. Pursuant to Section 3553(a):

> The court, in determining the particular sentence to be imposed, shall consider—
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner;

26

(3) the kinds of sentences available;

(4) the kinds of sentences and the sentencing range established [under the Sentencing Guidelines] subject to any amendments made to such guidelines by act of Congress . . .;

(5) any pertinent policy statement . . . issued by the Sentencing Commission . . . subject to any amendments made to such policy statement by an act of Congress . . .;

(6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to the victims of the offense.

18 U.S.C. § 3553(a).

Therefore, after calculating the advisory Guidelines range, the Court must conduct an individualized assessment of the case-specific factors, set forth in Section 3553(a), to determine whether, "in [this] particular case, a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing." *Kimbrough*, 552 U.S. at 91, quoting 18 U.S.C. § 3553(a).

### B. Discussion

Applying these statutory factors, it is clear that a sentence of two years' imprisonment, particularly when coupled with supervised release, is sufficient but not greater than necessary to serve the purposes of sentencing in this case. Pursuant to the plea agreement negotiated with the government, Ms. Hunsicker agreed that "in light of the factors set forth in 18 U.S.C. §3553(a), a sentence of less than two years' imprisonment would not be sufficient to comply with the purposes of sentencing." The logical corollary of this agreement is that, while less than that amount of time would be insufficient to comply with the purposes of sentencing, two years *is* sufficient in these circumstances and any lengthier sentence, accordingly, would be "greater than necessary" to comply with the purposes of sentencing pursuant to Section 3553(a).

27

1.  **The nature and circumstances of the offense and the history and characteristics of the defendant**

To the extent there is a "typical" fraud case, this is not it. Ms. Hunsicker did not engineer a sophisticated scheme to enrich herself at the expense of a vulnerable population. There were no luxury purchases, hidden offshore accounts, or efforts to obstruct the government's investigation. In fact, Ms. Hunsicker turned herself in to the CaaStle Board and then followed the Board's instructions to try to recover as much value as possible for CaaStle shareholders. While her misconduct was serious, it differs in myriad ways from the vast majority of fraud prosecutions that come before this Court.

As a privately-held company, CaaStle allowed investments only by accredited investors who were betting on the ideas and technology platform that CaaStle was pursuing. Many of these sophisticated investors, who included multi-billion-dollar hedge funds and family offices, invested in CaaStle without the benefit of any financial data—not an income statement, not a balance sheet, not even a simple spreadsheet reflecting assets and liabilities. These were not retail investors; they were professional investors using small fractions of their assets to speculate on CaaStle's potential growth. If the platform was successful, they would benefit. If it didn't, they would move on to the next innovative idea.

What's more, the money investors put into CaaStle was used entirely to try to make the company successful. It covered payroll and kept the lights on. Ms. Hunsicker did not use investor funds to line her own pockets or fund a lavish lifestyle. To the contrary, Ms. Hunsicker put basically every dollar she had into CaaStle, and when her significant net worth was depleted, she took out a $20 million personal loan and invested that into CaaStle too. (PSR ⸗ 70). Today, as the Presentence Report reflects, Ms. Hunsicker has a significantly negative net worth. When CaaStle failed, her entire life's savings went with it. (PSR ¶ 83). She did not commit fraud to get rich.

28

She believed in the promise of CaaStle and that, if she worked hard enough, it would succeed and the investors would make money. Her psychological vulnerabilities and brain injury led her to be misguided, and she fully acknowledges that she acted wrongfully, but she was not venal.

An important component of sentencing pursuant to Section 3553(a) is that this Court must sentence not just the crime, but the defendant. Ms. Hunsicker is the primary breadwinner for her spouse, and the primary familial caretaker for her elderly mother. (PSR ¶¶ 49, 61; A.138). She has a history of charitable giving and significant good works. From the emergency fund Ms. Hunsicker set up to help CaaStle employees pay for expenses associated with extraordinary life events to the support she offered colleagues during times of crisis, Ms. Hunsicker's life has been marked by a history of caring for others. (PSR ⸿ 79; A.107-11, 112-15). Even at this low point in her life, Ms. Hunsicker has tried to find ways to help others. Her children's book and "Accountable" program have the potential to enrich the lives of many for years to come, and her commitment to helping others struggling with gambling addiction is inspiring.

