UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------

UNITED STATES OF AMERICA

v.                                                          25 Cr. 318 (JPO)

CHRISTINE HUNSICKER


---------------------------------------------------


**APPENDIX TO DEFENDANT CHRISTINE
HUNSICKER'S SENTENCING MEMORANDUM
(PART A)**


Michael N. Levy
Elizabeth L. Martin
ELLERMAN ENZINNA LEVY PLLC
1050 30th Street, NW
Washington, DC 20007
Tel: (202) 753-5553
mlevy@eellaw.com
emartin@eellaw.com

Anna M. Skotko
SKOTKO LAW PLLC
29 Broadway, Floor 31
New York, NY 10006
Tel: (646) 396-5251
anna@skotkolaw.com

*Counsel for Christine Hunsicker*

# APPENDIX
# TABLE OF CONTENTS

Report of Dr. Sarah Schaffer ............................................................................ A.1

Dr. Sarah Schaffer Curriculum Vitae................................................................ A.84

April 29, 2018 Email Correspondence.............................................................. A.91

Letters of Support

    Monica Graham ......................................................................... A.92

    Investor 2 ................................................................................... A.101

    Investor 3 ................................................................................... A.102

    Investor 4 ................................................................................... A.106

    Cynthia Joseph........................................................................... A.107

    Melissa Robinson....................................................................... A.112

    Emma Hutchens ......................................................................... A.116

    Ellen Goldberg........................................................................... A.118

    Vivian Polack............................................................................. A.120

    Gregory Lewis ........................................................................... A.122

    Gamblers Anonymous Member 1 .............................................. A.125

    Gamblers Anonymous Member 2 .............................................. A.128

    Gamblers Anonymous Member 3 .............................................. A.130

    Gamblers Anonymous Member 4 .............................................. A.133

    Phaidra Knight ........................................................................... A.136

    Susan Hunsicker......................................................................... A.138

    Brian Jones................................................................................. A.139

    Tammy Jones .............................................................................. A.141

    Rick Hunsicker........................................................................... A.144

    Terry Hunsicker ......................................................................... A.146

    Kirsty Viedra.............................................................................. A.149

    Laura Field.................................................................................. A.151

Lauralee Field ................................................................................ A.154

Searle Field .................................................................................... A.156

Chris Vlasto .................................................................................... A.160

Deb Stenack .................................................................................... A.162

Andrew Faulkner ............................................................................ A.163

Adrienne Breslin ............................................................................ A.165

Beth Bozman.................................................................................... A.167

Ernie Stefanelli................................................................................ A.170

Alison Janes .................................................................................... A.172

Jason Pawlowski ............................................................................ A.175

Molly Watts .................................................................................... A.177

February 21, 2026 Investor Texts ...................................................... A.179

"Investor-4" Communication ............................................................ A.183

Draft Hunsicker Book, *The In Between* ............................................ A.186

Hunsicker Medical Records................................................................ A.283

Hunsicker Medications List and Scope of Treatment .......................... A.752

**Sarah G. Schaffer, Ph.D., ABPP-CN**

Board Certified Clinical Neuropsychologist NYS License ██████

██████████

---

## FORENSIC NEUROPSYCHOLOGICAL REPORT

Prepared for the United States District Court Sentencing Phase —
United States v. Christine Hunsicker

| | |
|---|---|
| **Defendant:** | Christine Hunsicker |
| **Date of Birth:** | 04/27/1977 |
| **Age at Evaluation:** | ██████ |
| **Education:** | B.A., Princeton University (1999) |
| | Graduate coursework, Pratt Institute (Toy Design) |
| **Handedness:** | Right |
| **Date of Report:** | July 20, 2026 |
| **Referring Attorney:** | Michael Levy & Elizabeth Martin |
| | Ellerman Enzinna Levy PLLC |
| | 1050 30th Street, NW, Washington, DC 20007 |
| | Tel: (202) 753-5553 \| mlevy@eellaw.com |
| | |
| | Anna M. Skotko Skotko Law PLLC |
| | 29 Broadway, Floor 31, New York, NY 10006 |
| | Tel: (646) 396 -5251 \| anna@skotkolaw.com |

## INTRODUCTION

Christine Hunsicker is a 48-year-old right-handed female who has pled guilty to securities fraud in connection with her role as founder and Chief Executive Officer ("CEO") of CaaStle, a "clothing-as-a-service" business that enabled clothing brands to rent their clothing inventory to consumers. The current forensic neuropsychological evaluation was requested by defense counsel in connection with the sentencing phase of Ms. Hunsicker's criminal case. The purpose of this report is to provide the Court with a comprehensive understanding of the psychological, neurological, and developmental factors that contributed to Ms. Hunsicker's criminal conduct, as well as to offer an opinion regarding the likelihood of recurrence and to make recommendations for conditions of supervision. Of particular interest to Ms. Hunsicker's attorneys was the potential contribution of a concussion that she sustained in late 2017, which resulted in prolonged and debilitating neurologic and cognitive sequelae that overlapped in time with the onset of her fraudulent activity.

The following report is based on information obtained from multiple sources, including a comprehensive in-person clinical interview with Ms. Hunsicker conducted on 03/26/2026, with two additional follow-up interviews via videoconference on 04/17 and 04/20/2026, totaling approximately 3.5 hours; a thorough review of medical, psychiatric, and neurological records; and a review of pharmacogenomic testing results. It is important to note that I did not conduct an independent neuropsychological examination of Ms. Hunsicker, as her cognitive functioning has returned to baseline and the goal of this evaluation is retrospective in nature—that is, to explain the circumstances under which her criminal conduct occurred, rather than to assess her current cognitive abilities.

Prior to initiating the clinical interview, I discussed my professional role and the purpose of the evaluation with Ms. Hunsicker. I informed her that the information she provided would be incorporated into a written report to be submitted to the Court for sentencing purposes. Ms. Hunsicker indicated that she understood these terms and agreed to participate in the evaluation.

## SOURCES OF INFORMATION

1. Clinical Interview with Christine Hunsicker (03/26/2026; follow-up interviews 04/17/2026 and 04/20/2026)

2. Medical Records:
   a. Tisch Hospital — Perelman Emergency Department (NYU Langone)
   b. NYU Langone — Physical Medicine and Rehabilitation (Naheed Asad Van de Walle, MD)
   c. Rusk Rehabilitation at NYU Langone (Vestibular PT; Vision OT)
   d. NYU Langone — Neuro-Optometry (Neera Kapoor, OD)
   e. Weill Cornell Neurology (Louise Klebanoff, MD)
   f. Physicians Pain Treatment Associates (Alexander Mauskop, MD)

    g.  Hyperbaric Medical Solutions (HBOT)
    h.  Brain Resource Center (Kamran Fallahpour, PhD — Neurofeedback; qEEG/ERP; Neuropsychological Testing)
    i.  Jennifer Kraker, MD, MS (Outpatient Psychiatry)
    j.  NYU Langone Radiology (CT Head; MRA)

3. IntellxxDNA Pharmacogenomic Report (02/12/2026; ordered by Dr. Jennifer Kraker)

## BEHAVIORAL OBSERVATIONS

Ms. Hunsicker presented as a casually dressed, well-groomed woman who appeared her stated age. She was alert, fully oriented, and cooperative throughout the interview.

Spontaneous speech was fluent, well-articulated, and normal in rate, volume, and prosody. There was no evidence of word-finding difficulty, paraphasia, or tangential thinking during the evaluation, which is consistent with her report that her cognitive functioning has returned to baseline. Her thought process was coherent and goal-directed, and she was able to provide a highly detailed and organized narrative history with minimal prompting.

Ms. Hunsicker's affect was euthymic, congruent with reported mood, and generally appropriate to content. However, she appeared somewhat detached when recounting her history of childhood abuse, ███████████████ and the sexual violence she endured ██████████ That is, despite her openness and candor when providing details of the trauma that was perpetrated upon her as a youth, she did not show any overt signs of distress. Notably, when she followed up several days later via email to send some files that I had requested, she mentioned that after our meeting she was "wiped out" and had slept for about three days. When discussing her fraudulent behavior, she displayed genuine remorse, particularly when distinguishing between the period during which she was cognitively impaired and the later period during which she was aware that her conduct constituted a crime. She did not minimize her responsibility for the offense, nor did she attempt to portray herself as a victim of circumstances beyond her control. Rather, she demonstrated a nuanced understanding of the multiple factors that contributed to her behavior, while simultaneously accepting full accountability for the harm she caused.

There were no signs of psychosis, disorganized thinking, or cognitive impairment during the evaluation. Her mood was described as "much lighter" than in recent years, and she appeared genuinely invested in her recovery, citing her one-year anniversary in Gamblers Anonymous (which fell approximately two weeks before the interview) as a source of pride—something she noted was unfamiliar to her, as she had never previously been encouraged to celebrate her own accomplishments.

## BACKGROUND & HISTORY

*The following history was obtained through a direct interview with Ms. Hunsicker, unless otherwise noted. Where applicable, information obtained from the interview is supplemented and/or contrasted with information derived from the medical records and other documents reviewed for this evaluation*

### Early Life and Family Background

Ms. Hunsicker was born on ▮▮▮▮▮▮ and raised in Northampton, Pennsylvania. She is the youngest of three children; her two older brothers are currently ages 53 and 54. Her parents married at age 16 and had all three children by age 22. Her father worked as a welder at Bethlehem Steel until the plant began winding down in approximately 1995. For several years, including while Ms. Hunsicker was a student there, he held a second job as a coach at the local high school. He later served as a line worker at the Alpo Dog Food plant until close to the time of his death. ▮▮▮▮▮▮▮▮▮ and by Ms. Hunsicker's account the household was characterized by frequent yelling and emotional volatility. He passed away in 2004. Her mother ran an H&R Block office and was reportedly the number-one volume tax preparer in Pennsylvania for many years. ▮▮▮▮▮▮▮

Ms. Hunsicker's description of her family environment revealed a childhood characterized by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Her father, while deeply involved in her athletic development—he never missed a game and declined career advancement at Bethlehem Steel in order to attend her sporting events—▮▮▮▮▮▮ She reported that he gave her the nickname "Bubba" around age 6 and would yell "half man, half woman" at her sports events to humiliate her, despite knowing that she hated it. Even when she performed well—scoring multiple goals in a game, for example—his response upon her coming off the field was, "Why do you suck?" She described him as "unrelenting" and noted that "nothing was ever enough."



▮▮▮▮▮▮▮ Her parents directed all of their time and energy toward her athletic development, to the exclusion of her brothers. She reported that she had no friends growing up, and that her first real friend was in college, where she finally felt like she "found [her] people" (i.e., other intelligent and highly driven elite athletes).

This early environment established a pattern that would prove central to understanding Ms. Hunsicker's later conduct: she learned that her value was contingent upon performance, that pain was to be endured and not acknowledged,

and that expressing vulnerability or asking for help would be met with rejection and punishment.

## Athletic Background

Ms. Hunsicker was an exceptional athlete from a young age, beginning organized sports at age four. She played four sports year-round, including field hockey, soccer, and basketball, and well enough to play with boys in the 1980s when girls' leagues were limited. She was recruited to play Division I field hockey at Princeton University.

Several incidents from her athletic career are relevant to this evaluation. At age 16, she suffered a "blown-out" ankle during a soccer game, after which her father made her run laps for an hour and a half on the severely injured ankle, telling her it was so she learned "not to get hurt." In college, she played with a broken back that required her to wear a steel cage/brace molded to her midsection, despite being told that she had a 30% chance of paralysis. During this period while her back was injured, she also experienced anaphylactic shock from naproxen while warming up for a game against Cornell. She reportedly flatlined and required two adrenaline injections, but she still played in the Syracuse game the following day, against medical advice, and her team won. Her coach and father both supported her playing despite these life-threatening conditions, because "no pain, no gain."

These experiences reinforced a deeply held belief that she could overcome anything, regardless of the physical or psychological cost, by pushing herself to keep going. As she stated during the interview: "There's no amount of abuse that you could put on me that I would feel like I couldn't make it through." She also acknowledged that this belief system, which she carried into adulthood, was ultimately maladaptive: "Those things are no longer points of pride. They're like—I feel really sad for that girl."

## History of Sexual Abuse

Ms. Hunsicker disclosed a history of severe and prolonged sexual abuse that, to her knowledge, has not been previously documented in any of the medical records that were reviewed for this evaluation, though her psychiatrist did confirm that this was part of the trauma history reported in the course of her treatment of Ms. Hunsicker, and was the foundation for her diagnosis of complex PTSD.





Ms. Hunsicker had no support system during this period. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Meanwhile, she had no friends, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and no other adults or authority figures that she trusted enough to tell what was happening. She described herself during this period as "the perfect target." With no support system and no avenue for disclosure, she coped through dissociation, severe anorexia, and the internalization of a belief that her experience was not unusual or worthy of attention. At age 16, Ms. Hunsicker became pregnant. With no adult she could turn to, she first attempted to terminate the pregnancy herself using a bent wire coat hanger. When this was unsuccessful, she drove to another state to obtain an abortion, alone and without her parents' knowledge. The following day, she played in a soccer game — coached by her father — and bled profusely throughout the game. She kept this from her parents and only told her brother Rick when he saw that she was bleeding uncontrollably and confronted her. This incident encapsulates, in its most extreme form, the behavioral pattern that would come to define Ms. Hunsicker's adult life: enduring a crisis of profound severity in complete isolation, telling no one, and continuing to perform as though nothing had happened.

The relevance of this trauma history to Ms. Hunsicker's criminal conduct cannot be overstated. The sexual abuse, combined with the emotional abuse ████████████ established a deeply ingrained pattern of dissociation under stress, compulsive performance despite distress, pathological self-reliance, and an inability to ask for help or acknowledge vulnerability. Several days after our meeting, Ms. Hunsicker emailed me to share a memory from 2006 that perfectly exemplified this maladaptive behavior pattern. She was working as the President and COO of Right Media, a technology start-up that she helped build (which was eventually bought by Yahoo). She recounted that she was in the middle of leading a board meeting and started to have a miscarriage, at which point she "paused the meeting for a quick bathroom break, went into the bathroom, and passed the fetus. Walked back out and continued the board meeting like nothing ever happened." She added that she was "completely dissociated and had no idea what to do, but I knew interrupting a meeting was not an option."

Ms. Hunsicker's trauma history also established a relationship with truth-telling that was fundamentally distorted. That is, in Ms. Hunsicker's formative experience, telling the truth resulted in punishment, abandonment, and further harm. These behavior patterns developed during childhood and adolescence, and at that time they were adaptive defense mechanisms that she employed to protect herself in the context of ongoing and pervasive threats across every facet of her life. However, having persisted into adulthood, these now maladaptive behavioral patterns were operating at full force when a concussion in late 2017 stripped away the executive control she had been using to manage them (discussed in detail below).

Taken together, the experiences described above left Ms. Hunsicker with a deeply entrenched set of behavioral patterns that would prove directly relevant to her eventual criminal conduct, including an inability to stop performing regardless of personal cost; a compulsive need to meet the expectations of authority figures, particularly older men in positions of power; a reflexive tendency to dissociate and resort to deception under stress; and an absolute inability to ask for help or acknowledge weakness. These patterns, which were forged as survival mechanisms in childhood and adolescence, constituted the psychological infrastructure through which the effects of a traumatic brain injury would ultimately be channeled into criminal behavior.

