UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

UNITED STATES OF AMERICA         :

                                              :

           - v. –                :        25 Cr. 318 (JPO)

                                              :

CHRISTINE HUNSICKER,        :

                                              :

         Defendant.         :

-------------------------------------------------------- x

# SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA

JAMES M. MCDONALD
United States Attorney
Southern District of New York

Marguerite B. Colson
Alexandra N. Rothman
Assistant United States Attorneys
   *- Of Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................................1

FACTUAL BACKGROUND .................................................................................................2

    I.    Gwynnie Bee and CaaStle .........................................................................................2

    II.    Hunsicker Lied to Investors ......................................................................................3

    III.    Hunsicker Forged CaaStle's Audited Financial Statements.................................7

    IV.    Hunsicker Paid Off a Victim to Continue Her Fraud..........................................8

    V.    Hunsicker Launched P180 to Conceal Her Fraud...............................................10

    VI.    Hunsicker Forged the Signatures of CaaStle Board Members .........................10

    VII.    Hunsicker Used Investor Money to Pay Out Her Co-Founder and Other Investors .........12

    VIII.  Hunsicker Profited from Her Fraud .....................................................................13

    IX.    Hunsicker's Fraud Was Exposed before She "Confessed" to the Board ..........14

    X.    Hunsicker Flouted the Board's Restrictions until She Resigned .....................16

PROCEDURAL HISTORY ...................................................................................................18

A SENTENCE OF 151 MONTHS' IMPRISONMENT IS NECESSARY ..................................20

    I.    The Nature, Circumstances, and Seriousness of the Offense Warrant a Sentence of 151 Months' Imprisonment.................................................................................21

    II.    A Sentence of 151 Months' Imprisonment Is Necessary to Protect the Public and for Specific Deterrence .................................................................................28

    III.    A Sentence of 151 Months' Imprisonment Is Necessary for General Deterrence .............31

    IV.    The Defendant's History and Characteristics Do Not Warrant a Variance ........................35

    V.    A Sentence of 151 Months' Imprisonment Is Necessary to Avoid Unwarranted Sentencing Disparities .................................................................................39

    VI.    The Remaining Sentencing Factors Do Not Warrant a Variance.....................................43

FORFEITURE AND RESTITUTION.....................................................................................48

CONCLUSION.....................................................................................................................49

The Government respectfully submits this memorandum in advance of the sentencing of Christine Hunsicker, presently scheduled for August 20, 2026, and in response to the defendant's sentencing submission dated July 22, 2026 ("Def. Mem.").

## PRELIMINARY STATEMENT

Christine Hunsicker orchestrated a massive fraud scheme in which she duped investors into giving her hundreds of millions of dollars for CaaStle, a retail technology company she founded and touted as a staggering success. In truth, CaaStle was a flop. Over six years, Hunsicker victimized hundreds of investors, feeding them lies about CaaStle's valuation and preparing inflated income statements and balance sheets. She fabricated audited financial statements. She even forged the signatures of business luminaries who served on CaaStle's Board.

In 2023, an investor discovered that Hunsicker had falsified a CaaStle audit. Hunsicker bought the investor's silence and returned to her fraud. A year later, when another victim made the same discovery, Hunsicker again tried to pay off the investor. But this investor refused. Only then did Hunsicker tell the Board what was unavoidable: She had been lying about CaaStle's finances and more than $300 million of investor money was gone.

Remarkably, after Hunsicker "confessed" to the Board, she continued to deceive others. In late 2024 and early 2025, Hunsicker told more lies about CaaStle's finances, including on recorded calls. She raised millions for P180, a new venture she had launched to conceal her original fraud. She sold her own worthless CaaStle shares to unwitting investors. She even shared with an investor the same fake audit that had landed her in trouble.

A gifted athlete, with an Ivy League education and a high-paying job after college, Hunsicker could have used her talents for honest work. She could have built a company that delivered on its promises and taken care to safeguard investor money. Instead, Hunsicker chose to

lie, cheat, and steal from her investors, all while touting herself as a successful entrepreneur. And to be clear, these were choices.

The defense argues this is "not a typical fraud case," asserting Hunsicker did not use the money for herself but rather to build a company for investors. In making this claim, however, Hunsicker merely underscores the hubris that propelled her crimes. She did not act altruistically by feeding investor money into her failing business; she acted to achieve the status, prestige, and influence that follows a successful start-up founder. If anything it is the scale of Hunsicker's crimes that makes this fraud unique. The shocking losses caused by Hunsicker place her in the rare company of front-page fraudsters, such as Elizabeth Holmes, who destroyed more wealth than most people could imagine. At the same time, Hunsicker's hollow gesture toward acceptance of responsibility—while blaming a high-handed investor, a traumatic brain injury, and the Board— reveals her to be quite typical in failing to reckon with her conduct.

Hunsicker devotes much of her sentencing submission to personal circumstances that distract, rather than explain—much less excuse—her crimes. In the absence of true mitigating circumstances, Hunsicker merits a prison sentence that is sufficiently severe to provide justice for her crimes and to dissuade others from committing similar crimes, and that will permit the defendant's release from custody only after society can be assured that she will not have the opportunity to return to fraud and deceit. For these reasons, the legitimate purposes of punishment require a sentence of 151 months' imprisonment.

**FACTUAL BACKGROUND**

**I.      Gwynnie Bee and CaaStle**

In 2011, Christine Hunsicker and her co-founder, JP Singh, launched Gwynnie Bee, a company that focused on plus-size clothing. PSR ¶ 5. Hunsicker raised millions of dollars for Gwynnie Bee from private investors. In 2018, Hunsicker rebranded the business as CaaStle, a

2

technology company that enabled fashion brands to rent their clothing to consumers as part of a subscription-based service. PSR ¶ 6. Hunsicker served as CaaStle's CEO. PSR ¶ 5.

In public, Hunsicker touted CaaStle's remarkable growth and characterized the business as the "leading B2B technology company driving the next evolution of inventory monetization for apparel and beyond." *Id.* ¶ 6. She valued the business at more than $1.4 billion. *Id.* ¶ 7. Hunsicker was quoted in articles, featured in magazines, and even made a guest appearance on the hit television show, *Project Runway*.[1]

By Hunsicker's telling, CaaStle was a company that could not be stopped. In reality, Hunsicker was a swindler who would not be stopped. Shortly after rebranding the business as CaaStle, Hunsicker knew the company faced financial challenges that threatened the trajectory she had promised investors. Company cash was dwindling and expenses mounted. PSR ¶ 7. Rather than concede those headwinds, Hunsicker concealed them. For the next six years, Hunsicker raised nearly $300 million from hundreds of investors based on false and fabricated financial documents, material omissions, and deliberate lies. PSR ¶¶ 13, 15.

## II.    Hunsicker Lied to Investors

In late December 2018, Hunsicker looked to the private markets to raise cash for CaaStle. Hunsicker told investors that her business was worth $1.2 billion. To back up that valuation, Hunsicker prepared a fraudulent income statement that grossly inflated CaaStle's revenue to more than $70 million. In truth, CaaStle's revenue was nothing close to that number. Nevertheless, by at least February 24, 2019, Hunsicker had circulated a fraudulent income statement to an investor. PSR ¶ 8.[2] From that point on, Hunsicker charted a fraudulent course that grew increasingly brazen.

---

[1] SDNY_SWR_REL_01_02048051. The Government has included citations to documents gathered in its investigation, and will make them available to the Court, if requested.

[2] SDNY_REL_01_00966204.

The following month, in March 2019, Hunsicker provided the same inflated income statement, now accompanied with a fraudulent balance sheet, to a different group of investors.[3]

To be sure, certain CaaStle's investors were investment firms and family offices. But many others were individuals—a group of victims Hunsicker largely ignores in her sentencing submission. Hunsicker met these individuals through Singh or other personal connections. At least two she met through a Columbia University MBA course where she guest lectured.[4] One victim was an 86-year-old retired Major General in the U.S. Air Force who, along with his family, invested millions. As to each, Hunsicker spun the same story of CaaStle's purported success as she induced victim after victim to invest hard-earned savings and, at times, retirement funds in the CaaStle business.[5] Hunsicker then spent her victims' money to mask CaaStle's failures and keep the business afloat, all while building her personal brand as a successful entrepreneur.

One early investor in CaaStle was the finance leader and philanthropist who Hunsicker tacitly blames for her crimes. Def. Mem. at 15. According to Hunsicker, this investor—exceeding his information rights—peppered her with "volatile, insistent, and relentless" demands for detailed financial data. *Id.* Hunsicker supposedly buckled under the pressure and presented him with doctored financial statements after an in-person meeting in late March 2019 that Hunsicker

---

[3] SDNY_REL_01_00961202; SDNY_REL_01_00022957.

[4] Victim Impact Statement No. 3 ("I invested $100,000 of my own funds in CaaStle. I met Ms. Hunsicker through a Columbia Business School Executive MBA entrepreneurship course, and she solicited my investment in connection with that academic and professional setting."); Victim Impact Statement No. 29 ("I am a Professor of Entrepreneurship at Columbia University…I met [Christine] and then asked her to do a guest speaking appearance in one of my classes…I invited her back about 3 more times…."). Victim Impact Statements are attached as Ex. A.

[5] Victim Impact Statement No. 24 ("The original $250K in funds were from my retirement IRA account."); Victim Impact Statement No. 12 ("$415,000 total loss. Initial loss was the amount of my 401K ($365,000) …This has been a devastating loss for me and especially my family.").

"anticipated would become confrontational." *Id.* at 15-16. From there, Hunsicker claims, the fraud simply could not be stopped.

Hunsicker's rendition is at odds with reality. For one thing, contemporaneous communications reflect an appreciative and collaborative relationship between Hunsicker and the investor even after the March 2019 meeting.[6] More to the point, Hunsicker's "origin story" does nothing to explain her transmission of doctored financials to different investors prior to the March 2019 meeting, let alone her continuing the sprawling fraud scheme years after the March 2019 meeting, as reflected in the chart below:



By 2021, Hunsicker was still burning through cash at CaaStle, and desperately needed money to keep the business afloat. At the same time, Hunsicker realized she could not keep launching new fundraising rounds if CaaStle, supposedly, was flush with cash, as she had told her investors. So Hunsicker devised a new ruse. She began telling investors they could purchase

---

[6] SDNY_REL_01_00022960. Notably, the only corroboration Hunsicker offers for this rendition is a letter from investor ███████ who describes Hunsicker as "a friend" and "truly brilliant," urges the Court for leniency to allow Hunsicker "to use her undoubted intellect to find a way to create value for those that she has defrauded," and recalls that "around the same time Christine was acutely suffering from the effects of a concussion." A.101.

discounted CaaStle shares from existing shareholders who desperately needed liquidity after falling on hard times. Hunsicker's lies were deliberate, manipulative, and at times cruel. Hunsicker even went so far as to issue fake capitalization tables and share certificates to the investors to demonstrate that they had purchased existing CaaStle shares. PSR ¶ 8(d).

