# Victim Impact Statement No. 22

| | |
|---|---|
| **Date:** | Thu, 12 Mar 2026 4:13:24 AM (UTC) |
| **Sent:** | Thu, 12 Mar 2026 4:09:41 AM (UTC) |
| **Subject:** | Re: [EXTERNAL] Re: U.S. v. Christine Hunsicker, 25 Cr. 318 (JPO) - Victim impact statement and restitution |
| **From:** | Pranav Pai ███████████████████ |
| **To:** | Rothman, Alexandra (USANYS) <Alexandra.Rothman@usdoj.gov>; |
| **CC:** | Colson, Marguerite (USANYS) <Marguerite.Colson@usdoj.gov>; Siddarth Pai ████████████████████ |
| **Attachments:** | 2018 - Fwd_ CaaStle _ GB.pdf; 2016- GB Quick Update.pdf; 2018 - Fwd_ CaaStle _ GB Update.pdf; 2018 - CaaStle _ GB update.pdf |

Office of the United States Attorney
Southern District of New York
The Jacob K. Javits Federal Building
26 Federal Plaza, 37th Floor
New York, New York 10278

## Re: *United States v. Christine Hunsicker*, 25 Cr. 318 (JPO) — Victim Impact Statement and Restitution Submission

Dear Alexie,

Thank you for reaching out regarding the sentencing of Christine Hunsicker and the collection of victim impact statements and restitution information. I write in my capacity as an individual investor in CaaStle (formerly Gwynnie Bee Inc.) to submit the following.

## I. Restitution Information

(a) Full name of individual: **Pranav Mohan Pai**

(b) Address for restitution payments: ████████████████████████████
███████████████████████████████████

(c) Out-of-pocket financial loss: **USD 500,000** (total invested amount, representing a complete loss following CaaStle's Chapter 7 bankruptcy filing in June 2025)

(d) Corroborating documents: Investment documentation and the investor communications referenced below have been shared via email. Countersigned documents have also been shared via email.

## II. Victim Impact Statement

I am the Founder and Managing Partner of 3one4 Capital, an early-stage venture capital firm based in Bengaluru, India. My investment in CaaStle was made in my personal capacity, in good faith, relying on representations made by Ms. Hunsicker and the information she provided to investors. The total amount invested was USD 500,000, and this amount has been entirely lost.

## Pattern of Information Concealment and Restricted Access

What is particularly troubling about our experience as investors is the deliberate and systematic pattern of information concealment that Ms. Hunsicker maintained throughout our period of investment. This was not merely a case of receiving falsified financials—it was a case of being denied meaningful access to information altogether, which made it effectively impossible for us to identify the fraud or exercise any form of informed oversight.

Specifically:

**1. Minimal and infrequent communication.** Over the course of our investment, there was very little communication from Ms. Hunsicker or the company's management. Investor updates were rare, and when they did arrive, they were cursory. We were kept at arm's length despite being shareholders entitled to material information about the business.

**2. Investor reports shared via time-limited links that were deliberately made inaccessible.** When investor updates were shared, they were distributed through DocSend links that expired after a very short window. These links were not available for download and were removed from our access quickly, often before we could review them in detail. This practice—which we now understand in the context of the fraud—effectively ensured that investors could not retain, scrutinise, or compare financial information across reporting periods. The email correspondence we have retained from 2018 confirms that even co-investors flagged to the company that update links had expired and were inaccessible, and that re-sending was required.

**3. Requests for information were ignored or deflected.** Despite multiple requests to management and board members for more detailed and regular updates on the company's financial performance and operations, we were unable to obtain meaningful information. These requests were either not responded to or met with vague assurances that updates would follow—updates that frequently did not materialise in any substantive form.

