# EXHIBIT D



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Jacob K. Javits Federal Building
26 Federal Plaza, 37th Floor
New York, New York 10278

February 27, 2026

**BY EMAIL**

Michael Levy, Esq.
Elizabeth Martin Esq.
Ellerman Enzinna Levy PLLC
1050 30th Street NW
Washington, DC 20007

Anna Skotko, Esq.
Skotko Law PLLC
29 Broadway, Floor 31
New York, NY 10006

Re:    **United States v. Christine Hunsicker, 25 Cr. 318 (JPO)**

Dear Counsel:

On the understandings specified below, the Office of the United States Attorney for the Southern District of New York ("this Office") will accept a guilty plea from Christine Hunsicker ("the defendant") to Count Two of the above-referenced Indictment (the "Indictment").

Count Two charges the defendant with securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5. Count Two carries a maximum term of imprisonment of 20 years; a maximum term of supervised release of three years; a maximum fine, pursuant to Title 15, United States Code, Section 78ff and Title 18, United States Code, Section 3571 of the greatest of $5 million, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense; and a $100 mandatory special assessment.

In addition to the foregoing, the Court must order restitution as specified below.

In consideration of the defendant's plea to the above offense, the defendant will not be further prosecuted criminally by this Office (except for criminal tax violations, if any, as to which this Office cannot, and does not, make any agreement) for (a) her participation in a scheme to defraud investors in CaaStle between 2019 and 2025, as charged in Counts One and Two of the Indictment; (b) her participation in a scheme to defraud investors in P180 between 2024 and 2025, as charged in Count Three of the Indictment; (c) her false statements made to a financial institution, in connection with a $20 million loan from the financial institution, as charged in Count Four of the Indictment; (d) her transfer of funds to her CaaStle co-founder and to P180, with such funds consisting of proceeds from the offenses alleged in Counts One, Two, and Three of the Indictment,

2025.03.12

as charged in Count Five of the Indictment; and (e) her creation of false documents of the CaaStle Board of Directors bearing the names and signatures of Board Directors falsely reflecting that the Board had authorized the grant of stock options to investors, as charged in Count Six of the Indictment, it being understood that this agreement does not bar the use of such conduct as a predicate act or as the basis for a sentencing enhancement in a subsequent prosecution including, but not limited to, a prosecution pursuant to 18 U.S.C. §§ 1961 *et seq.* In addition, at the time of sentencing, the Government will move to dismiss any open Counts against the defendant. The defendant agrees that with respect to any and all dismissed charges the defendant is not a "prevailing party" within the meaning of the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), and will not file any claim under that law.

The defendant hereby admits the forfeiture allegation with respect to Count Two of the Indictment and agrees to forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), a sum of money equal to $283,291,940 in United States currency, representing proceeds traceable to the commission of said offense, as well as the proceeds from a scheme to defraud investors in P180 between 2024 and 2025 (the "Money Judgment"). It is further understood that any forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon her in addition to forfeiture. The defendant consents to the entry of the Consent Order of Forfeiture annexed hereto as Exhibit A and agrees that the Consent Order of Forfeiture shall be final as to the defendant at the time it is ordered by the Court.

The defendant further agrees, pursuant to 18 U.S.C. § 3663(a)(3), to make restitution in an amount of $283,291,940 in accordance with 18 U.S.C. §§ 3663, 3663A, and 3664, and that the obligation to make such restitution shall be made a condition of probation, *see* 18 U.S.C. § 3563(b)(2), or of supervised release, *see* 18 U.S.C. § 3583(d), as the case may be. The restitution amount shall be paid according to a plan established by the Court. The defendant will be given credit against this restitution amount for any payments made prior to sentencing, as verified by the Office.

By accepting this agreement, the defendant admits the factual allegations set forth in the attached Stipulation of Facts.

In consideration of the foregoing and pursuant to United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") Section 6B1.4, the parties hereby stipulate to the following:

A. Offense Level

1. The Guidelines Manual in effect as of November 1, 2025 applies to this offense conduct.

2. The applicable guidelines to the offense charged in Count Two is U.S.S.G. § 2B1.1.

3. Pursuant to U.S.S.G § 2B1.1(a)(1), because the offense of conviction has a statutory maximum sentence of 20 years or more, the base offense level is 7.

2025.03.12

4.  Pursuant to U.S.S.G § 2B1.1(b)(1)(O), 28 levels are added because the loss resulting from the offense and applicable relevant conduct, including $13,575,129 fraudulently obtained from P180 investors, was more than $250,000,000 and less than $550,000,000.

