# EXHIBIT G

### Elie G. Aoun, MD

#### General, Addiction and Forensic Psychiatry

ElieGAounMD.com
90 Broad St. Suite 1009
New York, NY, 10004

Phone: (347) 766 – 1941
Fax: (347) 767 – 2113
Email: Elie@ElieGAounMD.com

## Expert Forensic Psychiatric Report of Elie G. Aoun, MD

**Matter:** *United States v. Christine Hunsicker*

**Date of Report:** August 10, 2026

**Length of Report (including cover page):** 24 pages

**Purpose of the Report:** Sarah G. Schaffer, Ph.D. evaluated Christine Hunsicker and issued a Forensic Neuropsychological Report dated July 20, 2026 (The Report). I was retained by the United States Attorney's Office for the Southern District of New York to conduct a critical review of The Report evaluating its methodology and the soundness of the opinions it offers.

**Report Prepared by:**

Elie G. Aoun, M.D.

General, Addictions and Forensic Psychiatrist

Assistant Professor of Psychiatry – Columbia University

Diplomate of the American Board of Psychiatry and Neurology – Specialties: General Psychiatry, Addiction Psychiatry and Forensic Psychiatry

Diplomate of the American Board of Preventive Medicine – Specialty: Addiction Medicine

Certified Medical Review Officer

New York State Medical License Number: 287660

**Qualifications:** I have enclosed a copy of my Curriculum Vitae, which states my qualifications to perform this evaluation.

**Table of Contents:**

| | **Page** |
|---|---|
| Sources of Information | **3** |
| Background Information | **3** |
| Summary of Historical Recitations Included in Dr. Schaffer's Report | **6** |
| Opinions and Conclusions from Dr. Schaffer's report | **12** |
| Discussion: Critical Review of Dr. Schaffer's Report | **17** |
| I. Gambling Disorder | **17** |
| II. Concussion | **17** |
| 1. Ms. Hunsicker's cognitive impairments | **18** |
| 2. Ms. Hunsicker's impairments in executive functioning | **20** |
| 3. The relationship between the cognitive/executive impairments and the fraudulent activity | **21** |
| III. Other Concerns | **22** |
| Conclusion | **24** |

**Sources of Information**

In preparing this report, I reviewed the following documents:

1. Sealed Indictment in the Matter of *United States v. Christine Hunsicker*, 25 Cr. 318 (JPO), signed by United States Attorney Jay Clayton, filed July 17, 2025
2. Stipulation of Facts in the Matter of *United States v. Christine Hunsicker*, 25 Cr. 318 (JPO) (not dated)
3. Forensic Neuropsychological Report of Christine Hunsicker by Sarah G. Schaffer, Ph.D., ABPP-CN, dated July 20, 2026

I did not interview Ms. Christine Hunsicker as a part of my evaluation as that would be outside the scope of my retention (to conduct a critical review of Dr. Schaffer's report).

---

*Not all records reviewed are abstracted in this report. There are minor grammatical corrections to some quoted material for readability*

---

**Background Information**

Christine Hunsicker is a 48-year-old woman who has pled guilty to securities fraud in connection with her role as founder and Chief Executive Officer ("CEO") of CaaStle. As documented in the Stipulation of Facts:

> *Ms. Hunsicker solicited investments from prominent venture capitalists [...] and, at times, valued the CaaStle business at more than $1.4 billion. In fact, and as Ms. Hunsicker knew, by 2019 CaaStle was facing financial challenges, with limited available cash and significant expenses.*
>
> *To raise the capital that CaaStle needed to sustain its operations, in or about February 2019, Ms. Hunsicker began providing existing and prospective investors with false statements, misleading claims, and fabricated documents regarding CaaStle. As part of this scheme, Ms. Hunsicker provided investors with an array of false documents, including falsely inflated income statements, fake audited financial statements, and fictitious bank account records.*

*United States v. Christine Hunsicker* - Forensic Psychiatry Forensic Report                    3

Examples of the fraudulent activity include:

- Sharing falsified income statements with investors showing operating profit of nearly $24 million when actual profit was less than $30,000
- Soliciting investors to purchase additional shares after providing falsified independent audit reports inflating the company's revenue by more than $100 million, or falsely reporting that net revenue had nearly doubled to $230 million in a year when the actual figure did not exceed $20 million
- Sharing digitally altered bank account statements to investors to show that the company had over $50 million in available cash when, in fact, it had less than $1 million.
- Sharing falsified what purported to be a final audit of the company when, in fact, the Audit Firm had never completed the audit.
- Falsely informing investors that their investments would be used to purchase shares of the company at a discount, from existing shareholders who supposedly needed liquidity. Ms. Hunsicker fabricated the existence of those shareholders, falsely claiming, among other things, that the shareholders needed money for a "family health emergency." She then issued fake tables to the investors to demonstrate that they had purchased existing shares.
- Telling the Audit Firm when questioned about her transmission of a false audit report to an Investor that she had created the fake audit in connection with a lecture that she gave at Princeton University, and that sending the audit to the investor had been a one-time error, unrelated to the solicitation of any investment. In fact, there was no such lecture, and she had provided two fabricated audits to the investor.
- Sharing falsified screenshots of bank statements with investors reflecting that the company had nearly $200 million in available cash when, in fact, it had less than $200,000 (in September 2024). When asked, she falsely told the investor that the board of directors would not allow her to provide a copy of the actual bank statement.
- Making false and misleading statements about the company to investors and falsifying the signature of two board directors in order to raise more than $20 million of investments.
- Provided an investor with a fake draft audited financial statement. When investor confronted her about that, she feigned ignorance and promised to get back to him. After he left, she conducted an internet search for "faking an audit."

