UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------

UNITED STATES OF AMERICA

v. 25 Cr. 318 (JPO)

CHRISTINE HUNSICKER

--------------------------------------------------

**DEFENDANT CHRISTINE HUNSICKER'S REPLY MEMORANDUM**

Michael N. Levy
Elizabeth L. Martin
ELLERMAN ENZINNA LEVY PLLC
1050 30th Street, NW
Washington, DC 20007
Tel: (202) 753-5553
mlevy@eellaw.com
emartin@eellaw.com

Anna M. Skotko
SKOTKO LAW PLLC
29 Broadway, Floor 31
New York, NY 10006
Tel: (646) 396-5251
anna@skotkolaw.com

*Counsel for Christine Hunsicker*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........ 1

ARGUMENT ........ 2

I. Ms. Hunsicker's Remorse and Rehabilitation Are Genuine and Important Factors for This Court to Consider ........ 2

II. Ms. Hunsicker's Fraud Was Not Motivated by Personal Financial Gain ........ 6

III. Dr. Sara Schaffer's Report Sheds Valuable Light on the Circumstances of the Offense and Ms. Hunsicker's Significant Personal History and Characteristics ........ 8

IV. A Sentence of More Than Two Years' Imprisonment is Greater Than Necessary to Serve the Purposes of Sentencing ........ 11

CONCLUSION ........ 16

## PRELIMINARY STATEMENT

The government's sentencing submission presents a deliberately selective distortion of Ms. Hunsicker. On the first page, it describes her as a "gifted athlete, with an Ivy League education," but nowhere in the following 48 pages does the government even acknowledge the psychological and physical harm that accompanied that athletic development; the eating disorders, alcohol abuse, and suicidal ideations that haunted those college years; or the traumatic sexual assaults and long-term mental health issues from which she has suffered. Nowhere does the government discuss the time and effort she has invested in Gamblers Anonymous, mental health treatment, and developing programs and books of real substance to help others at crossroads. This is consistent with the government's persistent refusal to ever speak with Ms. Hunsicker. The prosecution has deliberately chosen not to see Ms. Hunsicker as a person, but as a caricature to justify the excessive term of imprisonment they seek. This Court's role, however, is to sentence the complete person, not a two-dimensional sketch.

The prosecution's assertion that "she acted to achieve the status, prestige, and influence that follows a start-up founder" is based on nothing more than jaundiced speculation. They have chosen to ignore the accounts of numerous colleagues, friends, family members, and CaaStle investors who witnessed her struggling. They have chosen to dismiss extensive medical records and a forensic neuropsychological report that describe the perfect storm of underlying traits and aggravating events that precipitated Ms. Hunsicker's criminal conduct. And they have denigrated her sincere efforts to be accountable and make amends. These facts are presented not to absolve Ms. Hunsicker of responsibility for her actions, but rather to more thoroughly explain how Ms. Hunsicker ended up here. This Court should not, as the government has, ignore them.

The sentence sought by the government—more than 12.5 years' imprisonment—is clearly far greater than necessary to serve the purposes of sentencing. Such a sentence does not serve the interests of the victims, who, above all, want restitution. It does not serve the purpose of avoiding sentencing disparities, since Ms. Hunsicker would be locked up for significantly more time than defendants who committed larger frauds, used their ill-gotten gains to fund lavish lifestyles, and never accepted responsibility. It does not serve the needs of general or specific deterrence, since such a sentence assigns no value to Ms. Hunsicker's voluntary disclosure; her acceptance of responsibility well before indictment; and her sustained commitment to identifying and addressing the underlying issues that brought her to this place. And it does not account for the profound mitigating circumstances in her personal history and characteristics or the traumatic brain injury without which this offense would not have occurred. The government's recommendation that, notwithstanding all these factors, Ms. Hunsicker should serve a sentence 25% higher than the median imposed for defendants sentenced under the same Guideline—indeed, a sentence 22% more severe than that imposed on Elizabeth Holmes—renders it simply not credible. The government's request is unjustified and excessive. A sentence of 24 months' incarceration, followed by three years of supervised release, is the longest sentence that is sufficient, but not greater than necessary, to serve the purposes of sentencing.

