# EXHIBIT A

**Sarah G. Schaffer, Ph.D., ABPP-CN**

Board Certified Clinical Neuropsychologist
NYS License [redacted]
[redacted]

---

## SUPPLEMENTAL REPORT

In Response to the Government's Sentencing Memorandum
United States v. Christine Hunsicker, 25 Cr. 318 (JPO)
August 16, 2026

### INTRODUCTION

I have reviewed the Government's Sentencing Memorandum dated August 11, 2026, including the Psychiatric Expert Report of William Andrew Sterling, MD (Exhibit E), the Expert Forensic Psychiatric Report of Elie G. Aoun, MD (Exhibit G), and the accompanying exhibits. This supplemental report is submitted in response to the criticisms raised by Drs. Sterling and Aoun regarding my Forensic Neuropsychological Report dated July 20, 2026. I address each substantive critique below.

At the outset, I wish to clarify a point that appears to have been misunderstood by both government experts: my report did not claim that post-concussion syndrome caused Ms. Hunsicker to commit securities fraud. Rather, my opinion was, and remains, that the December 2017 concussion compromised the executive regulatory capacity that Ms. Hunsicker had been relying on to manage a set of pre-existing psychological vulnerabilities that were themselves the product of severe childhood trauma, psychiatric illness, and addiction. The fraud was not a symptom of brain fog. It was the behavioral consequence of what happens when a lifetime of maladaptive coping patterns—dissociation under stress, compulsive performance, deception as a survival mechanism—operate without the frontal-lobe braking system that had been keeping them in check. Stated differently, my opinion is not that the cognitive impairment caused the fraud, but that the fraud would not have occurred in its absence. This distinction is critical, and the failure of both government experts to engage with it renders much of their critique inapposite.

## PRELIMINARY OBSERVATIONS REGARDING THE GOVERNMENT'S EXPERT REPORTS

Before addressing the specific criticisms raised, I note several structural features of the government's expert submissions that bear on the weight the Court may wish to assign to them.

### *A. The Scope of Materials Reviewed*

Dr. Aoun's report identifies the materials he reviewed in preparing his opinion: the Sealed Indictment, the Stipulation of Facts, and my report. He did not review any medical records. He did not review Dr. Fallahpour's neuropsychological test data or the underlying qEEG reports. He did not review the treatment records from NYU Langone Physical Medicine and Rehabilitation, Rusk Rehabilitation, Weill Cornell Neurology, Physicians Pain Treatment Associates, Hyperbaric Medical Solutions, or the Brain Resource Center. He did not review Dr. Kraker's psychiatric medication history.

This is significant because Dr. Aoun's report offers opinions on the validity of the qEEG findings, the interpretive value of the ImPACT results, the adequacy of the neuropsychological data, and the clinical course of Ms. Hunsicker's post-concussion syndrome—all of which are documented in records he did not examine. An opinion regarding whether a diagnostic finding is adequately supported cannot be reliably rendered without reference to the underlying data. I note the particular tension between this limitation and Dr. Aoun's central methodological criticism, which is that my conclusions rest on an insufficient evidentiary foundation.

Neither Dr. Sterling nor Dr. Aoun conducted a clinical interview with Ms. Hunsicker or spoke with her by any means. Both offer conclusions regarding her insight, her motivations, her personality functioning, and the authenticity of her remorse. Several of their specific criticisms—discussed in the sections that follow—rest on inferences about her subjective experience that a clinical interview would have been well positioned to test.

### *B. Acknowledgment of Methodological Limitations*

Forensic opinion rendered without personal examination is an accepted practice in defined circumstances, and I do not suggest otherwise. The professional standard governing both government experts, however, imposes specific conditions on that practice. The American Academy of Psychiatry and the Law (AAPL) Practice Guideline for the Forensic Assessment provides that where "an assessment is limited to a record review with no interview, this limitation should be discussed in the report and testimony, which should indicate why a personal interview was not performed."[1] It further incorporates the AAPL

[1] Glancy, G. D., Ash, P., Bath, E. P., Buchanan, A., Fedoroff, P., Frierson, R. L., Harris, V. L., Hatters Friedman, S. J., Hauser, M. J., Knoll, J., Norko, M., Pinals, D., Price, M., Recupero, P., Scott, C. L., & Zonana, H. V. (2015). AAPL Practice Guideline for the Forensic Assessment. *The journal of the American Academy of Psychiatry and the Law*, *43*(2 Suppl), S3–S53.

Ethics Guidelines, which permit an opinion to be rendered on other information only "if, after appropriate effort, it is not feasible to conduct a personal examination," and which place on the evaluator the responsibility to "make earnest efforts to ensure that their statements, opinions, and reports or testimony based on those opinions, clearly state that there was no personal examination and note any resulting limitations to their opinions."

The guideline exempts certain assessments from this requirement — "record reviews for malpractice cases" is the example given — in which the object of analysis is itself a documentary record. The present evaluation is not of that kind. Both experts offer conclusions regarding Ms. Hunsicker's insight, her motivations, her personality functioning, and the authenticity of her remorse and her recovery. These are precisely the subjects for which the standard contemplates personal examination.

Neither report explains why no examination was conducted or notes any resulting limitation on the opinions offered. Both are written in the register of clinical conclusion rather than qualified inference. I note as well that Ms. Hunsicker has been available throughout: she participated without reservation in an evaluation with me and all subsequent follow up. Nothing in either report indicates that a personal examination was sought and found infeasible.