Ms. Hunsicker has no prior criminal record. She accepted responsibility for her actions before the government began investigating and has cooperated with the government from the earliest opportunity to do so. Her conduct in this case was an aberration in an otherwise law-abiding life caused by a "perfect storm" of converging factors. (A.18).

Dr. Sarah Schaffer, a board-certified clinical neuropsychologist specializing in forensic evaluation, conducted a forensic neuropsychological evaluation of Ms. Hunsicker consisting of comprehensive interviews of Ms. Hunsicker, a thorough review of Ms. Hunsicker's medical, psychiatric, and neurological records, and a review of pharmacogenomic testing results ordered by Ms. Hunsicker's treating psychiatrist. (A.1-22). Dr. Schaffer concluded that certain psychological, neurological, developmental, and situational factors led to Ms. Hunsicker's

29

criminal conduct. Specifically, those factors included Ms. Hunsicker's (a) pre-existing psychological vulnerabilities related to her emotional and sexual abuse and mental health diagnoses; (b) cumulative traumatic brain injuries; (c) genetic predispositions to reward-seeking behavior; and (d) situational and professional pressures. (A.18-19).

### (a) Pre-existing Psychological Vulnerabilities

From the rubble of a very troubled and abusive childhood, Ms. Hunsicker emerged as a highly gifted entrepreneur and an unusually thoughtful human. But she also carried vulnerabilities and maladaptive coping strategies. "The sexual abuse, combined with the emotional abuse ██████████ established a deeply ingrained pattern of dissociation under stress, compulsive performance despite distress, pathological self-reliance, and an inability to ask for help or acknowledge vulnerability." (A.7).

Through her early environment and trauma, Ms. Hunsicker "learned that her value was contingent upon performance, that pain was to be endured and not acknowledged, and that expressing vulnerability would be met with rejection and punishment." (A.4-5). As a child, she learned to hide any problems, from a sprained ankle to sexual abuse and an unplanned pregnancy. ████████████████████████ ████████████████ So, she hid any perceived failures. (A.7).

She carried these coping mechanisms into adulthood and into her role as the co-founder and CEO of CaaStle. When the business began to fail, in large measure due to the cognitive and emotional repercussions of Ms. Hunsicker's traumatic brain injury, she reverted to the strategies she had honed in her youth—to dissociate, to hide any problems, and to work harder.

30

### (b) Cumulative Traumatic Brain Injuries

Dr. Schaffer concluded, to a reasonable degree of scientific certainty, that if Ms. Hunsicker had not suffered a traumatic brain injury in December 2017, she would not have committed this offense. (A.18-20). Dr. Schaffer found that the concussion "was a *necessary* contributing factor to her criminal conduct" because "[t]he concussion compromised the executive functions that she had been relying on to compensate for her underlying psychological vulnerabilities throughout her adult life." (A.19) (emphasis added)). The maladaptive behavorial patterns that Ms. Hunsicker acquired as a child "were operating at full force when a concussion in late 2017 stripped away the executive control she had been using to manage them …." (A.7). The CaaStle Board, even though informed of Ms. Hunsicker's debilitating brain injury well before the fraud commenced, took no action to address the deficit. "From approximately 2019 through late 2023, Ms. Hunsicker was operating in a state of severe cognitive impairment, characterized by a lack of impulse control, significant memory deficits, and debilitating pain." (A.14).

### (c) Genetic Predispositions to Reward-Seeking Behavior

In addition, Ms. Hunsicker's biological profile provides "independent … evidence that is consistent with–and helps to explain–the behavioral patterns observed in this case." (A.17). Ms. Hunsicker

> carries the DRD3 CC genotype (present in 12.7% of the population), which is associated with increased dopamine-related reward and "a higher risk for short term reward seeking behaviors (i.e., gambling, etc.)," as well as an increased risk of obsessions and compulsive behaviors. She also carries the AUTS2 AA genotype (7.8% prevalence), associated with an "increased reward response in your brain in response to alcohol or drugs" and "more impulsive behavior and a higher sensitivity to drugs and alcohol." The DBH TT genotype (4.7% prevalence) indicates higher baseline dopamine levels and reduced conversion to norepinephrine . . . . Additionally, she was found to have the BDNF CT genotype, which is associated with lower levels of brain-derived neurotrophic factor.