### Psychiatric History

Ms. Hunsicker carries diagnoses of Bipolar Disorder NOS (active);[1] Complex Post-Traumatic Stress Disorder (active); Borderline Personality Disorder (active); Substance Use Disorder (Alcohol, Opioid), in sustained remission for >15 years;

---

[1] According to Ms. Hunsicker's psychiatrist, the NOS ("Not Otherwise Specified") modifier was used because Ms. Hunsicker has no history of overt mania but has had "hypomania evoked after prozac monotherapy, potential hypomania unprovoked, with consistent relapsing and remitting episodic mood shifts, well controlled on her current regimen."

Gambling Addiction, in sustained remission for approximately one year; and Eating Disorders (anorexia and bulimia), in sustained remission for >8 years. She has been under the care of her current psychiatrist, Dr. Jennifer Kraker, for approximately 15 years, and treatment has included a combination of psychopharmacology, Dialectical Behavior Therapy (DBT), and occasional Eye Movement Desensitization and Reprocessing (EMDR). She initially attended therapy twice a week and was attending weekly sessions at the time of this evaluation. However, Ms. Hunsicker reported that the therapeutic relationship had become strained in recent months due to her inability to pay Dr. Kraker's fees following her indictment. Although therapy notes were not included in the records obtained from Dr. Kraker, she provided written confirmation of Ms. Hunsicker's diagnoses and that certain topics referenced in this report had been addressed in the context of therapy over the course of their professional relationship, including: 1.) chronic physical, psychological, and sexual abuse ███████████████████████; 2.) intense pressure from her father related to sports participation and performance; 3.) psychological abuse ███████████; and 4.) Ms. Hunsicker's history of suicidal ideation and parasuicidal behaviors.

Ms. Hunsicker's psychiatric treatment history dates to her freshman year at Princeton, when she began drinking heavily, engaged in risky behaviors, and reportedly developed suicidal ideation. Her affective distress and maladaptive coping behaviors continued unabated through her freshman year and ultimately peaked at the beginning of her sophomore year. Her teammates intervened and helped her find a therapist, but the therapist utilized an approach that required her to relive the trauma in detail, which proved harmful rather than therapeutic. She described becoming immobilized for days after sessions: "I went in there on a Thursday and she would ask me all sorts of questions of the abuse, and I would not move till Sunday other than to drink." She was started on Zoloft, which she took for approximately two years before discontinuing it because she felt like "a failure for taking it."

The psychiatric medication records from Dr. Kraker's practice (spanning 2011 through 2025) reveal a complex pharmacological history that is relevant to this evaluation on several levels. Of particular note, Ms. Hunsicker was prescribed disulfiram (Antabuse) from September 2011 through July 2013, indicating a period of problematic alcohol use. During the interview, she confirmed that she was a "full-blown alcoholic by freshman year of college," and described a period after selling a company to Yahoo during which she was drinking two bottles of rum per day while isolated at home, "rich and miserable." She had repeatedly tried to quit but had been unsuccessful until July 2011. Shortly after getting her first dog, a 10-week old Chinese shar pei puppy named Mabel, Ms. Hunsicker got drunk and passed out while making pasta. She left the pot on the stove burner, resulting in a kitchen fire that could have killed her and her new puppy. Although she did not care about what happened to herself at the time, she realized that Mabel was completely reliant on her, and the thought of dying and leaving Mabel on her own prompted her to action. Since she knew she could not stop drinking on her own, she sought out a doctor who

could prescribe Antabuse, which was how she initiated treatment with Dr. Kraker. In 2013, after determining that she "liked who I was more off of alcohol," she was able to stop taking the Antabuse without resuming her alcohol intake, though she characterized this as "abstinent, but no recovery"—that is, she stopped drinking through willpower alone, without engaging in a formal recovery program. To this day, she credits Mabel with saving her life, and she noted that it was the first time she truly understood what unconditional love was.

Also notable in the medication records are provider comments from 2015 and 2016 documenting cognitive side effects from lamotrigine (Lamictal) at doses of 100–125mg. Specifically, Dr. Kraker noted "hold for now, SEs cognitive at 125" in November 2015, and "taper to 75mg, reports cognitive slowing, word finding difficulty; STM [short term memory] loss" in August 2016. These entries document pre-existing cognitive complaints that preceded the December 2017 concussion by one to two years, establishing that Ms. Hunsicker's cognitive vulnerability was not solely attributable to the head injury but reflected an interaction between her psychiatric medication regimen and her neurological status. It is also worth noting that she found a diminution of her cognitive abilities to be less tolerable than the symptoms that these medications were treating, which is not uncommon in high-functioning individuals, who tend to notice even slight decrements in cognition more acutely than lower-functioning peers.

Following the concussion, Ms. Hunsicker's psychiatric medication regimen underwent significant changes. The lamotrigine dose was tapered in January 2019 "in context of PCS" (post-concussion syndrome). Lithium carbonate was introduced in March 2021 at 150mg per day and was titrated to 450mg per day by March 2022, a tripling of the dose that suggests increasing mood instability requiring more aggressive stabilization. Ms. Hunsicker's current medications include fluoxetine (Prozac) 20mg daily, lithium carbonate 450mg daily, and trazodone 25–50mg as needed at bedtime. She is also prescribed tirzepatide (Monjaro), a GLP-1 receptor agonist that she takes off-label for its anti-inflammatory properties; without it she experiences significant fluid retention and inflammatory symptoms.

### Substance Use History

Ms. Hunsicker's history of substance use is significant and reflects a longstanding pattern of addiction vulnerability that is consistent with both her psychiatric diagnoses and her genomic profile (discussed below).

In addition to the alcohol use disorder described above, Ms. Hunsicker developed an opioid addiction to Percodan during college following her back injury (as she was no longer able to use naproxen due to the aforementioned allergic reaction), noting that within two weeks she was "throwing my trainer against the wall telling her to give

me more pills." More recently, in 2024, she developed an addiction to oxycodone after being overprescribed the medication following jaw surgery; this lasted approximately two to three months and required a slow titration to discontinue. She also described a severe nicotine addiction, consuming 70 to 80 pieces of Nicorette gum per day. She reported that she has never used cocaine, acknowledging that she has deliberately avoided it because, "I know that if I tried coke, I'd be a crack whore."

Perhaps most relevant to the current case is Ms. Hunsicker's gambling behavior, which she identified as a central component of the fraud's escalation.



it did not occur to her that some of her own behaviors and propensities might also fall into this domain, since they manifested so differently. However, in retrospect she realizes that she was exhibiting signs of such an addiction dating back to her early days building and running tech start-ups. For example, Ms. Hunsicker recalled an interaction with her co-founder when they were trying to get the first CaaStle investors on board in a round of seven million. One investor was going to invest one million dollars, but only if the round was filled. They needed 3.5 million dollars to complete the round, and Ms. Hunsicker decided she would put the money in herself, despite the financial risks that would have accompanied such a move. Another time she sold an apartment, and instead of putting the money towards other financial obligations or depositing it into an account where it could earn interest, she put it all into the company. This was an ongoing pattern that she only recognized when she started attending Gamblers Anonymous (GA) meetings; question 12 of GA is "Were you ever hesitant to use gambling money for everyday expenditures?"

She described a more recent pattern in which when her company's bank account ran down to near-zero every two weeks, creating a payroll crisis for 600 employees, she experienced a dopamine rush from the 24-hour scramble to find money to cover payroll. She also purchased Powerball and Mega Millions tickets regularly, genuinely believing that she could win and pay back the investors. She described mentally dividing the lottery winnings among investors and acknowledged that this was "delusional thinking." Ms. Hunsicker has been active in Gamblers Anonymous (GA), attending six to seven meetings per week, leading meetings, and volunteering on the GA hotline. Her one-year "clean date" fell approximately two weeks before this interview. Her definition of "clean" encompasses abstinence from all financial transactions that could produce a dopamine rush.

## Educational and Career History

Ms. Hunsicker attended Princeton University, where she majored in English with a minor in Medieval Studies. She described rarely attending class yet still graduating with approximately a 3.4 GPA. She was recruited to play Division I field hockey but came to college significantly underweight due to anorexia. She subsequently developed severe bulimia, purging six to eight times daily for approximately 15 to 20 years. After Princeton, she spent nine months in Germany snowboarding and then briefly attended the Pratt Institute for graduate work in toy design but did not complete the program.

Ms. Hunsicker's career history reflects both her exceptional intellectual capacity and her constitutionally poor fit for sustained operational leadership. She founded multiple technology startups, one of which was acquired by Yahoo and another by Facebook. She described making "a ton of money" from these exits but being indifferent to wealth, noting that she ate "Cinnamon Toast Crunch for dinner." She was motivated by the dopamine she derived from building—that is, from the intellectual stimulation of creating new products and marketplace structures— rather than by financial gain or corporate status.

## The December 2017 Concussion and Post-Concussion Course

On 12/10/2017, while attempting to remove a 30-pound mirror from a wall, the mirror fell and struck Ms. Hunsicker on the parietal area of her head. She denied loss of consciousness but described being "very stunned." Consistent with the pattern established throughout her life—in which pain is endured and not acknowledged—she did not go to the emergency room and did not seek medical evaluation for approximately two months. Despite experiencing symptoms that persisted beyond the acute period, she attempted to "push through," hoping that they would eventually abate on their own.

Per medical records, when she was finally evaluated by Dr. Naheed Asad Van de Walle at NYU on 02/07/2018, she was approximately two months post-injury and was reporting severe symptoms: difficulty staying awake, inability to focus, feeling "foggy and lethargic," headaches, dizziness, balance problems, sensitivity to noise, difficulty concentrating and remembering, and fatigue. Her symptom ratings on the SAC Symptom Inventory (a brief self-report measure used to assess the presence/severity of concussion symptoms) were at or near the maximum (5–6 out of 6) for feeling slowed down, feeling foggy, difficulty concentrating, and difficulty remembering. Balance testing (modified BESS) revealed a score of 17/30, indicating significant impairment, and her delayed recall was 2 of 5 words. A CT of the head performed on 02/15/2018 was normal.

Over the ensuing months, Ms. Hunsicker was treated by an extensive array of providers, including physiatry (Dr. Van de Walle), vestibular physical therapy, vision occupational therapy, neuro-optometry (Dr. Kapoor), neurology (Dr. Klebanoff at Weill Cornell; subsequently Dr. Mauskop), neurofeedback (Dr. Fallahpour at the Brain Resource Center), and hyperbaric oxygen therapy

A.11

(Hyperbaric Medical Solutions)—in addition to ongoing psychiatric care with Dr. Kraker. The breadth and intensity of her treatment-seeking clearly demonstrated the severity of her symptoms and was especially notable in light of her usual modus operandi of just pushing through adversity without asking for help, though it did reflect her characteristic determination to solve problems through relentless effort.

In May 2018, Ms. Hunsicker's symptoms were aggravated when a cell phone was dropped on her head. Records from the NYU Emergency Department on May 10, 2018, reflect this incident and note that "at baseline patient reports chronic dull headache, brain fog, lethargy, hypo or hypersomnia, depression and balance problems since concussion in December 2017 when a 30 lb mirror fell over her head. Today she has new sharp shooting pain on left side of head, blurred vision, dizziness and increased word finding difficulties." Ms. Hunsicker reports that an additional incident in November 2018 during which she was hit in the head by a young family member further exacerbated the symptoms she had been experiencing since December 2017.

Several findings from this treatment period are particularly relevant. Dr. Klebanoff's initial neurology evaluation on 06/22/2018 yielded a Montreal Cognitive Assessment (MoCA) score of 30/30, which would typically suggest intact cognition, though it should be noted that the MoCA is a brief screening instrument that is typically used to screen for dementia and is not sensitive enough to pick up more nuanced disruptions in cognition; however, Dr. Klebanoff noted that she "would have expected her ability to generate words starting with 'F' to be better than her actual performance." Notably, this comment by Dr. Klebanoff was in reference to a test that has been shown to be highly sensitive to brain dysfunction, regardless of etiology. At that time, she reported working at only "60% efficiency" as CEO of a company with 600 employees. She described being awake only four to five hours per day, having someone follow her around taking notes because she could not remember anything, and being in constant pain from migraines.

Comprehensive neuropsychological and electrophysiological testing conducted at the Brain Resource Center on 01/26/2019—approximately 13 months after the December 2017 concussion and eight months after the May 2018 injury—revealed objective evidence of significant cognitive and neurophysiological dysfunction. Quantitative EEG (qEEG) demonstrated markedly elevated frontal delta power, with Z-scores of 4.69 and 4.54 at frontal pole electrode sites (eyes open), consistent with frontal lobe dysfunction.[2] Elevated frontal delta power on a qEEG indicates excessive slow-wave activity in the front of the brain, often suggesting cortical dysfunction, hypo-arousal, or reduced cerebral blood flow. While normal in deep sleep, this pattern is less typical during wakefulness and has been associated with traumatic brain injury (TBI) and PTSD. From a functional standpoint, it often

---

[2] To put this into perspective, in a normal distribution, about 99.7% of all data points fall within 3 standard deviations of the mean (z-scores between -3 and 3). A z-score of 4 is extremely rare and corresponds to the 99.997th percentile, meaning the value is higher than approximately 99.997% of all other data points in a standard normal distribution.

reflects an inability to sustain attentional tone (i.e., the overall state of mental alertness, readiness, and cognitive engagement), creating a perpetual drowsy state or "brain fog."

Neuropsychological testing at that time revealed significant deficits in short delay recall (6th percentile) and recognition accuracy (8th percentile), with elevated intrusion and perseveration errors indicative of disruptions in executive control processes (i.e., executive functioning skills that facilitate memory encoding and retrieval). Importantly, her short-term span of attention and verbal task performance fell in the 93rd to 100th percentile range, indicating that the memory deficits were genuine and not attributable to poor attention or suboptimal effort. A formal malingering assessment confirmed that there was "no suggestion of sub-optimal effort or any deliberate attempt to feign impairment." It is worth noting that her ability to perform well on a brief task of attention (i.e., short-term attention span), while also evidencing impaired ability to sustain attention/arousal over time, are not contradictory. The former relates to brief periods of engagement (in order to process discrete bits of information) and employs the "visual sketchpad" — a temporary storage workspace that is active during memory encoding — while sustained attention is the underlying energy source that keeps that workspace active over time. While the sketchpad handles the *contents* of one's immediate thoughts, sustained attention dictates *how long* one can maintain focus on a task. Importantly, the former (short-term/active attention) is processed in brain regions that were not impacted in Ms. Hunsicker, whereas the latter (sustained attention) primarily involves the prefrontal cortex (and right hemisphere networks that are often compromised in affective disorders). Notably, a follow-up qEEG in January 2020 showed persistent and even more pronounced frontal abnormalities, with a frontocentral delta Z-score of 6.47.