In November 2021, for instance, Hunsicker emailed one investor:

> An earlier investor of ours had a SPAC blow up on him and he's in a bad liquidity position while it goes to court (he and the other investors are suing). He is looking to liquidate some of his shares very quickly at a super attractive price…do you have any interest in all or some of it?...It's a huge discount to the last investment you just did at $6.20, so it's a win-win for everyone. I would buy it if I could, but I'm not allowed. :-)[7]

In December 2022, Hunsicker emailed another investor that a shareholder had "an FTX issue" and needed to sell his shares, writing:

> I have an investor who got crushed by the FTX debacle. He's willing to liquidate at $1.20 per share, which puts the valuation below our LTM revenue (!!!). He has $3M to move. Do you want it? Would love for it to go to you - it would be a preferred transaction with CaaStle, so you'd be fully protected.[8]

And another:

> I have an opportunity for you to pick up some super cheap shares at basically a 1x valuation due to an investor with an FTX issue. It's only $300K, but I thought of you since we just spoke and you have a very current update…Only issue is speed - the investor is in a bad place - which is also why I need to go to an individual instead of one of our funds which will take longer. You'd buy directly from CaaStle, and we'll buy from the investor so that you are fully protected.[9]

And another:

> I got a call from one of our investors who got crushed in the FTX blow-up…He has $300K worth of shares (initially) that he needs to move asap. There may be more behind it. Given the speed he's looking for in exchange for the unbelievable price,

---

[7] SDNY_REL_01_00700716.

[8] SDNY_REL_01_00699276.

[9] SDNY_REL_01_00699084.

I can't push this to one of our funds - it has to be an individual…I hope you can take it - it would be a huge help for him and a really great pick-up for you.[10]

In 2023, Hunsicker spun stories about CaaStle employees who needed to liquidate their shares due to "a family health emergency (his mom needs extensive medical care)" or "for an elder care situation."[11] Investors believed Hunsicker's lies. One investor even responded, "Thank you for thinking of Me. So far, this is the Best BDay present I have received today!!!!"[12]

These secondary sales were fictitious, as were the heart-wrenching narratives Hunsicker invented to execute them. Rather than provide needed liquidity to secondary sellers, Hunsicker used the investors' money to raise fresh capital for CaaStle while concealing from the investors that CaaStle itself needed cash. By the beginning of 2023, Hunsicker had raised over $100 million from her investors through fraud.

### III.    Hunsicker Forged CaaStle's Audited Financial Statements

In 2023, Hunsicker solicited an existing CaaStle investor ("Investor-2") to purchase additional shares of CaaStle. Before investing more funds, however, Investor-2 asked to see copies of CaaStle's audited financial statements.

In April 2023, Hunsicker sent Investor-2 what purported to be a final audit of CaaStle by the independent audit firm, BDO, for fiscal years ("FY") 2021 and 2020. In fact, Hunsicker had surreptitiously altered the FY 2021 and 2020 audit to inflate CaaStle's FY 2021 revenue by more than $100 million. Hunsicker also sent Investor-2 an altered version of the draft audit of CaaStle by BDO for FY 2022 and 2021, falsely reporting that CaaStle's net revenue had nearly doubled to $230 million from FY 2021 to FY 2022 when, in truth, it did not exceed $20 million. PSR ¶ 8(b).

---

[10] SDNY_REL_01_00700716.

[11] SDNY_REL_01_00362886.

[12] SDNY_REL_01_00394141.

In August 2023, Hunsicker continued to press Investor-2 to purchase more shares. In response, Investor-2 requested a screenshot of CaaStle's bank accounts, to verify its cash position, and a copy of the final FY 2022 and 2021 audit. Hunsicker sent back a screenshot that she had digitally altered to show over $50 million in CaaStle's bank accounts. A copy of the altered screenshot is below:



In fact, CaaStle did not have even $1 million in cash at the time. Hunsicker also falsified and transmitted to Investor-2 what purported to be a final audit of CaaStle for FY 2022 and 2021 prepared by BDO. In reality, BDO had never completed the audit. PSR ¶ 8(c).

## IV.    Hunsicker Paid Off a Victim to Continue Her Fraud

On September 29, 2023, Investor-2 contacted an audit partner at BDO to confirm the audit was authentic. It was not. Not only had BDO not finished the audit, the financial numbers inside were false, having been inflated by Hunsicker. To make the audit appear final, however, Hunsicker affixed the signature of "BDO USA, LLP" to the draft audit opinion.

On October 2, 2023, the audit partner confronted Hunsicker on a telephone call, during which Hunsicker lied. Hunsicker falsely claimed to have created the fake audit in connection with a lecture she gave at Princeton University. The next day, the audit firm informed Hunsicker that BDO was terminating its relationship with CaaStle. Hunsicker responded with more lies, claiming,

"the email to the investor - a single email - was a very embarrassing error," and "[w]e were not soliciting new investment from them that would have required it either."[13] In truth, Hunsicker had provided two fabricated audits to Investor-2 and was soliciting a new investment. PSR ¶ 8(e).

Hunsicker's lies to BDO in late 2023 were not the product of cognitive impairment or pandemic-related "chaos." Def. Mem. at 32. By Hunsicker's own admission, her "fog" began to lift in late 2023, prompting a return to normal cognitive function. *Id.* at 18. Indeed, Hunsicker was cogent enough to contemplate the consequences of her false statements when, a few hours before the call with BDO, she conducted internet searches for "fraud" and "created an audit firm fake," *id.*, and also prepared a document with the subject "Outline for p'ton class"[14]—a document Hunsicker drafted as purported "talking points" for the non-existent college course she had described to BDO.

Approximately a week after the BDO call, counsel for Investor-2 sent a letter to Hunsicker, in which he identified himself as a "former federal prosecutor" and demanded repayment of Investor-2's existing $10 million investment based on "the authenticity of information" Hunsicker had provided to Investor-2.[15] Hunsicker quickly entered into a confidential settlement with Investor-2, agreeing to repay the value of Investor-2's investment in CaaStle in exchange for Investor-2's silence. PSR ¶ 8(e).

Having lied to BDO and paid off Investor-2, Hunsicker was free to continue her fraud. In 2024, Hunsicker raised nearly $90 million from investors based on false statements and misrepresentations regarding CaaStle.

---

[13] SDNY_REL_01_00241561. Hunsicker went on to blame Investor-2 for checking with BDO and relayed that "we will address this error with the investor at our end." *Id.*

[14] SDNY_SWR_REL_01_01637167.

[15] SDNY_REL_01_00392318.

## V.    Hunsicker Launched P180 to Conceal Her Fraud

By 2024, CaaStle had burned through millions fraudulently raised from investors and was in financial distress with few options. Hunsicker could keep raising funds from victims duped into believing they were getting a cut-rate price on existing CaaStle shares, but CaaStle would need to generate revenue at some point. Otherwise, Hunsicker's fraud would be exposed.

Around the same time, Hunsicker began to pivot to P180, a new business venture that would acquire interests in clothing brands. PSR ¶ 14. Hunsicker intended for P180 to mask CaaStle's problems—and her fraud—by contracting with CaaStle to pay for its e-commerce technology, and thereby infusing CaaStle with needed cash. *Id.*

Hunsicker turned to existing CaaStle investors to raise money for P180. *Id.* In doing so, she promoted CaaStle as the engine behind P180 but failed to disclose to prospective P180 investors that the true financial condition of CaaStle paled in comparison to the picture she continued to portray through fabricated and inflated financial statements and audits. *Id.*

In total, Hunsicker raised more than $13 million of investments in P180. PSR ¶ 15. As explained below, all of that money came in *after* Hunsicker had paid off Investor-2 in late 2023, and nearly $10 million came in *after* she had "confessed" to the Board in December 2024.

## VI.    Hunsicker Forged the Signatures of CaaStle Board Members

In the spring of 2024, Hunsicker was introduced to a Miami-based investment firm, KSV. Hunsicker provided KSV with the same false and misleading financial statements about CaaStle that she had given to other investors. When KSV sent Hunsicker a due diligence questionnaire that asked, among other things, whether there had been any changes to the "capitalization table" as of "November 1, 2022," Hunsicker falsely denied "rais[ing] any primary capital."[16]

---

[16] SDNY_REL_01_00164234.

By May 2024, KSV was preparing to invest around $10 million in CaaStle. Before doing so, KSV insisted that Hunsicker provide signed confirmation that the CaaStle Board had authorized the grant of stock options to KSV.[17] Instead of going to the Board, which Hunsicker needed for authorization, Hunsicker forged the signatures of Board members, John Hennessy and Scott Callon, and provided the forged document to KSV. PSR ¶ 8(h).

In the fall of 2024, Hunsicker raised an additional approximately $37 million from KSV. Once again, KSV insisted on signed confirmations that the Board had authorized the grant of stock options to KSV. As before, Hunsicker forged the signatures of Mssrs. Hennessy and Callon, and provided the forged document to KSV. PSR ¶ 8(h). Excerpts from Hunsicker's forged Board documents are below:

**September 26, 2024**                          **October 8, 2024**



---

[17] The granting of "stock options" was the mechanism by which Hunsicker represented she was able to offer investors like KSV discounted shares. The blended rate of the CaaStle shares and options equaled a purportedly discounted share price.