**4. Super-voting structure insulated management from accountability.** In April 2017, the company sought stockholder consent to create a new class of super-voting stock (Class F, carrying ten votes per share) to be issued to the founders, including Ms. Hunsicker. This structure, ostensibly justified as preserving management continuity ahead of a financing round, had the practical effect of concentrating voting control entirely with the founders and making it extremely difficult for minority investors to exercise any governance oversight or accountability mechanisms. In hindsight, this structure was a critical enabler of the fraud, as it removed the principal check that equity investors would normally have on management.

**5. The limited information we did receive was itself fraudulent.** The few investor communications we received—including a September 2016 update touting rapid customer acquisition growth, a Payless partnership, and dramatically declining CPAs—painted a picture of a business on a strong growth trajectory. As the Stipulation of Facts in the plea agreement now makes clear, the company was in fact facing serious financial distress by 2019, and Ms. Hunsicker was fabricating income statements, falsifying audit reports, digitally altering bank account screenshots, and forging board authorisation documents to sustain the illusion of a healthy business. The information we relied upon to maintain our confidence in the investment was fundamentally false.

**Impact**

The financial loss of USD 500,000 is significant. But beyond the direct monetary harm, this fraud has caused substantial damage to investor trust. As an India-based investor, our willingness to invest in early-stage US-domiciled companies was a function of our confidence in the governance and disclosure standards of the US venture ecosystem. Ms. Hunsicker's conduct—spanning years of systematic fabrication, forgery, and deception—represents a profound breach of that trust.

The scale of the deception is staggering. The plea agreement records that Ms. Hunsicker fraudulently obtained over $283 million from investors through fabricated financials, fake audits, forged board documents, and digitally altered bank screenshots. She used investor funds earmarked for the company to enrich associates, and continued soliciting investments even after being removed as Board Chairperson and prohibited from acting on the company's behalf. The fact that she pled guilty to these

charges and acknowledged that she did so because she is in fact guilty speaks to the gravity of the offence.

We respectfully urge the Court to consider the full scope of the harm caused—not only to large institutional investors, but to smaller investors like us who had no realistic mechanism to detect the fraud given the information concealment practices described above—when determining an appropriate sentence.

We are available to provide any additional documentation the Court may require, and would be willing to submit further testimony if it would be of assistance in connection with sentencing.

Thank you for your attention to this matter.


Respectfully submitted,
**Pranav Mohan Pai**

--

Warm regards,

Pranav Pai

Managing Partner

3one4 Capital

www.3one4capital.com



# Victim Impact Statement No. 23

| | |
|---|---|
| **Date:** | Mon, 9 Mar 2026 2:28:50 PM (UTC) |
| **Sent:** | Mon, 9 Mar 2026 2:28:07 PM (UTC) |
| **Subject:** | [EXTERNAL] Re: U.S. v. Christine Hunsicker, 25 Cr. 318 (JPO) - Victim impact statement and restitution |
| **From:** | Victor Patel ▮▮▮▮▮▮▮▮▮▮▮ |
| **To:** | Rothman, Alexandra (USANYS) <Alexandra.Rothman@usdoj.gov>; |
| **Attachments:** | Executed CaaStle Series A-12 SPA Victor.pdf; Executed CaaStle Warrant Common Stock Victor.pdf; Virendra Patel_share_certificate.pdf; CaaStle Annex I 1.pdf |

Dear Ms. Rothman.

My name is Virendra (Victor) Patel and I am a victim of Ms.Hunsicker's fraud.

Attached are the agreements to purchase stock in CaaStle. Ms. Hunsicker personally sent these documents to me.

Please note, an insider by the name of J P Singh who ostensibly was the CTO of the company worked alongside Ms. Hunsicker and was extremely active in selling the company to me and my fellow victims Scott Hecker and Ken Pirelli in convincing us that this was indeed a very good investment. He more than Ms. Hunsicker spent hours on the phone selling the company.