5.  Pursuant to U.S.S.G § 2B1.1(b)(2)(A)(i), two levels are added because the offense involved 10 or more victims.

6.  Pursuant to U.S.S.G. § 3B1.3, two levels are added because the defendant abused a position of trust or used a special skill in a manner that significantly facilitated the commission or concealment of the offense.

7.  Pursuant to U.S.S.G. § 4C1.1(a), the offense level is decreased by two levels because, based upon the information now available to this Office (including representations by the defense), the defendant meets all of the criteria in that section.

8.  Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through the defendant's allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of the defendant's intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

9.  The applicable Guidelines offense level for Count Two is 34.

B. Criminal History Category

Based upon this Office's current understanding (including from representations by the defense), the defendant had zero criminal history points.

In accordance with the above, the defendant's Criminal History Category is I.

C. Sentencing Range

Based upon the calculations set forth above, the defendant's stipulated Guidelines range is 151 to 188 months' imprisonment (the "Stipulated Guidelines Range"). In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. At Guidelines level 34, the applicable fine range is $35,000 to $5,000,000.

The parties agree that neither a downward nor an upward departure from the Stipulated Guidelines Range set forth above is warranted. Accordingly, neither party will seek any departure or adjustment pursuant to the Guidelines that is not set forth herein. Nor will either party in any

way suggest that the Probation Office or the Court consider such a departure or adjustment under the Guidelines.

The parties agree that either party may seek a sentence outside of the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a), with the following limitation: the defendant acknowledges that, in light of the factors set forth in 18 U.S.C. § 3553(a), a sentence of less than two years' imprisonment would not be sufficient to comply with the purposes of sentencing, and the defendant agrees that she will not directly or indirectly seek a sentence of less than two years' imprisonment at sentencing.

Except as provided in any written Proffer Agreement that may have been entered into between this Office and the defendant, nothing in this Agreement limits the right of the parties (i) to present to the Probation Office or the Court any facts relevant to sentencing; (ii) to make any arguments regarding where within the Stipulated Guidelines Range (or such other range as the Court may determine) the defendant should be sentenced and regarding the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a); (iii) to seek an appropriately adjusted Guidelines range if it is determined based upon information not contained in this Agreement that the defendant's criminal history category is different from that set forth above; and (iv) to seek an appropriately adjusted Guidelines range or mandatory minimum term of imprisonment if it is subsequently determined that the defendant qualifies as a career offender under U.S.S.G. § 4B1.1. Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, regardless of any stipulation set forth above, if the defendant fails clearly to demonstrate acceptance of responsibility, to the satisfaction of the Government, through the defendant's allocution and subsequent conduct prior to the imposition of sentence. Similarly, nothing in this Agreement limits the right of the Government to seek an enhancement for obstruction of justice, *see* U.S.S.G. § 3C1.1, regardless of any stipulation set forth above, should it be determined that the defendant has either (i) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice or (ii) committed another crime after signing this Agreement.

It is understood that pursuant to U.S.S.G. § 6B1.4(d), neither the Probation Office nor the Court is bound by the above Guidelines stipulation, either as to questions of fact or as to the determination of the proper Guidelines to apply to the facts. In the event that the Probation Office or the Court contemplates any Guidelines adjustments, departures, or calculations different from those stipulated to above, or contemplates any sentence outside of the stipulated Guidelines range, the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same.

It is understood that the sentence to be imposed upon the defendant is determined solely by the Court. It is further understood that the Guidelines are not binding on the Court. The defendant acknowledges that the defendant's entry of a guilty plea to the charged offense authorizes the sentencing court to impose any sentence, up to and including the statutory maximum sentence. This Office cannot, and does not, make any promise or representation as to what sentence the defendant will receive. Moreover, it is understood that the defendant will have no right to

2025.03.12

withdraw the defendant's plea of guilty should the sentence imposed by the Court be outside the Guidelines range set forth above.