*United States v. Christine Hunsicker* - Forensic Psychiatry Forensic Report                    4

- Submitting falsified income statements to the bank while preparing a financial reporting package for a previously obtained $20 million loan. The falsified statements showed that the company had over $100 million in revenue and over $32 million in available cash (the actual numbers were $16 million and $1 million respectively).
- Using company funds obtained through fraud to repurchase, $6 million in company shares from a close associate and former co-founder.
- Selling $8 million of her company shares to an investor in January 2025 without disclosing material information regarding the business. Note that in December 2024, the board of directors investigated her conduct and consequently removing her from her position as Chairperson of the Board (she was permitted to remain as CEO).
- Fundraising for P180, a new business, which would have allowed her to infuse CaaStle with needed cash. In soliciting these investments, she repeated affirmative misstatements about CaaStle's financial performance, and failed to disclose that her prior representations regarding CaaStle's financial performance had been false.
- Discussing selling an additional $19 million of her CaaStle shares to an investor in February 2025. After the meeting with the investor, she conducted an internet search for "bank fraud vs. wire fraud severity."
- Providing the investor in March 2025with the same fake draft audited financial statement that she had provided to another investor four months earlier.

In total, based on the false and fraudulent statements and representations of Ms. Hunsicker regarding the company, Ms. Hunsicker raised $269,716,811 of investments in the company.

In total, based on misrepresentations and omissions, Ms. Hunsicker raised $13,575,129 of investments in P180.

On March 29, 2025, the CaaStle board of directors disclosed Ms. Hunsicker's activity to the investors. She resigned as CEO and the company filed for Chapter 7 bankruptcy on June 20, 2025.

*United States v. Christine Hunsicker* - Forensic Psychiatry Forensic Report                    5

**Summary of Historical Recitations Included in Dr. Schaffer's Report**

Ms. Hunsicker's defense counsel hired Dr. Schaffer to conduct a forensic neuropsychological evaluation of her in connection with the sentencing phase. She issued a report with her findings dated July 20, 2026. She noted:

> *Of particular interest to Ms. Hunsicker's attorneys was the potential contribution of a concussion that she sustained in late 2017, which resulted in prolonged and debilitating neurologic and cognitive sequelae that overlapped in time with the onset of her fraudulent activity.*

As a part of her evaluation, Dr. Schaffer did not conduct an independent neuropsychological examination of Ms. Hunsicker, because: "her cognitive functioning has returned to baseline and the goal of this evaluation is retrospective in nature—that is, to explain the circumstances under which her criminal conduct occurred, rather than to assess her current cognitive abilities."

I quote below significant historical points raised in Dr. Schaffer's report:

1. ███████████████████████, and by Ms. Hunsicker's account the household was characterized by frequent yelling and emotional volatility. [Her] childhood [was] characterized by intense parental pressure, emotional dysfunction, and the systematic suppression of normal developmental needs."

2. "Her father, while deeply involved in her athletic development—he never missed a game and declined [personal] career advancement […] in order to attend her sporting events—was simultaneously cruel, demeaning, and psychologically abusive. […] She described him as 'unrelenting' and noted that 'nothing was ever enough.'"

3. "At age 16, she suffered a 'blown-out' ankle during a soccer game, after which her father made her run laps for an hour and a half on the severely injured ankle, telling her it was so she learned 'not to get hurt.'"

4. "Her mother exhibited traits that Ms. Hunsicker characterized as ████████ including a pattern of making everything about ████ and using ████ and ████████ as ████████████"

5. "She was recruited to play Division I field hockey at Princeton University."

6. "In college, she played with a broken back […] despite being told that she had a 30% chance of paralysis. During this period, […] she also experienced anaphylactic shock from naproxen. […] She reportedly flatlined and required two adrenaline injections, but she still played […] the following day, against medical advice, and her team won."

7. ███████████████████████████████████████████████████████████
████████████████████████████████

8. "She coped [with the abuse] through dissociation, severe anorexia, and the internalization of a belief that her experience was not unusual or worthy of attention."

9. "At age 16, Ms. Hunsicker […] [had] an abortion, alone and without her parents' knowledge. The following day, she played in a soccer game […] and bled profusely."

10. In 2006, while leading a board meeting, she paused the meeting, went into the bathroom as she was having a miscarriage. She then "walked back out and continued the board meeting like nothing ever happened."

11. She "carries diagnoses of Bipolar Disorder NOS (active); Complex PostTraumatic Stress Disorder (active); Borderline Personality Disorder (active); Substance Use Disorder (Alcohol, Opioid), in sustained remission for >15 years; Gambling Addiction, in sustained remission for approximately one year; and Eating Disorders (anorexia and bulimia), in sustained remission for >8 years.

12. Dr. Schaffer clarified that Ms. Hunsicker's psychiatrist gave her the bipolar diagnosis after she experienced a hypomanic reaction to being prescribed an antidepressant, without any other history of experiencing manic or hypomanic episodes.

13. She was a "'fullblown alcoholic by freshman year of college,' and described a period after selling a company to Yahoo during which she was drinking two bottles of rum per day while isolated at home, 'rich and miserable.'" She started psychiatric treatment with Dr. Kraker in 2011 and was prescribed Antabuse to abstain from alcohol. In 2013, she stopped taking Antabuse and sought to remain abstinent from alcohol.