## ARGUMENT

### I. Ms. Hunsicker's Remorse and Rehabilitation Are Genuine and Important Factors for This Court to Consider

Ms. Hunsicker's demonstrated remorse and rehabilitation are not performative. They are corroborated by letters from investors, colleagues, friends, and family members who have observed her over the last few years. (*See, e.g.*, A.92-100, 107-11, 112-15, 116-17, 118-19, 120-

21, 122-24, 125-27, 130-32, 136-37, 141-43).[1] Her sustained participation in Gamblers Anonymous ("GA") and mental health treatment started before any whiff of a criminal investigation. She has attended more than 400 GA meetings, started new GA programming, and sponsored new participants. She has worked hard to learn skills and build a community that will ensure she does not reoffend. She has put tremendous time and energy into becoming a better person and using her experience to help others in similar situations.

The interviewing Probation Officer, who is indisputably experienced at assessing the credibility of individuals facing sentencing, concluded that Ms. Hunsicker's "expressions of remorse to the Probation Office; positive pretrial adjustment, participation in mental health treatment and Gamblers Anonymous; Gamblers Anonymous volunteerism; substantial employment history; and her reported past emotional and physical trauma" are factors that may warrant a sentence outside of the advisory Guidelines range. (PSR ¶109; *see also* PSR p.29). Contrary to the government's unsupported belief, the Probation Officer found that Ms. Hunsicker's "recidivism risk is low." (PSR p.29).

The prosecution's attempt to belittle and devalue her efforts to make amends shows that they are monocularly focused on simply trying to justify putting Ms. Hunsicker in prison for as long as possible. For example, they offhandedly dismiss her early and voluntary decision to set aside 10% of her income toward restitution as being worthless, because her post-indictment earnings have not, in the government's view, been substantial—even though that amount far exceeds what she would be able to contribute from prison. (Gov.34). They also belittle the "various programs" that she has developed to help children, prisoners, and women with decision-

[1] "A." refers to the Appendix filed with Ms. Hunsicker's submission (ECF No. 35). "Gov." refers to the government's sentencing memorandum (ECF No. 41). "V." refers to the letters appended as Exhibit A to the government's sentencing memorandum. "PSR" refers to the final Presentence Investigation Report filed on May 28, 2026. "Ex." refers to the exhibits attached to this reply.

making, accountability, and compulsive gambling difficulties. (Gov.29). It is highly relevant to sentencing that Ms. Hunsicker now sees clearly the maladaptive coping strategies "forged as survival mechanisms in childhood" that she previously employed to deal with conflict and, through intense therapy and work, has developed skills to manage, even when under considerable stress. (A.7, 18-22). Good decisions and good work should be commended, not mocked.

Contrary to the government's contentions, Ms. Hunsicker does not "blame" the victims, the traumatic brain injury, or the Board for her conduct. (*See* Gov.2, 14 n.18). She has fully accepted responsibility for her conduct and the harm it has caused others. Ms. Hunsicker's sentencing submission provides the Court with important information about the context in which her conduct occurred to make clear that it is not going to happen again. The instant offense was the result of a "perfect storm" memorialized in years of medical records and witnessed in real time by her colleagues, family, and friends. (A.18, 283-751; *see also, e.g.,* A.92-100, 101, 102-04, 107-11, 116-17, 136-137, 154-55).

Along those lines, Ms. Hunsicker's description of and response to being yelled at by "finance leader" [redacted] in early 2019 is not, as the government characterizes, "at odds with reality." (Gov.4-5). It is corroborated by a defrauded investor who confirmed Ms. Hunsicker's contemporaneous description of the interaction to him. (A.101). [redacted] has not disputed it. And the very document the government points to as evidencing "an appreciative and collaborative relationship" between the two actually corroborates the aggressive and disturbing nature of their encounter. (Gov.5). Four days after the meeting, Ms. Hunsicker sent an email

thanking [redacted] and noting, "I enjoyed 95% of the conversation. :-)" (Ex. B).[2] The part of the conversation Ms. Hunsicker understandably did not enjoy was being threatened and yelled at. Likewise, the pressure Ms. Hunsicker felt to appease and perform for investors like this, her co-founder, and the "business luminaries" on the Board was the very real result of her traumatic childhood.[3] (Gov.1). She has done the self-reflection and hard work needed to change that.