This bears directly on the weight of several specific conclusions. Where Dr. Aoun states that "the problem is not that Ms. Hunsicker did not tell anyone or seek counsel from others, the problem is that she actively falsified records," he offers no clinical reasoning, no supporting literature, and no data source for a conclusion about the internal drivers of a person he has never met.

### *C. Areas of Professional Expertise*

I raise this final point with respect for both clinicians' credentials in their respective fields. Dr. Sterling is board certified in psychiatry and forensic psychiatry. Dr. Aoun is board certified in general psychiatry, addiction psychiatry, forensic psychiatry, and addiction medicine, and holds an academic appointment at Columbia University. Their qualifications within psychiatry are not in question.

Neither curriculum vitae, however, reflects training, fellowship, clinical practice, publication, or teaching in traumatic brain injury, clinical neuropsychology, neuropsychological assessment, or brain injury medicine. The central question before the Court concerns the behavioral sequelae of traumatic brain injury and the interpretation of neuropsychological and electrophysiological data. That is the domain of clinical neuropsychology, in which I hold board certification through the American Board of Professional Psychology, and in which I have practiced for more than two decades. I offer this observation not to disparage either clinician, but because the specific criticisms advanced in their reports reflect, in my professional judgment, unfamiliarity with the neuropsychological literature on traumatic brain injury and its expected clinical course,

and an incomplete understanding of frontal systems dysfunction and behavioral regulation more broadly. Dr. Sterling's recommendation that I should have conducted contemporary neuropsychological testing illustrates the point: because recovery is the long-term expected outcome in the type of traumatic brain injury suffered by Ms. Hunsicker, a clinician familiar with that literature would not anticipate that testing conducted seven years post-injury would reveal impairment. I address this criticism, and the data that do bear on the question, in Section II below.

This concern is not merely my own. The AAPL Practice Guideline for the Forensic Assessment, which governs both experts' practice, addresses the situation directly: "When a psychologist has performed the test and scoring and provides a report, unless the psychiatrist has specialized training, he should not claim expertise in the area. Rather, the psychiatrist in this situation should have a general understanding of the use of the individual test. A psychologist can be called to provide testimony, if necessary." The guideline further advises, with respect to electroencephalography and neuroimaging specifically, that "consultation with a colleague expert in the specific area may be desirable."

The neuropsychological testing and quantitative EEG in this case were performed and interpreted by a psychologist. Both government experts nonetheless offer opinions on the interpretive validity of those instruments, and Dr. Sterling offers opinions regarding what additional neuropsychological and validity testing should have been conducted. Neither reports specialized training in neuropsychology or neuropsychological assessment, and neither indicates having consulted a colleague with expertise in these areas.

## I. RELATIONSHIP BETWEEN POST-CONCUSSION SYNDROME AND CRIMINAL CONDUCT

### *A. The Mechanism Is Disinhibition, Not Incapacity*

Dr. Sterling argues that my report “does not adequately support the nexus between Ms. Hunsicker’s reported Post-Concussion Syndrome (PCS) and her criminal behavior” and observes that the cognitive profile described—slowed processing, impaired concentration, brain fog—“contradicts the mental skills required to commit financial fraud over 6 years.” Dr. Aoun makes a similar argument: “Impairments in this domain will never cause someone to falsify a bank statement or misrepresent corporate financial statements.”

Both critiques rest on a fundamental misunderstanding of my opinion. I did not claim that cognitive impairment caused Ms. Hunsicker to commit fraud in the way that, for example, a seizure causes a person to lose consciousness. The mechanism I described is disinhibition, not incapacity. Ms. Hunsicker entered adulthood with a deeply entrenched set of behavioral patterns: a compulsive need to perform through crisis regardless of personal cost, a reflexive tendency to resort to deception under stress, an inability to ask for help, and a pathological self-reliance forged in the crucible of [redacted]

three years of daily sexual violence. These patterns had always been present. What kept them from producing criminal conduct prior to 2019 was Ms. Hunsicker's executive regulatory capacity—her ability to monitor her own behavior, appreciate long-term consequences, exercise impulse control, and make sound judgments under pressure.

The concussion and its sequelae compromised precisely these frontal-lobe-mediated capacities. Two distinct evidentiary points support this conclusion, and I state them separately because they operate at different levels of inference.

First, the neuropsychological literature has long established that disruption to frontal systems—particularly orbitofrontal and ventromedial prefrontal regions—produces behavioral disinhibition, impaired self-monitoring, poor appreciation of long-term consequences, and disordered social and moral decision-making, and that these deficits frequently occur in individuals whose performance on standard cognitive testing remains within normal limits. This dissociation between preserved performance on structured testing and profoundly impaired real-world behavioral regulation is among the most well-documented findings in the field, and it is precisely why Dr. Sterling's reliance on Ms. Hunsicker's 30/30 MoCA score, [2] as evidence against impairment is misplaced.[3] Indeed, one of the canonical case studies illustrating this phenomenon involved a patient who, following bilateral ablation of orbital and lower mesial frontal cortices, continued to perform in the superior range on measures of intelligence, memory, and executive function while proving unable to sustain employment or manage his financial affairs, ultimately entering into a business venture against the advice of those around him and losing his savings. His preserved performance on formal testing coexisted with a collapse in precisely the real-world judgment that such testing does not measure.[4]