31

Notably, BDNF plays a critical role in neuronal repair and recovery from brain injury.

(*Id.*).

In other words, Ms. Hunsicker was, as a result of her biological makeup, "particularly vulnerable to the type of reward-seeking, crisis-driven decision-making that characterized the fraud," and "the frontal lobe dysfunction caused by her concussion may have had a disproportionately destabilizing effect on her already-vulnerable regulatory systems." (A.17-18).

### (d) Situational and Professional Pressures

Early 2019 brought unprecedented professional pressure for Ms. Hunsicker at precisely the wrong time. She "was serving as founder and CEO of a 600-person technology company while cognitively impaired, in chronic pain, awake only four to five hours per day, and with no meaningful operational support." (A.19). She was trying, as she had been conditioned to do since childhood, to live up to the expectations of powerful men in positions of authority, including an important investor who had threatened her and a co-founder she couldn't satisfy. (A.7) (noting Ms. Hunsicker's "compulsive need to meet the expectations of authority figures, particularly older men in positions of power" and "her lifelong pattern of performing through crises and appeasing authority figures at any cost"). Within a year, the COVID pandemic and its attendant disruptions loomed large. Amid this chaos, Ms. Hunsicker relied on deeply engrained patterns. She tried to push through. "She was running on the same fuel that had propelled her throughout her life: the belief that she could endure any amount of punishment and perform her way through any crisis." (A.19).

Notably, despite her psychological vulnerabilities and genetic predispositions, Ms. Hunsicker's prior career as an entrepreneur, while equally complex, was characterized by legitimate business success—indicating that, but for the traumatic brain injury and its debilitating

32

effects, Ms. Hunsicker would not have engaged in fraudulent behavior at CaaStle. As Dr. Schaffer stated, "Without the 2017 concussion, there is no evidence to suggest that Ms. Hunsicker would have engaged in securities fraud ...." (A.19-20).

Dr. Schaffer's ultimate conclusion is worth underscoring:

> Over the course of my 20-year career evaluating individuals in forensic contexts, it is rare to encounter someone who combines the degree of insight, accountability, and genuine commitment to change that Ms. Hunsicker has demonstrated. She is an exceptional individual—a person of extraordinary intellect, creativity, and drive—who committed serious crimes under circumstances that she now understands with remarkable clarity. She has not asked for sympathy, nor has she sought to minimize the harm she caused. Instead, she has looked unflinchingly at how she got here, identified every vulnerability that contributed to her conduct, and built a structure of accountability around each one. Her work in Gamblers Anonymous, her proactive establishment of financial guardrails, her youth sports program, her prison rehabilitation proposal, and her policy of radical honesty are not the actions of a person who is performing for a sentencing judge. They are the actions of a person who has finally stopped performing and started recovering, and she has demonstrated remarkable grace and integrity as she navigates this process.

(A.21-22).

   2. **The need for the sentence imposed to (A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) afford adequate deterrence to criminal conduct; (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner**

Ms. Hunsicker recognizes that the sentence imposed by this Court must be appropriate and just. In part, that recognition, and a genuine appreciation for the need to be held accountable, is what spurred Ms. Hunsicker to make the somewhat remarkable agreement not to seek a sentence of less than two years' imprisonment. Make no mistake; Ms. Hunsicker does not welcome the prospect of jail time, and she understands the significant toll that her incarceration will take on her wife, her elderly mother, the person she sponsors in GA, and numerous others in her life, to say nothing of what it will mean for her own mental health and ongoing recovery. But

33

part of her acceptance of responsibility, codified in the plea agreement accepted by the government, is the acknowledgement that a sentence of *less* than two years in prison would not be sufficient to serve the purposes of sentencing. It is axiomatic, then, that a sentence of two years' imprisonment *would* be sufficient to serve the purposes of sentencing under Section 3553(a), and therefore any sentence longer than that would be "greater than necessary" to comply with those purposes.