The ImPACT test administered on 03/05/2019 yielded a Total Symptom Score of 81, which is extremely elevated. Self-rated symptom severity was at or near the ceiling for feeling mentally foggy (6/6), difficulty remembering (6/6), difficulty concentrating (5/6), and feeling slowed down (5/6). Ms. Hunsicker completed 40 sessions of hyperbaric oxygen therapy by May 2019 and reported that her "migraines decreased by 95%" and her "short-term memory improved from the 10th to the 95th percentile." However, after traveling by airplane on vacation, her symptoms returned, including migraines and cognitive decline, and she experienced an anxiety attack during a subsequent HBOT session that prevented her from continuing that treatment. During the interview, Ms. Hunsicker described her cognitive state during this period in terms that are consistent with the objective data. She reported remembering only fragments of 2020, "zero of 2021," and "nothing of 2022 (maybe 1–2 days)," with memory beginning to return in 2023. She attributed her cognitive recovery primarily to time and to her move from Manhattan to a small rural town in New Jersey, stating: "I needed to be in nature and be in quiet. Until I moved out here, I don't think anything else would have done it."

## The Fraud: Context, Timeline, and Progression

From approximately 2019 through late 2023, Ms. Hunsicker was operating in a state of severe cognitive impairment, characterized by a lack of impulse control, significant memory deficits, and debilitating pain. By her own account, she was awake only four to five hours per day, was unable to engage in complex thought, and had someone following her around taking notes because she could not retain information. The objective testing described above confirms this clinical picture: memory performance at the 6th to 8th percentile, an ImPACT Total Symptom Score of 81, and qEEG evidence of profound frontal lobe dysfunction. Beginning in the fall of 2023, the "fog began to lift" and her cognition gradually improved, though this period of recovery also brought with it the painful realization of the full extent of what had transpired.

It was in this context of severe cognitive impairment that Ms. Hunsicker's fraudulent conduct began and escalated. An initial confrontation with a prominent investor, who threatened to "ruin" her career after she declined to provide more financial reporting than was permitted by company policy, led her to send fabricated numbers in an effort to defuse the situation—a response that was consistent with her lifelong pattern of performing through crises and appeasing authority figures at any cost. At the same time, a serious conflict with her co-founder—whom she described as playing "the role of my dad in all of this"—created additional pressure to conceal problems and maintain the appearance of control. These interpersonal dynamics, layered upon the cognitive impairment caused by the concussion, the onset of COVID-19 and its devastating impact on the company's business, and Ms. Hunsicker's deeply ingrained behavioral patterns of dissociation and deception under stress, created a "perfect storm" in which each factor amplified the others. It is critical to note that at no point throughout this process did she attempt to enrich herself, but rather genuinely thought that if she could just keep the company running, she would be able to make things right. Indeed, she invested tens of millions of dollars of her own money attempting to fix the situation and is now millions of dollars in debt.

## Current Functioning and Recovery

Ms. Hunsicker reports that her cognitive functioning has returned to baseline, which is consistent with her presentation during this evaluation. She currently resides in a rural area of New Jersey with her wife, Phaidra Knight, a former professional rugby player and current professional MMA fighter. Ms. Hunsicker works at a tennis club ███████████████████████, where she has implemented systems improvements that turned the club from operating at a loss to operating at a profit. Notably, and consistent with the self-awareness she has developed through her work in GA, Ms. Hunsicker proactively established explicit boundaries around her role. On her first day, she introduced herself to the club's accountant, disclosed that she had committed securities fraud, and insisted that she have no access to bank accounts, no involvement with finances or fundraising, and

no eligibility for sales-based incentives. This initiative reflects a level of self-regulation and accountability that is directly attributable to her recovery work.

In addition to the administrative assistance she has provided at the tennis club, Ms. Hunsicker has also developed a youth sports program for the club's existing summer camp—the "███████████ Badge Series"—aimed at building character and life skills in a safe and supportive environment. The ethos of the badge program is stated on the first page of Ms. Hunsicker's written proposal as follows (the full proposal is included as an appendix at the end of this report):

> "At ███████████ we believe sport is one of the clearest teachers of character. The ███████████ Badge Series is a structured framework recognizing the habits and mindsets that define lasting growth — Accountability, Bravery, Curiosity, Emotional Regulation, Flow, Guardianship, Joy in the Journey, Resilience, Problem-Solving, and Unity."

Ms. Hunsicker is also writing a children's book structured around ten character traits that sports can teach, designed as the resource she wished she had had as a child.

In addition to her work at the tennis club and the other projects noted above, Ms. Hunsicker has also become deeply involved in Gamblers Anonymous, attending six to seven meetings per week, leading meetings, and volunteering on the hotline. As noted above, she achieved her one-year clean date approximately two weeks before this interview and is working with a mentor to introduce "beginners rooms" for online and in-person GA meetings specifically aimed at newcomers to the program.

In thinking about the possibility of a prison sentence, and after several meetings with her pre-trial services officer, Officer ███████, Ms. Hunsicker became interested in how the justice system prepares inmates for life after prison. She mused on the applicability of the GA framework for a prison population, and Officer ███████ encouraged her to write a proposal that they can give to the new Commissioner at Rikers Island. A working draft of her proposal (entitled "Accountable") can be found in Appendix B.

Ms. Hunsicker expressed an attitude of acceptance of whatever sentence is imposed and described one of her primary concerns as not being available to help care for her mother, ███████████████████████████████████████████ for whom Ms. Hunsicker is the primary familial caretaker. Prior to her indictment, Ms. Hunsicker and her mother had been discussing having her move in with Ms. Hunsicker and Phaidra. Her mother's well-being, and the uncertainty with regard to the length of her sentence (and associated delay in relocating her mother), is a current source of stress. In addition, Ms. Hunsicker is concerned about maintaining access to her current medications while incarcerated—including tirzepatide (Monjaro), which she takes for its anti-inflammatory properties and which she believes is unlikely to be available in the federal prison system. When discussing how she is feeling about her

current situation and her impending sentencing, Ms. Hunsicker conveyed an attitude of hope and optimism. She attributed her current mental health and general well-being to the work she has done in GA. In particular, she has adopted a policy of radical honesty, which she contrasted with her prior pattern of "pathological lying" that she habitually used as a defense mechanism in an effort to please others in the moment and avoid conflict. She even noted: "I feel so much lighter to the point where a couple times I've had to be like, am I manic? I feel so much lighter not dealing with that stuff and not having to remember what I said to somebody last week."

As my interview was winding down, Ms. Hunsicker remarked that the years following her concussion were one of the worst periods of her life, because her ability to use her brain is the most important resource she has, and she realized that as long as she has the ability to engage in creative thinking, she will be able to find meaning and purpose regardless of her circumstances. She referenced Boethius's Consolation of Philosophy as a framework for approaching the possibility of incarceration, noting that "you're actually never in prison if your mind is free."

### Summary of Medical Record Review

A comprehensive review of the medical records provided to me was conducted prior to the clinical interview. The records span from 2010 through 2025 and include documentation from Tisch Hospital Emergency Department (NYU Langone), NYU Langone Physical Medicine and Rehabilitation, Rusk Rehabilitation, NYU Neuro-Optometry, Weill Cornell Neurology, Physicians Pain Treatment Associates, Hyperbaric Medical Solutions, the Brain Resource Center, and the outpatient psychiatry practice of Dr. Jennifer Kraker. A detailed chronological record review is maintained in my files and is available upon request. The key findings have been integrated into the Clinical Interview section above and the Summary and Opinions section below. A brief summary of the most relevant medical records is as follows:

Ms. Hunsicker has sustained multiple concussions throughout her life, all reportedly involving impacts to the parietal region of her head. Her medical records document at least three concussions prior to the December 2017 index injury: a head strike on a beam in 2006, a stereo falling on her head in 2010, hitting her head on the corner of a table in 2013, and the most recent, on 12/10/2017, when a 30-pound mirror fell on her head. She told the neurology team at NYU that she had "blacked out momentarily" with some of these prior injuries and that following each, she experienced "headaches, dizziness, cognitive impairment and emotional lability," though symptoms had previously resolved within days. This is notable, as a single concussion would not be expected to produce any ongoing symptoms, whereas a history of multiple prior concussions has been shown to increase both the severity and duration of symptoms following subsequent concussions.

Indeed, the medical records document a consistent clinical picture of a woman who sustained a concussion on 12/10/2017 in the context of multiple prior concussions, pre-existing bipolar disorder, and pre-existing medication-related cognitive

A.16

vulnerability. She did not seek medical attention for approximately two months, at which point she was found to have significant balance impairment and cognitive complaints. Regarding the latter, she reported particular difficulty with concentration and memory, which was noted to be of concern to her because "she works with data as part of her job." She also reported an exacerbation of bipolar disorder symptoms, including feelings of irritability, sadness and anxiety. Over the subsequent 18 months, she was treated by no fewer than eight different providers or treatment modalities, reflecting both the severity and the treatment-resistant nature of her symptoms. She reported two additional head injuries, in May and November 2018, which exacerbated her symptoms. Objective testing at 13 months post-injury confirmed frontal lobe dysfunction on qEEG (with markedly elevated frontal delta power), memory impairment at the 6th–8th percentile with valid effort, and an ImPACT Total Symptom Score of 81. These abnormalities persisted and in some cases worsened on follow-up testing at 25 months post-injury (January 2020). Her psychiatric medication regimen was significantly altered during this period, with lamotrigine tapered "in context of PCS" and lithium subsequently introduced and escalated to triple the initial dose between 2021 and 2022. Both lamotrigine and lithium are prescribed as mood stabilizers in patients with bipolar disorder.

**Pharmacogenomic Testing**

An IntellxxDNA pharmacogenomic report was generated on 02/12/2026, ordered by Dr. Kraker. While genomic testing of this type is not a standard component of forensic neuropsychological evaluation, the results are included here because they provide independent biological evidence that is consistent with—and helps to explain—the behavioral patterns observed in this case. The most relevant findings are summarized below.

Ms. Hunsicker carries the DRD3 CC genotype (present in 12.7% of the population), which is associated with increased dopamine-related reward and "a higher risk for short term reward seeking behaviors (i.e., gambling, etc.)," as well as an increased risk of obsessions and compulsive behaviors. She also carries the AUTS2 AA genotype (7.8% prevalence), associated with an "increased reward response in your brain in response to alcohol or drugs" and "more impulsive behavior and a higher sensitivity to drugs and alcohol." The DBH TT genotype (4.7% prevalence) indicates higher baseline dopamine levels and reduced conversion to norepinephrine—a finding that Ms. Hunsicker herself referenced during the interview when she stated, "I recognize I don't make enough norepinephrine." Additionally, she was found to have the BDNF CT genotype, which is associated with lower levels of brain-derived neurotrophic factor. Notably, BDNF plays a critical role in neuronal repair and recovery from brain injury.

These genomic findings do not determine behavior, and they are not offered as an excuse for Ms. Hunsicker's criminal conduct. Rather, they provide a biological substrate for understanding why she was particularly vulnerable to the type of

reward-seeking, crisis-driven decision-making that characterized the fraud, and why the frontal lobe dysfunction caused by her concussion may have had a disproportionately destabilizing effect on her already-vulnerable regulatory systems.

## SUMMARY AND OPINIONS

Based on my review of the available records, my clinical interview with Ms. Hunsicker, and my training and experience as a board-certified clinical neuropsychologist specializing in forensic evaluation, I offer the following opinions to a reasonable degree of psychological and neuropsychological certainty.

1. **Ms. Hunsicker's criminal conduct occurred in the context of a "perfect storm" of converging factors, each of which is independently documented and clinically significant.**

   The fraudulent conduct in this case did not arise in a vacuum, nor does it represent a lifelong pattern of criminal behavior. Rather, it emerged from the convergence of the following factors, all of which were operating simultaneously during the relevant time period:

   a. *Pre-existing psychological vulnerabilities:* Ms. Hunsicker entered adulthood with a deeply ingrained pattern of compulsive performance, pathological self-reliance, dissociation under stress, and distorted relationship with truth-telling—all of which were the direct products of childhood emotional abuse, three years of daily sexual abuse, and a family system that punished vulnerability and rewarded endurance of pain. These patterns were further complicated by diagnoses of Bipolar Disorder, Borderline Personality Disorder, and Complex PTSD, as well as a history of multiple addictions (alcohol, opioids, nicotine, gambling, eating disorders).

   b. *Cumulative traumatic brain injury:* Ms. Hunsicker sustained at least three concussions prior to the December 2017 injury, creating a cumulative neurological vulnerability. The December 2017 concussion resulted in prolonged post-concussion syndrome with objectively documented frontal lobe dysfunction (qEEG frontal delta excess with Z-scores at the >99.99th percentile), significant memory impairment (6th–8th percentile with valid effort), and severe symptom burden (ImPACT TSS = 81). These deficits were most pronounced during the period when the fraudulent conduct began and escalated.

   c. *Genomic vulnerability to reward-seeking behavior:* Pharmacogenomic testing revealed multiple genetic variants associated with elevated dopamine signaling, increased reward-seeking, and heightened risk for gambling and compulsive behaviors (DRD3 CC, AUTS2 AA, DBH TT). These findings are consistent with Ms. Hunsicker's documented history of multiple addictions and the specific gambling-like pattern that characterized the fraud's

escalation.

d. *Situational and professional pressures:* Ms. Hunsicker was serving as founder and CEO of a 600-person technology company while cognitively impaired, in chronic pain, awake only four to five hours per day, and with no meaningful operational support. She was simultaneously managing an investor who had threatened to destroy her career, a conflict with her co-founder, the impact of COVID-19 on her business, and the expectations associated with her public persona as a trailblazing female entrepreneur. She was running on the same fuel that had propelled her throughout her life: the belief that she could endure any amount of punishment and perform her way through any crisis.

2. **The concussion and its sequelae played a significant and causally relevant role in Ms. Hunsicker's criminal conduct.**

It is my opinion that the December 2017 concussion, occurring in the context of Ms. Hunsicker's pre-existing vulnerabilities and compounded by subsequent head injuries, was a necessary contributing factor to her criminal conduct. The concussion compromised the executive functions that she had been relying on to compensate for her underlying psychological vulnerabilities throughout her adult life. Largely subserved by the frontal lobes, "executive functions" are those skills that allow one to carry out goal-directed behavior, and executive functioning impairments can have a widespread impact across other cognitive domains, as well as having behavioral implications that can manifest during everyday activities. These skills include the ability to initiate activities; to maintain the motivation necessary to complete activities once initiated; to plan a course of action and organize the steps needed to carry it out (including generating hypotheses and/or strategies to aid in this process); to think flexibly and be able to shift focus when needed; to monitor and track progress towards an intended goal in order to recognize if/when mistakes are made or modifications are needed; to understand and respond appropriately to external feedback; to resist interference from irrelevant or competing information (i.e., impulse control); and to disengage from a stimulus/activity when necessary or when the action is completed (and not before). Higher order reasoning and problem-solving are also involved. The involvement of these skills in ensuring the smooth operation of other primary cognitive functions is referred to as "executive control." Together, these skills contribute to the ability to make sound decisions and to judge the appropriateness of one's own and others' actions. Importantly, quantitative EEG revealed profound abnormalities in frontal lobe brain regions, providing evidence of a physiological mechanism to account for the difficulties that she was reporting to her providers during that time.