### VII.    Hunsicker Used Investor Money to Pay Out Her Co-Founder and Other Investors

Hunsicker did not put investors' money "entirely" into the CaaStle business as her submission insists. Def. Mem. at 28. For one thing, she used investor funds to pay out investors who threatened to expose her fraud. And not just in October 2023, when she paid out $10 million to Investor-2 (*supra* at 9). In September 2024, for example, Hunsicker provided a CaaStle investor ("Investor-3") with another fake screenshot of CaaStle's bank accounts reflecting that CaaStle had nearly $200 million in available cash. A copy of that screenshot is below:



In fact, CaaStle had less than $200,000 in available cash at the time. PSR ¶ 8(f). When Investor-3 requested a copy of the bank statement itself, Hunsicker falsely claimed that the CaaStle Board would not allow her to share the information. Investor-3 was unsatisfied and demanded access to the information under the share purchase agreement. To avoid turning over the document, which would have revealed that Hunsicker had fudged the numbers, Hunsicker allowed Investor-3 to redeem its investment in CaaStle. *Id.*

The following month, in October 2024, Hunsicker allowed Singh, her former co-founder, to cash out $6 million of worthless CaaStle shares, the day after CaaStle had received millions from KSV. On October 10, 2024, KSV wired approximately $37 million to CaaStle based on the fraudulent Board documents (*supra* at 11). The next day, Hunsicker wired $6 million to Singh's personal account in exchange for his CaaStle shares. PSR ¶ 10.

When early-stage investors ignorant of Hunsicker's crimes had asked about redeeming their investments, she routinely refused. But as to Singh and others who threatened to halt her spree, Hunsicker cut them a deal.

## VIII.   Hunsicker Profited from Her Fraud

Not only did Hunsicker spend CaaStle funds on select investors, she also spent CaaStle funds on herself. Hunsicker received a salary of $21,000 per month. On top of that, Hunsicker routinely transferred money from CaaStle accounts to her personal bank accounts and then used those funds to pay for her personal expenses: credit card bills, veterinary bills, mortgage payments, landscaping costs, a donation to her college social club, and even to make payments on the $20 million personal loan from Emigrant Bank.

Below are a few examples of Hunsicker's unlawful spending:







## IX.    Hunsicker's Fraud Was Exposed before She "Confessed" to the Board

In October 2024, Hunsicker provided an existing investor (Investor-4")[18] with a fake draft audit for FY 2023 and 2022, supposedly by BDO. Rather than risk transmitting the fabricated audit over email, Hunsicker insisted that Investor-4 view a hard copy of the report in her office. The numbers Hunsicker presented were even more fanciful than the BDO numbers she had been caught trying to pass off to Investor-2 a year earlier.

During the meeting at CaaStle's office, Investor-4 noticed that a page of the audit was missing. When Investor-4 asked Hunsicker about the missing page, Hunsicker alleged a "printing issue." Investor-4 then asked to see the audit on Hunsicker's computer, but she claimed not to have

---

[18] Investor-4 managed the family investment office for the finance leader and philanthropist who Hunsicker blames for her fraud. *See* Def. Mem. at 15.

a copy. Finally, Hunsicker pulled a single piece of paper out of a large stack of documents–supposedly the missing page.

Following the visit to CaaStle's office, Investor-4 learned that BDO had not performed the audit. On November 18, 2024, Investor-4 returned to CaaStle's office to confront Hunsicker and recorded the meeting. Hunsicker feigned ignorance of the circumstances surrounding the fabricated audit, expressed dismay at the auditor for supposedly speaking with an investor in violation of its confidentiality obligations, and assured Investor-4 that the situation would be "relatively easy to fix."[19] Once Investor-4 left the office, Hunsicker conducted an internet search for "faking an audit." PSR ¶ 8(g).

Investor-4 and Hunsicker spoke by telephone on November 26, 2024. During the call, which also was recorded, Hunsicker told Investor-4, "I understand what has happened here and there is an issue," and offered to buy out their investment in CaaStle. PSR ¶ 8(g).[20] Investor-4 refused to be paid off.

Instead, on November 27, 2024, Investor-4 emailed a CaaStle Board member to alert him to "disturbing information about CaaStle." PSR ¶ 11.[21] Investor-4 informed the Board member that Hunsicker had provided what appeared to be a fabricated audit and requested that the Board investigate the financials of CaaStle and the validity of the audit. *Id*.

On December 8, 2024—*i.e.*, one week after Investor-4 had rebuffed Hunsicker's repayment offer—Hunsicker told the Board that she had been lying to investors about CaaStle's financial performance. Hunsicker describes this disclosure as a "confession" or "self-report," and touts it as

---

[19] SDNY_REL_01_01991003.

[20] SDNY_REL_01_01991001.

[21] SDNY_REL_01_01032218.

"voluntary," "proactive," and "transparent." Def. Mem. at 18-20. None of those adjectives applies. Only after Investor-4 had refused her overture to get paid back did Hunsicker report anything to the Board. She did not come forward in October 2023 or September 2024, when her payoff playbook had worked to buy investors' silence. Nor was Hunsicker transparent in her "confession." Among other things, she never disclosed that she had forged the signatures of Mssrs. Hennessy or Callon on CaaStle documents.

### X.    Hunsicker Flouted the Board's Restrictions until She Resigned

In December 2024, after her "confession," the CaaStle Board allowed Hunsicker to remain as CEO of CaaStle but prohibited her from taking any actions on behalf of CaaStle, including soliciting investments in the company. PSR ¶ 17. Hunsicker flouted those restrictions. Far from "placing the interests of CaaStle's investors ahead of her personal interests," Def. Mem. at 19, or taking responsibility for her actions, Hunsicker continued to steal from CaaStle's investors.

On December 10, 2024, Hunsicker participated in a recorded interview with KSV, the Miami-based investment firm. In the video clip, Hunsicker pitched new investments in P180 and lied about CaaStle's performance, reporting the CaaStle "grew about 60% between 2023 and 2024 topline and more than doubled cash production in 2024;" that CaaStle had "several hundred millions of dollars on the balance sheet;" that CaaStle "beat [its] projections;" and that its "balance sheet has a lot of cash on it."[22] In January 2025, KSV invested $1.5 million in P180.

In early January 2025, Hunsicker also disregarded the Board's prohibition on raising money for CaaStle when she sold $8 million of her worthless CaaStle shares to an unwitting CaaStle investor, failing to disclose any financial delinquency at the company, much less her role in it. PSR ¶ 12. To keep this transaction under the radar, Hunsicker asked the investor to use her

---

[22] Hunsicker Interview with KSV, 14:10-15:00, attached as Ex. B.

personal email address, not her CaaStle email address.[23] Hunsicker went on to invest some of the money from the sale in P180, adding to the $3.5 million that Hunsicker collected that month from KSV as well as Investor-1. The seeming success of CaaStle—billed as P180's engine—drove those investors to contribute to Hunsicker's spinoff venture.

On January 9, 2025, Hunsicker participated in an investor call with Cava Capital in which she continued to lie about the financial health of CaaStle. For instance, she did nothing to correct one investor's misimpression that CaaStle had $300 million in cash on its balance sheet. Indeed, Hunsicker responded that even though $300 million was "more cash than we've had…it still is not a ton of cash given our revenue level." Asked about CaaStle's projected profitability, Hunsicker predicted $250 million the following year.[24] Cava Capital also invested in P180.

In early February 2025, Hunsicker offered to sell Investor-1 "up to 9.3M of [her] common shares at $2.15 pps as long as the transaction is completed in 30-45 days."[25] According to Investor-1, Hunsicker proposed this transaction during a breakfast meeting at which she claimed to be searching for liquidity to pay off an $18-million bank loan, never letting on that CaaStle was in dire financial straits. Directly after the meeting with Investor-1, Hunsicker searched Google for "bank fraud vs. wire fraud severity." PSR ¶ 16.

On March 17, 2025, law enforcement agents with the FBI executed search warrants at Hunsicker's New Jersey home and the CaaStle offices in Manhattan. PSR ¶ 17. Three days later, on March 20, 2025, Hunsicker again met with Investor-1 and failed to disclose the financial fraud she had perpetrated at CaaStle. Indeed, she was so bold as to discuss the falsified 2023 audit with

---

[23] SDNY_REL_01_00166112.

[24] Hunsicker Interview with Cava Capital (excerpt), 1:45-1:55, 9:25-9:55, attached as Ex. C.

[25] SDNY_REL_01_01040728.

Investor-1—the same document she had provided to Investor-4, which caused her fraud scheme to unravel. PSR ¶ 16.[26]

On March 29, 2025, the CaaStle Board disclosed to investors that Hunsicker was under investigation for falsifying CaaStle's financial information and had resigned as CEO.

## **PROCEDURAL HISTORY**

On July 17, 2025, the defendant was charged in Indictment 25 Cr. 318 (JPO) (the "Indictment") in six counts. Count One charged her with wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. Count Two charged her with securities fraud in connection with the purchase and sale of CaaStle securities, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b5, and 18 U.S.C. § 2. Count Three charged her with securities fraud in connection with the purchase and sale of P180 securities, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b5, and 18 U.S.C. § 2. Count Four charged her with false statements to a financial institution in connection with misrepresentations to a bank in order to maintain a $20 million loan, in violation of 18 U.S.C. §§ 1014 and 2. Count Five charged her with money laundering in connection with the transfer of millions of dollars of Singh and P810, in violation of 18 U.S.C. §§ 1957 and 2. Count Six charged her with aggravated identity theft for using the identities of Board members to issue stock options to KSV, in violation of 18 U.S.C. §§ 1028A and 2. Dkt. 1.

On March 4, 2026, Hunsicker pled guilty to Count Two of the Indictment, pursuant to a plea agreement with the Government. As part of her plea agreement, Hunsicker admitted the factual allegations set forth in the attached Stipulation of Facts.[27]

---

[26] SDNY_REL_01_01040757.

[27] Plea Agreement at 2, attached as Ex. D.

18

## **APPLICATION OF SENTENCING GUIDELINES**

The parties stipulated in the plea agreement that the adjusted offense level is 39, and the total offense level is 34 as calculated below:

- *Base Offense Level*: Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is seven.

- *Loss Amount*: The total loss to CaaStle and P180 investors was more than $250,000,000 and less than $550,000,000 resulting in a 28-level increase under U.S.S.G. § 2B1.1(b)(1)(O).

- *Number of Victims*: The offense involved hundreds of victims. Because the offense involved at least ten victims, a two-level increase is required by U.S.S.G. § 2B1.1(b)(2)(A)(i).

- *Abuse of Trust*: Because the defendant abused a position of private trust in a manner that significantly facilitated the commission of the offense, a two-level increase is required by U.S.S.G. § 3B1.3.