My residential address is:

Victor Patel

# Victim Impact Statement No. 24

**Date:**    Mon, 30 Mar 2026 7:44:22 AM (UTC)

**Sent:**    Mon, 30 Mar 2026 7:43:41 AM (UTC)

**Subject:**  [EXTERNAL] Fw: U.S. Department of Justice - VNS - Investigative Case 318B-NY-4026171

**From:**    Rich Perilli ███████████████████████

**To:**      Defendre, Valeen (USANYS) <Valeen.Defendre@usdoj.gov >;

---

Hi Valeen, below is my Victim Impact Statement. Please feel free to contact me if you have any questions. Thanks.

Impact Statement for Richard Perilli

I initially invested $250,000.00 in Caastle shares on 2/28/19. I did not receive my share certificates until 8/5/20 via an email from JP Singh. I have attached the stock certificate that JP sent me via email on the 8/5/20 date. The share price I paid for the shares were at the time said to be valued at $6.20 per share which we obviously know now was overinflated because of fraudulent financial reports by Christine Hunsicker. The share total for this original investment gave me 40,338 shares.

In December of 2023 we were contacted by Christine Hunsicker again saying we had the opportunity to buy a current employees stock who she stated would be selling the shares at a heavily discounted rate. I bought an additional 75,268 Common shares and 8,065 Preferred shares for $50,000. I have attached the stock certificate that Christine sent me via her 12/29/23 email.

In total, I paid $300,000 for a total of 123,671 shares.

The impact of being defrauded was both emotionally and financially devastating. I know Caastle had many iconic and wealthy investors, but I am not one of those. The original $250K in funds were from my retirement IRA account. Although we will survive it was certainly a tough time when we found out we were defrauded. The shocking thing is I was on several calls with Christine over the years, and it is hard to imagine someone could lie so easily to us over and over and have no shame or guilt about it.

Please feel free to call or email me if you have any additional questions.

Richard Perilli

████████████

# Victim Impact Statement No. 25

**GWYNNIE BA BM LLC**
**c/o Quail Street Partners**
**52 Alderbrook Drive**
**Topsfield, Massachusetts 01983**

April 10, 2026

*(via Email only: Alexandra.Rothman@usdoj.gov)*

Alexandra Rothman, Esq.
Assistant United States Attorney
Southern District of New York
The Jacob K. Javits Federal Building
26 Federal Plaza – 37th Floor
New York, New York 10278

Re:    **U.S. v. Christine Hunsicker, 25 Cr. 318 (JPO)**
       **Victim impact statement and Request for Restitution**

Dear Mrs. Rothman:

My name is Bryan W. Anderson, I am the manager of GWYNNIE BA BM, LLC (the "Company"). Please accept this letter as a victim impact statement and restitution request from the Company in the matter of U.S. v. Christine Hunsicker, 25 Cr. 318.

Victim Impact Statement.

The amount of funds invested by the Company in CasStle, Inc. was not insignificant and represented the Company's sole asset. Additionally, the losses sustained by the Company as a result of Hunsicker's massive fraud and misrepresentations had an adverse impact on the reputation of the Company and its founders within the investment community.

Request for Restitution.

The Company seeks restitution of its out of pocket losses sustained in this matter in the amount of $500,000.00 which represents the Company's entire investment in 111,111 shares of Series A-9 Preferred Stock in CasStle, Inc. (f/k/a Gwynnie, Inc.) pursuant to that certain Series A-9 Preferred Stock Purchase Agreement dated as of March 27, 2017.

No portion of the losses sustained by the Company were covered by insurance.