It is agreed that the defendant will not file a direct appeal or otherwise challenge, by petition pursuant to 28 U.S.C. § 2255 or any other provision, the defendant's conviction. In addition to any other claims the defendant might raise, the defendant waives the right to challenge the conviction based on (1) any non-jurisdictional defects in the proceedings before entry of this plea, (2) a claim that the statute to which the defendant is pleading guilty is unconstitutional, and (3) a claim that the admitted conduct does not fall within the scope of the statute. It is further agreed that (i) the defendant will not file a direct appeal or otherwise challenge, by petition pursuant to 28 U.S.C. § 2255 or any other provision, any sentence within or below the Stipulated Guidelines Range of 151 to 188 months' imprisonment, and (ii) that the Government will not appeal any sentence within or above the Stipulated Guidelines Range. This provision is binding on the parties even if the Court employs a Guidelines analysis different from that stipulated to herein. Furthermore, it is agreed that any appeal as to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) the above stipulation. The parties agree that this waiver applies regardless of whether the term of imprisonment is imposed to run consecutively to or concurrently with the undischarged portion of any other sentence of imprisonment that has been imposed on the defendant at the time of sentencing in this case. The defendant further agrees not to appeal or bring a collateral challenge of any term of supervised release that is less than or equal to the statutory maximum or any condition of supervised release imposed by the Court for which she had notice, including from a recommendation by the Probation Office in the presentence investigation report, and an opportunity to object. The defendant also agrees not to appeal or bring a collateral challenge of any forfeiture amount that is less than or equal to $283,291,940, and the Government agrees not to appeal any forfeiture amount that is greater than or equal to $283,291,940. The defendant also agrees not to appeal or bring a collateral challenge of any restitution amount that is less than or equal to $283,291,940, and the Government agrees not to appeal any restitution amount that is greater than or equal to $283,291,940. The defendant also agrees not to appeal or bring a collateral challenge to any special assessment that is less than or equal to $100. Notwithstanding the foregoing, nothing in this paragraph shall be construed to be a waiver of whatever rights the defendant may have to assert claims of ineffective assistance of counsel, whether on direct appeal, collateral review, or otherwise. Rather, it is expressly agreed that the defendant reserves those rights.

The defendant hereby acknowledges that the defendant has accepted this Agreement and decided to plead guilty because the defendant is in fact guilty.

By entering this plea of guilty, the defendant waives any and all right to withdraw the defendant's plea or to attack the defendant's conviction or sentence, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material (other than information establishing the factual innocence of the defendant), including *Jencks* Act material, material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement.

2025.03.12

The defendant recognizes that, if the defendant is not a citizen of the United States, the defendant's guilty plea and conviction make it very likely that the defendant's removal from the United States is presumptively mandatory and that, at a minimum, the defendant is at risk of being removed or suffering other adverse immigration consequences. If the defendant is a naturalized citizen of the United States, the defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status. Under federal law, an individual may be subject to denaturalization and removal if the defendant's naturalization was procured by concealment of a material fact or by willful misrepresentation, or otherwise illegally procured. The defendant acknowledges that the defendant has discussed the possible immigration consequences (including removal or denaturalization) of the defendant's guilty plea and conviction with defense counsel. The defendant affirms that the defendant wants to plead guilty regardless of any immigration or denaturalization consequences that may result from the guilty plea and conviction, even if those consequences include denaturalization and/or removal from the United States. The defendant understands that denaturalization and other immigration consequences are typically the subject of a separate proceeding, and the defendant understands that no one, including the defendant's attorney or the District Court, can predict with certainty the effect of the defendant's conviction on the defendant's immigration or naturalization status. It is agreed that the defendant will have no right to withdraw the defendant's guilty plea based on any actual or perceived adverse immigration consequences (including removal or denaturalization) resulting from the guilty plea and conviction. It is further agreed that the defendant will not challenge the defendant's conviction or sentence on direct appeal, or through litigation under Title 28, United States Code, Section 2255 and/or Section 2241, on the basis of any actual or perceived adverse immigration consequences (including removal or denaturalization) resulting from the defendant's guilty plea and conviction.

It is further agreed that should the conviction following the defendant's plea of guilty pursuant to this Agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this agreement (including any counts that the Government has agreed to dismiss at sentencing pursuant to this Agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

It is further understood that this Agreement does not bind any federal, state, or local prosecuting authority other than this Office.

2025.03.12

Apart from any written Proffer Agreement that may have been entered into between this Office and defendant, this Agreement supersedes any prior understandings, promises, or conditions between this Office and the defendant. No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

Very truly yours,

JAY CLAYTON
United States Attorney

By: _____

Marguerite B. Colson
Alexandra Rothman
Assistant United States Attorneys
(212) 637-2580

APPROVED:

_____

Nicolas Roos/Andrew Thomas
Chiefs, Securities & Commodities Fraud
Task Force

AGREED AND CONSENTED TO:

_____

Christine Hunsicker

_____    3-4-2026
DATE

APPROVED:

_____

Michael Levy, Esq.
Anna Skotko, Esq.
Elizabeth Martin, Esq.
Attorneys for Christine Hunsicker

_____    3/4/26
DATE

2025.03.12

*United States v. Christine Hunsicker*, 25 Cr. 318 (JPO)
**Stipulation of Facts**

- Christine Hunsicker, the defendant, was the founder and Chief Executive Officer ("CEO") of CaaStle. In 2011, Ms. Hunsicker launched the business "Gwynnie Bee," a subscription-based clothing service, before rebranding it as "CaaStle" in or around 2018.