14. In 2015, her psychiatrist started prescribing her lamotrigine, causing her to experience side effects including: "cognitive side effects including cognitive slowing, word finding difficulty, short term memory loss." She remained on the medication, albeit at a lower dose until 2019, when the psychiatrist tapered the lamotrigine dose ""in context of PCS" (post-concussion syndrome)."

15. In 2021, her psychiatrist started prescribing her lithium starting at a dose of 150mg per day and by the following year, her dose was increased to 450mg per day.

16. At the time of Dr. Schaffer's evaluation, Ms. Hunsicker was prescribed fluoxetine (Prozac) 20mg daily, lithium carbonate 450mg daily, and trazodone 25–50mg as needed at bedtime, in addition to "tirzepatide (Monjaro), a GLP-1 receptor agonist that she takes off-label for its anti-inflammatory properties; without it she experiences significant fluid retention and inflammatory symptoms."

17. Ms. Hunsicker has "a ███████████████████████████████████████████ ███████████████████████████████████████████.

18. In addition to her addiction to alcohol, Ms. Hunsicker developed an addiction to opioids after she was prescribed Percodan in college following back injury (suggesting that she misused or otherwise abused the medication she was prescribed). According to Dr. Schaffer, Ms. Hunsicker started "throwing my trainer against the wall telling her to give me more pills."

19. Dr. Schaffer asserted that "More recently, in 2024, she developed an addiction to oxycodone[1] after being overprescribed the medication following jaw surgery; this lasted approximately two to three months and required a slow titration to discontinue."

20. Dr. Schaffer framed Ms. Hunsicker's fraudulent actions in the instant offense as gambling. She wrote:

> Because of her experience witnessing her ███████████████████████, it did not occur to her that some of her own behaviors and propensities might also fall into this domain, since they manifested so differently. However, in retrospect she realizes that she was exhibiting signs of such an addiction dating back to her early days building and running tech start-ups. For example, Ms. Hunsicker recalled an interaction with her co-founder when they were trying to get the first CaaStle investors on board in a round of seven million. One investor was going to invest one million dollars, but only if the round was filled. They needed 3.5 million dollars to complete the round, and Ms. Hunsicker decided she would put the money in herself, despite the financial risks that would have accompanied such a move. Another time she sold an apartment, and

---

[1] I note that oxycodone is Percodan, and as such, Ms. Hunsicker would not have developed a new addiction, instead, relapsed to her existing addiction to opioids

*instead of putting the money towards other financial obligations or depositing it into an account where it could earn interest, she put it all into the company. This was an ongoing pattern that she only recognized when she started attending Gamblers Anonymous (GA) meetings; question 12 of GA is "Were you ever hesitant to use gambling money for everyday expenditures?* She described a more recent pattern in which when her company's bank account ran down to near-zero every two weeks, creating a payroll crisis for 600 employees, she experienced a dopamine rush from the 24-hour scramble to find money to cover payroll. She also purchased Powerball and Mega Millions tickets regularly, genuinely believing that she could win and pay back the investors. She described mentally dividing the lottery winnings among investors and acknowledged that this was "delusional thinking."

21. "Ms. Hunsicker has been active in Gamblers Anonymous (GA), attending six to seven meetings per week, leading meetings, and volunteering on the GA hotline. Her one-year 'clean date' fell approximately two weeks before this interview. Her definition of 'clean' encompasses abstinence from all financial transactions that could produce a dopamine rush."

22. In December 2017, a mirror fell and struck Ms. Hunsicker on her head. She did not lose consciousness and did not seek medical evaluation for approximately two months. "She attempted to 'push through,' hoping that they would eventually abate on their own." According to Dr. Schaffer, this incident represented a concussion.

23. Ms. Hunsicker was evaluated by an NYU neurologist in February 2018, and reported the following symptoms: "difficulty staying awake, inability to focus, feeling "foggy and lethargic," headaches, dizziness, balance problems, sensitivity to noise, difficulty concentrating and remembering, and fatigue."

24. "In May 2018, a cell phone fell on Ms. Hunsicker's head. She went to the emergency room and reported 'new sharp shooting pain on left side of head, blurred vision, dizziness and increased word finding difficulties.'"

25. Ms. Hunsicker had "someone follow her around taking notes because she could not remember anything, and being in constant pain from migraines."

26. In January 2019, Ms. Hunsicker underwent a quantitative electroencephalogram (qEEG) which revealed an electrical pattern "often suggesting cortical dysfunction, hypo-arousal,

or reduced cerebral blood flow. While normal in deep sleep, this pattern is less typical during wakefulness and has been associated with traumatic brain injury (TBI) and PTSD."

27. "Neuropsychological testing at that time revealed significant deficits in short delay recall (6th percentile) and recognition accuracy (8th percentile), with elevated intrusion and perseveration errors indicative of disruptions in executive control processes (i.e., executive functioning skills that facilitate memory encoding and retrieval)."

28. The ImPACT test[2] administered on 03/05/2019 yielded a Total Symptom Score of 81, which is extremely elevated. Self-rated symptom severity was at or near the ceiling for feeling mentally foggy (6/6), difficulty remembering (6/6), difficulty concentrating (5/6), and feeling slowed down (5/6)."