As part of her early and consistent acceptance of responsibility, Ms. Hunsicker voluntarily confessed to the Board in December 2024—well before any federal investigation. In that confession, Ms. Hunsicker revealed far more than the fraudulent accounting provided to Investor-4, whose inquiry to the Board was deliberately not shared with Ms. Hunsicker and was limited to a single audit. (A.183-85). Ms. Hunsicker candidly disclosed that she had made false representations over many years to numerous investors. Although the government asserts that the Board "had already learned of" the fraud (Gov.29), [redacted] (A.102-05). The government denigrates Ms. Hunsicker's confession because she didn't also mention that she had falsified Mr. Callon's and Mr. Hennessy's signatures on two isolated occasions. (Gov.29). It wasn't discussed because it was so ancillary to the much larger offense. The critical point is that in December 2024 Ms. Hunsicker proactively decided to come clean to the Board and not continue her previous course of conduct. She put down the shovel.

The government complains that, following her voluntary disclosure, Ms. Hunsicker failed "to disclose to prospective P180 investors … the true financial condition of CaaStle" and

[2] The government provided a citation for this document (SDNY_REL_01_00022960) in its submission but offered to provide it, and the other documents it cited, only if the Court requested. Because we believe the government mischaracterized the document, we are providing it as Exhibit B to this Reply.
[3] Allowing her co-founder to redeem his shares was similarly consistent with Ms. Hunsicker's fear of disappointing men in power. (A.7). He was a powerful, older man who she viewed as a father-figure. (A.14).

neglected "to correct one investor's misimpression that CaaStle had $300 million in cash on its balance sheet." (Gov.10, 17). But these omissions were completely consistent with the Board's directives to her following her voluntary disclosure. In an effort to return as much value as possible to CaaStle investors through a partnership with P180, the Board, advised by Cravath, Swaine & Moore, specifically decided *not to disclose to anyone* that financial information previously provided by Ms. Hunsicker was incorrect. The Board directed Ms. Hunsicker not to raise additional money for CaaStle, and she did not.[4] [redacted] (A.102-05). Ms. Hunsicker followed the Board's directives.

## II. Ms. Hunsicker's Fraud Was Not Motivated by Personal Financial Gain

Consistent with their pattern of ignoring facts that do not fit their caricature of Ms. Hunsicker, the prosecution entirely omits any reference to the inconvenient truth that Ms. Hunsicker put more of her own money into CaaStle than she took out of it. About $20 million more. (PSR ¶79; ECF No. 34-1, Ex. D). And, yes, she received a salary, but she didn't take that salary for many years. She put it toward helping CaaStle employees through an emergency fund that she initiated. (PSR ¶79).

The colorful charts included in the government's submission purport to provide examples of Ms. Hunsicker's "routine[] transfer[] [of] money from CaaStle accounts to her personal bank accounts" and "unlawful" use of those funds for personal expenses. (Gov.13-14). The charts are grossly misleading. The government includes the same transfer of funds from CaaStle into Ms. Hunsicker's bank account on April 12, 2023, twice on two different pages. It also twice repeats a

[4] She did not raise money for CaaStle when she sold her personal shares and invested those funds in P180. And, while the government expresses outrage that Ms. Hunsicker "offered to sell" additional shares for CaaStle after December 8, 2024, she never actually sold any. (Gov.17; *see also* Gov.21 (describing how Investor-1 "nearly purchased" shares but did not)).

transfer of funds from CaaStle into Ms. Hunsicker's bank account on April 26, 2024. The duplications make it appear that Ms. Hunsicker received twice as much from CaaStle in April 2023 and April 2024 than she actually received. The government's charts reflect $4.7 million transferred from CaaStle into Ms. Hunsicker's bank accounts, but these charts must not be considered in a vacuum. The government does not dispute that Ms. Hunsicker deposited more than $32 million into CaaStle during her tenure—almost seven times the amount the government's charts reflect her withdrawing from it. (*See* ECF No. 34-1, Ex. D).