Second, the quantitative EEG data document objective physiological abnormality in those same frontal regions, with delta-power Z-scores of 4.54–4.69 at frontal pole sites in January 2019 and 6.47 at frontocentral sites in January 2020. I want to be precise about what this evidence does and does not establish. I do not contend that elevated frontal delta on qEEG is a validated individual-level predictor of disinhibited behavior; it is not, and I

---

[2] The Montreal Cognitive Assessment is a brief screening instrument, developed and validated for the detection of mild cognitive impairment and dementia in older adults. It was not designed to detect the subtle executive and regulatory deficits associated with traumatic brain injury in high-functioning individuals, and it lacks the sensitivity to do so. A ceiling score on a screening measure establishes that screening-level pathology is absent; it does not establish that more circumscribed deficits are absent. The distinction is one of instrument sensitivity, and reliance on brief cognitive screens as evidence against neuropsychological impairment is a common source of error among clinicians who do not routinely conduct neuropsychological assessment. Where differential diagnosis is at issue, comprehensive assessment is required.

[3] Lezak, M. D., Howieson, D. B., Bigler, E. D., & Tranel, D. (2012). *Neuropsychological assessment* (5th ed.). Oxford University Press.

[4] Eslinger, P. J., & Damasio, A. R. (1985). Severe disturbance of higher cognition after bilateral frontal lobe ablation: patient EVR. *Neurology*, *35*(12), 1731–1741. https://doi.org/10.1212/wnl.35.12.1731

did not advance that claim. I contend that the qEEG provides corroborative physiological evidence of dysfunction in the frontal systems that the lesion literature independently establishes as mediating behavioral regulation, and that this evidence is consistent with, and convergent upon, the neuropsychological findings, the treating providers' clinical observations, and the documented behavioral changes during the relevant period.

The distinction matters. Dr. Aoun's critique is directed at an inferential leap—from delta excess directly to disinhibition—that I have not made and do not make. The frontal systems literature carries the mechanistic argument; the qEEG corroborates that those systems were dysfunctional.

### *B. Dr. Aoun's Conditional Argument Rests on a Premise Never Established*

On page 21 of his report (page 22 of Exhibit G), Dr. Aoun offers the following reasoning: if Ms. Hunsicker's underlying psychological vulnerabilities "were driven by Ms. Hunsicker's executive functions, then impairments in executive functions would result in Ms. Hunsicker to not need to compulsively meet the expectations of authority figures, and not to reflexively dissociate and resort to deception under stress."

The argument is expressly conditional, and its antecedent is false. I did not state, and do not believe, that Ms. Hunsicker's compulsive performance, dissociation, and reflexive deception were "driven by" her executive functions. Nor does Dr. Aoun establish anywhere that they were. The premise does not describe a coherent neuropsychological relationship, because the two refer to categorically different phenomena. The behavioral patterns at issue are overlearned, automatized responses acquired in childhood and adolescence under conditions of chronic threat; they operate largely outside deliberate control and are characteristically triggered by stress. Executive functions are the regulatory system that acts upon such patterns — monitoring, inhibiting, and overriding them when circumstances require. This is not a matter on which neuropsychologists disagree. The distinction between automatized behavioral patterns and the executive systems that regulate them is foundational to the field.[5]

Conflating the two produces exactly the inversion visible in Dr. Aoun's conclusion. Impairment of a regulatory system does not eliminate the behaviors it regulates; it releases them. When that regulatory capacity was compromised, the underlying patterns did not disappear. They were unleashed.

An analogy may be useful. A person with a history of impulsive anger who has learned to manage that anger through cognitive control does not become less angry after a frontal-lobe injury. He becomes less able to control the anger. The anger was always there; the brakes were what kept it from becoming assault. In Ms. Hunsicker's case, the tendency to

[5] See note 3 above; Norman, D. A., & Shallice, T. (1986). Attention to action: Willed and automatic control of behavior. In R. J. Davidson, G. E. Schwartz, & D. Shapiro (Eds.), *Consciousness and self-regulation* (Vol. 4). Plenum Press.

dissociate, deceive, and perform through crisis was always there. The concussion removed the brakes.

That Dr. Aoun's central argument turns on this inversion bears on the concerns raised in Section C of the Preliminary Observations above.

### *C. Temporal Correspondence*

Dr. Sterling argues that the "available medical records show Ms. Hunsicker's PCS escalating in 2018 and subsiding by July 2019," and that this allows for only "a few months of overlap between Ms. Hunsicker's acute PCS symptoms and her fraudulent behavior." This characterization is inaccurate in two respects.

First, the medical records do not show PCS subsiding by July 2019. Dr. Sterling cites Ms. Hunsicker's report to her HBOT clinician in May 2019 that her "memory has returned 95%" as evidence of resolution, but he omits the critical subsequent entries in the same records: within weeks, Ms. Hunsicker's symptoms returned after air travel, including migraines and "some cognitive decline, particularly with speech," and she experienced an anxiety attack during HBOT that prevented further treatment. Moreover, the January 2020 follow-up qEEG showed persistent and worsened frontal abnormalities (delta Z-score of 6.47, up from 4.54–4.69 in January 2019). The medical record therefore documents a fluctuating course with objective evidence of worsening frontal dysfunction 25 months post-injury—not resolution.