Just punishment must consider what Ms. Hunsicker did not do, in addition to what she did. She did not orchestrate a sophisticated scheme to steal from the vulnerable. She did not act with greed or to enrich herself. Her fraud was precipitated by a period of unprecedented cognitive and emotional impairment. She came clean to CaaStle's Board about her behavior. She followed their instructions. She cooperated with the government's investigation. A just punishment will reward Ms. Hunsicker for choosing, once the "fog began to lift" and she realized the hole she had dug for herself, to stop digging. (A.14). A just punishment will seek to incentivize other individuals who find themselves in a similar situation to put down the shovel and accept accountability.

Ms. Hunsicker already has paid—and will continue to pay—a significant price for her misconduct. The substantial media attention that this matter has engendered has ensured that her reputation in the technology and fashion industries is ruined.[19] She has received numerous

---

[19] *See, e.g.*, Anita Raghavan, *CaaStle CEO Confessed to Fraud. The Board Let Her Stay in Charge*, The New York Times (Jun. 7, 2026), *available at* https://www.nytimes.com/2026/06/07/business/caastle-fraud-christine-hunsicker.html (accessed on Jul. 5, 2026); Jill R. Shah, *CaaStle CEO Hunsicker Resigns Over Fraud Claim as Firm Teeters*, Bloomberg (Apr. 1, 2025), *available at* https://www.bloomberg.com/news/articles/2025-04-01/caastle-ceo-hunsicker-resigns-over-fraud-claim-as-firm-teeters (accessed on Jul. 5, 2026); Larry Neumeister, *Fashion Startup Founder Charged With $300M Fraud Freed on $1M Bail*, Associated Press (Jul. 18, 2025), *available at* https://apnews.com/article/fashion-hunsicker-caastle-fraud-08720983ce404093425b3cc5fbddeb78 (accessed on Jul. 5, 2026); Jonathan Stempel, *Founder of Clothing Tech Startup CaaStle Pleads Guilty in $300 Million Fraud Case*, Reuters (Mar. 4, 2026), *available at* https://www.reuters.com/legal/government/founder-clothing-tech-startup-caastle-pleads-guilty-300-million-fraud-case-2026-03-04/ (accessed on Jul. 5, 2026).

34

hateful messages from former investors, one of whom suggested she kill herself. (A.179-82). Ms. Hunsicker is named as a defendant in seven civil lawsuits, including one filed by the Securities and Exchange Commission, that will stretch on for years. Her finances have been decimated, and she will spend the rest of her life paying restitution. A lengthy prison sentence on top of all this not only is not necessary to deter others from committing fraud, but it also would disincentivize others from stopping, accepting responsibility, and making amends.

There can be no credible claim that Ms. Hunsicker is likely to commit future crimes. The Probation Office found that Ms. Hunsicker's "risk of recidivism is low." (PSR p. 29; *see also* A.22) ("It is my professional opinion that Ms. Hunsicker poses a low risk of recidivism, that she has a unique capacity to contribute meaningfully to her community, and that the factors which converged to produce the criminal conduct in this case are unlikely to recur."). Ms. Hunsicker has demonstrated an ability and willingness to put guardrails in place for herself, adopting a "policy of radical honesty." (A.16). For example, before she began working at the tennis club, she proactively disclosed to the accountant that she had committed securities fraud and put appropriate boundaries in place for herself to ensure that she would not be involved in any way with the club's bookkeeping, finances, or fundraising. (A.118-19). "This initiative reflects a level of self-regulation and accountability that is directly attributable to her recovery work." (A.14-15).

As one long-time member of GA wrote, "It is rare to encounter someone who has approached accountability with the level of sincerity, humility, and determination that Ms. Hunsicker has displayed." (A.125). Her wife echoes this sentiment, noting, "What has impressed me most is not simply that she accepted responsibility for what she actually did, but the

seriousness with which she has tried to understand and address the underlying issues that contributed to her behavior." (A.137).

Ms. Hunsicker recognizes that the hard work of accountability and recovery must continue. Without regard to the specifics of the sentence imposed, she will continue pursuing therapy, protecting her sobriety, and regularly participating in GA, which accords with Dr. Schaffer's and the Probation Office's recommendations. (A.21; PSR p. 31).