Without the 2017 concussion, there is no evidence to suggest that Ms. Hunsicker

would have engaged in securities fraud; her prior career, despite its many complexities, was characterized by legitimate business success, and there is no history of prior criminal conduct. It is equally important to acknowledge, as Ms. Hunsicker herself did during the interview, that the concussion does not fully explain the conduct—particularly the continued conduct after fall 2023, when her cognition had begun to recover and she was aware that her actions constituted fraud. During that later period, the gambling addiction and the associated dopamine-driven crisis-solving behavior appear to have been the primary maintaining factors, even as cognitive clarity returned. This distinction, which Ms. Hunsicker drew spontaneously and without prompting, reflects a level of insight and honesty that is itself clinically significant.

3. **Ms. Hunsicker's current level of insight, remorse, and engagement in recovery is genuine and substantial.**

Ms. Hunsicker did not present as a person who has been coached to express remorse for the purpose of sentencing mitigation. She presented as a person who has, for the first time in her life, stopped performing and started recovering. She has been sober from gambling for one year, attends six to seven GA meetings per week, has established explicit boundaries around financial involvement in her current work, and has demonstrated the ability to identify and correct manipulative behavior in real time. She has taken a stance of radical honesty during the past year, as part of her recovery process, and perhaps for the first time in her life, she is holding herself accountable for her mistakes (both past and present). Of note, Ms. Hunsicker has also begun the difficult work of fully processing the sexual abuse that she had minimized for 30 years. Where she once viewed her survival and ability to push through any crisis, no matter how traumatic or tragic, as a point of pride, she is now beginning to recognize it as evidence of profound harm. Finally, it is worth noting that throughout my conversations with Ms. Hunsicker, I have been truly struck by her strength and resilience, given the extreme challenges that she faced growing up, and equally (if not more so) by the grace, integrity, and moral rectitude that she has brought to bear on her current situation.

4. **The likelihood of recurrence is low, provided that appropriate safeguards are maintained.**

In my opinion, the specific convergence of factors that produced the criminal conduct in this case is unlikely to recur. Ms. Hunsicker's cognitive functioning has returned to baseline, her bipolar disorder is being managed pharmacologically, she is actively engaged in addiction recovery, and she has developed a level of self-awareness about her vulnerabilities that she did not previously possess. However, given the severity of her psychiatric diagnoses, her history of multiple addictions, and her documented genomic vulnerability to reward-seeking behavior, I recommend the following conditions to further mitigate the risk of recurrence:

## RECOMMENDATIONS

1. **Continued psychiatric treatment.** Ms. Hunsicker should continue regular psychiatric care with a provider experienced in the treatment of Bipolar Disorder and Borderline Personality Disorder. Given the reported strain in her current therapeutic relationship, a structured transition to a new provider—or a formal repair of the existing relationship—should be considered.

2. **Continued participation in Gamblers Anonymous.** Ms. Hunsicker's engagement with GA has been a cornerstone of her recovery and should continue for the foreseeable future. This includes regular meeting attendance, sponsorship relationships, and continued service work (hotline volunteering, meeting leadership).

3. **Fiduciary accountability structure.** Any future professional role should include a mandatory accountability structure—analogous to a sponsor in the 12-step paradigm—in which a designated individual (such as a trusted advisor, mentor, or oversight board member) monitors for signs of cognitive or psychiatric decompensation and has the authority to intervene. Ms. Hunsicker should not hold fiduciary authority over investor funds, corporate accounts, or financial reporting. She has herself recognized this need, stating: "I want nothing to do with finances. I want nothing to do with raising money. I want nothing to do with being in charge of things."

4. **Head injury prevention and monitoring.** Given Ms. Hunsicker's history of multiple concussions and the documented cumulative vulnerability, she should be advised to avoid activities that carry a significant risk of head injury. In the event of any future head trauma, a prompt neuropsychological and neurological evaluation should be conducted, and the fiduciary accountability structure described above should be activated as a precautionary measure.

5. **Medication management.** Efforts should be made to ensure continuity of Ms. Hunsicker's psychiatric medications (fluoxetine, lithium carbonate), as abrupt discontinuation of lithium in particular carries a risk of mood destabilization. Her concerns regarding access to tirzepatide (Monjaro) for inflammatory management should also be documented and communicated to the Bureau of Prisons.

In closing, I would like to offer a final observation to the Court. Over the course of my 20-year career evaluating individuals in forensic contexts, it is rare to encounter someone who combines the degree of insight, accountability, and genuine commitment to change that Ms. Hunsicker has demonstrated. She is an exceptional individual—a person of extraordinary intellect, creativity, and drive—who committed serious crimes under circumstances that she now understands with remarkable clarity. She has not asked for sympathy, nor has she sought to minimize

the harm she caused. Instead, she has looked unflinchingly at how she got here, identified every vulnerability that contributed to her conduct, and built a structure of accountability around each one. Her work in Gamblers Anonymous, her proactive establishment of financial guardrails, her youth sports program, her prison rehabilitation proposal, and her policy of radical honesty are not the actions of a person who is performing for a sentencing judge. They are the actions of a person who has finally stopped performing and started recovering, and she has demonstrated remarkable grace and integrity as she navigates this process. It is my professional opinion that Ms. Hunsicker poses a low risk of recidivism, that she has a unique capacity to contribute meaningfully to her community, and that the factors which converged to produce the criminal conduct in this case are unlikely to recur.

Respectfully submitted,

Sarah G. Schaffer, Ph.D., ABPP-CN
Board Certified Clinical Neuropsychologist
NYS License █████████

# APPENDIX A

 **Badge Series**

## (Filed Under Seal)



A.23 to A.63

APPENDIX B

# ACCOUNTABLE

## (Filed Under Seal)



**Sarah G. Schaffer, Ph.D., ABPP-CN**
*Board Certified Clinical Neuropsychologist*
NYS License ███

## CURRICULUM VITAE

### Licensure & Certification

| | |
|---|---|
| 2010 | Board Certification in Clinical Neuropsychology ███<br>American Board of Professional Psychology |
| 2007 | New York State License ███ |

### Education

| | |
|---|---|
| 10/2003 – 9/2005 | **Doctor of Philosophy in Clinical Psychology**<br>Pacific Graduate School of Psychology (APA Accredited)<br>Palo Alto, CA |
| 9/2000 – 10/2003 | **Master of Science in Psychology**<br>Pacific Graduate School of Psychology (APA Accredited)<br>Palo Alto, CA |
| 9/1990 – 5/1995 | **Bachelor of Arts in Marine Biology**<br>University of California, Santa Cruz, CA |

### Professional Appointments

| | |
|---|---|
| 9/2007 – Present | **Private Practice (Clinical & Forensic)**<br>Adaptive Neuropsychological Services (Founding Partner)<br>New York, NY |
| 7/2019 – 6/2020 | **Health Quest Medical Practice / Neurology**<br>Highland, NY |
| 9/2008 – 8/2017 | **Senior Clinical Neuropsychologist (Pediatric and Adult)**<br>Comprehensive Epilepsy Center, Cushing Neuroscience Institute<br>Great Neck, NY |
| 1/2008 – 8/2008 | **Clinical Supervisor to Doctoral Student Extern (Pediatric)**<br>NYHQ – Theresa Lang Children's Ambulatory Care Center<br>Flushing, NY |
| 9/2007 – 8/2008 | **Clinical Neuropsychologist (Pediatric and Adult)**<br>New York Epilepsy and Neurology Group<br>Staten Island, NY |
| 9/2005 – 8/2007 | **Postdoctoral Fellowship in Clinical Neuropsychology**<br>NYU Comprehensive Epilepsy Center<br>New York, NY |

(Updated 01/2024)                     A.84

| 9/2004 – 8/2005 | **Predoctoral Internship in Clinical Neuropsychology** |
|---|---|
| | North Shore – Long Island Jewish Medical Center/Hillside Hospital |
| | Glen Oaks, NY |

## Academic Appointments

| 10/2008 – 8/2017 | **Assistant Professor of Neurology** |
|---|---|
| | Hofstra North Shore-LIJ School of Medicine |
| | Hempstead, NY |

| 8/2007 – 6/2008 | **Substitute Assistant Professor** |
|---|---|
| | Psychology Department, Queens College – CUNY |
| | Flushing, NY |

## Publications and Presentations

White, T., Zavarella, S., Jarchin, L., Nardi, D., Schaffer, S,. & Schulder, M. (2018). *Combined Brain Mapping and Compact Intraoperative MRI for Brain Tumor Resection.* Stereotactic Functional Neurosurgery, 96, 172-1871.

Schaffer, J., Rabinovitz, B.B. (2018). *Does General Intellectual Functioning (as Assessed Via Word Reading) Predict Performance on Learning and Memory in an Inpatient Psychiatric Sample.* The Clinical Neuropsychologist: Abstracts of the 16th Annual AACN Conference and Workshops of the American Academy of Clinical Neuropsychology (AACN). 32:4, 531-641.

Steiner, A.J., Perez, A., Schwartzblatt, A., Meltzer, E.P., Pimontel, M.A., Grinberg, A., LaBode, V.M., Cukier, Y., **Schaffer, S.G.** (2017, June). *Spatial Memory and Social Prosody in Patients with Lateralized Temporal Lobe Epilepsy.* Poster to be presented at the Annual Convention of the American Academy of Clinical Neuropsychology, Boston, MA.

Margolis, S.A., Nakhutina, L., **Schaffer, S.G.**, Grant, A.C., Gonzalez, J.S., (2018). *Perceived Epilepsy Stigma Mediates Relationships Between Personality and Social Well-being in a Diverse Epilepsy Population.* Epilepsy Behav. 78, 7-13.

Fossatti, D., Costabile, B., Crete, A., Paguyo, A., Keating, L., Schaffer, S. G., & Walker, K. G. (2017). *The Utility of Neuropsychological Measures for Predicting Poor Cognitive Outcomes Following Critical Illness.* Abstracts for the 2017 AACN Conference Scientific Poster Session, The Clinical Neuropsychologist, 31:4, 691-782

Steiner, A. J., Schwartzblatt, A., Perez, A., Meltzer, E. P., Pimontel, M. A., Grinberg, A., Labode, V., Cukier, Y. R., & Schaffer, S. G. (2017). Spatial Memory and Social Prosody in Patients with Lateralized Temporal Lobe Epilepsy. Abstracts for the 2017 AACN Conference Scientific Poster Session, The Clinical Neuropsychologist, 31:4, 691-782.

Venezia, R., Fossatti, D., Costabile, B., Paguyo, A., Crete, A., Keating, L., Schaffer, S., & Walker, K. (2017). *Verbal Memory Complaints in Critically Ill ICU Patients are Associated with Depression Severity, but not Memory Deficits.* Abstracts for the 2017 AACN Conference Scientific Poster Session, The Clinical Neuropsychologist, 31:4, 691-782.

A.85

Venezia, R., Walker, K., Happer, K., Kaur, A., Brice, S., Hiralall, A., Fossatti, D., & Schaffer, S. (2016). *Cognitive impairment persists after non-neurological critical illness in both young and elderly patients.* Abstracts for the 2016 AACN Scientific Poster Session, The Clinical Neuropsychologist, 30:3, 373-472.

Cukier, Y. & **Schaffer, S.G.** (2016, February). *The Neuropsychological Profile of a Child with Diamond-Blackfan Anemia and the Impact of Hemoglobin Level on Aspects of Cognition.* Poster presented at the Annual Convention of the International Neuropsychological Society, Boston, MA.

**Schaffer, S.G.** (2015). Evaluation of Adults with Professional Careers. In W. Barr & C. Morrison (Eds.), *Handbook on the Neuropsychology of Epilepsy and Seizure Disorders.* Springer.

Uderman, J., Cukier, Y., Rabinovitz, B., **Schaffer, S.G.** (2015, February). *Psychometric Assessment of Social Cognition in Pediatric Populations.* Poster presented at the Annual Convention of the International Neuropsychological Society, Denver, CO.

Cukier, Y., Janke, K.M., Rabinovitz, B., Hwang, S., Mehta, A., Harden, C., & **Schaffer, S.G.** (2014, December). *The impact of mood on memory complaints and memory performance in patients with epilepsy.* Poster presented at the Annual Convention of the American Epilepsy Society Annual Meeting, Seattle, WA.

Janke, K., Cukier, Y, Hwang, S, Mehta, A., Harden, C., & **Schaffer, S.G.** (2014, December). *Relations between Social Cognition and Quality of Life in Epilepsy.* Poster presented at the Annual Convention of the American Epilepsy Society Annual Meeting, Seattle, WA.

Uderman, J.Z., Miele, A.S., Rabinovitz, B., & **Schaffer, S.G.** (2013, October). *Neuropsychological Findings Following Cerebellar AVM Rupture.* Poster presented at the Annual Conference of the National Academy of Neuropsychology, San Diego, CA.

Margolis, S.A., Miele, A.S., Rabinovitz, B. & **Schaffer, S.G.** (2013, October). *Construct validity of the Neuropsychological Assessment Battery Naming Test in patients with intractable epilepsy.* Poster presented at the Annual Conference of the National Academy of Neuropsychology, San Diego, California.

Margolis, S.A., & Schaffer, S.G. (2013). *Correlations Between Executive Functions and Perceived Social Functioning Among Adult Epilepsy Patients With Mixed Etiologies.* Abstracts for the AACN Scientific Poster Session, The Clinical Neuropsychologist, 27:4, 539-646.

Margolis, S.A., & Schaffer, S.G. (2013). *MMPI-2-RF Somatic Complaints Correlates With Self-Reported Adverse Effects of Antiepileptic Drugs in Adult Epilepsy Patients With Mixed Etiologies.* Abstracts for the AACN Scientific Poster Session, The Clinical Neuropsychologist, 27:4, 539-646.

**Schaffer, S.G.**, Cukier, Y., & Gopin, C.B (2013, February). *The Utility of ACS—Faces II in Predicting Right Hemisphere Dysfunction.* Poster presented at the Annual Conference of the International Neuropsychological Society, Hawaii.

Gopin, C.G., Cukier, Y., & **Schaffer, S.G.** (2013, February). *The Convergent/Divergent Validity of the Neuropsychological Assessment Battery-Naming Subtest.* Poster presented at the International Neuropsychological Society, Hawaii.

Cukier, Y., **Schaffer, S.G.**, & Harden, C. (2012, December). *Concordance of Neuropsychological Data with VEEG and Neuroimaging in Presurgical Evaluation.* Poster presented at the Annual Conference of the American Epilepsy Society, San Francisco, CA.

Harden, C. L., Herzog, A. G., **Schaffer, S.G.,** Fowler, K.M. & Jobst, B. (2012, December). *The Effects of Progesterone Versus Placebo Treatment on Quality of Life in Women with Epilepsy.* Poster presented at the Annual Conference of the American Epilepsy Society, San Francisco, CA.

Oller-Cramsie, M. A., Hwang, S. T., Mihu, N., **Schaffer, S.G.**, & Harden, C. (2012, December). *(2012). Voltage Gated Calcium Channel Antibodies Associated with Subacute Limbic Encephalitis and Seizures.* Poster presented at the Annual Conference of the American Epilepsy Society, San Francisco, CA.