- *Chapter Four Adjustment*: Because the defendant is a zero-point offender, a two-level decrease is required by U.S.S.G. § 4C1.1(a) and (b)

- *Acceptance of Responsibility*: A three-level decrease is applicable under U.S.S.G. § 3E1.1(a), (b).

The defendant has zero criminal history points, and is in Criminal History Category I, resulting in a Stipulated Guidelines Range of 151 to 188 months' imprisonment.

As a condition of her guilty plea, the defendant "acknowledge[d], in light of the factors set forth in 18 U.S.C. § 3553(a), a sentence of less than two years' imprisonment would not be sufficient to comply with the purposes of sentencing, and the defendant agree[d] that she will not directly or indirectly seek a sentence of less than two years' imprisonment at sentencing."[28]

The Probation Department similarly calculates a Guidelines range of 151 to 188 months' imprisonment and recommends a sentence of 120 months' imprisonment. PSR at 28.

---

[28] Plea Agreement at 4.

**A SENTENCE OF 151 MONTHS' IMPRISONMENT IS NECESSARY**

The Sentencing Guidelines promote the "basic aim" of "ensuring similar sentences for those who have committed similar crimes in similar ways," *United States v. Booker*, 543 U.S. 220, 252 (2005), and so "to secure nationwide consistency, the [Sentencing] Guidelines should be the starting point and the initial benchmark," *Gall v. United States*, 552 U.S. 38, 49 (2007). Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

Taking into account the Sentencing Guidelines and all the factors set forth in 18 U.S.C. § 3553(a), a sentence at the bottom of the Stipulated Guidelines Range of 151 months' imprisonment is warranted. A sentence of merely two years—or anything close to it—would be

woefully inadequate to satisfy the purposes of sentencing, and send the wrong message to the defendant, to others considering committing fraud, to victims, and to society at large.

## I.   The Nature, Circumstances, and Seriousness of the Offense Warrant a Sentence of 151 Months' Imprisonment

The nature and circumstances of the defendant's crimes are extraordinarily serious. Hunsicker orchestrated, perpetuated, and concealed a $300 million fraud scheme that victimized hundreds of individuals. Whether measured by the serial and calculated nature of her lies, the length of her scheme, the harm to her investors, or the erosion of trust in the financial markets, Hunsicker's crimes were egregious and deserve meaningful punishment.

*First*, the magnitude of Hunsicker's theft calls for a significant sentence. Over six years, Hunsicker defrauded hundreds of victims out of nearly $300 million dollars. Her fraud spanned two businesses—CaaStle and P180—and involved dozens of falsified and inflated financial statements, as well audits forged for years. It involved hundreds of emails to investors, and even more in-person meetings and phone calls, in which Hunsicker lied about the CaaStle business and stole her investors' money. Certain victims took enormous financial hits. KSV, for instance, lost more than $40 million through its investment in CaaStle and P180.[29] Cava Capital lost nearly $50 million.[30] And Investor-1, a victim of Hunsicker's scheme who nearly purchased Hunsicker's CaaStle shares mere days after law enforcement executed search warrants at Hunsicker's home and CaaStle's offices, lost nearly $40 million. A loss of such scale to a single victim would justify a significant prison sentence. Even more so when Hunsicker inflicted staggering financial losses on multiple investors, to say nothing of the hundreds of investors who lost comparatively smaller sums totaling hundreds of millions of dollars.

---

[29] Victim Impact Statement No. 14.

[30] Victim Impact Statement No. 30.

*Second*, the duration of Hunsicker's schemes amplifies their severity. Her frauds were not the product of a momentary lapse of judgment. They began in 2019, and they continued until 2025, even after Hunsicker "confessed" to the Board. Along the way, Hunsicker rebuffed multiple opportunities to reverse course and come clean. Consider October 2023, when Hunsicker was first confronted by BDO and Investor-2 about the fraudulent audit. Had she come clean in that moment, more than $90 million of CaaStle and P180 investor money would be returned to those investors' pockets. Instead, because Hunsicker chose to continue to fraud, that money is gone.

*Third*, Hunsicker's criminality was pervasive. It was not limited to lying to investors but also involved Hunsicker forging the signatures of her two Board members, on multiple occasions. She submitted false statements to Emigrant Bank in connection with a $20 million loan. She secretly transferred $6 million in investor funds to Singh while the rest of CaaStle was collapsing. In other words, while the fraud against CaaStle and P180 investors may have been the biggest crime she committed, she expanded her arsenal deception and fraud.

*Fourth*, Hunsicker's crimes merit serious punishment for the lasting harm they inflicted on her victims. The Government has received victim impact statements from dozens of victims. Many of them detail the pain Hunsicker caused them, not simply by stealing their money but by breaching their trust. In some cases, that trust was built on years of friendship and shared experiences. Examples include:

- A victim wrote, "I would still love to know why she did it, just for my own piece of mind, but it's not going to change anything. I will go on with my life, but will always be bitter about how I was lied to the ENTIRE TIME and how she betrayed me and so many others. The fact that she wasted over $500 million of investor money on a business that was always a fraud is despicable. How can someone be so evil???"[31]

- A victim wrote, "As the manager of the Leeds family investments, I have a responsibility to act prudently and to rely on the honesty of those with whom we do

---

[31] Victim Impact Statement No. 1.

business. That trust was violated. I respectfully ask the court to consider not only the financial loss, but the broader principle at stake: that fraudulent conduct, regardless of the size of the investment or the sophistication of the investor, undermines confidence in the financial system and must be taken seriously."[32]

- A victim wrote, "Beyond the financial harm, the betrayal of trust has been deeply painful. My father invested in good faith because Christine Hunsicker approached him personally and because the apparel world is a relationship-driven industry. That trust was exploited. The repeated reassurances we received even after I became the shareholder prolonged the deception and prevented us from taking any protective steps. We now face the reality that capital we counted on for our own legitimate business is gone, while Christine Hunsicker used fabricated financial statements, fake audits, and misleading representations to raise hundreds of millions of dollars."[33]

- A victim wrote, "The losses suffered by Gagnon Securities Parters Private Fund I LLC represent not only a substantial financial impact but also a breach of trust in professional relationships that underpinned our investment decisions."[34]

- A victim wrote, "It is one thing to invest the money and lose it because the company fails but it is a whole different type of loss when the investment money is taken fraudulently. Ms. Hunsicker took advantage of our goodwill and stole the money from us…. So, we lost not only the $100,006 but we also lost trust in people."[35]

- A victim who lost $4.9 million wrote, "The loss of money is obviously substantial, and time and expertise were wasted in years of due diligence attempts that yielded what I now know to have been falsified or incomplete information. But the deeper damage lies in the betrayal of trust. My mission with Sherpalo has always been to foster innovation responsibly by backing founders who act with integrity and openness. Ms. Hunsicker's deceit undermined those principles and the trust that early-stage technology companies rely on to obtain the investor support that they need to build and grow."[36]

* * *

---

[32] Victim Impact Statement No. 15.

[33] Victim Impact Statement No. 2.

[34] Victim Impact Statement No. 7.

[35] Victim Impact Statement No. 17.

[36] Victim Impact Statement No. 26.

Hunsicker's sentencing submission is replete with arguments designed to temper the severity of her crimes. None is persuasive.

*First*, she paints her victims as "sophisticated investors," "multi-billion-dollar hedge funds and family offices," and "professional investors using small factions of their assets to speculate on CaaStle's potential growth." Def. Mem. at 28. Her argument seems to be that these speculator-investors assumed the risks of financial loss, and given their wealth, were not meaningfully harmed. While some of the defendant's investors were "hedge funds" or "family offices," many were individuals who invested their savings and retirement accounts in CaaStle. Unsurprisingly, these individuals do not share Hunsicker's blithe attitude toward their losses, as they have shared with the Court:

- A victim wrote, "The impact of being defrauded was both emotionally and financially devastating. I know CaaStle had many iconic and wealthy investors but I am not one of those. The original $250K in funds were from my retirement IRA account. Although we will survive, it was certainly a tough time when we found out we were defrauded. The shocking thing is I was on several calls with Christine over the years, and it is hard to imagine someone could lie so easily to us over and over and have no shame or guilt about it."[37]

- A victim wrote, "These lost monies were resources that my husband Neil and I earned over years of hard work, discipline and long-term financial planning…[T]his investment represented a significant portion of our investable assets…This was money we had set aside for our children's future—for their education, their stability, and the opportunities we hoped to provide them with. It was also part of our long-term retirement planning."[38]

- Another victim wrote, "I invested $20,000 in CaaStle. Ms. Hunsicker was very excited to have me personally invest…She explicitly stated that the company was in talks for a large growth fundraising, gaining new big-name customers, and was cash flow positive. …The financial loss itself is significant to me. While $20,000 may represent only a small fraction of the overall losses in this case, it represents years of savings and money that could have been used for my family's financial security, retirement, or other important life goals, such as a partial down payment on an apartment. Losing these

---

[37] Victim Impact Statement No. 24.

[38] Victim Impact Statement No. 27.

funds has had a meaningful impact on my financial planning. The emotional impact has been equally significant. What makes this fraud especially painful is that it was built on years of personal trust. Ms. Hunsicker was not simply the CEO of a company in which I invested. She communicated with me directly, met with me and my colleagues in person, welcomed investors into the company's offices, and cultivated confidence through ongoing personal relationships. Looking back, those interactions now feel fundamentally different. I find myself questioning whether the trust I placed in her over many years was intentionally exploited… I recognize that no sentence can restore what has been lost. However, I respectfully ask the Court to consider not only the financial harm caused by this offense but also the years of trust that were cultivated and ultimately betrayed. This was not a single misleading statement or isolated transaction. The trust that led to my investment was built over many years through repeated personal interactions, making the betrayal especially profound."[39]

- A victim wrote, "The impact this has had on my family has been traumatic, mostly on me since I was the one who decided to invest when I was introduced to Ms. Hunsicker by JP Singh…I am not a wealthy man, this loss has caused me and more importantly, my family, immeasurable financial harm. These funds were to provide for our grandchildren's college education. What impacts me even more was the blatant fraud Ms. Hunsicker committed when she wanted me to invest another $175,000 because another investor 'needed' quick money to settle what she said was some IRS obligations…The initial $500,000 was difficult for me and my family to lose. The audacity of her blatant lies and ultimate deceit concerning the additional $175,000 is difficult to understand."[40]

- Another victim described how Hunsicker, "painted such a compelling picture of her company that I asked if she took individual investors and she said she did for a minimum of $500,000. That was too much for me. Several years later she called me and told me she had a small investor who wanted his money back for personal reasons and that she could sell me his $75,000 position. I jumped at it and sent her the funds."[41]

- A victim wrote, "Genesis invested a total of $10 million in CaaStle…Each investment was made after discussions with Ms. Hunsicker and/or Mr. [JP] Singh…Although the investments were made through Gensis, the $10 million represented my personal capital, built over decades of effort."[42]

- A victim wrote, "The financial loss has had a real effect on my family. One hundred thousand dollars is a substantial amount of money for us. Those resources are no longer available for our family's future and financial security. This loss cannot fairly be viewed

---

[39] Victim Impact Statement No. 13.