In connection the Company's claim for restitution please be advised that:

1. The full name of the individual or entity that sustained out-of-pocket financial loss in connection with investments in CaaStle is:

GWYNNIE BA BM LLC, a Massachusetts limited liability company

Alexandra Rothman, Esq.
Assistant United States Attorney
April 10, 2026
Page 2

2. The address to which restitution payments can be mailed is:



3. Please fill in the information below for the best point of contact to deal with restitution related matters on the Company's behalf:

   Paul J. Waystack
   Telephone: ███████████
   Email: ███████████

4. The precise amount of any out-of-pocket financial loss is $500,000.00

5. The documents sufficient to corroborate the loss identified above are attached hereto.

If you have any questions, please do not hesitate to contact Mr. Waystack at ███████████

Very truly yours,
GWYNNIE BA BM LLC

By: _____
    Bryan W. Anderson, Manager

# Victim Impact Statement No. 26

July 15, 2026

The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square, Room 2101
New York, New York 10007

Re:    *United States v. Christine Hunsicker*, CR 25-318 (JPO)
       Victim Impact Statement of K. Ram Shriram, Sherpalo Ventures, and Janket Ventures
       Total Loss Amount:    **$4,900,034.40**

Your Honor,

I am Ram Shriram, the founder and owner of Sherpalo Ventures ("Sherpalo"), and write on behalf of Sherpalo, Janket Ventures LP ("Janket"), and myself regarding the sentencing of Christine Hunsicker, the founder and former CEO of CaaStle. I appreciate the opportunity to address the Court and to describe the harm Ms. Hunsicker's actions have inflicted on her investors and the integrity of early-stage investment relationships.

Sherpalo is an early-stage investment firm in Silicon Valley. Through Sherpalo, I work to partner with and advise technology founders to help them grow innovative companies. Janket is a family partnership that I control. Over the course of nearly a decade, Sherpalo, Janket, and I collectively invested a total of $4,900,034.40 in Gwynnie Bee/CaaStle, through multiple rounds, initially in 2013 and then again with subsequent transactions in 2021, 2022, and 2023.

Sherpalo first invested in what was then Gwynnie Bee, later restructured as CaaStle, in 2013, with two separate investments totaling $3,500,000 in 2013 (detailed in the table below). From the outset, I tried to act as a supportive advisor to Ms. Hunsicker, meeting repeatedly with her, serving on the board, and offering her guidance on responsible financing and corporate governance.

As is my practice, throughout my involvement with Ms. Hunsicker, I consistently asked direct and specific questions about financials. I often did not get the level of specific information for which I hoped, though nothing that alerted me to the fraud that has now been revealed Ms. Hunsicker was committing. In 2016, frustrated with lack of transparency, I resigned from the Board after briefly serving on it, and in 2017, considered attempting to sell my investment. At the time, and until her fraud was revealed in 2025, I had no reason to suspect Ms. Hunsicker of fraud or any other misconduct.

Nonetheless, I was persuaded by Ms. Hunsicker and the Company's financial updates touting growth in subscriber numbers, annual recurring revenue (ARR), and future projections (which we now know were made up and not supported by the company performance) to stay invested in the Company and, later, invest additional funds personally and on behalf of Sherpalo and Janket. In

June 2021, I personally invested another $200,000. In November 2021, the Company reported impressive subscriber and ARR growth. In June 2022, Ms. Hunsicker personally encouraged Sherpalo to purchase an additional 525,000 shares at what she described as a "65% discount," touting a projected $275 million in revenue and near-term profitability.

Relying on her representations, I caused Sherpalo to invest approximately $800,000 in that later round. Ms. Hunsicker affirmed that governance safeguards and liquidation protections remained intact, statements now revealed to be false or misleading. In August 2023, I caused Janket to invest an additional $400,005.40, also based largely on representations Ms. Hunsicker made to me and others.

Throughout 2023 and 2024, Ms. Hunsicker continued to communicate optimistic projections: $520 million in revenue, $100 million in net profit, and imminent M&A interest from public companies. In truth, we now know that many of those figures were fabricated or grossly exaggerated, designed to entice further investment and preserve her personal control.

In March 2025, just before her firing, Ms. Hunsicker canceled a lunch meeting we had scheduled. I had no idea what was coming: days later, I learned through formal investor communication that she had been terminated for misconduct. By then, Sherpalo, Janket, and I had lost the full value of our approximately $4.9 million in investments.