- Ms. Hunsicker marketed CaaStle as a "clothing-as-a-service" business that enabled clothing brands to rent their clothing inventory to consumers. To the public and to prospective investors, Ms. Hunsicker described CaaStle as a success with rapid business growth and promoted the business as the "leading B2B technology company driving the next evolution of inventory monetization for apparel and beyond." Ms. Hunsicker solicited investments from prominent venture capitalists—including investors located in Manhattan, New York—and, at times, valued the CaaStle business at more than $1.4 billion. In fact, and as Ms. Hunsicker knew, by 2019 CaaStle was facing financial challenges, with limited available cash and significant expenses.

- To raise the capital that CaaStle needed to sustain its operations, in or about February 2019, Ms. Hunsicker began providing existing and prospective investors with false statements, misleading claims, and fabricated documents regarding CaaStle. As part of this scheme, Ms. Hunsicker provided investors with an array of false documents, including falsely inflated income statements, fake audited financial statements, and fictitious bank account records. For instance:

  o In or about August 2023, Ms. Hunsicker transmitted to an investor ("Investor-1") a CaaStle income statement reflecting the first two financial quarters of 2023. According to that income statement, CaaStle reported an operating profit of nearly $24 million in the second quarter of 2023. The income statement was fictitious: in truth, CaaStle's operating profit for the second quarter of 2023 was less than $30,000.

  o In or about 2023, Ms. Hunsicker repeatedly solicited a CaaStle investor ("Investor-2") to purchase additional shares of CaaStle. Investor-2 requested, among other things, copies of CaaStle's audited financial statements. In or about April 2023, Ms. Hunsicker transmitted to Investor-2 what purported to be a final audit of CaaStle by an independent audit firm (the "Audit Firm") for fiscal years ("FY") 2021 and 2020. In reality, Ms. Hunsicker had intentionally altered the FY 2021 and 2020 audit to inflate CaaStle's FY 2021 revenue by more than $100 million. Ms. Hunsicker also transmitted to Investor-2 an altered version of the draft audit of CaaStle by the Audit Firm for FY 2022 and 2021, falsely reporting that CaaStle's net revenue had nearly doubled to $230 million from FY 2021 to FY 2022 when, in truth, it did not exceed $20 million.

  o In or about August 2023, Ms. Hunsicker solicited Investor-2 to purchase more CaaStle shares. Investor-2 requested a screenshot of CaaStle's bank accounts and a copy of the final FY 2022 and 2021 audit. Ms. Hunsicker emailed Investor-2 a

1

screenshot that she had digitally altered to show that CaaStle had over $50 million in available cash in its bank accounts when, in fact, CaaStle had less than $1 million in available cash at the time. Ms. Hunsicker also falsified and transmitted to Investor-2 what purported to be a final audit of CaaStle for FY 2022 and 2021 when, in fact, the Audit Firm had never completed the audit for FY 2022 and 2021.

o   Ms. Hunsicker also falsely represented to some investors that their investments would be used to purchase CaaStle shares, at a discount, from existing shareholders who supposedly needed liquidity. Ms. Hunsicker fabricated the existence of those CaaStle shareholders, falsely claiming, among other things, that the shareholders needed money for a "family health emergency" or due to the FTX collapse. Ms. Hunsicker used the investors' money to raise new capital for CaaStle while concealing from the investors that CaaStle itself needed cash. Ms. Hunsicker then issued fake capitalization tables to the investors to demonstrate that they had purchased existing CaaStle shares.

o   In or about October 2023, the Audit Firm questioned Ms. Hunsicker about her transmission of a false audit to Investor-2. During a call with the Audit Firm, Ms. Hunsicker falsely claimed that she had created the fake audit in connection with a lecture that she gave at Princeton University, and that sending the audit to Investor-2 had been a one-time error, unrelated to the solicitation of any investment. In fact, there was no such lecture, and Ms. Hunsicker had provided two fabricated audits to Investor-2 while soliciting an investment from Investor-2. A few hours before the call with the Audit Firm, Ms. Hunsicker had conducted internet searches for "fraud" and "created an audit firm fake." One week later, Investor-2 contacted Ms. Hunsicker about the same fake audit, and Ms. Hunsicker repaid Investor-2 the value of Investor-2's investment in CaaStle.