29. "During the interview, Ms. Hunsicker described her cognitive state during this period in terms that are consistent with the objective data. She reported remembering only fragments of 2020, "zero of 2021," and "nothing of 2022 (maybe 1–2 days)," with memory beginning to return in 2023. She attributed her cognitive recovery primarily to time and to her move from Manhattan to a small rural town in New Jersey, stating: 'I needed to be in nature and be in quiet. Until I moved out here, I don't think anything else would have done it.'"

30. With respect to the fraudulent activity Ms. Hunsicker pled guilty to, Dr. Schaffer noted: "From approximately 2019 through late 2023, Ms. Hunsicker was operating in a state of severe cognitive impairment, characterized by a lack of impulse control, significant memory deficits, and debilitating pain."

31. "Beginning in the fall of 2023, the 'fog began to lift' and her cognition gradually improved, though this period of recovery also brought with it the painful realization of the full extent of what had transpired."

32. "It was in this context of severe cognitive impairment that Ms. Hunsicker's fraudulent conduct began and escalated. An initial confrontation with a prominent investor, who threatened to 'ruin' her career after she declined to provide more financial reporting than

---

[2] The ImPACT (Immediate Post-Concussion Assessment and Cognitive Testing) test is a 20-to-25-minute computerized exam used by doctors and sports teams to evaluate memory, attention speed, and reaction time before and after a head injury. It is a management aid, not a standalone diagnostic tool

was permitted by company policy, led her to send fabricated numbers in an effort to defuse the situation—a response that was consistent with her lifelong pattern of performing through crises and appeasing authority figures at any cost. At the same time, a serious conflict with her cofounder—whom she described as playing 'the role of my dad in all of this'—created additional pressure to conceal problems and maintain the appearance of control. These interpersonal dynamics, layered upon the cognitive impairment caused by the concussion, the onset of COVID-19 and its devastating impact on the company's business, and Ms. Hunsicker's deeply ingrained behavioral patterns of dissociation and deception under stress, created a 'perfect storm' in which each factor amplified the others. It is critical to note that at no point throughout this process did she attempt to enrich herself, but rather genuinely thought that if she could just keep the company running, she would be able to make things right. Indeed, she invested tens of millions of dollars of her own money attempting to fix the situation and is now millions of dollars in debt."

33. "Ms. Hunsicker reports that her cognitive functioning has returned to baseline, which is consistent with her presentation during this evaluation."

34. In thinking about the possibility of a prison sentence, and after several meetings with her pre-trial services officer, […] she mused on the applicability of the GA [Gambler's Anonymous] framework for a prison population, and Officer Nisbeth encouraged her to write a proposal that they can give to the new Commissioner at Rikers Island. A working draft of her proposal (entitled "Accountable") can be found in Appendix B."

35. "Ms. Hunsicker expressed an attitude of acceptance of whatever sentence is imposed and described one of her primary concerns as not being available to help care for her mother, who has glaucoma and has had several falls recently due to having no peripheral vision, in addition to several other chronic health conditions (Hashimoto's thyroiditis) and dental issues, and for whom Ms. Hunsicker is the primary familial caretaker. […] In addition, Ms. Hunsicker is concerned about maintaining access to her current medications while incarcerated—including tirzepatide (Monjaro), which she takes for its anti-inflammatory properties and which she believes is unlikely to be available in the federal prison system."

36. "Ms. Hunsicker has sustained multiple concussions throughout her life, all reportedly involving impacts to the parietal region of her head. Her medical records document at least three concussions prior to the December 2017 index injury."

37. Ms. Hunsicker underwent pharmacogenomic in February 2026 which showed that "carries the DRD3 CC genotype (present in 12.7% of the population), which is associated with increased dopamine-related reward and "a higher risk for short term reward seeking behaviors (i.e., gambling, etc.)," as well as an increased risk of obsessions and compulsive behaviors. She also carries the AUTS2 AA genotype (7.8% prevalence), associated with an "increased reward response in your brain in response to alcohol or drugs" and "more impulsive behavior and a higher sensitivity to drugs and alcohol." The DBH TT genotype (4.7% prevalence) indicates higher baseline dopamine levels and reduced conversion to norepinephrine—a finding that Ms. Hunsicker herself referenced during the interview when she stated, "I recognize I don't make enough norepinephrine." Additionally, she was found to have the BDNF CT genotype, which is associated with lower levels of brain-derived neurotrophic factor. Notably, BDNF plays a critical role in neuronal repair and recovery from brain injury."

**Opinions and Conclusions from Dr. Schaffer's report**

I quote below opinions and conclusions noted in Dr. Schaffer's report:

1. "She learned that her value was contingent upon performance, that pain was to be endured and not acknowledged, and that expressing vulnerability or asking for help would be met with rejection and punishment."

2. "These experiences reinforced a deeply held belief that she could overcome anything, regardless of the physical or psychological cost, by pushing herself to keep going."

3. "The behavioral pattern that would come to define Ms. Hunsicker's adult life: enduring a crisis of profound severity in complete isolation, telling no one, and continuing to perform as though nothing had happened."

4. "The relevance of this trauma history to Ms. Hunsicker's criminal conduct cannot be overstated. The sexual abuse, combined with the emotional abuse from her parents,

established a deeply ingrained pattern of dissociation under stress, compulsive performance despite distress, pathological self-reliance, and an inability to ask for help or acknowledge vulnerability."

5. "Ms. Hunsicker's trauma history also established a relationship with truth-telling that was fundamentally distorted. That is, in Ms. Hunsicker's formative experience, telling the truth resulted in punishment, abandonment, and further harm. These behavior patterns developed during childhood and adolescence, and at that time they were adaptive defense mechanisms that she employed to protect herself in the context of ongoing and pervasive threats across every facet of her life."