Ms. Hunsicker was not purchasing luxury cars and watches or funding European vacations. She did not spend investor funds on extravagant purchases like the other defendants highlighted in the government's submission—she invested those funds, and her own funds, in CaaStle. As examples of Ms. Hunsicker's "unlawful spending," the government identifies: $20,000 to her alma mater; $64,800 toward her spouse's credit card;[5] $3,800 to her township; $24,000 to her psychiatrist; $5,600 in veterinary bill payments; $26,000 on home repair and maintenance; $36,500 in mortgage payments; and $1.1 million in payments on a $20 million personal loan from [redacted] that she had put into CaaStle.[6] (Gov.13-14). This totals $1,280,700 spent by Ms. Hunsicker, or 0.45% of the loss amount. Excluding the [redacted] loan (which, again, she invested in CaaStle), these pedestrian expenditures represent 0.06% of the loss amount. Ms. Hunsicker was not taking investors' money and using it to live the high life.

[5] Ms. Knight filed for bankruptcy in July 2025. *In re Phaidra Knight*, No. 25-18078 (Bankr. D.N.J. July 31, 2025).

[6] Ms. Hunsicker's loan from [redacted] was collateralized with substantial investment holdings of Ms. Hunsicker in addition to CaaStle stock. (Ex. C). Ms. Hunsicker used essentially all her wealth to back the [redacted] loan and then put all the proceeds of that loan into CaaStle. When CaaStle collapsed in 2025, [redacted] exercised its rights under the loan agreement and took possession of the collateral Ms. Hunsicker had pledged. (Ex. D).

### III. Dr. Sarah Schaffer's Report Sheds Valuable Light on the Circumstances of the Offense and Ms. Hunsicker's Significant Personal History and Characteristics

Dr. Schaffer is a board-certified forensic neuropsychologist with more than 20 years of experience evaluating patients. (A.84-90). It is flatly offensive to assert, with no support, that a professional with this level of experience was "charmed" into her expert opinions. (Gov.39). Her report was based on sound methodology and comprehensive sources. Unlike the rebuttal opinions proffered by the government, Dr. Schaffer actually met with Ms. Hunsicker. (A.2). Dr. Schaffer's thoughtful and thorough rebuttal to the critiques of the government and its experts (neither of whom have expertise in traumatic brain injuries) is appended as Exhibit A.

At its most basic level, the government and its experts fundamentally misapprehend Dr. Schaffer's opinion. For example, the government rhetorically asks "why Hunsicker did not begin engaging in her fraud immediately after her 2017 concussion if the concussion was, to use Dr. Schaffer's words, 'a necessary contributing factor to her criminal conduct.'" (Gov.37). Although Dr. Schaffer explains it more precisely in her Supplemental Report, the answer is simple. Dr. Schaffer did not opine that the traumatic brain injury "caused" Ms. Hunsicker to suddenly turn from a successful, law-abiding, 40-year-old entrepreneur into a fraudster. Rather, Dr. Schaffer opined that the concussion was "a necessary contributing factor to her criminal conduct." (A.19). In other words, her opinion "is not that the cognitive impairment caused the fraud, but that the fraud would not have occurred in its absence." (Ex. A at 1). As Dr. Schaffer explains, she "did not claim that cognitive impairment caused Ms. Hunsicker to commit fraud in the way that, for example, a seizure causes a person to lose consciousness." (*Id.* at 4). Rather, the concussion and its sequelae compromised Ms. Hunsicker's prior ability to regulate and control the deeply entrenched maladaptive coping patterns forged in the crucible of [redacted] and sexual violence. (*Id.* at 4-5).

As also explained by Dr. Schaffer, Dr. Aoun misunderstands the import of Ms. Hunsicker's gambling addiction.[7] Dr. Schaffer did not "frame[] Ms. Hunsicker's fraudulent actions … as gambling," (ECF No. 41-8 at 17), she "identified the gambling disorder as a maintaining factor in the fraud's escalation …. This does not mean the fraud was gambling; it means the same reward-seeking neurocircuitry that drives gambling was also driving the escalation of the fraud." (Ex. A at 14).