Second, Dr. Sterling's analysis conflates acute post-concussion symptoms (headache, dizziness, fatigue) with the chronic neurobehavioral sequelae that are the relevant mechanism for the criminal conduct. Even after headaches improve and balance normalizes, the frontal-lobe dysfunction documented on qEEG can persist and produce ongoing impairments in self-regulation, judgment, and behavioral control. This is precisely the pattern documented in Ms. Hunsicker's case.

I note additionally that the government questions why the fraudulent conduct did not begin immediately in December 2017. This question misapprehends my opinion. I have not asserted that the concussion generated an impulse to commit fraud that manifested on a particular date. My opinion is that the concussion progressively degraded the regulatory capacity that had previously allowed Ms. Hunsicker to withstand precisely the kind of pressure she encountered in 2019—and that when that pressure arrived, in the form of a prominent investor threatening to end her career, the capacity that would have permitted a different response was no longer intact.

### *D. A Previously Unaddressed Finding: Fluoxetine Monotherapy During the Fraud's Onset*

Dr. Sterling's report identifies a finding in Dr. Kraker's medication records that I did not address in my original report and that warrants discussion. He notes that Dr. Kraker's

prescription history indicates a period of fluoxetine (Prozac) monotherapy in the first six months of 2019, coinciding with the onset of Ms. Hunsicker's fraudulent conduct. This occurred because Ms. Hunsicker's lamotrigine (a mood stabilizer) was tapered "in context of PCS" in January 2019—meaning the concussion was the direct reason the mood stabilizer was removed.

Dr. Sterling correctly observes that "disinhibition and increased risk-taking are common hypomanic symptoms and should be screened for in an evaluation of an individual who engaged in unexpected criminal conduct." I agree.

A hypomanic episode is a discrete period of abnormally elevated, expansive, or irritable mood accompanied by persistently increased energy and goal-directed activity. Its characteristic features include inflated self-confidence, reduced need for sleep, increased talkativeness, distractibility, and — most relevant here — excessive involvement in activities carrying a high potential for adverse consequences, of which imprudent business decisions are a recognized example. Unlike mania, hypomania does not produce marked functional impairment or psychotic symptoms. The individual frequently appears energetic, confident, and productive to others, which is why the condition is often unrecognized at the time. What is impaired is not the capacity to act but the calibration of judgment about consequence: risks appear manageable, adverse outcomes appear improbable, and optimism about one's ability to resolve a deteriorating situation becomes unwarranted by the circumstances. Antidepressant medication is a recognized precipitant of hypomania in individuals with bipolar disorder, which is the reason such patients are typically maintained on a mood stabilizer concurrently.

Dr. Kraker's own notes indicate that Ms. Hunsicker's bipolar diagnosis originated from a hypomanic reaction to fluoxetine monotherapy. The implication is significant: in early 2019, Ms. Hunsicker was on the same medication configuration — fluoxetine without a mood stabilizer — that had previously produced hypomania, with the mood stabilizer having been removed because of the concussion. This pharmacological vulnerability is not an alternative explanation for the fraud; it is another causal pathway through which the concussion contributed to Ms. Hunsicker's criminal conduct. It adds a fifth element to the "perfect storm": the concussion not only compromised her executive regulatory capacity, it also necessitated a medication change that reproduced the precise pharmacological conditions under which she had previously become hypomanic.

I acknowledge that I should have addressed this finding in my original report, and I appreciate Dr. Sterling's identification of it. However, it strengthens, rather than undermines, the causal role of the concussion in Ms. Hunsicker's criminal conduct.

## <u>II. INDEPENDENT NEUROPSYCHOLOGICAL TESTING</u>

Both government experts criticize my decision not to conduct independent neuropsychological testing of Ms. Hunsicker. Dr. Sterling states that "contemporary

neuropsychological testing is necessary to assess for lasting impairment from the concussion." This criticism, discussed briefly above, warrants fuller treatment, because it rests on two distinct errors.

The first concerns the purpose of the evaluation. This assessment was retrospective: its goal was to explain the neuropsychological and psychological context in which Ms. Hunsicker's criminal conduct occurred between 2019 and 2024, not to characterize her present cognitive functioning. Ms. Hunsicker reports — and my behavioral observations confirm — that her cognitive abilities have returned to baseline. Testing her now would tell us nothing about her cognitive state during the relevant period. A normal result in 2026 would establish only that she has recovered; it would not bear on her functioning in 2019.

The second concerns what such testing would be expected to show. As noted above, the natural history of the type of traumatic brain injury suffered by Ms. Hunsicker is one of recovery. Even in the atypical prolonged presentations, return to baseline is the expected long-term outcome, and Ms. Hunsicker's course — protracted, fluctuating, but ultimately resolving — is consistent with that trajectory. A clinician familiar with this literature would not anticipate that testing conducted seven years post-injury would reveal impairment, and would not treat the absence of such testing as an evidentiary gap. Dr. Sterling's recommendation asks for a study whose predictable result would be uninformative, and treats the failure to obtain it as a deficiency in the analysis.

The data that bear on the question do exist. The relevant testing was conducted during the relevant period by qualified providers: Dr. Fallahpour's comprehensive neuropsychological battery and qEEG at the Brain Resource Center in January 2019 (memory at the 6th–8th percentile with valid effort, frontal delta excess), the follow-up qEEG in January 2020 (worsened frontal abnormalities), and the ImPACT administered in March 2019 (Total Symptom Score of 81). These data constitute the evidentiary basis for my opinions regarding Ms. Hunsicker's cognitive state at the time. I note that Dr. Aoun advances this criticism without having reviewed any of that testing data.