### 3. The kinds of sentences available

We respectfully submit that this Court should endeavor to craft a sentence that allows Ms. Hunsicker to continue her positive trajectory and use her intellect and entrepreneurial skills to contribute to society in ways that she is uniquely positioned to do. Such a sentence could combine a shorter term of incarceration with a longer term of supervised release. A shorter term of incarceration will allow Ms. Hunsicker to continue her treatment and recovery, with less interruption to her participation in the GA program and mental health therapy. It also will permit Ms. Hunsicker a meaningful opportunity to work and set aside money for restitution.

Furthermore, Ms. Hunsicker has demonstrated a remarkable ability to identify an issue and work to solve it. She has used lessons learned from her personal shortcomings and vulnerabilities to help a remarkable number of people through her work with GA, her writing, and her Accountable and badge programs. This Court's sentence should consider Ms. Hunsicker's gifts and her history of giving back. A sentence that permits her to continue that work as promptly as possible will be in the best interest of Ms. Hunsicker, the investors seeking restitution, and the community she is striving to serve.

### 4. The advisory Guidelines range

In fraud cases, "the amount of the loss [has] become the principal determinant of the

36

adjusted offense level and hence the corresponding sentencing range." *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016). "This approach, unknown to other sentencing systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider." *Id.* (citing *Kimbrough*, 552 U.S. at 101, for the proposition that a "sentencing judge may make a non-Guidelines sentence if the judge disagrees with a Commission's policy determination").

Because "[t]he guidelines place undue weight on the amount of loss involved in the fraud," many courts have concluded that the fraud guidelines do not accurately reflect criminal or moral culpability. *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.). *See also, e.g., United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (Rakoff, J.) (stating that the Guidelines place "inordinate emphasis . . . on the amount of actual or intended financial loss" and do not "explain[] why it is appropriate to accord such huge weight to such factors"); *United States v. Parris*, 573 F. Supp. 2d 744, 745 (E.D.N.Y. 2008) (Block, J.) (describing "another example where the guidelines in a securities-fraud [case] 'have so run amok that they are patently absurd on their face[]'"); *United States v. Johnson*, 16 Cr. 457 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. April 27, 2018) (observing that "the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment best fits the crime, nor any approximation of the moral seriousness of the crime"); *United States v. Milton*, 21 Cr. 478 (ER) (S.D.N.Y.), ECF No. 322 at 90 (noting that the fraud guidelines are a poor proxy for criminal and moral culpability).

The discrepancy between the loss amount and the extent of criminal and moral culpability is even more pronounced in a case such as this one, in which the defendant had no personal financial gain. "[T]he rigidity of the loss amount overriding the diverse reality of

37

complex financial crimes [and] the lack of any consideration of danger to society[]," *Johnson*, 2018 WL 1997975, at *4, contravenes the mandate issued to sentencing courts through Section 3553(a)—namely, to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing.

The loss guideline's failure to apply an empirical, reasonable approach yields "[t]he widespread perception that the loss guideline is broken[,]" and "fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guidelines advice to sentencing judges." *United States v. Corsey*, 723 F.3d 366, 378-80 (2d Cir. 2013) (Underhill, J., concurring). *See also Milton*, 21 Cr. 478 ECF No. 322 at 90 (stating that "there is a lot of intellectual and academic debate about whether or not the . . . fraud guidelines even comport with the rationale that the sentencing guidelines were instituted to address, which is to say, to impose a uniform system of sentencing across the entire country, taking into account the judiciary's experience in sentencing similar defendants based on similar crimes"). Indeed, the Sentencing Commission itself recently acknowledged that, as they stand today, the loss amount guidelines in 2B1.1(b)(1) overstate the "degree of harm and culpability" in fraud cases.[20] *See also Milton*, 21 Cr. 478 ECF No. 322 at 98 (noting that, because "the loss amount is immense, … it would be ludicrous for you to be sentenced in accordance with those guidelines").