Gopin, C.B., Terranova, S.P., & Schaffer, S.G. (2012). *Revisiting Reduplicative Paramnesias: A Case Study.* (2012) Abstracts for the AACN Scientific Poster Session, The Clinical Neuropsychologist, 26:3, 386-472.

Gopin, C.B., Cukier, Y., & Schaffer, S.G. (2012). *The Sensitivity/Specificity of the Neuropsychological Assessment Battery-Naming Subtest.* (2012) Abstracts for the AACN Scientific Poster Session, The Clinical Neuropsychologist, 26:3, 386-472.

Gopin, C.B., **Schaffer, S.G.**, & Fish, J.D. (2012, February). *Differential pattern emerges on Continuous Performance Test: Comparison between children treated for Acute Lymphoblastic Leukemia and those diagnosed with Attention-Deficit/Hyperactivity Disorder.* Poster presented at the Annual Conference of the International Neuropsychological Society's, Montreal, Canada.

Entz, L., Bickel, S., Argyelan, M., Klein, G., Hwang, S., Jain, S., **Schaffer, S.G.**, Kingsley, P., & Mehta, A. (2010, December). *Clinical Use of Functional Magnetic Resonance Imaging for Clearing Brain Areas for Resective Surgery.* Poster presented at the Annual Conference of the American Epilepsy Society.

Klein, G., Ettinger, A., Perrine, K., Hwang, S., **Schaffer, S.**, Jain, S., Ackerman, M. and Mehta, A. (2009, December). *Cross-Modal Registration Enabling Language Mapping With fMRI, Electrocortical Stimulation, and Intracranial Ecog in Individual Patients.* Poster presented at the Annual Conference of the American Epilepsy Society.

Brand, J.G., Burton, L.A., **Schaffer, S.G.**, Alper, K.R., Devinsky, O, & Barr, W.B. (2009). Emotional recognition in depressed epilepsy patients. Epilepsy & Behavior, 15, 333-338.

**Schaffer, S.G.**, Wisniewski, A., Dahdah, M., & Froming, K.B. (2009). The comprehensive affect testing system-abbreviated: effects of age on performance. Archives of Clinical Neuropsychology, 24 (1), 89-104.

Brand, J.G., Barr, W.B., **Schaffer, S.G.**, Burton, L.A., Alper, K.R., & Devinsky, O. (2008, August). Emotional Recognition Ability in Patients with Epileptic vs. Non-Epileptic Seizures. Poster session at the American Psychological Association Annual Convention. Boston, MA.

Bender, H., Cole, J., **Schaffer, S**., Aponte-Samalot, M., Cruz-Laureano, D., Barr, W., & Devinsky, O. (2008). Construct validity of the NeSBHIS in a neurological sample. Poster session at the International Neuropsychological Society Annual Convention, Honolulu, HI.

Brand, J., Burton, L.A., **Schaffer, S.G.**, & Barr, W.B. (2007, May). Emotional recognition in depressed epilepsy patients. Poster session at the nnnual meeting of the New York State Psychological Association.

MacAllister, W. & **Schaffer, S.** (2007). Neuropsychological deficits in childhood epilepsy syndromes. *Neuropsychology Review*, 17, 427-444.

Bender, H., Zaroff, C., Borod, J., **Schaffer, S.**, Morrison, C., & Barr, W. (2007, November). The multiple etiological determinants of neurocognitive dysfunction in children with epilepsy, National Academy of Neuropsychology Annual Convention, Scottsdale, AZ.

Madhavan, D., **Schaffer, S.G.**, Yankovsky, A., Arzimanoglou, A., Renaldo, F., Zaroff, C.M., LaJoie, J., Weiner, H.L., Andermann, E., Franz, D.N., Leonard, J., Connolly, M., Cascino, G.D., & Devinsky, O. (2007). Surgical outcome in Tuberous Sclerosis Complex: A multicenter survey. *Epilepsia*, 48, 1625-1628.

**Schaffer, S.**, Barr, W., & Devinsky, O. (2007, February). Ecological Validity of the Comprehensive Affect Testing System-Abbreviated (CATS-A) in a Clinical Sample. Poster session at the International Neuropsychological Society Annual Convention, Portland, OR.

**Schaffer, S.**, Barr, W., Brand, J., & Devinsky, O. (2007, February). Use of the MMPI-2 Restructured Clinical Scales in Patients with Epileptic and Nonepileptic Seizures. Poster session at the International Neuropsychological Society Annual Convention, Portland, OR.

Barr, W., **Schaffer, S.**, Alper, K., & Devinsky, O. (2007, February). Rates of invalid MMPI-2 profiles in patients with epileptic and nonepileptic seizures. Poster session at the International Neuropsychological Society Annual Convention, Portland, OR.

Zaroff, C.M., Madhavan, D., **Schaffer, S.G.**, Arzimanoglou, A., Renaldo, F., LaJoie, J., Weiner, H.L., Andermann, E., Yankovsky, A., Franz, D.N., Leonard, J., Connolly, M., Cascino, G.D., & Devinsky, O. (2006, December). Surgical outcome in Tuberous Sclerosis Complex: A multicenter survey. Poster session at the American Epilepsy Society Annual Convention, San Diego, CA.

Froming, K.B., Levy, M., **Schaffer, S.G.**, & Ekman, P. (2006). *The Comprehensive Affect testing System*. Gainesville, FL: Psychology Software, Inc.

**Schaffer, S.**, Gregory, A., Froming, K., Levy, M., & Ekman, P. (2006). *Emotion Processing: The Comprehensive Affect Testing System – User's Manual*. Gainesville, FL: Psychology Software, Inc.

*****Schaffer, S.**, Froming, K., Wisniewski, A., & Dahdah, M. (2006, June). The Comprehensive Affect System: Patterns of performance across the life span, Poster session at the American Association of Clinical Neuropsychologists Annual Convention, Philadelphia, PA.

**\*Schaffer, S.**, Froming, K., Wisniewski, A., & Dahdah, M. (2005, February). The Comprehensive Affect Testing System: Effects of age on performance. Poster session at the International Neuropsychological Society Annual Convention, Boston, MA.

**\*Schaffer, S.**, Froming, K. Wisniewski, A., & Dahdah, C. (2004, November). Age affects the ability to perceive emotions in others. Poster session at the National Academy of Neuropsychology Annual Convention, Seattle, WA.

Rider, K., Wisniewski, A., **\*Schaffer, S.**, & Medina, C. (2003, August). Latency and accuracy of performance on complex visuospatial tasks. Poster session at the American Psychological Association Annual Convention, Toronto, Canada.

Rider, K., Wisniewski, A., **\*Schaffer, S.**, & Medina, C. (2002, June). WAIS-III Matrix Reasoning measures non-spatial induction and visualization. Poster session at the American Psychological Society Annual Convention, New Orleans, LA.

**\*Schaffer, S.**, Rabinowitz, Y., Williams, V., & Sledge, R. (2001, October). Warning Signs: Violence prevention in schools. Hosted by Beth Am Congregation in association with the American Psychological Association and MTV, Palo Alto, CA

Froming, K. & **\*Schaffer, S.** (2000, March). The psychological and neuropsychological precursors to capital offense. Counseling in Asia Conference 2000, Bangkok, Thailand.

**\*Schaffer, S.** (1999, April). Capital punishment: Current issues related to mental health and SES. Invited to speak to upper division criminal justice class at the U of Notre Dame, Belmont, CA

***These publications and presentations were completed under my maiden name (Weiner)***

---

## Honors & Awards

| | |
|---|---|
| 2004 | Outstanding Student Poster Award<br>National Academy of Neuropsychology Annual Conference<br>Seattle, WA |
| 2000 – 2003 | Gary and Dana Shapiro Fellowship<br>Pacific Graduate School of Psychology, Palo Alto, Ca |
| 2003 | Alan and Nancy Schatzberg Assistantship<br>Awarded for Excellence in Clinical Work<br>Pacific Graduate School of Psychology, Palo Alto, CA |
| 2001 | Yitzhak Rabin Assistantship<br>Awarded for Excellence in Research<br>Pacific Graduate School of Psychology, Palo Alto, CA |
| 1995 | Honors in the Major<br>University of California, Santa Cruz, CA |

## *Professional Affiliations*

- American Academy of Clinical Neuropsychology (AACN)
- American Psychological Association (APA)
- APA Division 40 – Clinical Neuropsychology
- APA Division 41 – American Psychology-Law Society
- International Neuropsychological Society (INS)
- New York Neuropsychology Group (NYNG)
- New York State Association of Neuropsychology (NYSAN)

## *References*

**William Barr, Ph.D., ABPP**
Chief, Neuropsychology
Associate Professor of Clinical Neurology
NYU Langone Comprehensive Epilepsy Center



**Paul J. Mattis, Ph.D., ABPP**
Chief, Neuropsychology
Associate Professor of Clinical Neurology
Northwell-Hofstra School of Medicine
Neuroscience Institute at Great Neck



**Yael R. Cukier, Ph.D.**
Clinical Neuropsychologist
Director, Pediatric Neuropsychology
Pediatric Neurology
Cohen Children's Medical Center



**From:** Christine Hunsicker ███████████████
**Sent:** Tuesday, March 18, 2025 10:13 AM
**To:** ████████████████
**Subject:** Fwd: Call me anytime you're free

---------- Forwarded message ---------
**From: Scott Callon - Ichigo Asset Management** ██████████████████
Date: Sun, Apr 29, 2018 at 9:07 PM
Subject: Re: Call me anytime you're free
To: Christine Hunsicker ████████████████

Hi, Christine. Thx for the good board mtg, and I hope you are doing OK. So shocked and worried to hear about your concussion. Hang in there.

Re: our call, apologies, I've got stuff this morning. Will call you my Tuesday am.

Thanks,

Scott

On Mon, Apr 30, 2018, 05:09 Christine Hunsicker ███████████████████ wrote:
████████████

Christine

Sent from my iPhone

1

A.91

The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

May 20, 2026

Your Honor,

I am writing this from a unique and perhaps unexpected position. For twelve years, I ran a technology hedge fund where two-thirds of my investors were other money managers or their family members. These weren't just corporate funds — they were the personal savings of people I knew and respected. I am also a harmed investor in this case, having personally invested over five million dollars in CaaStle. I am intimately aware of the responsibility a founder carries and the weight of the loss involved.

I am speaking today in favor of a reduced sentence for Christine Hunsicker because I believe this Court needs context that isn't found in a ledger. Due to deep-seated trust issues rooted in my upbringing, I have spent my life — including my career on Wall Street — keeping my history guarded and my guard up. I am breaking that silence now in the name of justice. I am not here to excuse Christine's conduct, but to shed light on the mitigating factors I have witnessed firsthand. To understand why I am asking for leniency, it is necessary to understand the invisible landscapes of survival that many of us carry — and how those landscapes can influence a person's path.

I first met Christine at a political fundraiser in about 2014. I recognized JP, Christine's co-founder — he knew my brother John. Christine and I ended up chatting about tech people we knew in common. Then out of the blue she asked if I knew gay women out in the Hamptons. I was surprised — in her brown and white floral print dress, I had assumed she was straight. But that was Christine. Direct. No preamble. Just the real question.

As we continued to chat, she reminded me of my best friend Kriss, who had passed away leaving behind a husband and two small children. Kriss had been like a sister to John, and when he met Christine, he saw what I saw — the same directness, the same extraordinary mind, the same force of nature.

Like Kriss, Christine picked up my breadcrumbs. I shared things — carefully, in small pieces — without revealing they were the tip of an iceberg. Christine understood there were icebergs because she was carrying her own. I don't trust people with my

A.92

vulnerabilities — not easily, not even partners – and had led a very compartmentalized life. But I trusted Christine. My trust has not been misplaced. Kriss had been family to both John and me – not by blood, but by the kind of bond that holds regardless. Christine became that too. Over time, the three of us shared the intimate details of our lives and the realities of our childhoods. She was chosen family to both of us.

-----

I want to be clear about something before I describe my upbringing: it was not chaotic in the way people might imagine. It was, in its own way, entirely consistent. I always knew who my parents were. The expectations were low — and in a perverse way, that was a kind of gift. When nothing is expected of you, you cannot disappoint.

I was the sixth of seven children. Of the four younger children, I am the only one still alive. The others did not make it out.

Both of my parents drank heavily. My mother was always drunk. The neglect was profound enough that I did not speak until I was nearly four years old. Silence was my first language. I learned early that my existence registered as an afterthought, and I adapted accordingly: I became an observer. I listened. I asked questions.

When I was twelve, I overheard my mother tell my father — with a venom I can still hear — that his daughter was a lesbian. I didn't know the word, but I understood the tone perfectly. It was the worst thing a human being could be in her estimation. I spent the next decade hiding: dating men, lying, staying in the closet even on Wall Street, because I had been taught that the truth was a threat to survival.

When I was fifteen, I found my brother Christopher dead of an overdose in the bathroom. Thankfully, I got sober before I turned thirty and have been sober for thirty-eight years. I understand addiction and the ultimate cost.

I am telling you all of this because it is the lens through which I see Christine. Not with pity, and not with the clean distance of someone who read about trauma in a book. With recognition.

-----

Christine's childhood shared the essential shape of mine — ███████████ the volatility, the environment that no child should have to learn to navigate — but the specific texture of it was both different and, in certain ways, more destabilizing.

A.93

Where my home was consistently bleak, Christine's was unpredictably divided. There were periods when her mother was alive with warmth — engaged, funny, present in the way a child desperately needs. ████████████████████████████

That unpredictability produced something my childhood did not: chronic self-blame, and the curse of hope. Christine grew up constantly wondering what she had done wrong. ████████████████████████ She walked on eggshells every day, reading the atmosphere of the house, bracing for shifts she couldn't predict and couldn't control. She kept trying to solve it.

I never had that particular burden. My home was bleak, but it was legible. That predictability was its own kind of misery, but it left no room for the curse of hope. I knew early that nothing I did would change it. Christine never fully got to stop trying. That is its own form of damage, and in some ways a more corrosive one.

During tax season, her mother disappeared entirely into work, leaving Christine alone with her father. ████████████████████████ He gave Christine a nickname: "Bubba." It followed her everywhere, always paired with the phrase "half man, half woman." It was not teasing. It was erasure. He stripped away her identity so thoroughly that the label became the only thing people called her, including her teachers. It was not until she left for college that anyone called her by her name.

He was critical in the way that the most damaging parents are — not randomly cruel, but systematically so. Christine was a genuinely exceptional athlete. In her freshman year, at fourteen years old, she was nominated for the Eastern Pennsylvania All-State soccer team, competing against eighteen-year-olds and dominating. The vote for her inclusion was almost unanimous. Every single person voted yes — except one. Her father was the single dissenting vote against his own daughter.

When she was cleated during a game and came off the field hurt and in tears, he sent her back out to run laps as punishment for getting injured. She ran the required amount — and then kept running until someone physically stopped her. That is not

stubbornness. That is a child who has been conditioned to believe that stopping is failure, and that failure is unforgivable.

Playing injured was second nature. Her senior year in college, she played with a broken back. She was given a steel brace to prevent paralysis and naproxen for pain. She went into anaphylactic shock and almost died. She spent the night in the hospital and her dad told her she needed to play the next day against Syracuse. And, against medical advice, she did.