[40] Victim Impact Statement No. 18.

[41] Victim Impact Statement No. 29.

[42] Victim Impact Statement No. 9.

as the ordinary risk of investing. I accepted the normal business risk of a private-company investment; I did not accept the risk that the company's founder would induce the investment through deception and concealment."[43]

Relatedly, Hunsicker's claim that many of her investors did not truly care about CaaStle's financials because they invested "without the benefit of any financial data," Def. Mem. at 28, is belied by the record. Hunsicker lied about CaaStle's revenue, forged audits, and inflated income statements because investors asked questions about those metrics, and asked for those materials. This was as true in 2019, when Hunsicker's fraud got started, as it was in 2025, on the eve of its collapse. Were there any doubt on this point, the many victim impact statements the Government received in advance of sentencing confirm that the lies Hunsicker told about CaaStle's supposedly successful financial performance mattered to her investors.[44] Ultimately, this argument is just one more way that Hunsicker attempts to blame others, here, her victims, for her own failures.

*Second*, Hunsicker insists that the "money investors put into CaaStle was used entirely to try and make the company successful." Def. Mem. at 28. The bank records prove otherwise. Over the course of the scheme, and particularly in the final years, Hunsicker repeatedly used CaaStle funds for her personal benefit: to pay her bills, for her home, and for other expenses (*supra* at 13-14). Hunsicker may not have been buying yachts or private jets with investor money, but that distinction means little to her investors who lost their savings and retirement accounts based on her lies. Relatedly, Hunsicker argues that her decision to take out a $20 million loan from Emigrant Bank and then put those funds into CaaStle is a mitigating factor. Def. Mem. at 28. But Emigrant

---

[43] Victim Impact Statement No. 3.

[44] *See, e.g.*, Victim Impact Statement No. 26 ("Nonetheless, I was persuaded by Ms. Hunsicker and the Company's financial updates touting growth in subscriber numbers, annual recurring revenue (ARR), and future projections (which we now know were made up and not supported by the company performance) to stay invested in the Company and, later, invest additional funds personally and on behalf of Sherpalo and Janket.").

Bank is a victim,[45] as Hunsicker admitted when she pled guilty. PSR ¶ 9.[46] Hunsicker falsely represented to Emigrant Bank that CaaStle had over $100 million in revenue and $32 million in cash when it had nothing close to that amount. Hunsicker's loan at Emigrant Bank is a reason to increase her sentence, not vary downward.

Third, Hunsicker argues that her acknowledgment in the plea agreement that a sentence of less than two years in prison would not be sufficient to serve the purposes of sentencing makes it "axiomatic" that a sentence of more than two years is "greater than necessary." Def. Mem. at 34. This argument ignores the meaning of "axiomatic," the plain language of the plea agreement, and the facts of this case. Had the Government intended to cabin its sentencing advocacy or concede the appropriateness of a two-year sentence, it would have done so at the time of Hunsicker's plea. See Fed. R. Crim. P. 11(c)(1)(B), (C) (allowing pleas in which the Government will "recommend" or "agree" that a "particular sentence or sentencing range" or "specific sentence or sentencing range" is "appropriate"). More to the point, the limitation on the defendant seeking fewer than two years' incarceration was designed to capture the identity-theft conduct charged in Count Six, and which Hunsicker admitted as a condition of her guilty plea. The plea agreement leaves Hunsicker in the same place she would have been had she pled guilty to Count Six, with its two-year mandatory minimum sentence. But identity theft was just one aspect of Hunsicker's massive fraud scheme. To impose a two-year sentence capturing solely that aspect would overlook the hundreds of lies and hundreds of millions of dollars that Hunsicker stole from investors and fail to account for the serious nature of all of Hunsicker's crimes.

---

[45] Victim Impact Statement No. 6.

[46] Plea Agreement at 10.

## II.    A Sentence of 151 Months' Imprisonment Is Necessary to Protect the Public and for Specific Deterrence

A sentence of 151 months' imprisonment is separately necessary to "protect the public from further crimes of the defendant" and "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B), (C). Despite professing to accept responsibility, the defendant attributes her crimes to outside pressures, while simultaneously downplaying the significance of her conduct. Where, as here, a defendant is unwilling or unable to grapple with the gravity of her crimes, this Court can have no assurance that she has been specifically deterred from reoffending.

Rather than take full responsibility, Hunsicker attributes her crimes to Covid-related "chaos" and an overbearing investor whose unyielding and ultra vires[47] demands set her down a path of fraud in early 2019. Def. Mem. at 18. At the same time, she makes only scant reference to the several other investors she sought to defraud before the allegedly "abusive" meeting with the investor, literally minimizing such conduct by relegating it to a footnote. Def. Mem. at 17 n.15. Making matters worse, Hunsicker suggests that her *earlier* misrepresentations to *unrelated* investors were a necessary outgrowth of her investor-related anxiety. Relatedly, Hunsicker pays no mind to the harm she inflicted on scores of victims over her yearslong fraud. She takes pains to highlight their "financial resources" and "sophistication," Def. Mem. at 9, while ignoring the deceit, hardship, and humiliation she inflicted on human beings whose money she stole. Those emotions brought at least one investor to tears in an interview before the Government. "You could afford to lose your money" is cold comfort to Investor-1, who sat across the breakfast table from Hunsicker, as she tried to sell her worthless CaaStle shares days after an FBI search.

---

[47] This argument is reminiscent of Hunsicker's cover-up with Investor-2 where she claimed that Investor-2 should not have reached out to BDO *and* her cover-up with Investor-4 where she claimed that BDO had breached its confidentiality obligations to CaaStle by confirming the fictitious nature of the audit she tried to pass off to him.

28

While minimizing the gravity of her crime, Hunsicker utterly mismeasures her own accountability. To begin, she describes "fully confessing to the Board" in December 2024. The defendant may have come clean, but that was only after Investor-4 had refused her efforts to buy his silence and instead alerted the Board to her misconduct. Admitting misconduct to a Board that had already learned of it hardly constitutes a "confession." And even if this Court were to credit that Hunsicker "confessed" to the Board while ignorant that its members had already been debriefed, the defendant did not admit the "full" measure of her conduct. For one thing, she concealed the fact that she had forged the signatures of the very Board members to whom she was confessing. Moreover, the defendant flouted the prohibitions the Board placed on her in December 2024, when she sold millions of dollars in worthless shares of CaaStle to unwitting investors.

Nor does the defendant gain any points for alerting the Board hours after the FBI had searched her home in March 2025. Even assuming Hunsicker preempted the Government in alerting the Board to the news of the FBI search, Hunsicker was only sharing word that would inevitably reach the Board within hours, if not minutes. Under these circumstances, it is too cute by half to toute that the Board "learn[ed] about the criminal investigation from Ms. Hunsicker." Def. Mem. at 20.

Since embarking on her fraud in 2019, Hunsicker bypassed various off-ramps and, even after getting caught, continued to perpetrate her crimes. Mere days away from sentencing, she has yet to appreciate the gravity of her conduct. That track record offers the public and the Court little confidence that she will not quickly find her way to a new fraud under a different banner. This risk is hardly speculative; her submission describes "various programs" she has developed following her arrest, a "book" she authored, and her plans to help "develop ideas and create businesses that can be successful." Def. Mem. at 24, 43. Indeed, there is little to stop the defendant from picking

up where she left off. She will face no professional bar or reporting requirements. The private markets do not require disclosure of Hunsicker's crimes. And her vast professional network, some of whom continue to stand by her, will enable her to locate investors easily. Whether retail investors or institutional investors, speculators or nest-eggers, these members of the public deserve reprieve and protection from the defendant's future schemes.

Hunsicker responds that she is unlikely to reoffend, citing to the "professional opinion" of Dr. Sarah G. Schaffer that the "factors which converged to produce the criminal conduct in this case are unlikely to recur." Def. Mem. at 35.[48] As with most things in Dr. Schaffer's report, (*see infra* at 34), this opinion is based on little more than Dr. Schaffer's and Hunsicker's say-so. Meanwhile, the Court has good reason to doubt Hunsicker's promise that she won't reoffend. Hunsicker has the persistence, charm, and marketing skills to spin up a story that the CaaStle fraud was aberrant and that the Board, certain investors, or the thirty-pound mirror were to blame. In this way, Hunsicker shares many of the same attributes as fraudster Samuel Bankman Fried, who was sentenced to 25 years in prison based on, among other things, the need for specific deterrence. As Judge Kaplan explained in sentencing Bankman-Fried:

> [O]ne of the things he is is persistent, and another of the things he is is a great marketing guy. . . [T]he outlines of Sam Bankman-Fried's revised version of his story are clear to everybody as we sit here….The mistakes were made, other people are to blame, the bankruptcy people screwed up, this lawyer had a conflict of interest, that lawyer the other thing. It doesn't take much of an imagination to see the outlines of the campaign….But there is a risk that this man will be in a position to do something very bad in the future, and it's not negligible risk, not a negligible risk at all. So, in part, my sentence will be for the purpose of disabling him, to the extent that can appropriately be done, for a significant period of time.

---

[48] Hunsicker also cites her "proactive[] disclosure" to the luxury tennis club where she now works that she committed securities fraud as a reason to credit she will not reoffend. Def. Mem. at 35. But Hunsicker was only "proactive" in the sense that she told the tennis club before they saw the press release announcing her arrest.

No. 22 Cr. 673 (LAK), Dkt. 426 at 55. A sentence of 151 months in prison is important to ensure that Hunsicker cannot victimize others in her next endeavor.