The loss of money is obviously substantial, and time and expertise were wasted in years of due diligence attempts that yielded what I now know to have been falsified or incomplete information. But the deeper damage lies in the betrayal of trust. My mission with Sherpalo has always been to foster innovation responsibly by backing founders who act with integrity and openness. Ms. Hunsicker's deceit undermined those principles and the trust that early-stage technology companies rely on to obtain the investor support that they need to build and grow.

**Restitution Request**

On behalf of Sherpalo Ventures, Janket Ventures LP, and Mr. Shriram, we respectfully request restitution in the full amount of **$4,900,034.40**, representing the cumulative capital invested and lost based on Ms. Hunsicker's representations. Specifically, we request that restitution be ordered in the following amounts:

- Sherpalo Ventures: **$ 4,299,998.00**
- Janket Ventures LP: **$ 400,005.40**
- K. Ram Shriram: **$ 200,000.00**

The table below and attached supporting documentation set forth the investments supporting this request:

| ENTITY | DATE | INVESTMENT AMOUNT | SHARES QTY | STOCK TYPE |
|---|---|---|---|---|
| Sherpalo Ventures | 5/22/2013 | $ 500,000 | 780,762 | Series A Preferred Stock |
| Sherpalo Ventures | 9/30/2013 | $ 3,000,000 | 4,684,572 | Series A Preferred Stock |
| K. Ram Shriram | 6/25/2021 | $ 200,000 | 800,000 | Common Stock |
| Sherpalo Ventures | 7/1/2022 | $ 799,998 | 525,000 | Series A-12 Stock and Common Stock[1] |
| Janket Ventures | 8/14/2023 | $ 400,005.40 | 64,517 | Series A-12 Stock |
| | **TOTAL** | **$ 4,900,034.40** | | |

Thank you, Your Honor, for your consideration.

Respectfully submitted,

K. RAM SHRIRAM

---

[1]    Sherpalo purchased 129,032 preferred Series A-12 shares for $799,998.40, and was simultaneously granted 395,968 warrants for Common Stock.

# Victim Impact Statement No. 27

**May 20, 2026**

USAO - Southern District of New York
Southern District of New York
26 Federal Plaza, 37th Floor
New York, NY 10278

      **RE:**    **US v. Hunsicker, Case No. 1:25-cr-00318-JPO**
             **Victim Impact Statement of Deshi Singh**

Dear Judge Oetken:

I am submitting this statement to describe the impact that Christine Hunsicker's actions have had on me, my family, and our future. My husband and I, who are 44 and 41 years old respectively, invested over $5,000,000 in CaaStle, Inc. ("CaaStle") and loaned the company another $250,000, all of which now appears to be squandered away by Ms. Hunsicker's fraud.

We invested a significant portion of our savings in CaaStle ultimately for the benefit of our young children. Our investment was based in large part on Ms. Hunsicker's representations, which I understood at the time to be credible, verified, and grounded in legitimate business operations. Like many other investors, I relied on the integrity of the information she presented and the assumption that basic financial and legal standards were being upheld.

What has since come to light is not simply a business failure, it is a fundamental breach of trust built on deliberate deception by Ms. Hunsicker, and the financial harm is significant. Ms. Hunsicker's fraudulent conduct has rendered our investments worthless. These lost monies were resources that my husband Neil and I earned over years of hard work, discipline, and long-term financial planning. The capital invested in CaaStle was intended to be deployed thoughtfully for the benefit of our family and our long-term future. The loss is not just the principal itself, but the opportunity cost and the compounding effect of what those resources could have built over time.

The scale of the fraud, including the $283 million in proceeds tied to Ms. Hunsicker's misconduct, underscores that this was not an isolated lapse in judgment. It was sustained, intentional, and systemic, and the consequences ripple outward to investors and ultimately to families like ours.