o   In or about September 2024, Ms. Hunsicker provided an investor ("Investor-3") with a fake screenshot of CaaStle's bank accounts reflecting that CaaStle had nearly $200 million in available cash when, in fact, CaaStle had less than $200,000 in available cash at the time. When Investor-3 requested a copy of the actual bank statement, Ms. Hunsicker falsely claimed that the CaaStle Board of Directors (the "Board") would not allow her to share the information and permitted Investor-3 to redeem its investments in CaaStle.

o   In or about 2024, Ms. Hunsicker solicited investments from an additional investor ("Investor-5") making the same false and misleading statements about CaaStle that she had made to other investors. Investor-5 requested that Ms. Hunsicker provide signed documents confirming that the Board had authorized the grant of stock options to Investor-5. Instead, Ms. Hunsicker falsified the signature of two Board directors on a written board authorization, even though the directors had never signed the document. With these transactions, Ms. Hunsicker raised more than $20 million of investments in CaaStle.

2

- o In or about October 2024, Ms. Hunsicker provided an investor ("Investor-4") with a fake draft audited financial statement for FY 2023 and 2022, supposedly issued by the Audit Firm. Investor-4 learned that the Audit Firm had not prepared the audit and confronted Ms. Hunsicker during a meeting at the CaaStle office in Manhattan. Ms. Hunsicker feigned ignorance and promised to get back to Investor-4. After Investor-4 left the office, Ms. Hunsicker conducted an internet search for "faking an audit." Ms. Hunsicker then offered to buy Investor-4's total investment in CaaStle.

- In or about 2024, as part of a financial reporting package for a $20 million loan previously obtained through an FDIC-insured financial institution located in Manhattan (the "Bank"), Ms. Hunsicker submitted to the Bank falsified CaaStle income statements that purported to show that CaaStle had over $100 million in revenue and over $32 million in available cash. In fact, CaaStle had less than $16 million in revenue at that time and held less than $1 million in available cash.

- In or about 2024, Ms. Hunsicker used CaaStle funds obtained through fraud on investors to repurchase, on behalf of CaaStle, $6 million in CaaStle shares from Ms. Hunsicker's close associate and former co-founder at CaaStle ("Individual-1").

- In or about November 2024, Investor-4 raised concerns to the Board about the draft audit report shown to Investor-4 by Ms. Hunsicker in or about October 2024, and requested that the Board conduct an investigation into the validity of that document. In or about December 2024, the Board removed Ms. Hunsicker as Chairperson of the Board. The Board permitted Ms. Hunsicker to remain as CEO of CaaStle but prohibited her from taking any actions on behalf of CaaStle, including soliciting investments in CaaStle.

- In or about January 2025, Ms. Hunsicker sold $8 million of her CaaStle shares to a CaaStle investor, failing to disclose material information regarding the CaaStle business.

- In total, based on the false and fraudulent statements and representations of Ms. Hunsicker regarding CaaStle, Ms. Hunsicker raised $269,716,811 of investments in CaaStle.

- In or about 2024, Ms. Hunsicker began fundraising for P180, a new business venture that would acquire clothing brands. Ms. Hunsicker intended for P180, upon acquiring those brands, to pay for and leverage the CaaStle service, which would infuse CaaStle with needed cash. Ms. Hunsicker attempted to raise money for P180 from existing CaaStle shareholders, including after the Board had removed her as Chairperson. In soliciting investments for P180, Ms. Hunsicker repeated affirmative misstatements about CaaStle's financial performance, and failed to disclose that her prior representations regarding CaaStle's financial performance had been false.

- In total, based on misrepresentations and omissions, Ms. Hunsicker raised $13,575,129 of investments in P180.

3

- In or about February 2025, Ms. Hunsicker discussed selling an additional $19 million of her CaaStle shares to Investor-1. After meeting with Investor-1 to discuss the transaction, Ms. Hunsicker conducted an internet search for "bank fraud vs. wire fraud severity." Then, in or about March 2025, Ms. Hunsicker provided Investor-1 with the same fake draft audited financial statement for FY 2023 and 2022 that she had provided to Investor-4 months earlier. The following week, law enforcement agents approached Ms. Hunsicker and seized her electronic devices. Subsequently, when Investor-1 met with Ms. Hunsicker and inquired about the fake draft audited financial statement, Ms. Hunsicker did not reveal that the audit was fabricated or that she had been removed from the Board and was prohibited from taking any actions on behalf of CaaStle.

- On or about March 29, 2025, the Board disclosed to CaaStle investors that Ms. Hunsicker had misstated CaaStle's financial statements and falsified audited financial statements. Ms. Hunsicker resigned as CEO from CaaStle. On or about June 20, 2025, CaaStle filed for Chapter 7 bankruptcy.

4