6. Ms. Hunsicker [developed] a deeply entrenched set of behavioral patterns […] including an inability to stop performing regardless of personal cost; a compulsive need to meet the expectations of authority figures, particularly older men in positions of power; a reflexive tendency to dissociate and resort to deception under stress; and an absolute inability to ask for help or acknowledge weakness. These patterns, which were forged as survival mechanisms in childhood and adolescence, constituted the psychological infrastructure through which the effects of a traumatic brain injury would ultimately be channeled into criminal behavior."

7. When Ms. Hunsicker experienced cognitive side effects after being prescribed lamotrigine, Dr. Schaffer concluded: "These entries document pre-existing cognitive complaints that preceded the December 2017 concussion by one to two years, establishing that Ms. Hunsicker's cognitive vulnerability was not solely attributable to the head injury but reflected an interaction between her psychiatric medication regimen and her neurological status."

8. When Ms. Hunsicker's psychiatrist started prescribing her lithium in 2021, and increased the dose up to 450 mg within a year, Dr. Schaffer concluded: "a tripling of the dose that suggests increasing mood instability requiring more aggressive stabilization."

9. In the months after a mirror fell on her head in December 2017, "Ms. Hunsicker was treated by an extensive array of providers, including physiatry, […] vestibular physical therapy, vision occupational therapy, neuro-optometry, […] neurology, […] neurofeedback, […], and hyperbaric oxygen therapy, […] in addition to ongoing

*United States v. Christine Hunsicker* - Forensic Psychiatry Forensic Report                13

psychiatric care. The breadth and intensity of her treatment-seeking clearly demonstrated the severity of her symptoms."

10. "On 06/22/2018 […] [she had] a Montreal Cognitive Assessment (MoCA) score of 30/30, which would typically suggest intact cognition, though it should be noted that the MoCA is a brief screening instrument that is typically used to screen for dementia and is not sensitive enough to pick up more nuanced disruptions in cognition; however, Dr. Klebanoff noted that she "would have expected her ability to generate words starting with 'F' to be better than her actual performance.""

11. Dr. Shaffer concluded that Ms. Hunsicker's qEEG "often reflects an inability to sustain attentional tone (i.e., the overall state of mental alertness, readiness, and cognitive engagement), creating a perpetual drowsy state or 'brain fog.""

12. Dr. Schaffer noted that it is not standard practice to include pharmacogenomic analyses in forensic evaluations, however, she elected to deviate from her regular practice here because the results "provide independent biological evidence that is consistent with—and helps to explain—the behavioral patterns observed in this case." She acknowledged that "These genomic findings do not determine behavior, and they are not offered as an excuse for Ms. Hunsicker's criminal conduct. Rather, they provide a biological substrate for understanding why she was particularly vulnerable to the type of reward-seeking, crisis-driven decision-making that characterized the fraud, and why the frontal lobe dysfunction caused by her concussion may have had a disproportionately destabilizing effect on her already-vulnerable regulatory systems."

13. The fraudulent conduct in this case […] emerged from the convergence of the following factors, all of which were operating simultaneously during the relevant time period:

   a. Pre-existing psychological vulnerabilities: Ms. Hunsicker entered adulthood with a deeply ingrained pattern of compulsive performance, pathological self-reliance, dissociation under stress, and distorted relationship with truth telling—all of which were the direct products of childhood emotional abuse, ███████████████ ███ and a family system that punished vulnerability and rewarded endurance of pain. These patterns were further complicated by diagnoses of Bipolar Disorder, Borderline Personality Disorder, and Complex PTSD, as well as a history of multiple addictions (alcohol, opioids, nicotine, gambling, eating disorders).

b.  Cumulative traumatic brain injury: Ms. Hunsicker sustained at least three concussions prior to the December 2017 injury, creating a cumulative neurological vulnerability […].

c.  Genomic vulnerability to reward-seeking behavior […]

d.  Situational and professional pressures: Ms. Hunsicker was serving as founder and CEO of a 600-person technology company while cognitively impaired, in chronic pain, awake only four to five hours per day, and with no meaningful operational support."

14. "The concussion and its sequelae played a significant and causally relevant role in Ms. Hunsicker's criminal conduct. […] The December 2017 concussion [..] was a necessary contributing factor to her criminal conduct. The concussion compromised the executive functions that she had been relying on to compensate for her underlying psychological vulnerabilities throughout her adult life.

15. The reported dysfunction in Ms. Hunsicker's executive functions resulting from the concussion resulted in impairments in the following abilities: "ability to initiate activities; to maintain the motivation necessary to complete activities once initiated; to plan a course of action and organize the steps needed to carry it out (including generating hypotheses and/or strategies to aid in this process); to think flexibly and be able to shift focus when needed; to monitor and track progress towards an intended goal in order to recognize if/when mistakes are made or modifications are needed; to understand and respond appropriately to external feedback; to resist interference from irrelevant or competing information (i.e., impulse control); and to disengage from a stimulus/activity when necessary or when the action is completed (and not before)."

16. "Together, these skills contribute to the ability to make sound decisions and to judge the appropriateness of one's own and others' actions."

17. "Importantly, quantitative EEG revealed profound abnormalities in frontal lobe brain regions, providing evidence of a physiological mechanism to account for the difficulties that she was reporting to her providers during that time."