The government also attempts to discredit Dr. Schaffer by noting, in essence, that Ms. Hunsicker could not have been as impaired as Dr. Schaffer concluded because she sent a lot of emails. For starters, as Dr. Schaffer points out in her Supplemental Report:

> Sending email is a low-demand, overlearned task that requires minimal executive engagement. Individuals with significant cognitive impairment from concussion, chronic migraine, or medication effects routinely send emails, respond to routine communications, and perform familiar work behaviors while remaining profoundly impaired in higher-order functions such as judgment, planning, and decision-making.

(*Id.* at 12).

In addition, the government's "proof" on this point—a chart plotting Ms. Hunsicker's emails—not only fails to support the government's argument, but it presents the data in such a distorted way as to be misleading to this Court. (Gov.36). Each dot on the chart is supposed to represent a single email "sent from her CaaStle email account between 2019 and 2023, using the 'sent time' as the relevant data." (*Id.* at n.50). Given the five-year period covered by the chart,

---

[7] It is unethical for the government's expert to conclude that Ms. Hunsicker did not have a gambling problem without conducting an examination of her. *See* American Psychiatric Association Ethics Committee Opinion (issued March 15, 2017), *available at* https://www.psychiatry.org/news-room/news-releases/apa-reaffirms-support-for-goldwater-rule (accessed on August 12, 2026) (stating that it is "unethical for a psychiatrist to offer a professional opinion about an individual based on publicly available information without conducting an examination" and "saying a person does not have an illness is also a professional opinion"). The government's position on this point also defies credulity, as Dr. Schaffer comprehensively explains, highlighting, among other things, Ms. Hunsicker's "regular purchase of lottery tickets with the genuine belief that she could win and pay back investors." (Ex. A at 13-14).

the size of each dot actually spans an 11-day period on the horizontal axis and 15 minutes on the vertical axis.[8] (*Id.*). Even if each email took a full minute (and a review of Ms. Hunsicker's emails would suggest that the vast majority of them took only a few seconds), the horizontal axis would have to be 15,840 times longer and the vertical axis would have to be 15 times taller to accurately reflect the extent of Ms. Hunsicker's email activity during the relevant period. As opposed to being squeezed into a chart less than the width of a page, as presented by the government, the email traffic would have to be spread across a chart that extended for more than one and a half *miles* to be accurate. The government's chart is misleading by a factor of more than *23 million percent*.

By cramming these dots into such a small chart, the government is masking the very real physical and psychological constraints under which Ms. Hunsicker was operating. But those constraints were so dramatic that even looking at portions of the government's grossly distorted chart confirms Ms. Hunsicker's suffering. Focusing, for example, on the area toward the lower left of the chart, the blank area reflects that Ms. Hunsicker apparently did not send a *single* email between approximately 3:45pm and 8:30pm on *any* day during the month of January 2019. (*Id.*). That behavior—completely atypical for a CEO—was entirely consistent with Ms. Hunsicker's profound impairment, as recognized by Dr. Schaffer and confirmed by voluminous medical records and numerous letters from colleagues, investors, and others who observed her impairment in real time.[9]

---

[8] Without access to the chart in its native format, defense counsel enlarged the pdf file and measured as accurately as possible the height and width of each dot and compared those to the height and width of the chart and the time periods each was purported to reflect—24 hours high and 5 years wide.

[9] The government's effort to cast doubt on the severity of Ms. Hunsicker's brain injury by showing a photograph of her ziplining with her wife in August 2023 is baffling. (Gov.37). The photograph does not undermine Ms. Hunsicker's assertion that the fog began to lift in the fall of 2023, and ziplining is not inconsistent with that recovery.