Dr. Sterling further suggests that validity testing should have been conducted. The Brain Resource Center's evaluation explicitly addressed effort and malingering, finding "no suggestion of sub-optimal effort or any deliberate attempt to feign impairment." Moreover, Ms. Hunsicker's neuropsychological profile — memory at the 6th–8th percentile with attention and verbal skills at the 93rd–100th percentile — is inconsistent with malingering, as feigned cognitive impairment characteristically produces globally depressed scores rather than the domain-specific dissociation observed here; it would be highly atypical to see strong performance on attention tasks alongside weak memory performance in someone who is feigning the latter.

## III. VALIDITY OF qEEG AND ImPACT DATA

Dr. Aoun argues that qEEG "does not meet the threshold standard for scientific evidence admissibility" and that the ImPACT is "a management aid, not a standalone diagnostic tool."

Regarding qEEG: I did not use qEEG data as a standalone diagnostic instrument, nor did I claim that qEEG establishes a diagnosis of traumatic brain injury, distinguishes it from other conditions, or predicts disinhibited behavior. Dr. Aoun's critique is directed at the instrument's specificity — its difficulty differentiating among overlapping conditions such as head trauma, depression, and chronic stress. That limitation is real, and it is also irrelevant to the use I made of the data. The qEEG performs one function in my analysis: it documents, through objective physiological measurement independent of Ms. Hunsicker's self-report, that frontal systems were dysfunctional during the period in question. Delta-power Z-scores of 4.54 to 6.47 represent deviations of more than four standard deviations from normative values. What produced that dysfunction is a separate question, and the qEEG does not answer it. Nor does it need to. The attribution of that dysfunction to Ms. Hunsicker's traumatic brain injuries rests on independent evidence: the documented history of multiple head injuries, the temporal onset and course of her symptoms, the diagnoses rendered by the treating providers who examined her, the neuropsychological findings, and the fact that her psychiatrist tapered her mood stabilizer expressly "in context of PCS."

The distinction is not academic. If the qEEG cannot differentiate frontal dysfunction arising from head trauma from frontal dysfunction arising from depression or chronic stress, that is a limitation on what the qEEG can tell us about etiology. It is not a limitation on what it tells us about the presence of dysfunction — and the presence of dysfunction in frontal systems, whatever its source, is what bears on the capacity for behavioral regulation. Dr. Aoun's specificity objection would have force against a claim that the qEEG proves the concussion caused the fraud. I have not advanced that claim, and the objection accordingly does not reach the argument I did make. I note further that Dr. Aoun offers this critique of the qEEG data without having reviewed the qEEG reports.

The ACNS practice guideline that Dr. Aoun invokes does not address the use I made of these data. Its stated purpose, reflected in its title, is to evaluate the "Use of Quantitative EEG for the **Diagnosis** of Mild Traumatic Brain Injury," and its primary aim is framed as whether qEEG "accurately identif[ies] those patients with mTBI (i.e., concussion)" as compared with current clinical diagnostic criteria.[6] Each of the guideline's evidence-synthesis conclusions is scoped accordingly: the evidence does not support the use of qEEG

[6] Tenney, J. R., Gloss, D., Arya, R., Kaplan, P. W., Lesser, R., Sexton, V., & Nuwer, M. (2021). Practice Guideline: Use of Quantitative EEG for the Diagnosis of Mild Traumatic Brain Injury: Report of the Guideline Committee of the American Clinical Neurophysiology Society. *Journal of Clinical Neurophysiology*, 38(4), 287–292.

to identify patients with mTBI, to differentiate mTBI from other disorders, or to identify mTBI in the presence of central nervous system medication. Ms. Hunsicker's concussions were not diagnosed by qEEG. They were diagnosed on clinical grounds by the providers who examined her — the emergency departments that evaluated her following her injuries, Dr. Van de Walle at NYU Langone Physical Medicine and Rehabilitation, and Dr. Klebanoff at Weill Cornell Neurology — before any qEEG was obtained. The diagnostic question the guideline addresses had already been answered by conventional clinical means.

I would note as well that the guideline's own reasoning on specificity assumes what Dr. Aoun's argument denies. The guideline explains that specificity could not be determined because no qualifying study compared patients with mTBI against "other neurological and psychiatric disorders (such as depression, autism, attention-deficit hyperactivity disorder, and migraine) that are also likely to have altered qEEG measures." The limitation identified is that qEEG cannot tell us which of several conditions produced an abnormality — not that the abnormality is absent or artifactual. That is a limitation on etiological attribution, not a limitation on the detection of dysfunction, and my analysis does not ask the qEEG to perform the former function.

Finally, the guideline characterizes qEEG as "an investigational tool for mTBI diagnosis," resting on a review in which only nine studies met inclusion criteria, all graded class III, and observes that "there have been no well-designed studies of qEEG-related methods for the diagnosis of mTBI." This is a finding of insufficient evidence, not a finding that qEEG measures nothing.