As such, in fraud cases, the sentencing guidelines do not constitute a reasonable starting point for sentencing, and "district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides." *Corsey*, 723 F.3d at 379. In fact, in a case in which Section 2B1.1(b)(1) almost tripled the offense level to 16 from a base

---

[20] U.S. Sentencing Comm'n, *Adopted Amendments* (effective Nov. 1, 2026) (Apr. 30, 2026), *available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/202605_Amendments.pdf (accessed on Jul. 1, 2026).

offense level of six, the Second Circuit found that "remand is appropriate to permit the sentencing judge to consider whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence." *Algahaim*, 842 F.3d at 800. In Ms. Hunsicker's case, Section 2B1.1(b)(1) nearly *sextuples* the offense level to 34 from the same base offense level of six.[21]

### 5. Pertinent policy statements by the Sentencing Commission

Recent amendments to the Guidelines proposed for public comment reflect significant concern by the members of the Sentencing Commission that the current Guidelines do not adequately capture many of the material issues involved in this case.[22] Specifically, the proposed amendments note that the current Guidelines: (1) can allow loss amount to overstate the level of criminal and moral culpability involved in cases where the applicable Guideline is Section 2B1.1; (2) fail to adequately account for criminal conduct caused by physical or emotional conditions; (3) fail to adequately account for post-offense rehabilitative efforts, including stopping the criminal conduct, making efforts to restore funds to investors, and self-reporting, especially when such efforts pre-date the defendant's knowledge of a criminal investigation; and (4) unduly limit consideration of alternative sentencing options that could reduce the amount of time served in prison in favor of home detention and other non-incarceratory punishments.[23] While some of the proposed amendments were one vote short of the four voting members of the Commission required to move from promulgating a proposed amendment for public comment to

---

[21] The Probation Office's reliance on the median sentence imposed under the same Guideline and Guidelines range does not solve these issues. That approach does not account for the distortive effects of the range's starting point, especially in cases involving high loss amounts, or the highly atypical factors of this particular case.

[22] U.S. Sentencing Comm'n, *Proposed Amendments to the Sentencing Guidelines* (Dec. 12, 2025), *available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202602_rf-proposed.pdf (accessed on Jul. 1, 2026).

[23] *Id.* at 65 (addressing "Culpability Factors"), 65, 70 (proposed 2B1.1(22)), 65-66 & 70-71 (proposed 2B1.1(23)), 83 (proposed "Post-Offense Rehabilitation Adjustment"); *Adopted Amendments* at 61.

39

submission to Congress, these recognized deficits in the Guidelines remain appropriate factors for the Court to consider under Section 3553(a)(5).[24]

### 6. The need to avoid unwarranted sentencing disparities

The Section 3553(a) factors also instruct sentencing judges to avoid unwarranted sentencing disparities. On this point, the sentencing of Nikola Corporation founder Trevor Milton is particularly instructive. *Milton*, 21 Cr. 478 (ER) (S.D.N.Y.). From 2019 to 2020, Mr. Milton engaged in a scheme to defraud investors by inducing them to purchase shares of Nikola, the electric- and hydrogen-powered vehicle and energy company that he founded, through false and misleading statements regarding Nikola's product and technology development. Mr. Milton's scheme targeted individual, non-professional investors—so-called "retail investors"— by making false and misleading statements directly to the investing public through social media and television, print, and podcast interviews. Mr. Milton took advantage of the fact that Nikola went public by merging with a Special Purpose Acquisition Company or "SPAC," rather than through a traditional IPO, by making many of his false and misleading claims during a period when he would not have been allowed to make public statements under rules that govern IPOs. *Milton*, 21 Cr. 478 ECF No. 315.

Moreover, in the government's words,

> Milton's offenses, like so many other white-collar crimes, were the result of greed, selfishness, and lack of concern for the potential impact on others …. Not only did Milton prioritize the status of being a wealthy entrepreneur, but he spent nearly all of the cash he had from Nikola going public on airplanes and lavish properties well before his lockup expired, and he made clear both at the time of the SPAC merger and later that he wished to be free to sell his shares.