The family was a closed system. ████████████████████████████
████████████████████████████████████████████████
████████████████████ Christine never had friends outside the family — she played only with cousins. ████████████████████████████
████████████████████████████████

Despite everything her parents did, and who they are, Christine still loves them.

The result of all of this was a core belief, installed early and reinforced constantly, that nothing Christine did would ever be enough. And that she was, at her foundation, alone.

-----

Christine entered adolescence already broken in the specific way her father had broken her — primed, without knowing it, to accept what came next. ████████████████
████████████

He began ████████████████████████ with isolation, silence, and humiliation — mirroring the environment Christine had already been trained to survive. ████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████ Christine was sexually assaulted on a daily basis for years ████████████████████████████████████████
████████

At sixteen, Christine became pregnant. Alone, with no one safe to turn to, she attempted to end the pregnancy herself with a wire hanger before ultimately obtaining an abortion in secret.

Her body responded the way bodies do when the psyche cannot absorb what is happening. In her senior year, she developed anorexia and bulimia. Her weight dropped from 165 pounds to 117. She was trying, in the most literal physical sense, to make herself disappear.

The trauma traveled with her to Princeton, where she continued the bulimia and also began cutting. Thank God for her Princeton teammates, who eventually got her to see a psychiatrist. She was prescribed Zoloft. She went home on a break and told her parents about the sexual assaults for the first time. Her father's response was: "What do you want me to do about it now?" He did not speak to her for three or four months. ███

███████████

-----

Before her recent head injury, I had not encountered many people with Christine's intelligence and talents. She absorbed information voraciously — passionate about learning anything and everything, capable of recalling verbatim what someone had said, sometimes weeks or months later. When you questioned a fact she had cited, she didn't get defensive. She enjoyed retrieving the data to verify it.

Christine mentioned the first injury in passing. It was the holidays, December 2017. Casually, almost as an aside. I didn't recognize the significance at the time. Over the next several months the migraines were omnipresent. I could sense they were taking a toll on her emotionally and wearing her out. She just wanted them to stop. Sadly, since she is allergic to NSAIDs, many of the usual medications were not an option. Desperate to find relief, she tried everything else she could — massive Botox injections, a brain wave specialist, routine visits to a hyperbaric chamber, isolation tanks. There were numerous times she was incapable of communicating, just wanting to pass out. She admitted she was having issues with her short term memory and that it was making it difficult to put her thoughts together. What frightened her most was what it might mean for her cognitive ability.

She kept trying to show up as best she could. But by the end of each week her body had made the decision for her. She would go home and sleep in the dark.

I asked Christine whether the board was aware of her head injury. She told me she had informed them in 2018. The Court should know who was on that board — Scott Callon, the only foreigner on the Japanese government council that drafted Japan's Corporate Governance Code, and John Hennessy, former President of Stanford, Chairman of Alphabet, and widely regarded as the godfather of Silicon Valley. Their presence gave investors every reason to believe proper oversight was in place.

For Christine, mentioning her injury at all was the closest she had ever come to asking for help. She had spent her life conditioning herself never to stop, never to show weakness, never to raise her hand. The board did not intervene, limit her duties, or implement any governance mechanism to address her impairment. That is a fact this Court should weigh.

-----

When CaaStle wasn't as profitable as expected, Christine thought she could solve the problem with more work and more time. She lied to investors and committed securities fraud. I know this. I lost over five million dollars because of it.

If Christine had taken money out of the company for herself — if this had been about personal enrichment, about greed — I would not be standing in her corner. She put millions of dollars of her own money into CaaStle. All of it. And then borrowed twenty million more and put that in too. She was trying to make it work for everyone — her employees, her investors, the company. She lost everything she had trying. That is not the behavior of someone who set out to steal. That is the behavior of someone who could not stop running laps.

-----

From the moment we met, Christine has consistently shown up for me and my family. And since her indictment, Christine has not only continued that commitment, but she

I believe Christine has spent countless hours reexamining how she screwed up so badly. She isn't blaming anyone. What she came away with wasn't excuses — it was a

question. How could this have been prevented? How do you stop a young Christine from going down that path?

That question is the birth of the ███████████ Badge Series and a children's book called The In-Between. The badge series gives children a framework for building character — earned, not given, not for everyone. The book puts children who are living what Christine lived into a room together, gives them language for it, and shows them there is always a door marked B. The secret badge — earned only by a child who demonstrates all ten values — is called John's Legacy. Named for my brother, who also struggled with addiction during his life, but who ultimately, like Christine, demonstrated exceptional resilience and resolve. In achieving sobriety, he proved it is never too late to change.

-----

One of the other investors — someone worth hundreds of millions of dollars, who lost a third of what I lost — sent Christine a text message telling her to kill herself.

I am writing this letter instead.

She committed fraud. She cost me over five million dollars. I trust her anyway. When John was dying of cancer in 2024, I saw her sit with him through countless hospital appointments, showing up the way family is supposed to. She was one of the only people he wanted around towards the end. I have seen who she is when she is not performing.

What Christine has demonstrated, consistently, over the course of her life is that when she recognizes a problem and commits to addressing it, she does not go back. She stopped drinking fifteen years ago and has not had a drink since. She stopped smoking. She stopped purging. She stopped cutting. When a dentist prescribed oxycodone after surgery and she recognized within two months that she was becoming dependent, she sought help immediately, titrated off properly, and stopped. No relapse. Each time, once she made the decision, it held.

That pattern has held even now — while facing the possibility of a lengthy prison term. That is not a small thing. That is the kind of pressure that sends people straight back to whatever numbed them before. She has not gone back.

Christine's greatest fear has always been abandonment, followed closely by the belief that she is not enough. She spent her whole life rationing herself — giving people

snippets, revealing only what felt survivable, keeping the full magnitude of what she carried carefully out of sight. In Gamblers Anonymous, the secrets started coming out. And something shifted.

I still hear her saying she never believed people liked her at her best. What she has discovered, at her worst, is that she is loved.

Christine's birthday is April 27th. She cannot celebrate it. That date belongs to ███████ — it was her sixteenth birthday, in that basement, where everything changed. She has never been able to reclaim it.

But March 6th is hers.

March 6th is the day she walked into Gamblers Anonymous and decided to stop lying. To only tell the truth. Unlike me — who sat in the back of AA rooms for years and never spoke — Christine is a sharer. Like my brother John, she has stood up in those rooms and told her story. She has shared her vulnerability, her pain, the full magnitude of what she has carried, and been accountable for what she has done without excuses. She has let people in.

This year she celebrated her one-year anniversary of GA with genuine pride. One year of telling the truth. One year of choosing, every single day, door B.

My brother John knew struggle intimately. Life didn't come easy for him. He faced challenges that many times seemed insurmountable. But he never let his struggles define him — he transformed them into strength. He found ways to channel his pain, his fears, and his doubts into something beautiful that went on to touch the lives of countless others. He turned his life around with courage and determination, and in doing so showed us all that it is never too late to change, to grow, and to make an impact.

Christine already knows that story. She created it — the entire badge series, John's Legacy, and the book. Because she understands, from the inside, what it means to transform suffering into something that protects other people from it.

I believe Christine will have the same trajectory as John. I have watched this movie before. I know how it ends when someone finally finds the right room and lets people in.

I am asking this Court to give her the chance to walk that path.

Respectfully submitted,

A.99

Monica Graham

Tuesday, June 30, 2026 at 11:02:23 PM Eastern Daylight Time

**Subject:** Re Christine Hunsicker

**Date:** Tuesday, June 30, 2026 at 9:12:44 PM Eastern Daylight Time

**From:** ███████████████

**To:** Michael Levy

To the Court,

I have known Christine Hunsicker since 2016. I invested my personal funds and worked as a senior advisor to ███████████ who invested $10m into CaaStle in the very early stages of Gwynnie Bee.

Over the past 10 years I came to know her as a friend, a loving and loyal partner to PK and finally someone who had a life changing fall from grace.
Around the time of ██████████████ investment, I served ████████████████████ primarily focused on business development. I was not privy to company financials in that role. As █████████████ I was able to observe Christine professionally, and she struck me as truly brilliant. I held her in high esteem.

I recall Christine telling me in approximately 2019 that ██████████████████████ was unhappy he wasn't receiving certain financial data. She recounted one meeting with him that brought her to tears. She said he "wiped the floor" with her and made her "feel like a piece of shit on the bottom of his shoe." I also recall that around the same time Christine was acutely suffering from the effects of a concussion. I do not know who else was aware of her head injury or what role, if any, the concussion played in her misconduct.

I am certain that Christine is 100% contrite, and that she knowingly defrauded the numerous investors into the Company. Whilst I understand that Christine is likely to serve time in prison, I believe that the best way for her to pay for her crime is to use her undoubted intellect to find a way to create value for those that she has defrauded.

I sincerely hope that you can consider the above and find a way to minimize Christine's time in prison along with an agreement from her that she will dedicate the remainder of her working life to making good the financial losses suffered by her investors.

In closing I would add that Christine is a good person at heart. Somewhere along the road she lost her way. But for the grace of G-d go all of us.

Sincerely,

███████████████

*FILED UNDER SEAL*



Hon. J. Paul Oetken
July 15, 2026

*FILED UNDER SEAL*



2

A.103

Hon. J. Paul Oetken
July 15, 2026

*FILED UNDER SEAL*



3

A.104

Hon. J. Paul Oetken
July 15, 2026

*FILED UNDER SEAL*



4



July 20, 2026

The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Dear Judge Oetken:

I am writing on behalf of Christine Hunsicker.

My name is James Sullivan. I was a significant investor in CaaStle from the beginning. My best friend, John Graham, made the introduction to Christine through his sister Monica. Monica had a strong successful career of her own in finance running a hedge fund. The endorsement of both of them was more than enough for me to become an investor.

This letter is not easy to write because Christine lied to and deceived me when I made my last investments in CaaStle, but I am writing this letter in support of leniency for her. Although what she did was criminal, I do not believe Christine acted for self gain. This was not a Bernie Madoff scam for her to be rich. I believe that Christine is an addict. I believe that even when the business was suffering, she continued to double down on her belief that she could make the company a success. In the end, she went over the line.

I have known many addicts in my lifetime. Each have a story as to what drove them to their addiction. I believe what drove Chrstine was not greed, but a drive to deliver success for the investors. In the end, the results are the same. But I believe it is important to know what the intent was.

That distinction is why I wanted to write to you. I believe Christine wants and deserves the chance to make all investors whole. Her spending a long time in jail would not offer that opportunity. I ask that you consider a reduced term due to the circumstances of her crime.

Thank You for the Consideration.

Sincerely,

The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Dear Judge Oetken,

I am writing on behalf of Christine Hunsicker, whom I worked with closely for more than ten years as both her personal and professional assistant.

I understand the seriousness of the charges before the Court, and I am not writing to excuse or minimize them. Rather, I am writing because I believe it is important for the Court to know the person I have known for the past decade.

Over nearly eleven years, my relationship with Christine has been built on trust, honesty, and mutual support. During that time, I witnessed both extraordinary accomplishments and profound personal struggles. During the years we worked together, Christine shared with me the severe childhood trauma and abuse she endured, and I came to understand how deeply those experiences affected her throughout her life. I also witnessed firsthand the challenges she faced following the traumatic brain injury she suffered in 2017, as well as her struggles with depression, alcoholism, eating disorders, and other mental health challenges that have been documented elsewhere for the Court.

While I am not qualified to speak to these conditions from a medical perspective, I can speak to what I observed. Following her brain injury, I watched Christine struggle with chronic migraines, exhaustion, emotional instability, memory issues, difficulty concentrating, and significant changes in her ability to manage daily life.

There were periods when she could not drive herself, and I regularly drove her to appointments with neurologists and other specialists. For a significant period of time I drove her to and from work because she was unable to drive herself.

The effects of her condition also impacted her ability to travel. On one occasion, when she needed to attend an important business meeting in Orlando, she was unable to fly and instead took a train from New York City to Orlando and back, a journey lasting more than twenty hours each way. On another occasion, she attempted to attend a conference on the West Coast by air, but suffered such a severe migraine that she became incapacitated and was unable to
meaningfully participate, spending much of the conference confined to her hotel room.

The impact of the injury was also visible in the workplace. There were many occasions when I had to cancel most, if not all, of Christine's meetings for the day because her symptoms had become overwhelming. Often, she would need to rest or sleep in her office in order to manage severe migraines and exhaustion. Her office had glass walls, and these struggles were not hidden from those around her. Before important meetings or calls, there were times when she needed to disconnect completely and rest in order to regain enough focus and composure to continue working.

I also observed significant changes in her memory and ability to concentrate. Prior to her injury, Christine had an extraordinary ability to manage an enormous number of responsibilities, conversations, and commitments simultaneously. Afterward, I watched her struggle to remember meetings, commitments, conversations, and events that previously would have come naturally to her. There were times when she could not remember plans she had made, commitments she had accepted, or details from conversations that had taken place only a short time earlier.

These difficulties became one of the reasons we spent so much time traveling to neurologists and specialists over the course of more than a year, searching for answers and hoping to restore some of what had been lost. The appointments were not occasional; they became a regular part of life as we tried to understand what was happening and how best to help her recover.

Perhaps the most difficult change to witness was the change in Christine herself. The woman who hired me was vibrant, outgoing, energetic, and deeply engaged with the people around her. Over time, I watched that brightness begin to fade. As she struggled with chronic pain, exhaustion, memory issues, and confusion, she became quieter, more withdrawn, and less like the person I had first met.

Even now, years later, I do not believe she has fully returned to the person she was before the injury. However, I have seen gradual progress over time and moments that remind me of the person I first met. I will never forget the toll those years took on her.

Despite these challenges, she continued working, caring for others, and trying to meet the responsibilities she carried. What struck me most was not simply the difficulties she faced, but the determination with which she continued moving forward.

One of the reasons I continue to have hope for Christine's future is that I have seen her make a genuine effort to grow and change. For more than sixteen months, she has remained committed to Gamblers Anonymous. More importantly, I have seen a willingness to

examine difficult truths about herself, seek help when needed, and take steps toward becoming healthier and more accountable. Real growth is rarely easy, and from my perspective, her commitment to that process has been sincere.

What stands out most to me, however, is not what Christine endured but how she treated the people around her while enduring it.

Over the ten years I worked with her, I witnessed countless acts of generosity and kindness that were never done for recognition and often never spoken about afterward. When my cats became seriously ill and I was facing overwhelming veterinary expenses, she quietly paid the bills to help save them. When my mother was hospitalized during Christmas of 2024, Christine paid for my flights so I could be at my mother's bedside.

Most significantly, when a fellow employee experienced a severe mental health crisis and was contemplating ending her life, Christine welcomed her into her home and allowed her to stay there for as long as she needed. She spent time with her, talked with her, and made sure she was not alone during an extremely vulnerable period. Christine continued supporting her until she was able to find a safe and stable place to go. It was one of the clearest examples I witnessed of Christine's willingness to put another person's well-being ahead of her own.

What has stayed with me most over the past decade is not any single act of generosity, but the consistency with which Christine showed up for the people in her life. During the uncertainty and isolation of the pandemic, when my anxiety often became overwhelming, she was one of the few people I knew I could always call. No matter what she was dealing with herself, she would listen without judgment, offer perspective when fear had taken over, and remind me that I was not alone. To this day, if I do not respond to her messages, she checks in to make sure I am okay.