### III.    A Sentence of 151 Months' Imprisonment Is Necessary for General Deterrence

A sentence of 151 months' imprisonment is also necessary to afford general deterrence to criminal conduct, particularly in the startup sector. The legislative history of Section 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white collar crime.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259); *see also United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").That is because the decision to commit white collar crimes is often a calculated cost-benefit analysis. *Martin*, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."); *United States v. Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018) ("The need for general deterrence is particularly acute in the context of white-collar crime.").

This is particularly true in the venture space. Empirical work on startup fraud suggests that significant sentences are necessary for deterrence for three reasons. *First*, startups are structurally prone to fraud: high-growth pressure creates incentives to exaggerate or fabricate performance,  while the technologies many startups pursue compound the problem on the detection side. As Dyck, Fang, Hebert, and Xu explain, the use of novel and complex technologies in markets with uncertain demand can raise monitoring costs, as outcomes driven by deception are often difficult to disentangle from those resulting from technological or market risk.  *See* Alexander Dyck, Freda Fang, Camille Hebert & Ting Xu, *Venture Fraud* (Nat'l Bureau of Econ. Rsch., Working Paper No. 34868, 2026), https://www.nber.org/papers/w34868. Venture fraud is therefore

31

a uniquely difficult category of fraud to detect and prove, which independently argues for a sentence sufficient to offset the low probability of apprehension.

*Second*, the informal market mechanisms that discipline fraud in public companies—reputational sanctions, short-selling, analyst scrutiny—are largely absent here. *Id.* Despite the contractual protections investors attempt to build into their investments, Dyck et al. find a lack of market discipline for fraudulent founders, leaving legal punishment as one of the few remaining checks on fraud by startup founders. *Id.*

*Third*, this absence of market discipline is not merely theoretical, it shows up directly in founders' ability to keep raising money. Dyck et al. find that fraudulent entrepreneurs continue to found new investor-backed startups unharmed relative to non-fraudulent entrepreneurs, suggesting a lack of market discipline. Where the ordinary consequence of fraud—the inability to raise capital again—does not materialize, and where fraud in this sector is both easy to commit and hard to detect, criminal sentencing is one of the only tools left to impose a real cost on founders who would otherwise treat fraud as a low-risk strategy with a ready supply of new investors on the other side.

Here, imposing a 151-month sentence will be consistent with Congress' intent and academic research, and send a clear message that the fraudulent solicitation of startup investors will be duly punished. Headlines that continue to report on media-savvy founders who believe it acceptable to "fake it till they make it" demonstrate the need for general deterrence. *See, e.g.*, *United States v. Holmes*, No. 18 Cr. 258 (EJD) (N.D. Cal.) (founder of blood-testing company, Theranos, defrauded investors by making misrepresentations about the company's innovative technology); *United States v. Javice*, No. 23 Cr. 251 (AKH) (S.D.N.Y.) (founder of financial aid startup, Frank, defrauded JP Morgan Chase by making misrepresentations about the company's number of student users); *United States v. Guven*, No. 25 Cr. 592 (LAK) (S.D.N.Y.) (founder of

technology rewards platform, Kalder, defrauded investors by making misrepresentations about the company's revenue and customers). Startup companies are not subject to SEC registration requirements and therefore provide fertile ground for fraudsters who prey on investor excitement and competition. This case presents an opportunity to send an urgent message about the consequences of startup fraud. As Cava Capital founder Geoff Schneider wrote:

> Private markets operate on documents and on trust. There is no exchange, no ticker, no quarterly filing to check the story against. Diligence in our world means asking for the audit and reading it carefully, which is exactly what we did. If a founder can hand an investor a forged audit and a doctored bank screenshot and face a modest consequence for it, that is the lesson this market will take from this case. I ask the Court to send a different one.[49]

Hunsicker argues that the negative publicity from this case and the loss of her reputation and finances are sufficient to deter others from committing fraud. Def. Mem. at 35. Not so. The Second Circuit has stated that simply because a case has been widely reported on and drawn notoriety does not suggest that imprisonment is not required to promote deterrence:

> [T]he circumstances referred to by the district court do not constitute punishment. The public nature of criminal prosecutions is part of our constitutional fabric; the public humiliation suffered by one prosecuted and convicted of a crime is an ordinary consequence of his conduct, not a condition imposed by the criminal codes or the judicial process. These circumstances, though adverse, are not what § 3553(a)(2)(A) means by "punishment." Hence they cannot properly be viewed as fulfilling the need for the imposition of just punishment. And given that the more massive a fraud, the more likely it is that the prosecution will generate publicity, the logical extension of the district court's view—i.e., that Freedman's public humiliation and the public nature of his prosecution were punishment enough— would mean that the more flagrant the crime, the less actual statutorily prescribed "punishment" it would require. And of course, the less punishment that is meted out, the less deterrent effect the sentence will have on others contemplating similar crimes.

*United States v. Cutler*, 520 F.3d 136, 171 (2d Cir. 2008).

---

[49] Victim Impact Statement No. 30.

If anything, the publicity this case has received weighs in favor of a substantial sentence. As the defense acknowledges, the defendant's crimes have captured media attention, making it more likely that the deterrent message and effect of the sentence this Court imposes will resonate with any founder tempted to lie to investors. *See, e.g.*, *United States v. Ulbricht*, 858 F.3d 71, 94 (2d Cir. 2017) (affirming district court's sentence which took into account, among other things, general deterrence and the fact that the sentence imposed "could have a powerful general deterrent effect because the case had attracted an unusually large amount of publicity"). This case presents an appropriate opportunity for the Court to send a strong signal to participants in the startup space. A sentence of the length proposed by the defendant, however, would have the opposite effect, signaling to would-be fraudsters that the defendant's crimes were insignificant and that the risk of being caught for their own fraud is worth the reward.

Hunsicker also claims that a lengthy sentence might "disincentivize others from stopping, accepting responsibility and making amends." Def. Mem. at 35. A baffling argument. Hunsicker "stopp[ed]" only after she got caught faking documents—for the second time—by an investor who refused to be paid off. And even then, Hunsicker did not stop in earnest. Instead, she sold millions of dollars of her own worthless CaaStle shares to an unwitting investor and would have sold millions more but for the Government's decision to execute search warrants in March 2025. True, she has pleaded guilty (in the face of the overwhelming evidence against her), but she has yet to meaningfully "accept[] responsibility." And Hunsicker has not made "amends," let alone in a way that would make her victims whole. Her decision to "allocate 10% of the earnings from her part-time job toward restitution"—a mere $900 per month—means her victims will be paid back in thousands of years—long after the time for restitution has expired.

34

**IV.     The Defendant's History and Characteristics Do Not Warrant a Variance**

Hunsicker's personal history and characteristics do not warrant a downward variance, let alone to the meager, two-year sentence requested by the defense. Unlike many defendants who come before this Court, Hunsicker had privileges and opportunities in her life, including an Ivy-league education, a job after college at a successful company, Right Media, which was sold to Yahoo! and earned her $30 million, and mentors and other professional support that offered her connections and a leg up in her business endeavors. With so much in her favor, Hunsicker's choice—to be clear, her serial lies and outright theft were choices— to engage in a massive fraud is an aggravating factor, not a mitigating one.

In seeking extreme leniency, the defense submits a Forensic Neuropsychological Report from Dr. Schaffer that offers several "opinions" about Hunsicker and her crimes. At a high level, Dr. Schaffer concludes that Hunsicker's crimes arose from the convergence of four factors— (i) her history of abuse; (ii) cumulative traumatic brain injuries; (iii) a genetic predisposition to reward-seeking behavior; and (iv) situational and professional pressures—and that, in the absence of Hunsicker's brain trauma, she would not have engaged in the fraud. A.19 ("December 2017 concussion, occurring in the context of Ms. Hunsicker's pre-existing vulnerabilities and compounded by subsequent head injuries, was a necessary contributing factor to her criminal conduct."). Dr. Schaffer further opines that, given Hunsicker's "insight, remorse, and engagement in recovery," the "likelihood of recurrence is low." A.20.

The Court should reject Dr. Schaffer's report and "opinions" in full. Dr. Schaffer did no independent neuropsychological testing. She offers no reliable methodology for her opinions. She does not mention, let alone address, the nature of Hunsicker's specific fraud crimes. She offers little, if anything, to explain how Hunsicker could have been in a "brain fog" for years but, at the same time, took the premeditated and deliberate steps to buy an investor's silence once she was

35

caught sending fake financials and running Google searches relating to the criminal charges applicable to her scheme.

Instead of any actual analysis, Dr. Schaffer appears to have relied on Hunsicker's self-serving rendition of events. For instance, Hunsicker self-reported to Dr. Schaffer, and Dr. Schaffer parroted back, that Hunsicker was only awake "four to five hours per day" during the time period of her scheme. Def. Mem. at 32; A.109. Hunsicker's email patterns, however, reveal a CEO sending emails from the morning until the night, as reflected in the below chart:[50]



_____

[50] This chart plots all emails Hunsicker sent from her CaaStle email account between 2019 and 2023, using the "sent time" as the relevant data. It disproves Hunsicker's claim that she was only awake "four to five hours per day," because she is emailing throughout the day. If anything, this chart is a conservative look at Hunsicker's email patterns because it only reflects emails sent by Hunsicker from her CaaStle email account. It does not include, for instance, emails Hunsicker sent from her personal Google account.

Hunsicker also reported to Dr. Schaffer, and Dr. Schaffer again parroted back, that Hunsicker was "operating in a state of severe cognitive impairment" between "2019 and 2023," and that the "fog began to lift" only "[b]eginning in the fall of 2023." Def. Mem. at 17; A.14. But documentary evidence reveals that notwithstanding her claims of living in a fog and being unable to function normally, Hunsicker engaged in significant physical activities, such as ziplining in August 2023:



Nor does Dr. Schaffer offer any explanation, let alone a credible one, for what caused Hunsicker's "brain fog" to clear in late 2023, or better yet, why Hunsicker did not begin engaging in her fraud immediately after her 2017 concussion if the concussion was, to use Dr. Schaffer's words, "a necessary contributing factor to her criminal conduct." A.19. Likewise Dr. Schaffer glosses over the deeply inconvenient fact that Hunsicker reported short-term memory loss and cognitive slowing before the December 2017 mirror incident. A.9. If those concussion-related symptoms contributed to Hunsicker's fraud and were present before December 2017, why did Hunsicker not begin her crimes earlier?