The financial impact is only one part of the story. There is also profound psychological and emotional harm. First, this investment represented a significant portion of our investable assets. We made the decision to invest not casually, but with conviction. We believed in the business, in the vision, and in the reported performance, and particularly the consistent, positive quarterly results that were presented. Those results informed our confidence and directly influenced our decision to continue and deepen our investment (we invested first in 2018 and then again in 2020). This was money we had set aside for our children's future—for their education, their stability, and the opportunities we hoped to provide them with. It was also part of our long-term retirement planning. To realize that these decisions were made based on falsified information is deeply destabilizing.

Second, there is the ongoing burden of unwinding what happened. The process of understanding the scope of the fraud, engaging with legal and financial experts, and attempting to assess what, if anything, can be recovered is time-consuming and emotionally draining. It is an ongoing disruption that continues to affect our time, focus, and sense of stability.

Third, beyond financial loss, there is a broader loss of trust. Trust is foundational to how we operate—not just in markets, but in relationships, institutions, and society more broadly. That trust was violated by Ms. Hunsicker. The experience of realizing that we were lied to, and that information was intentionally falsified and decisions were manipulated creates a lasting sense of instability and uncertainty. It will force a reevaluation of how and where we place our trust going forward.

Fourth, as parents to three boys, my husband and I teach our children that honesty and integrity matter. We try to instill in our children that people uphold basic standards of truth and accountability. Through no fault of our own, that did not happen here, and the result sends an entirely different message. It introduces doubt that rules are applied fairly and that wrongdoing has meaningful consequences.

Finally, Ms. Hunsicker's actions matter on a macro level. Financial systems depend on trust to function. When that trust is eroded, it does not just impact individual investors but also capital formation, innovation, and the broader economy. It makes people more hesitant to participate, more cautious in ways that can limit growth and opportunity. Ms. Hunsicker's actions also matter at a human level. The normalization of deception at scale shifts expectations. It changes what people believe is acceptable, or survivable, or even rewarded. That is not the kind of system we should be reinforcing for the next generation.

Accountability, in this context, is not just about punishment. It is also about reaffirming that fraud of this magnitude has real consequences, and that the systems we rely on are capable of responding accordingly. What happened here cannot be undone, but how it is addressed will shape what comes next—for those directly impacted such as me and my family, and for those watching.

I appreciate the opportunity to share this statement.

Respectfully submitted,

_____
Deshi Singh

# Victim Impact Statement No. 28

| | |
|---|---|
| **Date:** | Mon, 30 Mar 2026 2:56:52 PM (UTC) |
| **Sent:** | Mon, 30 Mar 2026 2:56:11 PM (UTC) |
| **Subject:** | [EXTERNAL] Re: United States v. Christine Hunsicker, 25 Cr. 318 (JPO) - Victim Impact Statement and Restitution Information |
| **From:** | Atsushi Taira ▮▮▮▮▮▮▮▮ |
| **To:** | Rothman, Alexandra (USANYS) <Alexandra.Rothman@usdoj.gov>; |
| **Attachments:** | GWYNNIE-BEE-INC.pdf; Gwynnie Bee - Stockholder Notice and Consent (Class F).pdf; Gwynnie Bee - Series A-2 Third A&R Stockholders Agreement-AT.pdf; Gwynnie Bee - Series A-2 Preferred Stock Purchase Agreement-AT.pdf |

Dear Ms. Rothman,

Thank you for your email and for the opportunity to provide information in connection with the sentencing of Christine Hunsicker.

I am writing as a victim of the fraud described in the plea agreement. I invested in CaaStle based on the false and misleading financial statements and representations made by Ms. Hunsicker. Like other investors, I relied on fabricated documents—including falsified income statements, fictitious bank account records, and fake audited financial statements—when making my investment decision. Had I known the true financial condition of CaaStle, I would never have invested.