18. Without the 2017 concussion, there is no evidence to suggest that Ms. Hunsicker would have engaged in securities fraud; her prior career, despite its many complexities, was

characterized by legitimate business success, and there is no history of prior criminal conduct."

19. "Ms. Hunsicker [acknowledged] did during the interview, that the concussion does not fully explain the conduct—particularly the continued conduct after fall 2023, when her cognition had begun to recover and she was aware that her actions constituted fraud. During that later period, the gambling addiction and the associated dopamine-driven crisis-solving behavior appear to have been the primary maintaining factors, even as cognitive clarity returned."

20. "Ms. Hunsicker's current level of insight, remorse, and engagement in recovery is genuine and substantial."

21. "The likelihood of recurrence is low, provided that appropriate safeguards are maintained." Dr. Schaffer listed the following safeguards in her recommendations:
    a. Continued psychiatric treatment.
    b. Continued participation in Gamblers Anonymous.
    c. The establishment of a fiduciary accountability structure.
    d. Head injury prevention and monitoring.

22. Dr. Schaffer concluded her report with the following note: "In closing, I would like to offer a final observation to the Court. Over the course of my 20-year career evaluating individuals in forensic contexts, it is rare to encounter someone who combines the degree of insight, accountability, and genuine commitment to change that Ms. Hunsicker has demonstrated. She is an exceptional individual—a person of extraordinary intellect, creativity, and drive—who committed serious crimes under circumstances that she now understands with remarkable clarity. She has not asked for sympathy, nor has she sought to minimize the harm she caused."

**Discussion: Critical Review of Dr. Schaffer's Report**

    **I.**        **Gambling Disorder**

Dr. Schaffer framed Ms. Hunsicker's fraudulent actions in the instant offense as gambling. While Ms. Hunsicker's behaviors in the fraud she pled guilty for and prior examples listed by Dr. Schaffer are financially irresponsible, they are not considered to be gambling. Indeed, in including gambling disorder as a diagnostic entity into the DSM-5 (Diagnostic and Statistical Manual, 5th Edition), the American Psychiatric Association was referring to actual gambling behaviors. Such behaviors are not meant to include any financially irresponsible behavior, or any unleveraged financial investment.

The facts of this case are inconsistent with the conclusion that Ms. Hunsicker has a gambling disorder. While gambling behaviors and Ms. Hunsicker's actions in this case (including lying to investors, falsifying documents, or misrepresenting financial statements in order to entice them to invest in one's firm) share antisocial drives, they are not and should not be assumed to be equivalent behaviors clinically. When gambling, a gambler understands that a win is driven by statistics and odds, yet, but believe that they are lucky, or that the odds will favor them this one time. In contrast, when Ms. Hunsicker engaged in the fraudulent activities, she pled guilty to, it would not have been odds and statistics that would have led to her succeeding in her endeavors, rather, it would have been her misrepresentations and her ability to convince others of falsehoods. That is not gambling. Creating a false equivalency between Ms. Hunsicker's activities and gambling is an unjust usurpation of a legitimate medical disorder, namely gambling disorder, misrepresents fraudulent activities behind the veil of a clinical pathology. As such, I am unable to agree with Dr. Schaffer's conclusion that Ms. Hunsicker's participation in Gambler's Anonymous will mitigate her risk of reoffending criminally.

    **II.**       **Concussion**

In addition to the gambling, Dr. Schaffer concludes that Ms. Hunsicker's reported cognitive impairments (caused by a mirror falling on her head in December 2017 in addition to other factors) played a causative role in her fraudulent activity. She proffered that "Without the 2017

concussion, there is no evidence to suggest that Ms. Hunsicker would have engaged in securities fraud," and that "the December 2017 concussion, occurring in the context of Ms. Hunsicker's pre-existing vulnerabilities and compounded by subsequent head injuries, was a necessary contributing factor to her criminal conduct."

Dr. Schaffer presents a clinical picture of Ms. Hunsicker as suffering from profound cognitive impairments. She relies on this determination of profound cognitive impairments to conclude that Ms. Hunsicker suffered from profound impairments in her executive function, which she relies on to conclude that the fraudulent activity in this case is a manifestation of said executive function impairment.

I disagree with this assessment noting that it is inconsistent with the facts of this matter, in addition to being based on a scientifically incorrect analysis. I detail the basis for this opinion below:

1. <u>Ms. Hunsicker's cognitive impairments</u>

While Ms. Hunsicker may have experienced impairments in her executive functioning around the time she engaged in some of the fraudulent activity, the data presented in Dr. Schaffer's report contradicts the conclusion that she was as cognitively impaired as the report purports. Indeed, Ms. Hunsicker underwent neuropsychological testing in 2019 which revealed deficits in short delay recall and recognition accuracy, with elevated intrusion and perseveration errors indicative of disruptions in executive control processes.

However, it is worth noting that she also achieved a perfect score on the MOCA, a test designed to screen cognitive impairments (the statement that the tester expected her to be able to list more words starting with the letter F is irrelevant given that she listed a sufficient number of words to get a full grade on the test item).

Dr. Schaffer bases her opinion regarding Ms. Hunsicker's cognitive impairments on a combination of tests with limited validity/reliability, and subjective reports by Ms. Hunsicker:

*United States v. Christine Hunsicker* - Forensic Psychiatry Forensic Report                     18

- Quantitative electroencephalogram (qEEG): EEG is a test that measures brain electrical signals. Its use in concussions, traumatic brain injuries is considered to be investigational and the American Clinical Neurophysiology states that the current evidence does not support its use in these settings. Research studies of its use shows conflicting findings, and the test is considered to specificity. The test struggles to differentiate specific overlapping conditions including head trauma, depression or chronic stress. As such, it does not meet the threshold standard for scientific evidence admissibility.