## IV. A Sentence of More Than Two Years' Imprisonment is Greater Than Necessary to Serve the Purposes of Sentencing

A sentence of two years' imprisonment plus three years of supervised release is sufficient but not greater than necessary to serve the purposes of sentencing here.[10] It reflects the history and characteristics of Ms. Hunsicker and the nature and circumstances of this offense, in which Ms. Hunsicker did not seek to enrich herself, and which, as Dr. Schaffer concluded, would not have occurred but for her concussion in December 2017. (A.19). It provides for an appropriate level of general deterrence, recognizing the need to incentivize those who have crossed the line to stop and try to make amends. It recognizes the substantial losses suffered by investors in the manner that those investors overwhelmingly seek—through a legitimate opportunity for restitution. And it avoids unwarranted sentencing disparities when these circumstances are compared to others.

Ms. Hunsicker has consistently acknowledged her wrongdoing. The government's efforts to embellish the seriousness of her offense with ubiquitous references to "forgeries" and its impugnation that Ms. Hunsicker also is guilty of aggravated identity theft are disingenuous. (*See* Gov.10-11, 16, 22, 27, 29). And the government's assertion that Ms. Hunsicker's agreement that a sentence of less than two years' imprisonment would not be sufficient to satisfy the purposes of sentencing was "designed to capture the identity-theft charged in Count Six" (Gov.27) is wrong and highly misleading.

As the government well knows, it initially presented a plea offer in which Ms. Hunsicker would plead guilty to securities fraud (Count Two) and aggravated identity theft ("AggID")

[10] The government's reference to spending two years in confinement as "meager" (Gov.35) is both callous and inconsistent with the views of anyone who has actually been incarcerated. As the Court well understands, sentencing a human being to the loss of their liberty is very serious. Sentencing is not a game, the length of a sentence is not a score to be maximized, and two years in prison is not meager.

(Count Six).[11] Ms. Hunsicker never disputed that she committed securities fraud. However, while she had indeed put Mr. Callon's and Mr. Hennessy's signatures on two resolutions authorizing her to do what the Board already had authorized her to do (issue warrants to accompany preferred shares), Ms. Hunsicker was not guilty of AggID.[12] Firmly committed to the radical honesty rooted in her GA recovery, she refused to plead guilty to a crime she did not commit. To demonstrate that her position was based on principle, not merely a desire to seek a lesser sentence, Ms. Hunsicker offered to provide the government with its desired two-year mandatory sentence, but in a plea to fraud, *not* identity theft. The plea agreement here was not designed to "capture" the AggID charge. (Gov.27). It was a refutation of the AggID charge, designed to allow her to honestly plead guilty to the securities fraud charge. The government's repeated efforts to use two isolated, perfunctory signatures as a justification for an egregiously long sentence is fundamentally misguided.

Along the same lines, the government misconstrues Ms. Hunsicker's references to the extensive negative publicity, loss of reputation, financial ruin, and hateful text messages she has received. (Gov.33). Ms. Hunsicker has never asserted that these consequences constitute "sufficient" punishment on their own. (*Id.*). Rather, it is appropriate for the Court to consider

---

[11] By purporting to interpret the intent of a provision of the plea agreement, the government may be violating Federal Rule of Evidence 408. Without regard to whether such a violation has occurred, in light of the government's misleading assertions, Ms. Hunsicker feels obligated to provide this Court with the accurate record regarding her agreement not to advocate for a sentence of less than two years in prison.

[12] The falsified signatures did not play "a key role" in the commission of the securities fraud, as required under Supreme Court and Second Circuit precedent. *See Dubin v. United States*, 599 U.S. 110, 129 (2023); *United States v. Omotayo*, 132 F.4th 181, 185 (2d Cir. 2025). While Ms. Hunsicker acknowledges that she did not expressly get permission to sign their names, the inclusion of Mr. Callon's and Mr. Hennessy's signatures was not required—the Board already had given Ms. Hunsicker the authority to issue the stock warrants at issue—nor was it "at the locus of the criminal undertaking," *Dubin*, 599 U.S. at 123, because, among other things, those warrants were not fraudulent. They were, in fact, issued. These two isolated, ancillary signatures do not form a proper basis for a charge under 18 U.S.C. § 1028A.

these factors, along with others, that in combination add considerably to both specific and general deterrence.