Regarding ImPACT: Dr. Aoun correctly notes that ImPACT is a computerized assessment tool rather than a diagnostic instrument. However, the ImPACT Total Symptom Score of 81 is not offered as a diagnosis; it is offered as a quantification of Ms. Hunsicker's symptom burden at a specific point in time (March 2019). The fact that symptom severity ratings are self-reported does not render them invalid—particularly when they are consistent with the objective qEEG findings, the neuropsychological test results, and the clinical observations of multiple independent providers across different settings.

## <u>IV. SELF-REPORT, CORROBORATION, AND THE EMAIL ACTIVITY DATA</u>

Both government experts criticize my reliance on Ms. Hunsicker's self-report, and the government's memorandum presents an email activity chart purporting to disprove Ms. Hunsicker's claim that she was "awake only four to five hours per day." I address both issues.

First, regarding corroboration: it is true that several of Ms. Hunsicker's statements are extraordinary and warrant scrutiny. However, the implication that I uncritically accepted everything she reported is not accurate. The cornerstone of my opinions—the frontal-lobe dysfunction and memory impairment—is based on objective testing (qEEG,

neuropsychological battery), not on self-report. Ms. Hunsicker's subjective descriptions of her cognitive state were consistent with those objective findings, which is why I characterized them as such in my report. Where her self-report could not be independently verified (e.g., the extent of her amnesia for 2020–2022), I presented it as her report, not as established fact.

Second, regarding the email activity chart: the government presents a chart showing when Ms. Hunsicker sent emails from her CaaStle account during 2019–2023 and argues that this disproves her claim of being awake only four to five hours per day. I acknowledge that Ms. Hunsicker's subjective characterization of her wakefulness may not have been literally accurate as a daily average, and I would restate it as her description of the hours during which she was able to function rather than a precise account of her sleep-wake cycle. However, the email data does not undermine the clinical picture. Sending email is a low-demand, overlearned task that requires minimal executive engagement. Individuals with significant cognitive impairment from concussion, chronic migraine, or medication effects routinely send emails, respond to routine communications, and perform familiar work behaviors while remaining profoundly impaired in higher-order functions such as judgment, planning, and decision-making. The question before the Court is not whether Ms. Hunsicker was physically capable of typing emails, but whether she retained the executive capacity to regulate her behavior under stress and exercise sound judgment. Email volume does not bear on that question. The evidence that does — the memory impairment and elevated intrusion and perseveration errors documented on formal testing, the frontal systems dysfunction documented on quantitative EEG, and the contemporaneous observations of her treating providers — is set out in Section I above.

## V. CLUSTER B PERSONALITY TRAITS AND ALTERNATIVE EXPLANATIONS

Both government experts argue that my report fails to adequately account for Ms. Hunsicker's Borderline Personality Disorder diagnosis and the narcissistic personality traits identified by Dr. Kraker. Dr. Sterling notes that Dr. Kraker's email specified a diagnosis of "Borderline Personality Disorder, with NPD traits," and argues that narcissistic traits—grandiosity, entitlement, exploitation, lack of empathy—are "highly relevant to explore" in a forensic assessment of criminal behavior.

I acknowledge that my report could have discussed Ms. Hunsicker's personality pathology in greater detail. However, I disagree with the suggestion that personality traits represent an alternative explanation for the criminal conduct that undermines the role of the concussion. Personality traits are, by definition, stable and enduring patterns. Ms. Hunsicker had Borderline Personality Disorder and narcissistic traits throughout her adult life—including during the decades when she was building legitimate businesses, successfully exiting companies through acquisitions by Yahoo and Facebook, and maintaining her standing in the entrepreneurial community without any criminal

conduct. If her personality pathology were sufficient to explain the fraud, we would expect to see a history of similar behavior prior to 2019. There is none.

The relevant question is not whether Ms. Hunsicker has personality pathology (she does), but what changed in 2017–2019 that activated those pre-existing vulnerabilities into criminal conduct. Personality pathology is the constant in this case. The traumatic brain injury, the resulting medication change, and the situational pressures that exploited her specific vulnerabilities are the variables. An explanatory account must address what changed.

Dr. Aoun suggests that Ms. Hunsicker's personality traits may have "charmed" me into producing an overly positive assessment, citing the DSM-5's note that antisocial personality is associated with "a glib, superficial charm." This argument merits a brief response. I am a board-certified clinical neuropsychologist with more than two decades of practice encompassing both clinical and forensic work, the latter comprising the majority of my practice in recent years. I have conducted comprehensive evaluations of individuals with antisocial, narcissistic, and borderline personality pathology throughout that career, in both settings. The suggestion that I was unable to detect or resist interpersonal manipulation reflects a misunderstanding of the competencies required for board certification and the standards of practice in forensic evaluation. I would add that the speculation is offered by a clinician who has never met Ms. Hunsicker, regarding an interaction he did not observe, in support of a personality construct he does not otherwise diagnose.

My impressions of Ms. Hunsicker rest on convergent evidence rather than interpersonal impression: her documented conduct over the period since her indictment, including sustained participation in Gamblers Anonymous, the establishment of financial guardrails at her current workplace that no one required her to adopt, and her voluntary disclosure of her conviction to that employer's accountant. I would note as well that behavior of this kind, sustained over a year and undertaken largely without observers, is difficult to characterize as performance.

## <u>VI. GAMBLING DISORDER</u>

Dr. Aoun argues that Ms. Hunsicker's fraudulent conduct does not constitute gambling and that framing it as such "is an unjust usurpation of a legitimate medical disorder." He states that "when gambling, a gambler understands that a win is driven by statistics and odds," whereas Ms. Hunsicker's success would have been driven by "her misrepresentations and her ability to convince others of falsehoods."