---

[24] Publication of a proposed amendment requires the affirmative vote of at least three voting members of the Commission and is deemed to be a request for public comment on the proposed amendment. *See* Rules 2.2 and 4.4, U.S. Sentencing Comm'n, *Rules of Practice and Procedure* (as amended, Aug. 18, 2016). In contrast, the affirmative vote of at least four voting members is required to promulgate an amendment and submit it to Congress. *See* Rule 2.2; 28 U.S.C. § 994(p).

*Id.* at 25-26.

Mr. Milton was convicted of securities and wire fraud following a one-month trial in this district in 2023. The Probation Office calculated an advisory Guidelines range of 210 to 262 months' imprisonment, and the Probation Office and the government recommended a below-Guidelines sentence of 132 months. *Milton*, 21 Cr. 478 ECF No. 315 at 3-4. Judge Eduardo Ramos found the loss amount resulting from Mr. Milton's fraud to be $660 million and found an advisory Guidelines range of 324 to 405 months' imprisonment. *Milton*, 21 Cr. 478 ECF Nos. 315 at 5, 322 at 8. Judge Ramos sentenced Mr. Milton to 48 months in prison, a $1 million fine, and $168 million in restitution. *Milton*, 21 Cr. 478 ECF No. 322. Shortly thereafter, Mr. Milton received a full and unconditional pardon.[25] *Milton*, 21 Cr. 478 ECF No. 366.

In Mr. Milton's case, like many of the heartland fraud cases, the loss amount was roughly equivalent to the personal gain to the defendant and, therefore, could serve as a closer proxy for criminal culpability. *See Milton*, 21 Cr. 478 ECF 322 at 90-91. Not so here. Ms. Hunsicker did not personally profit from her misrepresentations, and she put far more money into CaaStle than she took from it. "[A]t no point throughout this process did she attempt to enrich herself, but rather genuinely thought that if she could just keep the company running, she would be able to make things right." (A.14). As one investor stated, Ms. Hunsicker "lost everything she had trying. That is not the behavior of someone who set out to steal. That is the behavior of someone who could not stop running laps." (A.97).

---

[25] Following his conviction, Mr. Milton and his wife donated more than $3.2 million to Donald Trump's 2024 presidential campaign and affiliated entities. Ben Foldy and Christopher Kup, *Pardoned for Fraud, a CEO Mounts His Comeback: 'We Can Trust You Now,'* The Wall Street Journal (March 17, 2026), *available at* https://www.wsj.com/business/trevor-milton-pardon-nikola-trump-3163e19c (accessed on Jul. 15, 2026). In March 2025, Mr. Milton was given a full pardon. In September 2025, the SEC also dropped its civil enforcement case against Mr. Milton. Consequently, Mr. Milton will not have to pay any civil penalties or court-ordered compensation to shareholders and will be permitted to work in securities-related positions. Kenneth Vogel, *The S.E.C. Drops Efforts to Recoup Funds From Trump Clemency Recipients*, New York Times (Sept. 19, 2025), *available at* https://www.nytimes.com/2025/09/19/us/politics/sec-trump-clemency.html (accessed on Jul. 15, 2026).

Moreover, as Judge Ramos aptly stated, "With respect to moral culpability, the amount of the fraud, whether it's a million dollars or under a million dollars or a hundred million dollars, doesn't always or frequently doesn't get at what is important for people like myself to consider in imposing sentence." *See Milton*, 21 Cr. 478 ECF 322 at 90-91. There can be no doubt that Ms. Hunsicker is significantly less morally culpable by comparison. While Mr. Milton's fraud preyed on unsophisticated, retail investors, the investments in CaaStle all came from accredited investors. Nikola was a publicly-traded company, with all of the additional responsibilities and disclosure obligations that attach. CaaStle was not.

Ms. Hunsicker accepted responsibility for her actions by voluntarily disclosing her fraudulent conduct before any investigation, cooperated extensively with the government, pled guilty promptly, and has demonstrated profound remorse and accountability. Mr. Milton never accepted responsibility—instead, he was convicted following a trial, appealed his conviction, and ultimately entirely escaped both punishment and restitution.

The need to avoid unnecessary sentencing disparities speaks powerfully to the need for Ms. Hunsicker to receive a sentence substantially less severe than the 48-month sentence imposed in this district on a defendant who consistently denied responsibility and evaded accountability after enriching himself through a much larger fraud targeted at retail investors that, notably, was not brought about by a devastating traumatic brain injury.