What struck me then, and still strikes me now, is that Christine often gave emotional support far more readily than she asked for it herself. Throughout the years I have known her, I have watched her carry significant personal struggles while continuing to make herself available to others who needed help. In my experience, caring for people was not something she did occasionally; it was simply part of who she was.

Since this matter came to light, I have not seen Christine attempt to shift blame to others or avoid responsibility for the consequences she faces. Instead, I have seen someone who has continued to confront difficult realities, seek help where it is needed, and move forward with humility. While the Court is already familiar with the legal proceedings in this case, from my perspective her actions during this process have reflected a willingness to accept

accountability rather than avoid it.

When I learned of the facts underlying this case, I was shocked and deeply saddened. I spent a great deal of time reflecting on what I had learned and on the person I had known for more than ten years. Ultimately, I chose to continue standing by Christine. That decision was not based on denying the seriousness of her conduct. It was based on the totality of my experience with her over more than a decade. The Christine I have known is a person who has repeatedly shown kindness, compassion, and concern for others, often while struggling herself.

I also intend to remain part of Christine's support system moving forward, just as I have been for nearly eleven years. Throughout these proceedings, I have continued to stand by her as a friend, helping her manage daily responsibilities, care for her dogs, pay bills, navigate practical challenges, and face the uncertainty of what lies ahead. I have supported her through some of the most difficult periods of her life, and I will continue to do so. I will not abandon her. I remain committed to encouraging her recovery, personal growth, accountability, and efforts to build a positive future.

I am not asking the Court to excuse or overlook the conduct at issue in this case. While Christine must be held accountable for her actions, I am asking the Court to see the entirety of the person Christine Hunsicker is. She is not defined solely by the conduct that brings her before the Court today. She is a multifaceted, intelligent, compassionate, and generous person who has had a profound impact on the lives of many people, including my own.

Throughout the years I have known Christine, I have watched her consistently show up for other people, often while quietly carrying significant struggles of her own. Despite the trauma she endured, the challenges she faced after her brain injury, and the personal battles she has worked to overcome, she continued to offer support, compassion, and kindness to those around her. Looking back, what stands out to me most is not simply that Christine helped people, but that she so often did so while privately facing difficulties that many never fully saw or understood.

While I understand that accountability is necessary, I respectfully ask the Court to consider mercy in sentencing and to consider the full context of Christine's life, her struggles, her efforts toward recovery and self-improvement, and the many ways she has helped others throughout the years.

Thank you for your time and consideration.

Respectfully submitted,



Cynthia Joseph

The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Dear Judge Oetken,

I am writing this letter on behalf of Christine Hunsicker, who I have known for the past 14 years. My goal is to provide the Court with insight into Christine's character as both a leader and a friend, and in doing so, offer a more nuanced and complete picture of who she is.

I began working for Christine at Gwynnie Bee in March 2012 and remained with the company until July 2021. Over the years, my relationship with Christine evolved from an employee to a close personal friend. As both an early employee and someone who worked across many teams over the years, I developed trusted relationships with many employees across the organization, and was often treated by upper management as an informal barometer of employee morale. I served as an unofficial conduit to Christine, especially with regard to sensitive employee situations. As a result, I witnessed firsthand the generosity and compassion she showed our colleagues behind the scenes.

One of the most powerful examples of this was when a young woman on my team came into my office and told me she had been sexually assaulted by her roommate the night before. She had come to work because she didn't know where to go and needed a safe space. She was traumatized, upset, and overwhelmed. With her permission, I spoke to Christine. Christine's response was immediate and unequivocal. She told me to let our employee know she should take whatever time she needed and that her healing was the priority. Together, Christine and I located a therapist who could see her immediately. Christine personally paid for eight weeks of therapy, while I helped the employee find a long-term provider covered by our insurance. She never hesitated, never asked what it would cost, and never sought recognition for doing it.

On another occasion, an employee learned that her grandmother had only days left to live. She was devastated, but couldn't afford the last-minute airfare to be with her family. When I brought the situation to Christine, she immediately purchased the ticket so the employee could leave the following day, no questions asked.

In October of 2017, when another young employee was assaulted by a much older family member, she was severely traumatized, unable to work or be alone, and in serious need of professional help. I was alerted to the situation by other colleagues, and called Christine when I found myself overwhelmed by this young woman's needs. She assisted our employee in getting the therapy she needed very quickly, and provided comfort and guidance, despite the fact that the situation was very triggering for her personally.

These were not isolated incidents. Time and again, I saw Christine quietly step up to help people during some of the most difficult moments of their lives, having nothing to directly do with work, or the business itself.

I also had a front row seat to how deeply Christine was affected when she needed to make important business decisions that would affect people's livelihoods. When the company was in a growth phase, the decision was made to move warehouse operations from NYC to Ohio. Even though this was necessary to the future of the business, it meant laying off employees that Christine cared about deeply. She explained the decision in an all hands meeting, directly and professionally. After employees left for the day, we stood amongst the racks of clothing in the warehouse and cried. The emotional weight she carried in those moments was real.

Christine is, by nature, an introvert. Investor meetings and constant external obligations often left her emotionally drained, yet she consistently pushed herself because she believed in the company and felt responsible for everyone whose livelihoods depended on it.

She was almost always the smartest person in the room, but she carried that intelligence with humility. People admired and respected her without fearing her. She had an offbeat sense of humor, embraced her quirky personality, and never pretended to be someone she wasn't. Employees appreciated that authenticity. She wasn't an executive hidden away in an ivory tower, issuing directives from afar. She was exceptionally intelligent, incredibly driven, endlessly curious, and genuinely fun to be around.

Gwynnie Bee (and later CaaStle) were special places because they attracted exceptionally talented people who believed deeply in what we were building. Just as importantly, they believed in Christine's leadership.

When the news about the charges against Christine went public last year, I spoke with many former colleagues. Remarkably, the first question almost everyone asked was, "Is she okay?" That immediate concern for her well-being speaks volumes about the relationships she built and the genuine affection people felt for her. She was the all-too-rare leader that truly led by example. She was always the smartest and hardest-working person in the building, and therefore enjoyed an enormous amount of respect from the people who worked for her. She had a reputation for being direct but fair, and the true visionary behind the company. As a result, the company was able to attract some of the best and brightest colleagues I have ever had the pleasure of working with.

Part of the allure of Gwynnie Bee/CaaStle was the vision behind the company and what we were all building together. The idea of subscription-based clothing rental was new and exciting, and seemed like the logical next step in the shared economy that was pioneered by companies like Airbnb and Uber. Building the CaaStle platform was absolutely electric. We had a large cross-functional team of people from a variety of industries who were all marching in the same direction with three goals in mind: to allow retailers to diversify their revenue streams, to provide customers with an exciting way to experience fashion and clothing, and to build a proprietary platform that would give the company longevity and profitability.

I was a part of the team that first started working with retailers in 2017, starting with our first two platform partners, NY&Co and Ann Taylor. In November of 2017, I was also part of the team that traveled to meet with the executive team at URBN (parent company to Anthropologie, Free People, and Urban Outfitters) on their Philadelphia campus. We spent the next several months working in good faith to educate their team about the concept of Clothing as a Service and how subscription-based rental could become a hugely valuable part of their offering.

URBN was a dream client for us, with a passionate and engaged group of retail professionals and a company that had incredible brand recognition with women across the country. As a result, we dedicated an enormous amount of time selling them on both rental as a concept, and our custom platform as a provider. We traveled to Philadelphia multiple times, had countless video calls, collectively spent hundreds of hours on strategy decks, education materials, and financial models, all working towards what we genuinely believed would be an extremely fruitful partnership for both companies.

For all of the reasons listed above, it was devastating when all communication from everyone we'd spent months working with and talking to suddenly ceased. We wondered if after all  the work we'd done, we had somehow failed to convince them that rental was a viable revenue model. Of course, these things happen, and no platform is going to land every prospective client that they court, so we moved on.

Less than a year later URBN launched Nuuly, a subscription-based clothing rental service for women. It was clear that they had in fact seen the value in what we were offering. In fact, they found it so valuable that they decided to start their own service. In the last 7 years, Nuuly has provided incredible proof of concept of the subscription-based clothing rental model. Their service is profitable, and boasts nearly half a million active subscribers. For this reason, it has pained me to read accusations in the media in the last year that Christine and the company that I spent 9 years of my life working for were all one big fraud. Christine's vision for the future of retail and the role our company could play in the ever-expanding shared economy was shared by employees, investors, and even the media, because it was real. It had the ability to be profitable and the potential to serve hundreds of millions of subscribers, just as it is doing now under a different company.

Around the same time that we lost the prospect of having URBN join the platform, Christine was suffering from a traumatic brain injury, due to dropping a heavy mirror while attempting to move it within her apartment. I knew about this incident not in my capacity as an employee, but as her friend. She was seeing numerous specialists in the following years, and suffering from pain, migraines, and short-term memory issues, all of which I personally witnessed. My level of concern was such that I was researching alternative treatments, including the possibility of purchasing a hyperbaric chamber to install in her apartment. Christine tried everything she could to mitigate the effects of her TBI including changing her diet, trying to reduce stress, suffering through countless doctor visits, acupuncture, and resting as much as possible. It's awful to watch someone you love suffer in pain, especially when there is no end or "cure" in sight. Christine's greatest fears were around potentially having reduced mental capacity, and memory

issues. She was determined to not let the injury affect her performance, terrified by the prospect of letting down employees and investors.

I have to assume that her performance was greatly impacted, as much as she tried to power through. I know that in her personal life, she was a shell of a person. She was usually able to make it through most of the week, but by Fridays the migraine pain would be debilitating and she would typically spend three days laying in the dark, limiting exposure to light and sound. One of the medications she was on was causing major gastric distress for months, and she was going to long and exhausting treatments to try to improve her brain's functioning. She fought as hard as she could through the pain and discomfort to make sure that she could be well enough to be responsible for her company, all of the people she employed, all those who invested, and for everyone else who was watching. The weight of the world seemed to live on her shoulders over those two years leading into COVID.

I recognize that Christine has accepted responsibility for serious mistakes, and nothing in this letter is intended to diminish the gravity of those actions. Rather, I hope to provide the Court with a fuller picture of the person I have known for over a decade, a leader and a friend who demonstrated profound compassion, generosity, humility, and commitment to the people around her. Those qualities were genuine, and I believe they remain an important part of who she is.

Respectfully,

Melissa Robinson

The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

**Re: Sentencing of Christine Hunsicker**

Dear Judge Oetken,

I am writing in connection with the sentencing of Christine Hunsicker.

I worked for Christine at Gwynnie Bee/CaaStle from March 2016 through March 2018, and during that time I reported to her and worked closely with her as a member of the leadership team. I am writing because I believe I can offer a perspective on Christine's character, leadership, and the environment in which she was operating during part of the relevant period.

I want to begin by saying clearly that I understand the seriousness of what happened. People were harmed. Trust was broken. The consequences are real, including for employees, investors, and many people who believed in Christine and the company she was building. I am not writing to excuse the conduct or suggest that the harm should be minimized.

I am writing because the Christine I knew was not a person motivated by greed, cruelty, or indifference to others. The Christine I knew cared deeply about employees, customers, and the company's mission. She was demanding, but she was also deeply invested in building a culture that valued debate, creativity, inclusion, and respect. As a leader, she created an environment where people were encouraged to challenge ideas, solve hard problems, and care about the people affected by the work.

That is part of what makes this so difficult to reconcile.

In my experience, Christine was capable of extraordinary intensity and commitment. She carried an enormous amount on her shoulders, and I believe she often felt personally responsible for not letting people down. That does not excuse what happened. But I do believe it helps explain something important about her. My experience of Christine was not of someone trying to take from others for personal gain. My experience was of someone who was desperate to keep the company, its employees, and its promise intact, even when the pressure around her became extreme.

I also observed dynamics with her co-founder, JP Singh, that I believe are relevant to understanding the environment in which she was operating. During my time at the company, Christine worked hard to create a culture that was collaborative and respectful. JP's behavior, in my observation, often ran counter to that culture. He could be dismissive, hypercritical, authoritarian, and openly disrespectful toward Christine. At times, employees could observe the tension between them, including through glass offices where arguments or visibly difficult interactions were hard to miss. Even when the words could not always be heard, the dynamic was visible.

My impression was that JP exerted significant pressure on Christine and that his treatment of her was damaging. He often seemed to communicate, directly or indirectly, that what she was doing was not enough. I saw him speak down to her and treat her with a lack of respect, even berating her to force business success. I also saw the

A.116

amount of time and emotional energy those interactions consumed. It appeared circular, relentless, and destabilizing.

I do not offer that as a way to shift responsibility away from Christine. She made decisions that were wrong and harmful. But I do believe the Court should understand that, from my vantage point, she was operating in an environment of extraordinary pressure, criticism, and fear of failure, including from someone whose approval and partnership appeared to matter greatly to her.

I also personally observed that Christine was physically struggling after her brain injury. During my time working with her, I knew her to be in pain and to have difficulty with short-term memory. I did not know the full medical picture then, and I do not pretend to be qualified to speak to it now beyond what I personally saw. But I did observe a change. She was visibly suffering. There were times when she would forget things we had discussed or seem to be pushing through pain in a way that was obvious to those close enough to see it.

Looking back, I believe there were multiple forces converging: the pressure of a high-growth company, the expectations of investors and stakeholders, a demanding and often damaging co-founder dynamic, and Christine's own physical and emotional vulnerabilities. Again, none of that makes the misconduct acceptable. But I do believe it makes the full picture more human and more complex than a simple narrative of greed or manipulation.

I also recognize that people who were harmed may view Christine differently than I do, and I respect that. My intention is not to speak over their experience, but to offer the Court my own firsthand perspective on the person and leader I knew.

The Christine I knew was not perfect. She could be intense. She could be difficult to read. She carried more than she let people see. But she was also generous, thoughtful, creative, and deeply committed to building something meaningful. She cared about people. She cared about employees. She cared about customers. And I believe she cared about the investors and stakeholders she ultimately harmed.

That is the painful contradiction at the center of this for me. I believe Christine made very serious and damaging choices. I also believe those choices were inconsistent with the best of who she is. I believe they came from fear, desperation to please her co-founder, impaired judgment, and a desire to avoid failure, not from malice or a desire to enrich herself at others' expense.

I respectfully ask the Court to consider a sentence that holds Christine accountable while also recognizing her capacity for rehabilitation, her history of trauma and medical challenges, the pressurized environment in which she was operating, and the good she has done for many people over the course of her life and career.

I believe Christine is a good person who made bad decisions that harmed others. I also believe she is capable of remorse, repair, and living a life of meaning and integrity beyond this chapter.

Thank you for considering my perspective.

Respectfully,

Emma Hutchens

A.117

The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

July 6, 2026

Your Honor

I am writing on behalf of Christine Hunsicker. I am Ellen Goldberg the bookkeeper for ███████████ a tennis club ███████████████████████████ are clients of mine for several years now and I have had a front row seat of the clubs finances throughout this time.