Two Boad certified psychiatrists, William Andrew Sterling, MD, and Elie G. Aoun, MD, agree that Dr. Schaffer's "opinions" are unreliable and her methodology flawed.[51] Dr. Sterling identifies at least five significant flaws in Dr. Schaffer's report, namely, she fails to adequately support the "nexus" because Hunsicker's concussion and her criminal behavior; does not explore Hunsicker's other psychiatric history; does not seek corroboration for Hunsicker's self-report of her medical history and symptoms; cites to unsupported genomic data in formulating opinions; and does not utilize a formal risk assessment tool to evaluate the likelihood of recidivism, even though validated risk assessment tools exist.[52]

Dr. Aoun raises similar concerns, finding that "[t]he relationship between cognitive impairments and executive impairments is not a straight line as Dr. Schaffer's report suggests."[53] Of particular note, Dr. Aoun opines, "The fraudulent activity described in the Statement of Facts is the result of poor judgement, not poor memory or poor executive functions. Impairments in this domain will never cause someone to falsify a bank statement or misrepresent corporate financial statements."[54] Moreover, like Dr. Sterling, Dr. Aoun remarks on Dr. Schaffer's failure to acknowledge or account for Hunsicker's "cluster B" personality traits, including narcissistic

---

[51] Psychiatric Expert Report of William Andrew Sterling, MD ("Sterling Report"), at 1 ("Due to the methodological errors listed above, it is my opinion that the report does not arrive at reliable opinions with regard to the psychiatric factors that led to Ms. Hunsicker's criminal conduct, her risk of recurrent criminal behavior, or recommended monitoring conditions."), attached as Ex. E; Expert Forensic Psychiatric Report of Elie G. Aoun, MD ("Aoun Report") at 24 ("In reviewing Dr. Schaffer's report, I find no evidence to support the opinions presented in her July 20, 2026 forensic neuropsychological evaluation report of Ms. Christine Hunsicker."), attached as Ex. G.

[52] Sterling Report at 4-8.

[53] Aoun Report at 20.

[54] *Id.* at 21. Equally relevant, Dr. Aoun explains, "Genuine cognitive impairments caused by concussions do not resolve spontaneously after six years when one's life becomes more serene and less stressful," *id.* at 19, despite Dr. Schaffer's view that Hunsicker's relocation to the suburbs corresponded with her recovery.

personality and antisocial personality, and further describes Dr. Schaffer's report as "atypically enthusiastic[,] unequivocally supportive" and "effusive [with] praise" of Hunsicker.[55] Dr. Aoun continues:

> The reason it is important for forensic evaluation reports [to] be free of such effusive praise of an evaluee is that it may suggest that the evaluator is biased and is not impartial. In this case, it is possible that as a result of antisocial personality disorder traits exhibited by Ms. Hunsicker, she may have charmed Dr. Schaffer resulting in the unusually positive assessment that overlooks important risk factors. Indeed, the DSM-5 notes that antisocial personality is associated with features including: "a glib, superficial charm and can be quite voluble and verbally facile.[56]

Ultimately, both Dr. Sterling and Dr. Aoun conclude—as this Court should—that Dr. Schaffer's report is replete with holes and based on shoddy methodology, and that her opinions should be rejected.

## V.    A Sentence of 151 Months' Imprisonment Is Necessary to Avoid Unwarranted Sentencing Disparities

Among the factors a sentencing court must consider in imposing sentence is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Congress adopted Section 3553(a)(6) "to eliminate unwarranted disparities nationwide." *United States v. Williams*, 524 F.3d 209, 215 (2d Cir. 2008).

The PSR notes that the sentencing data from the last five years shows that for the 58 defendants sentenced under the fraud Guidelines with offense level 34 and Criminal History Category I, the average sentence was 121 months' imprisonment and the median sentence was 120 months' imprisonment. PSR at 24. The Probation Office has recommended a sentence of 120

---

[55] Aoun Report at 22.

[56] *Id.* at 22.

months, considering all the Section 3553(a) factors, including the need to avoid unwarranted sentencing disparities. PSR at 29. The defense argues that the sentencing data is unhelpful, and the Probation Office's recommendation is too high because Probation recommended the "quintessentially typical sentence" for a "very atypical defendant who committed a very atypical offense." Def. Mem. at 3. But, as set forth above, Hunsicker's case is only "atypical" in ways that are aggravating and counsel in favor of a lengthier sentence than the norm.

Leaving aside the average sentences described in the PSR, significant sentences are often imposed in fraud cases where the loss exceeded $100 million. *United States v. Javice* is one such example. There, over the course of two years, the defendant defrauded one victim, JPMorgan Chase, out of $175 million. Javice was convicted at trial and sentenced to 85 months in prison. No. 23 Cr. 251 (AKH) (S.D.N.Y. Sept. 29, 2025), Dkt. 453. Hunsicker's fraud scheme was dramatically larger than Javice's scheme. Hunsicker had more victims, more losses, and perpetuated the scheme for three times as long. Hunsicker also forged signatures of high-profile Board executives with sterling reputations, paid off a victim, tried to pay off another, and had multiple off-ramps, which she repeatedly refused to take to continue her fraud. Thus, by any objective standard, the sentence in this case should be higher than the 85-month sentence imposed in *Javice*.

*United States v. Holmes* is also instructive. There, defendant Elizabeth Holmes was convicted at trial for defrauding investors in Theranos over a five-year period, and sentenced to 135 months in prison. Holmes raised around $1 billion from investors and was ordered to pay approximately $450 million in restitution. Hunsicker's restitution obligation is lower but not by much; she has agreed to make nearly $300 million in restitution payments. Moreover, Holmes never "cashed out" from Theranos, much in the same way that Hunsicker had denied getting rich off CaaStle. Holmes also tried to attribute much of her criminal conduct to the abusive dynamic

40

with her co-founder. Hunsicker has done the same. Def. Mem. at 16 ("Mr. Singh exerted enormous pressure on Ms. Hunsicker, insisting that her efforts were not enough…Mr. Singh was publicly 'dismissive, hypercritical, authoritarian, and openly disrespectful' towards Ms. Hunsicker."). Holmes's conduct was serious, but Hunsicker's is worse. Hunsicker paid off a victim, went back to the fraud, and tried to pay off another. Then, even after she "confessed," she continued her fraud scheme, selling and trying to selling millions of dollars of her worthless CaaStle shares to investors.

Looking outside the startup fraud context, a helpful comparison is *United States v. Zemlyansky*, No. 12 Cr. 171 (JPO) (S.D.N.Y.), where this Court sentenced the defendant to 180 months in prison for his operation of several fraud schemes that resulted in losses of $17 million to nearly 300 victims. In imposing sentence, the Court emphasized the serious nature of the offense, the financial harm to victims including victims who lost their "retirement savings," and the need for a "lengthy sentence," because "people need to understand that this sort of criminal activity is punished severely." *Id.* Dkt. 1900 at 92-93. Those considerations apply here with equal force.[57]

Ultimately, the Guidelines, which the Supreme Court has explained "should be the starting point and the initial benchmark," *Gall*, 552 U.S. at 49, appropriately reflect Hunsicker's criminal conduct while considering each of the Section 3553(a) factors. A sentence anywhere within the Stipulated Guidelines Range of 151 to 188 months' imprisonment would be reasonable. Given that

---

[57] Were the Court to have any doubt on the utter insufficiency of a two-year sentence, the Court can compare this case to other less serious frauds where the defendant was sentenced to *more* than two years in prison. In *United States v. Haena Park*, No. 16 Cr. 473 (RA) (S.D.N.Y.), for example, Judge Abrams sentenced the defendant to three years in prison for defrauding around 40 investors out of $23 million over the course of six years. Hunsicker defrauded a single investor out of $23 million in the span of minutes. And then she went on and defrauded hundreds of more investors out of hundreds of millions of dollars.

Hunsicker is a first-time offender, however, the Government believes that a sentence at the bottom of the Stipulated Guidelines Range—of 151 months' imprisonment—is sufficient but no greater than necessary to achieve the purposes of sentencing.

The defendant instead points the Court to a single case, *United States v. Milton*, No. 21 Cr. 478 (ER) (S.D.N.Y.), where Judge Ramos sentenced Trevor Milton, the CEO of Nikola, an electric and hydrogen powered truck company, to 48 months' imprisonment. Def. Mem. at 41-43. According to Hunsicker, Milton's scheme was far worse than the defendant's—Milton preyed on retail investors, attempted to enrich himself, and failed to accept responsibility by going to trial and then obtaining a pardon—and so Hunsicker should receive a sentence "substantially less severe than" the 48 months Milton received. *Id. Milton* is a poor comparison for several reasons:

*First*, Milton's scheme targeted the stock price of Nikola. Loss was calculated as a percentage of the decline in Nikola's $16 billion market capitalization. *Milton*, Dkt. 322 at 14. Hunsicker, by contrast, targeted the pocketbooks of her investors directly. Loss is calculated without resorting to formulas or percentages but instead by tallying up the actual dollars Hunsicker stole from her victims. This distinction offers important context for Judge Ramos's statements in *Milton*, which the defense quotes, that the "amount of the fraud . . . doesn't always or frequently get at what is important" in imposing sentence. *Id.* Dkt. 322 at 91. In *Milton*, there was a dispute over how to calculate loss, and the Court, while adopting the Government's view, arguably had more of a basis to find the Guidelines overstated the loss. The same cannot be said here.

*Second*, Milton's scheme was serious, but he did not engage in identity theft or forge any signatures, let alone the signatures of Board members with public reputations. *Third*, Milton's scheme took place over the course of a year, from 2019 to 2020. Hunsicker's scheme lasted over five times as long, from 2019 until 2025. She had multiple off-ramps that she chose to bypass,

42

instead doubling down on her fraud. *Fourth*, Judge Ramos was persuaded that Milton was unlikely to recidivate. Here, as set forth above, there is a need for the Court's sentence to promote specific deterrence and protect future investors from further crimes by the defendant. These distinguishing factors make Hunsicker's case far more serious than Milton's and separate her conduct from the generic "heartland fraud cases" cited in the defense submission. Def. Mem. at 41.

## VI.    The Remaining Sentencing Factors Do Not Warrant a Variance

Hunsicker finally offers the Court a grab bag of other sentencing factors that she believes justify a two-year sentence. Each should be rejected.