I. Victim Impact Statement

The financial and emotional impact of Ms. Hunsicker's fraud has been significant. I entrusted my capital to CaaStle in good faith, based on what I now know were deliberately falsified financial records. The loss of my investment has caused me considerable financial hardship and distress. Ms. Hunsicker's scheme was not a momentary lapse in judgment but a sustained, deliberate pattern of deception spanning years, involving fabricated audits, fake bank statements, and forged board documents. I respectfully request that the Court consider the full scope of harm caused to victims like myself when determining an appropriate sentence.

II. Restitution Information

In accordance with your request, please find below the information for the Schedule of Victims:

(a) Full name: Atsushi

(b) Address for restitution payments:
▮▮▮▮▮▮▮▮▮▮▮▮

(c) Amount of out-of-pocket financial loss: $50,000

(d) Corroborating documents: I will provide the following supporting documentation under separate cover:
  - Investment agreement(s) / subscription documents
  - Any correspondence with Ms. Hunsicker or CaaStle regarding the investment

Please let me know if there is a preferred method or deadline for submitting these corroborating documents.

Thank you for your continued work on this matter. Please do not hesitate to contact me if you require any additional information.

Sincerely,
Atsushi Taira

# Victim Impact Statement No. 29

**Date:**     Thu, 12 Mar 2026 2:36:33 AM (UTC)

**Sent:**     Thu, 12 Mar 2026 2:36:13 AM (UTC)

**Subject:**  [EXTERNAL] Christine Hunsicker

**From:**     Donald Weiss ███████████████████

**To:**       Defendre, Valeen (USANYS) <Valeen.Defendre@usdoj.gov >;

I am a Professor of Entrepreneurship at Columbia University. Christine was brought to my attention as an extremely successful entrepreneur as the COO of Right Media and then another company. I met her and then asked her to do a guest speaking appearance in one of my classes. She did that probably about 15 years ago and was a big hit with the students. Her story as a high school athlete from the midwest, going to Princeton and landing a few jobs before she was in the right place at the right time, had a successful experience when the company was sold was quite a story. She is a terrific speaker. The values she fostered in her company were admirable. I invited her back about 3 more times to tell her story and answer questions. She was a terrific resource.

At one point she painted such a compelling picture of her company that I asked her if she took individual investors and she said she did for a minimum of $500,000. That was too much for me. Several years later she called and told me she had a small investor who wanted his money back for personal reasons and the she could sell me his $75,000 position. I jumped at it and sent her the funds. She sent minimal paperwork. I asked for financial reports and she told me she doesn't provide them.

It's hard to believe she is a crook. I have been defrauded by Madoff for millions and another crook Bart Stuck who actually spent some minimal time in jail. My advice to all, is not to invest in anything I go into. I'm sure many lost much more than I did with her and I'm also sure no one will ever see a penny.

Donald Weiss

# Victim Impact Statement No. 30

**Geoff Schneider**
Founder and Managing Partner, Cava Capital
50 Washington Street
Suite 403W
Norwalk, Connecticut 06854

August 10, 2026

**VIA THE UNITED STATES ATTORNEY'S OFFICE**

The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

Re:    **United States v. Christine Hunsicker, 25 Cr. 318 (JPO)**
        **Victim Impact Statement of Geoff Schneider and Cava Capital**

Dear Judge Oetken:

I am the founder and Managing Partner of Cava Capital, a venture investment firm based in Norwalk, Connecticut. I write on behalf of Cava Capital and its affiliated investment vehicles. I knew Christine Hunsicker and invested in her for more than a decade. I take no satisfaction in writing this letter.

**Our history with Ms. Hunsicker**

Cava first invested in Ms. Hunsicker's business in 2014, when it was known as Gwynnie Bee. We invested repeatedly over the following 11 years, through the rebranding to CaaStle and into her related venture, P180. We were among her earliest backers and, by the end, among her largest.