- The ImPACT (Immediate Post-Concussion Assessment and Cognitive Testing) test: ImPACT is a 20-to-25-minute computerized test for memory, attention speed, and reaction time after a head injury. It is a management aid, not a standalone diagnostic tool. In Ms. Hunsicker's case, not only was the test not administered until March 2019 (the test is designed to examine the immediate effects of concussions), it also relies on subjective self-reports of symptoms by the patient. While this test can be a helpful tool in the clinical management of concussions, it presents significant validity and reliability challenges. It does not meet the threshold standard for scientific evidence admissibility.

- The SAC Symptom Inventory (a brief self-report measure used to assess the presence/severity of concussion symptoms) that Ms. Hunsicker completed two months after the December 2017 incident. The test relies on a patient subjectively assessing their own symptoms.

- Ms. Hunsicker experiencing cognitive side effects after being prescribed lamotrigine: Dr. Schaffer concluded: "These entries document pre-existing cognitive complaints that preceded the December 2017 concussion by one to two years, establishing that Ms. Hunsicker's cognitive vulnerability was not solely attributable to the head injury but reflected an interaction between her psychiatric medication regimen and her neurological status." This is incorrect, as experiencing a side effect from a medication is just that, a side effect. It does not indicate a person's cognitive vulnerability.

Additionally, Dr. Schaffer notes that Ms. Hunsicker's cognitive function recovered fully ("that her cognitive functioning has returned to baseline") starting in 2023 which she attributed to "time and to her move from Manhattan to a small rural town in New Jersey, stating: "I needed to be in nature and be in quiet. Until I moved out here, I don't think anything else would have done it."

*United States v. Christine Hunsicker* - Forensic Psychiatry Forensic Report                    19

Genuine cognitive impairments caused by concussions do not resolve spontaneously after six years when one's life becomes more serene and less stressful.

While I do not seek to deny that Ms. Hunsicker experienced some degree of cognitive impairments, her ability to function at the level that she did as the CEO of her company is not consistent with the profound cognitive impairments described in Dr. Schaffer's report.

2. Ms. Hunsicker's impairments in executive functioning

The relationship between cognitive impairments and executive impairments is not a straight line as Dr. Schaffer's report suggests. As such, even someone who is as profoundly cognitively impaired as Ms. Hunsicker is described in Dr. Schaffer's report would not experience the deficits in executive functioning claimed in the report: "The concussion compromised the executive functions that she had been relying on to compensate for her underlying psychological vulnerabilities throughout her adult life."

On top of the speculatory aspect of this analysis, it relies foundationally on the qEEG, a test which does not meet the threshold standard for scientific evidence admissibility in situations such as Ms. Hunsicker's. Indeed, the only reference to frontal lobe dysfunction noted in Dr. Schaffer's report comes from the qEEG testing:

- "Importantly, quantitative EEG revealed profound abnormalities in frontal lobe brain regions, providing evidence of a physiological mechanism to account for the difficulties that she was reporting to her providers during that time."
- "Objective testing at 13 months post-injury confirmed frontal lobe dysfunction on qEEG (with markedly elevated frontal delta power), memory impairment at the 6th–8th percentile with valid effort."

While Ms. Hunsicker may have experienced mild impairments in her executive functions, her ability to function at the level that she did as the CEO of her company is not consistent with the profound impairment in executive functioning described in Dr. Schaffer's report.

3.  <u>The relationship between the cognitive/executive impairments and the fraudulent activity</u>

Most importantly, it is essential to recognize that having cognitive or executive function impairments, even if such impairments are as severe as what is described in Dr. Schaffer's report will not result in anyone engaging in the fraudulent activities that Ms. Hunsicker engaged in. The fraudulent activity described in the Statement of Facts is the result of poor judgement, not poor memory or poor executive functions. Impairments in this domain will never cause someone to falsify a bank statement or misrepresent corporate financial statements.

While Ms. Hunsicker may have been relying on her executive functions "to compensate for her underlying psychological vulnerabilities throughout her adult life," claiming that cognitive or executive function impairments lead to the fraudulent behaviors presents a contradiction. Indeed, the "underlying psychological vulnerabilities" refer to Ms. Hunsicker's history of being emotionally abused by her father. ████████████████████████████████████ ███████████. Dr. Schaffer opined that abusive experiences established in Ms. Hunsicker "a deeply entrenched set of behavioral patterns […] including an inability to stop performing regardless of personal cost; a compulsive need to meet the expectations of authority figures, particularly older men in positions of power; a reflexive tendency to dissociate and resort to deception under stress; and an absolute inability to ask for help or acknowledge weakness." As such, if these functions were driven by Ms. Hunsicker's executive functions, then impairments in executive functions would result in Ms. Hunsicker to not need to compulsively meet the expectations of authority figures, and not to reflexively dissociate and resort to deception under stress.

In recounting the abortion that Ms. Hunsicker had at age 16 when she did not tell anyone of what she was going through, Dr. Schaffer concluded: "This incident encapsulates, in its most extreme form, the behavioral pattern that would come to define Ms. Hunsicker's adult life: enduring a crisis of profound severity in complete isolation, telling no one, and continuing to perform as though nothing had happened." Here too, the link between how trauma affected Ms. Hunsicker and the fraudulent activity she engaged in is inaccurate. Indeed, in the recent fraudulent activity,

the problem is not that Ms. Hunsicker did not tell anyone or seek counsel from others, the problem is that she actively falsified records.