Significantly for the victims of her offense, a sentence of two years' imprisonment followed by three years of supervised release will allow Ms. Hunsicker to make meaningful restitution payments through a garnishment of her salary—something she is already voluntarily endeavoring to do. The sentence that the government seeks—longer than 12.5 years in prison—completely disregards the victims' interest in restitution by guaranteeing that no meaningful restitution will occur. Notably, only two CaaStle investors out of the dozens who submitted letters expressed a desire for Ms. Hunsicker to serve any time in prison. (V.18, 30). All of them sought restitution.

The government's disregard of the victims' priorities extends to its negligence in properly determining who qualifies as a victim. The government attached to its submission letters from 31 distinct investors in CaaStle.[13] (ECF No. 41-1, 41-2). Twelve of those letters—nearly 40%—were written by investors who made their investments in CaaStle entirely before February 2019. (V.2, 3, 5, 8, 10, 11, 16, 19, 22, 25, 28, 31). The government has not alleged, nor did Ms. Hunsicker commit, any fraudulent conduct prior to February 2019. The government has not claimed that any investments made prior to that date are subject to restitution. These twelve investors suffered unfortunate investment losses, but, even as defined by the government, they are not victims of fraud.[14]

---

[13] This number excludes the letters from [redacted] (V.21) and [redacted] (V.6). [redacted] invested in a Special Purpose Vehicle offered by [redacted] which included [redacted] investment in the restitution amount it claimed. (V.30). [redacted] was not an investor in CaaStle. (V.6).

[14] The government also quotes, as evidence of Ms. Hunsicker's deceit, email correspondence with an investor, [redacted] who actually submitted a letter seeking leniency for Ms. Hunsicker because her conduct was a result of an addiction, not greed, and she deserves an opportunity to provide meaningful restitution to investors. (*Compare* Gov.7 (quoting SDNY_REL_01_00394141) *with* A.106).

Finally, the defendants proffered by the government as benchmarks for an appropriate sentence are inapposite. (Gov.30, 40-41). Sam Bankman-Fried, Elizabeth Holmes, Charlie Javice, and Mikhail Zemlyansky never accepted responsibility for their crimes; they all went to trial and continue to dispute their guilt and the restitution owed. Ms. Hunsicker accepted responsibility before even being investigated or indicted, and she pled guilty. None of the defendants cited by the government had the traumatic background and mitigating circumstances presented by Ms. Hunsicker. None of them even approached the level of pre-sentence rehabilitation and accountability that Ms. Hunsicker has demonstrated. The considerations for sentencing, and specific deterrence in particular, could not be more different.

Mr. Bankman-Fried committed one of the most massive frauds in history. Ms. Holmes' fraud also dwarfs the scale of Ms. Hunsicker's, and, unlike Ms. Hunsicker, she put patients' lives at risk. Ms. Javice profited handsomely from her fraud, receiving more than $21 million, with an agreement that she was to receive $20 million more as a bonus. Ms. Hunsicker put almost as much of her own money on a net basis *into* CaaStle as Ms. Javice took *from* JPMorgan. Mr. Zemlyansky, as the Court well knows, was the leader of "a wide-ranging and sophisticated criminal enterprise that engaged in a number of different illegal schemes over the course of several years ...." (12 Cr. 171, ECF No. 1900 at 90). Mr. Zemlyansky never invested his victim's money as promised. He laundered it through Eastern Europe and "spent it on vacations and expensive watches and expensive cars." (*Id.* at 91-92). Ms. Hunsicker is nothing like Mr. Zemlyansky, who, from age 23, was a "professional criminal" who never had a real job and devoted his entire life to crime. (*Id.* at 75-76).[15] Before her head injury, Ms. Hunsicker had a

---

[15] While Mr. Zemlyansky's case is not a good comparator factually, this Court's analysis of the Guidelines range in that case is instructive. Just as Judge Ramos did in Milton, this Court in Zemlyansky found that, "[i]n some circumstances the loss amount can drive the overall guidelines calculation to the exclusion of other factors that should be considered," producing a guidelines range that "is overly severe." (*Id.* at 94). Accordingly, this Court

significant history of legitimate employment and career success. Indeed, the government has not alleged a single illegal act committed by Ms. Hunsicker prior to February 2019, when she was 41 years old.