Dr. Aoun's critique conflates two distinct arguments in my report. First, I did not diagnose the securities fraud itself as gambling. I identified Ms. Hunsicker's gambling disorder as a separate clinical entity, supported by her regular purchase of lottery tickets with the genuine belief that she could win and pay back investors (which is, by any definition,

actual gambling), the payroll-crisis dopamine cycle she described, and her engagement in Gamblers Anonymous. [redacted] and the pharmacogenomic data identified multiple genetic variants associated with elevated dopamine signaling and reward-seeking behavior. The gambling disorder is independently supported.

Second, Dr. Aoun's definitional premise does not survive contact with the authority that actually governs the standard to which Ms. Hunsicker is held. For the compulsive gambler, Gamblers Anonymous defines gambling as "any betting or wagering for oneself or others, whether for money or not, no matter how slight or insignificant, where the outcome is uncertain or depends upon chance **or skill**."[7]

The distinction Dr. Aoun draws—between wagering on odds and relying on one's own persuasive ability—is expressly collapsed by the governing definition, which encompasses outcomes dependent on skill. A gambler who believes his expertise will produce a win is gambling. So is a person who staked increasingly large sums on her belief that she could keep a company solvent long enough to make her investors whole.

Third, I identified the gambling disorder as a maintaining factor in the fraud's escalation—particularly after fall 2023, when Ms. Hunsicker's cognition began to recover. The dopamine-driven cycle of financial crisis and crisis-resolution, combined with the belief that she could fix the situation through one more round of fundraising, is clinically consistent with the loss-chasing behavior that characterizes gambling disorder. This does not mean the fraud was gambling; it means the same reward-seeking neurocircuitry that drives gambling was also driving the escalation of the fraud.

## VII. PHARMACOGENOMIC DATA

Both government experts argue that pharmacogenomic data should not be used in forensic evaluations. Dr. Sterling states that the data "have no support in the forensic literature," and Dr. Aoun describes them as "of limited validity and reliability."

I note that the AAPL Practice Guideline identifies genetic predisposition among the recognized considerations in forensic causal analysis and observes that determining whether a condition was triggered by a particular event "usually requires a multifactorial analysis." I explicitly acknowledged in my original report that "genomic testing of this type is not a standard component of forensic neuropsychological evaluation" and that "these genomic findings do not determine behavior." The pharmacogenomic data were included as corroborative evidence—one piece of a much larger clinical picture—not as a basis for any opinion. The DRD3 CC, AUTS2 AA, and DBH TT genotypes are documented in the peer-reviewed literature as associated with reward-seeking behavior, impulsivity, and

[7] Gamblers Anonymous New York, available at www.newyorkga.org/definition-of-gambling (accessed Aug. 12, 2026).

addiction vulnerability. The fact that these findings are consistent with Ms. Hunsicker's documented behavioral history (multiple addictions, gambling behavior, risk-taking, [redacted]) does not make them misleading; it makes them convergent.

That said, I want to be clear that none of my opinions depend on the pharmacogenomic data. If the Court chooses to disregard that evidence entirely, the remaining clinical picture—the objective neuropsychological and electrophysiological data, the medical record, the psychiatric history, the developmental history, and the behavioral analysis—independently supports my conclusions.

## VIII. RISK ASSESSMENT METHODOLOGY

Dr. Sterling criticizes my report for not utilizing a formal risk assessment tool, suggesting that "the use of validated risk assessment tools is preferable because they rely on empirically derived risk factors." He specifically references the Historical-Clinical-Risk Management-20, Version 3 (HCR-20v3).

I note several issues with this criticism. First, the HCR-20v3 is a violence risk assessment instrument. It was designed and validated for assessing risk of violent behavior, not financial crime. Dr. Sterling acknowledges this, noting that "there is no specific risk assessment tool validated for assessing an individual's risk of committing financial crime." His suggestion that the HCR-20v3's structured professional judgment methodology could be adapted for this purpose is reasonable in principle, but it does not establish that my approach was methodologically deficient—it establishes that the field lacks validated tools for this specific question.

Second, my risk assessment was based on a structured clinical analysis of the factors that contributed to the criminal conduct, an evaluation of which of those factors remain operative, and an assessment of the protective factors now in place. This is a defensible methodology in the absence of a validated actuarial instrument for financial crime recidivism. The factors I considered include: the resolution of the cognitive impairment that was a necessary contributing factor to the conduct; the stabilization of her bipolar disorder on appropriate medication; her active engagement in addiction recovery; her proactive establishment of financial guardrails; and her demonstrated insight into the specific vulnerabilities that contributed to her behavior. My opinion that the risk of recurrence is low is based on the convergence of these factors, not on subjective impression alone.

I note finally that the AAPL Practice Guideline, which governs Dr. Sterling's practice, expressly cautions against the use he proposes. It provides that actuarial instruments "support probabilistic statements concerning large groups, but do not permit determinations about the risk of recidivism, guilt, or innocence of an individual or support statements about the individual's predicted actions in the ensuing years." It further

provides that such "instruments are valid only if the individual resembles the group for which the scale was developed." The HCR-20v3 was developed and validated on populations at risk for violence. Ms. Hunsicker has no history of violence. Applying that instrument to her would have contravened the standardization principle the guideline articulates, and would not, by the guideline's own terms, have supported an individual determination of recidivism risk in any event.