### 7. The need to provide restitution to the victims of the offense

In most fraud cases, where the defendant has kept the proceeds of their fraud for themselves, the path to restitution is by recovering as many of those funds as possible from the defendant's ill-gotten gains. Ms. Hunsicker directed the investors' funds to CaaStle, not herself, and went into personal debt putting even more of her own money into CaaStle. There are no

funds to recover from Ms. Hunsicker. The only way for the investors to receive restitution is for Ms. Hunsicker to earn it for them, and she is committed to doing so.

Regardless of the sentence imposed, Ms. Hunsicker will spend the rest of her life working to provide restitution to those harmed by her misconduct. As one longtime friend wrote, "Christine told me that she intends to pay back everyone who was misled. I have no idea if that is possible, but I have no doubt that she will try." (A.155). Since pleading guilty in this case, and on her own initiative, Ms. Hunsicker has allocated 10% of the earnings from her part-time job toward restitution.

Ms. Hunsicker's proven ingenuity and entrepreneurial experience put her in a unique position with respect to restitution going forward. Having helped build successful start-up companies, she has the skills and determination to generate meaningful income that could be directed to victims if she is given the opportunity to work. And the guardrails she has put in place for herself, in her recent employment and as an active participant in GA, ensure that she will not fall into old, maladaptive patterns. (A.21-22, 118-19). She need not personally act as a CEO or have any involvement whatsoever in finances or raising funds from investors to develop ideas and create businesses that can be successful.

In fashioning an appropriate sentence, the Court should consider that every additional day in jail will reduce Ms. Hunsicker's ability to provide restitution to the victims. A law enforcement officer with twenty-two years on the job describes it best:

> I believe that people need to be held accountable by the Court and that sentencing should be beneficial to society while being mindful of what the victims have lost. My cursory view of this case is that it is mostly a financial crime in which the victims have lost finances. Typically, their restitution would be financial. In this case, I do not see how a 50 year old woman doing significant prison time serves a greater good for society. I feel that Christine has a lot to offer to society and that the only way that the victims would be able to recover any of their lost finances would be for Christine to be afforded an opportunity to work to the greatest extent

43

possible. I believe that her activities could be monitored by the Court while working and that she would be able to provide far greater restitution than she would if she were simply incarcerated for a long time. Christine is highly intelligent and capable of being productive, despite having a criminal record.

(A.124).

Victims of her offense agree. As one harmed CaaStle investor put it, "I sincerely hope that you can consider the above and find a way to minimize Christine's time in prison along with an agreement from her that she will dedicate the remainder of her working life to making good the financial losses suffered by her investors." (A.101; *see also* A.106 ("I believe Christine wants and deserves the chance to make all investors whole. Her spending a long time in jail would not offer that opportunity."))

Indeed, even the investors who submitted the victim impact statement included in the Presentence Report assiduously avoided asking the Court to impose an incarceratory sentence, while explicitly requesting that the Court "require restitution payments." (PSR ¶ 23). They want their money back, not vengeance, and the sentence most likely to serve Section 3553(a)'s objective of making victims financially whole is one that permits Ms. Hunsicker to resume productive employment and begin paying restitution as soon as possible.

44

## CONCLUSION

Ms. Hunsicker should receive a sentence that is sufficient, but not greater than necessary, to achieve the purposes of sentencing pursuant to 18 U.S.C. § 3553(a). For the reasons stated above, we respectfully submit that sentence is 24 months' imprisonment coupled with supervised release and any other conditions the Court deems appropriate.

Dated: July 22, 2026

Respectfully submitted,

Michael N. Levy
Elizabeth L. Martin
ELLERMAN ENZINNA LEVY PLLC
1050 30th Street, NW
Washington, DC 20007
Tel: (202)753-5553
mlevy@eellaw.com
emartin@eellaw.com

Anna M. Skotko
SKOTKO LAW PLLC
29 Broadway, Floor 31
New York, NY 10006
Tel: (646)396-5251
anna@skotkolaw.com

*Counsel for Christine Hunsicker*

45