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

One morning Christine joined us on our walk. She told me in detail what she had done not in general terms, not with excuses but specifically and honestly. She specifically told me that she had committed securities fraud. And she was remorseful. She was not asking for forgiveness or minimizing what happened, she was telling the truth.

The club had struggled financially for many years. I know its books intimately. ████
███████████████████████████████████████████████
███████████████████████████████████████████████

Christine was clear that she did not want access to the books or the bank accounts, that she wanted to help and with appropriate boundaries in place: she would not be involved with the club's finances or fundraising, and she would not be eligible for sales-based incentives. This made me more comfortable that she understood that accountability was important.

Within the constraints of those guardrails, Christine put back office systems in place, cleaned up years of accumulated disorder and helped grow revenues in a meaningful way. In 2025, for the first time in the clubs history we turned a profit and are on track to be profitable again this year.

A.118

I have known people who say the right things. Christine certainly did right for ███████ ████████ She asked for no special access, no trust she hadn't earned, no credit she hadn't built. She just showed up and worked. I have seen with my own eyes that Christine Hunsicker is someone who is trying in every way available to her, to make things right.

I ask the court to consider this when determining her sentence.

Respectfully Submitted,

Ellen Goldberg

**Vivian L. Polak** ███████████

███████████████████████████

June 29, 2026

The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

**Re:     United States v. Christine Hunsicker**
         **Case No. 25 Cr. 318 (JPO)**

Dear Judge Oetken,

I am writing this letter in relation to Christine Hunsicker ahead of her upcoming sentencing hearing. I am a Harvard Law graduate and now a semi-retired New York attorney who has spent my career specializing in information technology, intellectual property and media law. I have known Christine over a number of years at a distance, but over the past year I have become quite familiar with Christine through our shared efforts ███████████████████████████ with the operations of ███████ ██████ a seasonal tennis club ██████████████████

I am fully aware that Christine has pleaded guilty to securities fraud in your Honor's court. While I do not wish to minimize or excuse the offense for which Christine is being sentenced, I want to share my firsthand observations of Christine's day-to-day character, work ethic, and positive impact on our community.

During this past year, Christine has focused at least a part of her energy on helping ███████ manage the business and marketing operations of ████████████ while I have primarily focused on supporting the club's restaurant operations. Because our responsibilities frequently intersect, Christine and I cross paths often. I have been consistently impressed by her operational wisdom and her capabilities in solving complex workplace issues.

More importantly, I have seen firsthand her exceptional skill in managing, training and mentoring employees. Christine does not just manage people; Christine actively invests in them. I've watched Christine patiently teach club staff members who are in various roles at the club, identify their natural strengths and help them thrive in their roles. Her positive, constructive approach to dealing with the workforce and her

A.120

The Honorable Paul J. Oetken
Page 2
June 29, 2026

insights on operations have helped ███████ make the business of the club and the restaurant run more smoothly and profitably for the first time.

Beyond her sharp operational mind, I have personally witnessed Christine's genuine care for the personal growth of young people. This spring and summer, she has and continues to dedicate significant time to the club's children's summer camp.  She created a thoughtful "badge program" designed to teach children positive life values through their activities and actions at summer camp.  Christine personally designed merit badges that the kids would earn by exhibiting ten different positive traits (e.g., bravery, curiosity, and accountability), and wrote descriptions for each trait, translating these abstract concepts into practical, relatable terms that young children could easily grasp and apply. Seeing her use her exceptional skills to positively influence these children showed me a deeply compassionate side of her character.

In our personal interactions, Christine has spoken with me about her legal situation. I know that she deeply regrets her actions, and she has made it clear to me that the most important thing to her now is to always live and act with absolute truthfulness. She has made a firm promise of honesty to herself, and I am confident that her continued hard work and active participation in Gamblers Anonymous will provide her with the accountability and foundation she needs to permanently keep that promise.

Christine is a person of immense talent who is capable of doing profound good for those around her. I believe she has much more to offer society, and I hope your Honor will consider her quiet, dedicated contributions to our community, and specifically the children, alongside the other factors at sentencing.

Thank you for your time and your consideration of this letter.

Respectfully submitted,

Vivian L. Polak

Gregory C. Lewis



06/01/2026

The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Dear Judge Oetken,

This letter is respectfully submitted in support of my friend, Christine Hunsicker, pertaining to her sentencing in her current criminal case. In 2023, my son turned 18 years old and we decided to join an adult bowling league together in Sparta, NJ. The league required four team members, so we were paired with two other unknown individuals. In September 2023, we arrived for our first night of bowling and met our teammates. At the time, I had over 22 years of law enforcement experience as a New Jersey State Trooper and held the position of Station Commander at a Station in Warren County, NJ. This has always led me to be guarded when meeting people with zero knowledge of their history and background. On that first night, I discovered that one of our teammates was a younger Rockaway Twp. Police Officer (with a few years of experience) and Christine Hunsicker. Christine was friendly, but I quickly learned that we came from two completely different lifestyles. What I did not know then was that we would grow a surprisingly nice friendship and that we are a lot more similar in nature than we could ever have thought.

As the 35 week season progressed, I spent approximately three hours per week with Christine and our conversations flowed very easily. She found out that I am married (now for almost 25 years) with two children, have a clean background, and spent the majority of my career in law enforcement as a Station Detective and supervisor of Detectives. In my position, I have had an extensive amount of experience conducting interviews of suspects, victims, and witnesses while completing criminal investigations of every type. My work has always been victim-centered with a goal of supporting victims and obtaining every possible answer for them. By nature of my occupation, I am extremely pro-law enforcement and anti-criminal. However, I understand that every situation is different and I have usually been able to find empathy for the human beings who have committed offenses.

In speaking to Christine, I found that she was approximately my age and her occupation was somewhat unfamiliar to me. She explained that she was into fashion technology, but more into company development than the actual fashion design. At times during bowling,

she would have to excuse herself to answer calls with executives and she would describe having traveled the world because of her job. She indicated that she grew up in Pennsylvania and was a successful athlete throughout her life. The more I learned, the more fascinated I became with her story. She said that she was married to a woman, whom she called "PK," who was also a successful athlete having been a member of the US National Rugby team and was currently a professional MMA fighter. Christine seemed to be relatively conservative in demeanor, but had life experience that was completely different than my own.

Early in that 2023 season, I was shocked to find that Christine had a Wikipedia page which indicated she had sold a company for millions of dollars and there were several images of her on television doing interviews. I was very intrigued as she seemed to be very humble about this and it was not revealed by her in any way. As the year progressed, I eventually met Christine's wife, Phaidra, and some of her family members. She was open about her financial situation and advised me that she did not really need to work, but found that she was way too young to retire. I discovered that Christine did not drink alcohol and lived a relatively quiet life outside of her work. She was interested in nature, animals, and supporting women, but was not a religious person.

We renewed our team for the 2024-25 bowling season and my relationship with Christine continued to grow. We would often honestly discuss topics of life, family, spirituality, society, and law enforcement. I found that we were very similar in a lot of ways and our experiences helped expand our personal viewpoints. At times, Christine expressed being stressed out with her businesses but her demeanor remained calm. She never seemed to worry about finances or money and did not present herself extravagantly. I found her to be very open, honest, and funny in our conversations. She seemed to be content and very independent. Later in the season, Christine advised me that her company was being audited but she did not know what was happening. She did not express being overly concerned.

Toward the end of the summer of 2025, I learned from others in the bowling league that Christine had been charged criminally and I reviewed the online news articles. As the season began, I had many conversations with Christine about how she was feeling. She showed humility and expressed the fact that it had rightfully caused issues with her wife at home. She advised that she had begun regularly attending Gamblers Anonymous meetings which had helped her understand some of the issues she was facing. She also had emotional support from her family as she dealt with her legal troubles. In summary, Christine was not in denial of her circumstance and was showing a willingness to become a better person. She eventually told me that she had pled guilty to her charges and believed it was the right thing to do.

Throughout my 25 year career in law enforcement, I have experienced all aspects of humanity. I have arrested subjects who I did not believe would ever be able to be positive contributors to society. I have seen defendants who I did not believe actually cared about

what they had done to people's lives. I have maintained contact with victims many years after their cases were adjudicated and found that many of them did not feel that justice had been served by the Court. But I have experienced many cases where defendants have approached me years later and thanked me for helping them find the right path. I believe that the world is a difficult place and that human beings are complex in nature. This is the same for those of us who are in law enforcement as it is for everyone else. In Christine, I have found her to be a good-natured and open person who admits to being flawed. Even though she is going through a tremendous amount of stress, she seems to be positive and has accepted the position she is in. She has never tried to blame anyone else and is actively working to be a better person. I believe that people need to be held accountable by the Court and that sentencing should be beneficial to society while being mindful of what the victims' have lost. My cursory view of this case is that it is mostly a financial crime in which the victims have lost finances. Typically, their restitution would be financial. In this case, I do not see how a 50 year old woman doing significant prison time serves a greater good for society. I feel that Christine has a lot to offer to society and that the only way that the victims would be able to recover any of their lost finances would be for Christine to be afforded an opportunity to work to the greatest extent possible. I believe that her activities could be monitored by the Court while working and that she would be able to provide far greater restitution than she would if she were simply incarcerated for a long time. Christine is highly intelligent and capable of being productive, despite having a criminal record. I believe she has been greatly humbled by this experience, has expressed remorse, and would be willing to apologize directly to those who have been hurt by her actions.

All of these things are being said by a person who is admittedly skeptical of people who commit criminal acts. I have never authored a letter of support for an individual who is in this position. However, I genuinely feel that Christine's positive qualities outweigh the negative ones. I have only known her for three years, but I feel that our paths crossed for a reason and I am glad that they did. I offer my full support of Christine Hunsicker for sentencing and ask the Court for mercy in rendering this difficult decision. I feel that, if given the opportunity, Christine will work very diligently to earn forgiveness from those who have been wronged. No matter the outcome and decision made by Your Honor, I believe that Christine will become a better person having been held accountable during this moment.

Respectfully,

Gregory Lewis

A.124

May 26, 2026



The Honorable Judge,

I am writing this letter in support of Christine Hunsicker.

My name is █████████████████████, and I have been an active member of Gamblers Anonymous continuously, without placing a bet, since October 21, 1998. Over the years, I have remained deeply involved in the program through service work, mentoring, and hosting regular recovery meetings.

I have known Christine for over a year through our Gamblers Anonymous Zoom meetings, including a Tuesday evening Step Meeting that I host, as well as a Sunday General Meeting that we both attend regularly. During that time, I have had the opportunity to observe her character, honesty, and commitment to recovery firsthand.

Christine has been open about the mistakes she has made and has never attempted to minimize or avoid responsibility for her actions. What has stood out to me most is the genuine remorse she has shown and the courage she has demonstrated in confronting her problems directly. In nearly three decades in recovery, I have met many individuals struggling with addiction and the consequences that come with it. It is rare to encounter someone who has approached accountability with the level of sincerity, humility, and determination that Christine has displayed.

I have even referred to Christine as "my hero" during meetings — words I do not use lightly. I say this because I have witnessed someone who, despite facing overwhelming personal and legal challenges, has

continued to show up, participate honestly, and work toward rebuilding her life with dignity and purpose.

From my perspective, Christine is not someone trying to escape responsibility. Rather, she is someone who is actively trying to change, grow, and make amends. I truly believe she is committed to recovery and becoming a better person moving forward.

I also attend an in-person Gamblers Anonymous meeting every Wednesday at 5:45 PM, along with several Zoom meetings throughout the week. In GA, approximately 85% of in person members are men, while women make up a much smaller percentage of the fellowship. Christine has stepped forward in a meaningful way to support other women in recovery — something that is both rare and greatly needed.

She regularly speaks with women on the phone, offers encouragement and guidance, and helps them navigate the challenges of recovery and rebuilding their lives. Many of these women have personally expressed how much Christine's support has helped them and how grateful they are for the time and compassion she gives to others.

It is very difficult for most compulsive gamblers to stop gambling and maintain long-term recovery. Having someone who is willing to mentor, support, and encourage others can make a tremendous difference. Christine has become that person for many women in the program.

In addition, Christine recently started a new Gamblers Anonymous meeting specifically geared toward newer members. The meeting is designed to provide support and guidance to individuals in their first year of recovery — a critical and often difficult period. While I have not personally attended the meeting because it is focused on a specific demographic, I know that starting a new GA meeting requires significant dedication, commitment, and genuine concern for helping others.

Service work is one of the core principles that helps individuals remain accountable and maintain sobriety in recovery programs. Christine's

actions demonstrate that she is not participating simply in hopes of receiving leniency; rather, she has become sincerely devoted to recovery and to helping others who are struggling with the same addiction.

This is only the second time in my life that I have written a letter of this nature on behalf of someone facing sentencing. I chose to do so because I genuinely believe Christine is working hard to change her life, accept responsibility for her actions, and make a positive impact on others in recovery.

Lastly, I respectfully believe that the less time Christine is incarcerated, the sooner she can continue giving back to the Gamblers Anonymous community and supporting the many women who rely on her encouragement, guidance, and example in recovery. The need for strong female leadership and mentorship within GA is significant, and Christine has become an important source of support for many individuals who are struggling.

Thank you for taking the time to read my letter and consider my perspective. I truly appreciate the Court's time, attention, and consideration in this matter.

Please feel free to contact me at any time if I can provide any additional information.

Respectfully,

█████████████

Gamblers Anonymous Member Since October 21, 1998

A.127

The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

June 19, 2026

Your Honor,

My name is ███████████. I am a compulsive gambler and have been a member of Gamblers Anonymous for close to 7 years. Before I retired, I was a Director of global sales, sourcing and product development in the textile industry.

When I first heard Christine speak in GA meetings, she spoke of her compulsive gambling and about some of her legal issues. What I did not hear was "woe is me ". There was no self pity - she took responsibility for her actions.

My respect for Christine has only increased over the past year+. Christine is not just sitting around and waiting to see what her future will bring, she is giving of herself to help others. She has volunteered and is on the GA Hotline; when she got her first call, she was over happy that she was able to help a desperate caller. Christine gave him hope and persuaded him to join a GA meeting. Helping each other is one of the main concepts of GA; helping others helps us feel better about ourselves.

Christine hosts or co-hosts 4 or more meetings per week; that means she shows up early before the meeting and helps to make sure that the meeting runs smoothly. During the meetings she puts her telephone number out there for anyone who needs to talk one on one. After meetings Christine reaches out to newcomers to give them hope and a feeling of belonging.  Because of Christine, we now have a new virtual meeting- a beginners only meeting. Christine believes, and I agree, the beginners feel more comfortable in a group that has similar issues. That comfort level helps them to keep joining the meeting. Christine has also started a group text chat so that if someone in the group needs to discuss any issue the group text chat is always available.

Christine is also writing a piece, a story, of various childhood traumas. She is describing and explaining the traumas in great detail. And then also in great detail and insight, she is expressing ways to deal with the various traumas - ways to heal. This piece, this writing, could be of great help to parents and teachers who deal with troubled children. Christine is

truly wonderfully insightful.

Christine is now a sponsor; she is sponsoring a young beginner. Sponsorship is a huge responsibility, it can make or break someone's recovery. As Christine grew in  the program she gained the confidence to take on that responsibility.