*First*, the defense argues that the Court should consider the "kinds of sentences available" and craft a sentence that will allow her to continue her rehabilitation, treatment, and addiction recovery, while, at the same time, using her "intellect and entrepreneurial skills" to help "the community she is striving to serve." Def. Mem. at 36. The Court should do nothing of the sort. As an initial matter, the Bureau of Prisons is well equipped to treat individuals with addictions, whether they relate to drugs, alcohol, or gambling. Thus, Hunsicker's need for further treatment is not a basis to reduce her prison sentence.[58] Nor is her desire to "serve" the community. Indeed, her "entrepreneurial skills" and relentless drive put her at greater risk of recidivating. Hunsicker ought to spend the next several years not using those "gifts" but reflecting—in prison—on the mistakes she made.[59]

---

[58] Nor is there any logic to Hunsicker's claim. Hunsicker has agreed not to seek a sentence of less than two years in prison, and so the likelihood that she will take a break from her out-of-prison treatment providers over the next two years is all but certain.

[59] For this reason, among many others, the Court should reject the biased sentencing advocacy of ████, in which he vouches for Hunsicker as a person of "high integrity," offers his own non-medical "opinion" that Hunsicker's "major head injuries must have contributed to Christine's bizarre conduct," and shares his belief, and the purported belief of "some other investors"—*none of whom* ████ *identifies*—that "rather than spend a lot of time in jail," Hunsicker should be permitted to use her "talents . . . to help build something valuable." A.104-05.

*Second*, Hunsicker cites the need to provide "restitution" to victims as another basis to shorten her sentence. Def. Mem. at 42. But the enormity of the restitution order gives this argument little weight. Hunsicker will have a gargantuan restitution obligation for many years. She should not be able to use the fact that she spent all the money she stole, and thus has more to pay back, to shorten her prison sentence.

*Third*, Hunsicker argues that the fraud Guidelines are not based on empirical evidence and, as a result, "overstate" her "criminal and moral culpability. Def. Mem. at 37. This argument is misguided for several reasons: the current fraud Guideline is the result of extensive and iterative work by the Sentencing Commission and is based on sound policy choices, and even if the fraud Guidelines were overly reliant on loss as a general matter—a point the Government does not concede—they are an appropriate measure of the seriousness of the offense in this case.

"One of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008). "[T]he sentencing guidelines sought to address the inequities of prior sentencing practices that tended to punish white collar economic crimes less severely than other comparable blue collar offenses." *United States v. Fishman*, 631 F. Supp. 2d 399, 403 (S.D.N.Y. 2009). Over a five-year period between 1996 and 2001, the Commission engaged in a deliberative process to address the Guidelines' treatment of white-collar offenses, with the involvement of relevant stakeholders including the defense bar, the Department of Justice, probation officers, and the U.S. Judicial Conference. *See* Federal Register Notice BAC 2210-40, 62 Fed. Reg. 152, 171-74 (1997) (proposals by the Commission for comment regarding economic crime sentencing reform). The Commission explained that the resulting amendments, which became effective on November 1,

44

2001, were based on the determination that "loss serves as a measure of the seriousness of the offense and the defendant's relative culpability." Sentencing Guidelines for the United States Courts, 66 Fed. Reg. 30512, 30533 (June 6, 2001). Thus, the 2001 amendments to Section 2B1.1 reflected the considered view of the Commission, following a collaborative process with relevant stakeholders, that loss amount should be a central consideration in determining the seriousness of an offense to which that Guideline applies. Indeed, "[e]ven if the enhancements may lack robust empirical support related to deterrence, they have foundations in empirical data and national experience related to the goals of fair sentencing and retribution." *United States v. Moose*, 893 F.3d 951, 958 (7th Cir. 2018).

In 2002, following major corporate fraud at Enron, WorldCom, and Adelphia, Congress instructed the Commission to amend the Guidelines for white-collar crime again, this time as part of the Sarbanes-Oxley Act. In response, the Commission amended the modified loss-amount enhancement in Section 2B1.1 for high-loss cases—that is, cases involving loss amounts in excess of $200 million. *See* U.S. Sentencing Comm'n, Emergency Guidelines Amendments, 15 Fed. Sentencing Reporter 281, 283 (Apr. 1, 2003) ("[T]he amendment expands the loss table at §2B1.1(b)(1) to punish adequately offenses that cause catastrophic losses of magnitudes previously unforeseen, such as the serious corporate scandals that gave rise to several portions of the Act."), *available at* 2003 WL 22016909. Thus, to the extent Section 2B1.1 emphasizes loss amount, that was an intentional decision by the Commission based on years of consideration and guidance from Congress. *See United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006) ("[T]he Guidelines reflect Congress's judgment as to the appropriate national policy for [white collar] crimes."). The few district court opinions cited by Hunsicker appear not to have considered the Commission and legislative history. *See, e.g.*, *United States v. Johnson*, No. 16 Cr. 457 (NGG),

45

2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) (cited for the incorrect proposition that the loss guidelines were not the "result from any reasoned determination").

The defendant draws on language from Judge Rakoff's decision in *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006), Judge Block's decision in *United States v. Parris*, 573 F. Supp. 2d 744, 753 (E.D.N.Y. 2008), and Judge Underhill's concurrence in *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013), which quotes from *Adelson*. But each of those cases involved extremely lengthy sentencing ranges recommended by the Guidelines for defendants who personally had no participation in causing any loss.

For example, "Adelson was not the originator of the fraud, and, as the jury found in effect, Adelson did not participate in the fraudulent conspiracy until its final months," during which time the company's "stock was not further inflated." *Adelson*, 441 F. Supp. 2d at 513. In other words, "Adelson was closer (though not identical) to an accessory after the fact." *Id*. As a result, Judge Rakoff recognized that the Guidelines range of 85 years in prison could not account for the nuanced way in which the defendant participated in the scheme and resulted in a patently unjust advisory sentencing range. *Id*. And even after taking that factor into account, Judge Rakoff nevertheless noted the importance of considering general deterrence in financial-fraud cases and imposed a three-and-a half-year sentence: "notwithstanding all the mitigating factors outlined above, meaningful prison time was necessary to achieve retribution and general deterrence." *Id*. at 514. *Adelson* thus calls for implementing a meaningful custodial sentence in fraud cases, even when "it was undisputed at the time of sentencing that [a defendant's] past history was exemplary." *Id*. at 513.

In *Parris*, the defendants were engaged in a two-month "pump and dump" scheme in the penny stock market that resulted in approximately $2,500,000 in losses among hundreds of victims

46

who traded the stock. 573 F. Supp. 2d at 746-49. As a result of their brief penny-stock fraud, even with no criminal history, the defendants faced an advisory Guidelines range starting at 30 years' imprisonment. Judge Block found the defendants' crime "not of the same character and magnitude as the securities-fraud prosecutions of those who have been responsible for wreaking unimaginable losses on major corporations." *Id*. at 746. The district court asked the Government and the defendants to provide the court with a compendium of factually analogous cases nationally. *Id*. at 751-52. After considering those cases, the court ultimately sentenced the defendants to 60 months' imprisonment.

*Corsey* presented a similarly unusual situation warranting a variance. In *Corsey*, the defendants were prosecuted for trying to carry out an outlandish scheme against, what turned out to be, an FBI informant. "This was a clumsy, almost comical, conspiracy to defraud a nonexistent investor of three billion dollars. That scheme never came close to fruition." *Corsey*, 723 F.3d at 378. "This scheme amounted to a series of absurd lies piled on top of even more absurd lies." *Id*. at 379. However, the defendants in *Corsey* immediately faced a Guidelines calculation that was above the statutory maximum of 20 years and close to life in prison. It is in this context that Judge Underhill, in a concurring opinion, found the Guidelines to be of "low marginal value" for the case at hand. But he did not say the guidelines were always of such little import. In fact, Judge Underhill quoted *Adelson* in holding that in other instances, the Guidelines are "of considerable help to any judge in fashioning a sentence that is fair, just, and reasonable." *Id*. at 380.

Whatever merit there is to the argument that the Guidelines overstate the seriousness of the offense generally, this case is a poor vehicle to make it. While reasonable minds can disagree about the precise workings of the fraud Guidelines and whether they are unduly driven by loss, no one would argue that the size and scope of a financial fraud should be *unrelated* to the resulting

47

sentence. It stands to reason that a defendant who engages in a longer, bigger fraud involving more victims should be punished more harshly than a defendant who engages in a short-term scheme (*Parris*), only joins the scheme late (*Adelson*), or does not harm real victims (*Corsey*). Here, Hunsicker stole $300 million from her victims over the course of several years, placing her near the top of loss table. That placement does not merely reflect the "loss amount," but the amount of money Hunsicker stole from her victims.

*Finally*, Hunsicker cites a handful of recent proposed Amendments to the Guidelines posted for public comment. Def. Mem. at 39. None of these has been implemented, and none of them should factor into the Court's evaluation of the Guidelines or Section 3553(a) factors.

## FORFEITURE AND RESTITUTION

As a condition of her guilty plea, the defendant has agreed to forfeit $283,291,940, as proceeds of her fraud scheme, and to make restitution in the amount of $283,291,940.

As to forfeiture, the Court has signed a Consent Preliminary Order of Forfeiture. Dkt. 26. At the time of sentencing, the Government requests the Court impose a money judgment in the amount of $283,291,940.

With respect to restitution, to date, the Government has received restitution claims from nearly one hundred victims. The Government respectfully requests a period of 90 days to submit a proposed Restitution Order and Sealed Schedule of Victims to the Court.

## CONCLUSION

Christine Hunsicker is deserving of a prison sentence proportionate to her immense fraud scheme. The Government strongly urges the Court to impose a sentence that reflects the serious nature of the harm to hundreds of investors; prevents the defendant from ever again committing fraud; and sends a powerful message to others who might be tempted to engage in fraud that the consequences will be severe. A sentence of 151 months' imprisonment is necessary to serve the purposes of sentencing.

Dated:  New York, New York
        August 11, 2026

                                        Respectfully submitted,

                                        JAMES M. MCDONALD
                                        United States Attorney

                                By:     _____
                                        Marguerite B. Colson
                                        Alexandra N. Rothman
                                        Assistant United States Attorneys
                                        Telephone: (212) 637-2587 / -2580

49