As reflected in our investment records, Cava Capital and its affiliated vehicles invested approximately $49.2 million in CaaStle and P180. Approximately $1.9 million of that was invested before February 2019. The remainder was invested after February 2019 (i.e., during the time period covered by Ms. Hunsicker's guilty plea).

**What we relied on**

We as a firm undertake thorough pre-investment diligence. Every one of those reinvestment decisions followed a diligence process, and Ms. Hunsicker knew it.

Before each round, we requested and received Ms. Hunsicker's: (a) updated financial statements; (b) audited financials; (c) reports documenting system growth and key performance indicators across product categories and client accounts; (d) investor presentations she was distributing; and (e) screenshots of

1

CaaStle's bank accounts confirming its cash position. We maintained data rooms for our investors with this material.

These documents looked precisely like what they purported to be and passed rigid scrutiny. Every one of them was expertly fabricated.

**The secondary purchases**

Many of our investment decisions were made due to the misrepresentations of Ms. Hunsicker that we were purchasing existing shares from early investors or former co-founders who needed liquidity and were prepared to sell at a discount.

There were no sellers. She invented them. The money we sent went to the company or to her.

For years, Ms. Hunsicker used my firm and my personal credibility as the instrument for delivering her lies to people who trusted me.

**What this has cost**

The capital is gone. CaaStle filed for Chapter 7 liquidation on June 20, 2025, and the recovery available to shareholders is negligible. That loss falls on our investment vehicles, on the individual investors in those vehicles, and on my family personally, as I invested my own money alongside theirs.

Beyond the lost principal, Cava has spent approximately $750,000 to date on legal representation and forensic accounting arising from Ms. Hunsicker's misconduct. We expect to spend a further $250,000 to $500,000 responding to investor litigation and to the Chapter 7 trustee's investigation. These are not abstract figures. They are cash costs borne by a firm that was defrauded.

Whatever the outcome, the cost, the distraction, and the strain of the investor litigation are direct consequences of Ms. Hunsicker's decisions.

The damage to our reputation has been severe. This case has been covered extensively in the national and trade press, and our firm's name has appeared in that coverage. In our business, reputation is the entire asset. Limited partners commit capital to us because they believe we exercise judgment on their behalf. Ms. Hunsicker spent six years manufacturing evidence designed to defeat exactly that judgment.

The personal toll has been considerable. I was deceived, my reputation and business were badly damaged, and I suffer each day because of Ms. Hunsicker's actions.

**Our cooperation with the government**

From the outset, we made ourselves fully available to the Department of Justice. We produced our files and records on request, including recorded video calls of Ms. Hunsicker addressing our investors at annual meetings, and hundreds of documents related to the relationship. In June 2025, we spent an entire afternoon with the government reviewing this material. We did so because we believed, and still believe, that the full scope of what she did should be established on the record.

**What I respectfully ask of the Court**

First, that the Court order full restitution and recognize Cava Capital and its affiliated vehicles were victims and are entitled to it. We understand from the government that the funds available may fall far short of the loss. We ask that the order nonetheless reflect the true figure.

Second, that the Court impose a sentence at the upper end of the applicable Guidelines range.

I ask that for reasons beyond what happened to my firm. This was not a single bad decision under pressure. It was six years of deliberate work: forged audits, doctored bank records, fabricated capitalization tables, invented shareholders with invented hardships. When she was confronted, she did not stop. She escalated, and she kept raising money from innocent people.

Private markets operate on documents and on trust. There is no exchange, no ticker, no quarterly filing to check the story against. Diligence in our world means asking for the audit and reading it carefully, which is exactly what we did. If a founder can hand an investor a forged audit and a doctored bank screenshot and face a modest consequence for it, that is the lesson this market will take from this case. I ask the Court to send a different one.

Thank you for your consideration.


Respectfully submitted,

Signed by:

*Geoff Schneider*

6FF46B92C6D0425...

Geoff Schneider
Founder and Managing Partner
Cava Capital

3