### III.    Other Concerns

In her analysis, Dr. Schaffer does not account for the role Ms. Hunsicker's borderline personality disorder diagnosis in shaping her fraudulent activity. I note that traits of borderline personality often coincide with traits from other "cluster B" personality traits including narcissistic personality and antisocial personality. Evidence of such traits is described repeatedly throughout the report, but is neither acknowledged, nor accounted for in explaining Ms. Hunsicker's actions.

In fact, such underlying personality traits may offer a reasonable explanation for why Dr. Schaffer's report is as atypically enthusiastic and unequivocally supportive of Ms. Hunsicker. Indeed, Dr. Schaffer's effusive praise of Ms. Hunsicker is unusual for a forensic evaluation report. She wrote of the evaluaee:

> *Over the course of my 20-year career evaluating individuals in forensic contexts, it is rare to encounter someone who combines the degree of insight, accountability, and genuine commitment to change that Ms. Hunsicker has demonstrated. She is an exceptional individual—a person of extraordinary intellect, creativity, and drive—who committed serious crimes under circumstances that she now understands with remarkable clarity. She has not asked for sympathy, nor has she sought to minimize the harm she caused*

The reason it is important for forensic evaluation reports should be free of such effusive praise of an evaluee is that it may suggest that the evaluator is biased and is not impartial. In this case, it is possible that as a result of antisocial personality disorder traits exhibited by Ms. Hunsicker, she may have charmed Dr. Schaffer resulting in the unusually positive assessment that overlooks important risk factors. Indeed, the DSM-5 notes that antisocial personality is associated with features including: "a glib, superficial charm and can be quite voluble and verbally facile."

*United States v. Christine Hunsicker* - Forensic Psychiatry Forensic Report                    22

Indeed, I examine how Dr. Schaffer repeatedly discusses how Ms. Hunsicker is reportedly taking responsibility for her actions and a willingness to accept her punishment: "Ms. Hunsicker expressed an attitude of acceptance of whatever sentence is imposed." However, in the same breath, Ms. Hunsicker contradicts this sentiment, but listing reasons why she believes she should not be punished harshly:

> *Ms. Hunsicker expressed an attitude of acceptance of whatever sentence is imposed and described one of her primary concerns as not being available to help care for her mother, who has glaucoma and has had several falls recently due to having no peripheral vision, in addition to several other chronic health conditions (Hashimoto's thyroiditis) and dental issues, and for whom Ms. Hunsicker is the primary familial caretaker. Prior to her indictment, Ms. Hunsicker and her mother had been discussing having her move in with Ms. Hunsicker and Phaidra. [...] In addition, Ms. Hunsicker is concerned about maintaining access to her current medications while incarcerated—including tirzepatide (Monjaro), which she takes for its anti-inflammatory properties and which she believes is unlikely to be available in the federal prison system.*

Dr. Schaffer notes that the fact that Ms. Hunsicker's unlikely to be prescribed tirzepatide while incarcerated as a mitigating argument to be taken into account during her sentencing proceedings. I am unable to support this argument, as the scientific consensus does not support the use of this medication "for its anti-inflammatory properties." Ms. Hunsicker's claim that "without it she experiences significant fluid retention and inflammatory symptoms" is neither rational, nor scientifically accurate.

Dr. Schaffer's use of genomic testing data is misleading as such data should not be utilized in forensic evaluations. Pharmacogenomic analysis findings are of limited validity and reliability. As such, when seeking to make determinations that rise to the standard of a Reasonable Degree of Medical Certainty. In fact, not only should such data be excluded from forensic evaluations, even in clinical treatment settings the use of such data is considered experimental. It is not consistent with the standard of care in medical practice. As such, I find this statement from Dr. Schaffer's report to be misleading: "While genomic testing of this type is not a standard component of forensic neuropsychological evaluation, the results are included here because they

provide independent biological evidence that is consistent with—and helps to explain—the behavioral patterns observed in this case."

Dr. Schaffer noted that Ms. Hunsicker addiction to opioids was in sustained remission for >15 years. This is inconsistent with Dr. Schaffer's acknowledgement that Ms. Hunsicker had relapsed to opioids (oxycodone) in 2024. In fact, that demonstrates that at least during the latter part of the fraudulent activity, Ms. Hunsicker was engaging in such fraudulent activity while under the influence of opioids.

Dr. Schaffer concluded that when Ms. Hunsicker's psychiatrist started prescribing her lithium in 2021, and increased the dose up to 450 mg within a year, "that suggests increasing mood instability requiring more aggressive stabilization." I disagree with this conclusion, noting that 150 mg of lithium is a clinically insignificant dose. 450 mg is a clinically adequate dose (albeit still on the low end). For an individual to be taking 450 mg of lithium does not indicate severe pathology.

**Conclusion**

In reviewing Dr. Schaffer's report, I find no evidence to support the opinions presented in her July 20, 2026 forensic neuropsychological evaluation report of Ms. Christine Hunsicker.

This report constitutes my opinion based only upon the evidence now available to me as listed at the beginning on page three. I may qualify or modify my opinion as additional information becomes available from depositions or other records.

I remain available to the court to answer any questions or testify on my findings if deemed necessary. Please do not hesitate to contact me using my contact information listed on page one.

Respectfully submitted

Elie G. Aoun, MD

August 10, 2026