Mr. Bankman-Fried, Ms. Holmes, Ms. Javice, and Mr. Zemlyansky were all in their late-20s to early-30s when they engaged in multi-year fraud schemes and in their 30s when sentenced. Because they committed fraud without having established a lengthy history of law-abiding behavior, and because they did not ever accept responsibility for their crimes, specific deterrence was a considerable factor in each of their sentences. Yet, most of them will be younger than Ms. Hunsicker is *now* when they complete their terms of imprisonment. If the government has its way, Ms. Hunsicker will be in prison into her 60s.

The government's efforts to distinguish Trevor Milton's sentence are unavailing. In fact, Mr. Milton's case is a far better comparator than those suggested by the government. There can be no question that a sentence less than the 48 months imposed on (but never served by) Mr. Milton is necessary to reduce unwarranted sentencing disparities. Mr. Milton's fraud involved a higher loss amount and higher Guidelines range. He defrauded retail investors for the purpose of buying himself personal aircraft and residences. He denied culpability at trial and has never accepted responsibility. In an incredible effort to now make Mr. Milton out to be a boy scout as compared to Ms. Hunsicker, however, the government argues that the loss amount caused by Mr. Milton's market manipulation is somehow different than the investment losses at issue here and that Mr. Milton's larger fraud, committed over a shorter period, is less significant than a smaller

departed substantially downward from the Guidelines range. Here too, the Guidelines range is driven by the loss amount to the exclusion of other important factors and warrants a sentence substantially below the Guidelines range.

fraud committed over a longer one.[16] (Gov.42). There is no basis in the Guidelines or the law for these distinctions. Judge Ramos carefully and accurately calculated the loss amount caused by Mr. Milton's fraud to be $660 million. The retail investors lost real money, and Mr. Milton used real money to buy airplanes and properties. That he did so with alacrity is not mitigating.

Finally, the government notes that Judge Ramos concluded that Mr. Milton was not likely to recidivate. (*Id.* at 43). Neither is Ms. Hunsicker. The Probation Office, Dr. Schaffer, and the investors, employees, family members, friends, and GA members who wrote letters all agree that Ms. Hunsicker's risk of recidivism is exceedingly low. (*See, e.g.*, PSR p. 29; A.20, 92-100, 101, 102-05, 107-11, 123-24, 133-35, 136-37, 141-43). No other conclusion is supported by this record. The fact that the government, and the government alone, contends that it is necessary to lock her up at taxpayer expense until she is in her 60s to ensure specific deterrence demonstrates perhaps as well as anything the outrageous excessiveness of the government's sentencing recommendation.

## CONCLUSION

Ms. Hunsicker committed securities fraud—a fraud for which she is deeply sorry and for which she wants to make amends and repay victims to the fullest extent possible. She is also a survivor, a sponsor, a recovering addict, a compassionate colleague, a supportive friend, daughter, wife, and sister, and a highly intelligent woman who has shown commitment to the hard work of recovery and accountability. A sentence of two years' imprisonment with three years of supervised release is sufficient but not greater than necessary to comply with the purposes of sentencing Christine Hunsicker, the complete person.

[16] The government also argues that Mr. Milton did not commit identity theft. But Ms. Hunsicker did not commit identity theft, *see supra* at 11-12, and the government conveniently ignores the fact that, in addition to securities fraud, Mr. Milton also was convicted at trial of two counts of wire fraud. (21 Cr. 478, ECF No. 213).

Dated: August 18, 2026

Respectfully submitted,

Michael N. Levy
Elizabeth L. Martin
ELLERMAN ENZINNA LEVY PLLC
1050 30th Street, NW
Washington, DC 20007
Tel: (202) 753-5553
mlevy@eellaw.com
emartin@eellaw.com

Anna M. Skotko
SKOTKO LAW PLLC
29 Broadway, Floor 31
New York, NY 10006
Tel: (646) 396-5251
anna@skotkolaw.com

*Counsel for Christine Hunsicker*