## IX. AWARENESS OF CRIMINALITY AND IMPAIRED EXECUTIVE CONTROL

The government's memorandum highlights Ms. Hunsicker's Google searches for terms such as "fraud," "faking an audit," and "bank fraud vs. wire fraud severity" as evidence that she was aware of the criminal nature of her conduct, implying that this awareness is inconsistent with the cognitive impairment I described.

This argument conflates awareness with capacity. The fact that Ms. Hunsicker had some awareness that her conduct might be criminal does not mean she retained the executive capacity to stop. Impaired executive functioning does not eliminate knowledge of right and wrong; it impairs the ability to use that knowledge to regulate behavior in real time. A person with frontal systems dysfunction may recognize in the abstract that an action is wrong and still be unable to inhibit the behavior when faced with immediate pressure, emotional triggers, and overlearned response patterns. This dissociation between preserved declarative knowledge and impaired behavioral regulation is among the defining features of frontal systems dysfunction, and it is the same phenomenon discussed in Section I.A above.

Indeed, the Google searches are more consistent with my formulation than with the government's. A person with intact executive function who is deliberately committing fraud would be unlikely to search for "faking an audit" on a company device after being confronted about a fake audit. That behavior reflects the kind of impulsive, poorly planned, unmonitored action that characterizes frontal systems dysfunction—not the calculated, methodical cover-up that the government's narrative implies.

## X. ACCEPTANCE OF RESPONSIBILITY AND CONCERN FOR OTHERS

At page 23 of his report (page 24 of Exhibit G), Dr. Aoun suggests that Ms. Hunsicker's stated acceptance of responsibility and of whatever sentence the Court imposes is "contradicted" by her expressed concern regarding the effect of incarceration on her mother and the availability of her medications within the federal correctional system.

These positions are not in tension, and the suggestion that they are reflects, in my view, the absence of any clinical contact with Ms. Hunsicker. Acceptance of responsibility is a moral and cognitive stance regarding one's own conduct and its consequences. Concern about the collateral effects of a sentence on a dependent family member, and concern about continuity of medical care, are practical and affective responses to anticipated

circumstances. They operate at entirely different levels, and the presence of one says nothing about the sincerity of the other.

Clinically, the opposite inference is better supported. An individual who accepted responsibility while expressing no concern for the effects of her incarceration on an elderly mother for whom she is the primary caregiver would present a picture more consistent with the diminished empathic capacity that Dr. Aoun elsewhere suggests. Ms. Hunsicker's concern for her mother, and her acknowledgment that her conduct is what placed her mother in that position, is an ordinary and appropriate response. So is concern about the interruption of psychiatric medication in a patient with bipolar disorder maintained on lithium, where abrupt discontinuation carries documented risk of mood destabilization.

## CONCLUSION

The criticisms raised by Drs. Sterling and Aoun identify a few areas where my original report could have been more detailed—particularly regarding the Cluster B personality diagnosis, the fluoxetine monotherapy period, and the more explicit articulation of the disinhibition mechanism. I have addressed those gaps in this supplemental report, and I am grateful for the opportunity to clarify the reasoning underlying my conclusions.

However, none of the criticisms undermines my core opinion. Ms. Hunsicker's criminal conduct emerged from the convergence of pre-existing psychological vulnerabilities, traumatic brain injury, pharmacological destabilization, addiction, and situational pressures. The concussion was a necessary contributing factor because it compromised the executive regulatory capacity she had been using to manage those vulnerabilities throughout her adult life. This is not an argument that Ms. Hunsicker lacked the capacity to know that her conduct was wrong, and I have not advanced one. It is an account of why a woman with no criminal history, who had navigated decades of extraordinary pressure without resorting to fraud, ceased to be able to do so beginning in 2019.

I continue to hold the opinions expressed in my original report to a reasonable degree of neuropsychological certainty, supplemented by the additional analysis provided herein.

Respectfully submitted,



**Sarah G. Schaffer, Ph.D., ABPP-CN**
Board Certified Clinical Neuropsychologist
NYS License [redacted]

# EXHIBIT B

**From:** Christine Hunsicker [redacted]
**Sent:** Sunday, March 24, 2019 8:58 PM
**To:** [redacted]
**Subject:** CaaStle (nee Gwynnie Bee)
**Attachments:** December-2018-BS.pdf; FY2018-IS.pdf

Hi [redacted]

Thanks for the meeting on Wednesday - I enjoyed 95% of the conversation. :-)

Attached are the financials we reviewed. I will continue to send to you on a quarterly basis. I will also send to [redacted]. Pls keep confidential - we want to remain under the radar given our ambitions.

I plan on reaching back out to [redacted] since we are now sharing information with a few investors and I know that was a blocker for him. I'm hoping that you will now be supportive, but let me know if that's not the case.

As we discussed in the meeting, I'd love to talk with someone who's a creative "contract engineer" - we've done some smart, but basic, things with our current contracts and I think there's quite a bit of sophistication that we could add. I mentioned the same to [redacted] as well.

Thanks and speak soon,
Christine



FOIA CONFIDENTIAL TREATMENT
REQUESTED BY CAASTLE INC.

# EXHIBIT C

Filed Under Seal

# EXHIBIT D

## Filed Under Seal